Index No. 07 CV 10274 (JSR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAWRENCE FOWLER,

                                        Plaintiff,

            -against-

THE CITY OF NEW YORK, ROBERT T. JOHNSON,
District Attorney, Bronx County, and the STATE OF
NEW YORK, ELIOT SPITZER, Governor,

                                        Defendants.

## DEFENDANT CITY OF NEW YORK'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendant City of New York*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Susan P. Scharfstein*
*Tel:  (212) 227-4071*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF FACTS .................................................................................................... 2

      A.  Plaintiff's Allegations ................................................................................. 2

      B.  Plaintiff's Arrest and Criminal Prosecution ........................................ 4

ARGUMENT ........................................................................................................................ 5

      POINT I

          PLAINTIFF HAS FAILED TO STATE A
          MONELL CLAIM AGAINST THE CITY OF
          NEW YORK ....................................................................................... 5

      POINT II

          IN ANY EVENT, PLAINTIFF CANNOT SHOW
          AN UNDERLYING VIOLATION OF HIS
          RIGHTS ............................................................................................ 8

      POINT III

          THIS COURT SHOULD DISMISS OR DECLINE
          JURISDICTION OVER ALL OF PLAINTIFF'S
          STATE LAW CLAIMS ...................................................................... 14

CONCLUSION .................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

Aldinger v. Howard,
    427 U.S. 1 (1976)...................................................................................................16

Amnesty America v. Town of W. Hartford,
    361 F.3d 113 (2d Cir. 2004)......................................................................................7

Bernard v. United States,
    25 F.3d 98 (2d Cir. 1994)......................................................................................9, 10

Bright v. City of New York,
    1985 U.S. Dist. LEXIS 21042 (S.D.N.Y. Apr. 4, 1985).........................................16

Broughton v. State,
    37 N.Y.2d 451, 373 N.Y.S.2d 87 (1975) ................................................................9

Brown v. City of Oneonta,
    221 F.3d 329 (2d Cir. 2000).....................................................................................11

Bryant v. City of New York,
    2003 U.S. Dist. LEXIS 21642 (S.D.N.Y. Dec. 2, 2003),
    aff'd, 404 F.3d 128 (2d Cir. 2005) ...........................................................11, 13, 15

Chavez v. Martinez,
    538 U.S. 760 (2003).................................................................................................13

Ciambriello v. County of Nassau,
    292 F.3d 307 (2d Cir. 2002).....................................................................................13

City of Canton v. Harris,
    489 U.S. 378 (1989)...................................................................................................7

Colon v. City of New York,
    60 N.Y.2d 78 (1983) ................................................................................................10

County of Sacramento v. Lewis,
    523 U.S. 833 (1998).................................................................................................13

Covington v. City of New York,
    171 F.3d 117 (2d Cir. 1999).....................................................................................10

D'Angelo-Fenton v. Town of Carmel Police Department,
    470 F. Supp. 2d 387 (S.D.N.Y. 2007)......................................................................14

**<u>Cases</u>**                                                                                                               **<u>Pages</u>**

<u>Deshawn E. v. Safir</u>,
    156 F.3d 340 (2d Cir. 1998).................................................................................12, 13

<u>Dixon v. Village of Spring Valley</u>,
    6 A.D.3d 489, 774 N.Y.S.2d 574 (2d Dep't 2004)..................................................16

<u>Doe v. State of New York</u>,
    267 A.D.2d 913, 700 N.Y.S.2d 554 (3d Dep't 1999).............................................16

<u>Dwares v. City of New York</u>,
    985 F.2d 94 (2d Cir. 1993)..............................................................................6, 7, 8

<u>Eastman Kodak v. Image Tech. Services</u>,
    504 U.S. 451 (1992)...............................................................................................5

<u>Ferlito v. County of Suffolk</u>,
    2007 U.S. Dist. LEXIS 85523 (E.D.N.Y. Nov. 19, 2007).......................................14

<u>Fernandez v. City of New York</u>,
    2003 U.S. Dist. LEXIS 13122 (S.D.N.Y. July 29, 2003) ........................................9

<u>Fulton v. Robinson</u>,
    289 F.3d 188 (2d Cir. 2002)..................................................................................10

<u>Green v. City of New York</u>,
    465 F.3d 65 (2d Cir. 2006).....................................................................................7

<u>Green v. Montgomery</u>,
    219 F.3d 52 (2d Cir. 2000).....................................................................................10

<u>Hernandez v. City of Rochester</u>,
    260 F. Supp. 2d 599 (W.D.N.Y. 2003) ..................................................................11

<u>Higazy v. Millenium Hotels</u>,
    346 F.Supp. 2d 430 (S.D.N.Y. 2004).................................................................12, 13

<u>Jenkins v. City of New York</u>,
    478 F.3d 76 (2d Cir. 2007).....................................................................................7

<u>Johnson v. Newburn Enlarged Sch. District</u>,
    239 F.3d 246 (2d Cir. 2001)..................................................................................13

<u>Johnston v. Town of Greece</u>,
    983 F. Supp. 348 (W.D.N.Y. 1997) .......................................................................10

**<u>Cases</u>**                                                                                                 **<u>Pages</u>**

<u>L.B. v. Town of Chester</u>,
   232 F. Supp. 2d 227 (S.D.N.Y. 2002)..................................................................................11

<u>Linder v. City of New York</u>,
   263 F. Supp. 2d 585 (E.D.N.Y. 2003) ...............................................................................14

<u>Local 342, Long Island Public Serv. Employees v. Town Board</u>,
   31 F.3d 1191 (2d Cir. 1994)...............................................................................................11

<u>Marshall v. Sullivan</u>,
   105  F.3d 47 (2d Cir. 1996)...................................................................................................9

<u>Mehta v. Surles</u>,
   905 F.2d 595 (2d Cir. 1990)...............................................................................................11

<u>Mian v. Donaldson Lufkin & Jenrette Sec.</u>,
   7 F.3d 1085 (2d Cir. 1993).................................................................................................14

<u>Miloslavsky v. AES Engineering Society</u>,
   808 F. Supp. 351 (S.D.N.Y. 1992),
   <u>aff'd</u>, 993 F.2d 1534 (2d Cir. 1993),
   <u>cert. denied</u>, 510 U.S. 817 (1993) .......................................................................................9

<u>Mon v. City of New York</u>,
   78 N.Y.2d 309, 574 N.Y.S.2d 529 (1991) .........................................................................16

<u>Monell v. Department of Social Services</u>,
   436 U.S. 658 (1978)................................................................................................5, 6, 8

<u>Neighbour v. Covert</u>,
   68 F.3d 1508 (2d Cir. 1995),
   <u>cert. denied</u>, 516 U.S. 1174 (1995) ....................................................................................12

<u>Oklahoma City v. Tuttle</u>,
   471 U.S. 808 (1985)..............................................................................................................6

<u>Oparaji v. City of New York</u>,
   1997 U.S. Dist. LEXIS 23686 (E.D.N.Y. Mar. 25, 1997),
   <u>aff'd</u>, 153 F.3d 920 (1998) .................................................................................................11

<u>Pierre v. City of New York</u>,
   2007 U.S. Dist. LEXIS 60707 (E.D.N.Y. Aug. 17, 2007)......................................................13

<u>Pitchell v. Callan</u>,
   13 F.3d 545 (2d Cir. 1994).................................................................................................15

**Cases**                                                                                      **Pages**

Posr v. Doherty,
    944 F.2d 94 (2d Cir. 1991)..................................................................................15

Ricciuti v. New York City Transit Authority,
    941 F.2d 119 (2d Cir. 1991).................................................................................5

Rodick v. City of Schenectady,
    1 F.3d 1341 (2d Cir. 1993)..................................................................................15

Rothstein v. Carriere,
    373 F.3d 275 (2d Cir. 2004)................................................................................10

Saleh v. City of New York,
    2007 U.S. Dist. LEXIS 92193 (S.D.N.Y. Dec. 17, 2007) .....................................7, 8

Savino v. City of New York,
    331 F.3d 63 (2d Cir. 2003)...................................................................................9

Singer v. Fulton County Sheriff,
    63 F.3d 110 (2d Cir. 1995),
    cert. denied, 517 U.S. 1189 (1996) .................................................................9, 15

Smith v. City of New York,
    290 F. Supp. 2d 317 (E.D.N.Y. 2003) ...............................................................14

State of Connecticut v. Crotty,
    346 F.3d 84 (2d Cir. 2003)...................................................................................5

Thomas v. Roach,
    165 F.3d 137 (2d Cir. 1999)...............................................................................14

Vippolis v. Village of Haverstraw,
    768 F.2d 40 (2d Cir. 1985),
    cert. denied, 480 U.S. 916 (1987) ........................................................................6

Walker v. City of New York,
    974 F.2d 293 (2d Cir. 1992)................................................................................7

Washington v. County of Rockland,
    373 F.3d 310 (2d Cir. 2004)...............................................................................15

Weaver v. Brenner,
    40 F.3d 527 (2d Cir. 1994).................................................................................12

**Cases**                                                                                                          **Pages**

Webb v. Goord,
   340 F.3d 105 (2d Cir. 2003)...............................................................................................13

Weyant v. Okst,
   101 F.3d 845 (2d Cir. 1996)...................................................................................9, 10, 15

Woo v. City of New York,
   1996 U.S. Dist. LEXIS 11689 (S.D.N.Y. Aug. 14, 1996)......................................................6

Wray v. City of New York,
   490 F.3d 189 (2d Cir. 2007)..................................................................................................7

Ying Jing Gan v. City of New York,
   996 F.2d 522 (2d Cir. 1993)..................................................................................................7

**Statutes**

42 U.S.C. § 1983....................................................................................................... *passim*

42 U.S.C. § 1985..............................................................................................................13

New York Ct. Claims Act § 8-b(2)..............................................................................3, 15

New York Criminal Procedure Law § 440.10...............................................................2, 5

New York General Municipal Law § 50-e.............................................................5, 14, 15

New York General Municipal Law § 50-i...........................................................................14

Fed. R. Civ. P. 56(c)......................................................................................................1, 5

New York Penal Law § 125.25(1)........................................................................................4

New York Penal Law § 265.09(2)........................................................................................4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

LAWRENCE FOWLER,

                              Plaintiff,

              -against-                                    07 CV 10274 (JSR)

THE CITY OF NEW YORK, ROBERT T.                           (filed by ECF)
JOHNSON, District Attorney, Bronx County, and
the STATE OF NEW YORK, ELIOT SPITZER,
Governor,

                              Defendants.


-------------------------------------------------------------------x


## DEFENDANT CITY OF NEW YORK'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant City of New York submits this memorandum of law in support of its

motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

dismissing this action with prejudice on the grounds that there is no viable claim against it as a

matter of law.

Plaintiff Lawrence Fowler brings this action pursuant to 42 U.S.C § 1983 arising

out of his July 25, 1996 arrest in the Bronx, New York, and subsequent criminal prosecution and

incarceration.[1]  As there is no evidence in the record on which a reasonable jury could find that

defendant City of New York violated a federally-protected right, this case should be dismissed.

---

[1] As indicated below, plaintiff alleges that the arrest took place on July 26, 1996.  See Complaint,
Exhibit A to Declaration of Susan P. Scharfstein submitted herewith ("Scharfstein Decl."), at ¶ 1.

## STATEMENT OF FACTS

### A.    Plaintiff's Allegations

In this action filed on November 13, 2007, plaintiff alleges that, on July 26, 1996, he was arrested on false charges of second degree murder and related charges as a result of an incident in the vicinity of Park Avenue and 161st Street in the Bronx, New York. See Complaint at ¶¶ 1, 20. Plaintiff alleges that, shortly after he was taken into custody, he was identified as the perpetrator of the crime in a show-up by two witnesses, after which he was arrested and transported to the 44th NYPD precinct. Complaint at ¶ 18.[2] He alleges that, after his arrest, an attempt was made to coerce him into signing a statement at the precinct. Complaint at ¶ 19. He alleges, however, that he refused to sign the statement. Complaint at ¶ 19. He further alleges that he was found guilty by a jury in May of 1998, and was sentenced to 25 years to life. Complaint at ¶ 23. He appealed his conviction, and the conviction was affirmed on appeal. Complaint at ¶ 24. A writ was denied by the New York State Court of Appeals. Complaint at ¶ 24. Plaintiff did not thereafter file a federal writ of habeas corpus. Complaint at ¶ 24.

Over the years, his attorney continued to investigate to find evidence to support a motion pursuant to New York Criminal Procedure Law § 440.10. Complaint at ¶ 25. In June of 2006, the Assistant District Attorney assigned to the case, Daniel McCarthy, contacted plaintiff's counsel and informed her that his office might have information concerning plaintiff's claim of innocence. Complaint at ¶ 26. On August 2, 2006, the trial judge granted a motion made by plaintiff pursuant to New York Criminal Procedure Law § 440.10 and vacated his conviction.

---

[2] Plaintiff alleges that, at the time of his arrest, he was on a work release program related to his convictions on pleas of guilty to manslaughter and robbery charges in New York and Bronx counties. Complaint at ¶ 27. He had received aggregate terms of eight and one-third to twenty-five years, and seven and one-half to fifteen years on the manslaughter and robbery charges, respectively, to be served concurrently. Complaint at ¶ 27.

Complaint at ¶ 32. Plaintiff alleges that he served ten years unlawfully in prison until his release on August 20, 2006, after his judgment of conviction was vacated. Complaint at ¶¶ 1, 33. He alleges that he filed a notice of claim with defendant City of New York on November 2, 2006, which was disallowed. Complaint at ¶¶ 7, 34.

Plaintiff now alleges claims pursuant to 42 U.S.C. § 1983 and related state law claims. See Complaint at ¶¶ 37-79. He appears to allege federal law claims for false arrest and imprisonment, conspiracy, malicious prosecution, and violation of his Fifth and Fourteenth Amendment rights to due process of law as against defendant City of New York. Complaint at ¶¶ 37-51. He also alleges a claim for municipal liability as against the City of New York. Complaint at ¶¶ 52-63. He alleges that his federal constitutional rights were violated as a result of the City's purported "deliberate indifference" to the rights of "persons, including plaintiff, subject to investigation by the New York City Police Department or the Bronx County District Attorney's Office, and/or to prosecution by such D.A.'s Office" by their failure to institute adequate policies concerning, inter alia, the duty not to manufacture or use false, misleading, or unreliable evidence in criminal proceedings; the continuing obligation to correct such evidence; the continuing duty to preserve and make timely disclosures; and the duty not to arrest or prosecute suspects except on probable cause, as well as deliberate indifference by policymaking officials with respect to their obligations to properly instruct, train, supervise and discipline employees concerning these matters. Complaint at ¶¶ 53, 54.

As to defendant City of New York, plaintiff also alleges state law claims for false arrest and imprisonment, malicious prosecution, negligent hiring, training, and supervision and pursuant to § 8-b of the New York State Court of Claims Act for unjust conviction and imprisonment. Complaint at ¶¶ 64-79.

**B.    Plaintiff's Arrest and Criminal Prosecution**

Plaintiff was arrested on July 25, 1996 on charges of second degree murder (N.Y. Penal Law § 125.25(1)) and criminal use of a firearm in the first degree (N.Y. Penal Law § 265.09(2)).  Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Rule 56.1 Statement at ¶ ___"), at ¶ 4.[3]  He was indicted by a grand jury on or about August 7, 1996.  Rule 56.1 Statement at ¶ 5.  According to plaintiff, he presented twelve witnesses at trial who testified that plaintiff was not the at the scene or the crime or was not the perpetrator of the crime.  Complaint at ¶ 21; Rule 56.1 Statement at ¶ 6.  He was nevertheless convicted of the crime of second degree murder by a jury in May of 1998.  Complaint at ¶ 23; Rule 56.1 Statement at ¶ 10.  On May 9, 2000, plaintiff's conviction was affirmed by the New York State Appellate Division, First Department.  Complaint at ¶ 24; Rule 56.1 Statement at ¶ 11.  The Appellate Division concluded, <u>inter alia</u>, that the jury verdict resulting in plaintiff's conviction was based on legally sufficient evidence.  Rule 56.1 Statement at ¶ 12.  Plaintiff then sought leave to appeal to the New York Court of Appeals on May 10, 2000.  Rule 56.1 Statement at ¶ 13.  His application was considered by a state court judge, and leave to appeal was denied by the court on July 14, 2000.  Rule 56.1 Statement at ¶ 14.

In May of 2006, Bronx County Assistant District Attorney Daniel McCarthy, who had handled the prosecution of the underlying criminal matter, was notified of newly discovered evidence concerning the July 25, 1996 murder by the United States Attorney's Office for the Southern District of New York.  Rule 56.1 Statement at ¶ 15.  The new potentially exculpatory information was learned as a result of an investigation conducted by the U.S. Attorney's office that led to a cooperating witness who claimed to have been involved in the crime.  Rule 56.1

---

[3] Defendants refer the Court to their Rule 56.1 Statement for a complete statement of the facts.

Statement at ¶¶ 15, 16.  ADA McCarthy promptly contacted plaintiff's counsel and the state court judge who had presided over plaintiff's criminal trial.  Rule 56.1 Statement at ¶ 16. Plaintiff then moved to vacate the judgment of conviction against him pursuant to New York Criminal Procedure Law § 440.10, based on the newly discovered information that was received by the Bronx County District Attorney's office and disclosed to plaintiff's counsel in June of 2006. Rule 56.1 Statement at ¶ 17.  On August 2, 2006, plaintiff's conviction was vacated and the charges were dismissed.  Rule 56.1 Statement at ¶ 18.

On November 2, 2006, a document purporting to be a notice of claim filed by plaintiff was received by the Comptroller's Office of the City of New York.  Rule 56.1 Statement at ¶ 21.  The notice of claim was disallowed for failure to provide the information required by § 50-e of the New York General Municipal Law.  Rule 56.1 Statement at ¶ 22.

## ARGUMENT

Summary judgment is appropriate pursuant to Rule 56(c) when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and defendants are thus entitled to judgment dismissing plaintiff's claims as a matter of law.  See, e.g., Eastman Kodak v. Image Tech. Servs., 504 U.S. 451, 457 (1992).  As no reasonable jury could find in plaintiff's favor, his claims should be dismissed pursuant to Rule 56(c).  See State of Connecticut v. Crotty, 346 F.3d 84, 102 (2d Cir. 2003).

## POINT I

### PLAINTIFF HAS FAILED TO STATE A MONELL CLAIM AGAINST THE CITY OF NEW YORK

As set forth above, plaintiff alleges a claim pursuant to § 1983 against the City of New York.  More specifically, he alleges that the City engaged in conduct that amounted to deliberate indifference to the rights of persons who were investigated and prosecuted by the New

York City Police Department and the Bronx County District Attorney's office, by instituting inadequate policies concerning disclosure of evidence and failing to properly train, supervise, and discipline employees.   Complaint at ¶¶ 53-63.   However, plaintiff's allegations are conclusory and unavailing.  He cannot meet the standard set forth in Monell v. Department of Social Servs., 436 U.S. 658 (1978), to pursue a § 1983 claim against defendant City of New York, by proving a policy, custom, or practice of the City to which a violation of his rights was attributable.

      To establish Monell liability, plaintiff must show that a violation of his rights resulted from a municipal custom or policy, see Ricciuti v. New York City Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991), and a causal link between the alleged violation and the policy or custom.  Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985), cert. denied, 480 U.S. 916 (1987) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985)).  Further, a single incident of alleged misconduct is insufficient to establish municipal liability.  See Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993).

      In his complaint, plaintiff does not identify any policy, custom, or practice that resulted in a violation of his rights.  He recites only a single incident of alleged misconduct, which does not rise to the level of a "policy, practice or custom" as required by Monell.  See, e.g., Woo v. City of New York, 1996 U.S. Dist. LEXIS 11689 at *15 (S.D.N.Y. Aug. 14, 1996).[4] He has alleged no facts to support an inference that the single incident at issue was attributable to an unconstitutional policy of the City of New York.  Where, as here, plaintiff has failed to allege any facts to support his contention of a custom or policy, he cannot sustain a claim for municipal

---

[4] For the Court's convenience, copies of Lexis and other unreported decisions cited in this memorandum are arranged in alphabetical order and annexed hereto as Exhibit A.

liability. See Ying Jing Gan v. City of New York, 996 F.2d 522, 536 (2d Cir. 1993) (citing Dwares, 985 F.2d at 100 (noting that "mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference"). Consequently, plaintiff can advance no federal claim against defendant City of New York.

An alleged failure to train or supervise may in some circumstances constitute an official policy or custom if the failure amounts to "deliberate indifference" to the rights of those with whom City employees interact. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007); Saleh v. City of New York, 2007 U.S. Dist. LEXIS 92193 at *27 (S.D.N.Y. Dec. 17, 2007). To establish "deliberate indifference, " a plaintiff must show that: (i) a policymaker knows "to a moral certainty" that city employees will confront a given situation, (ii) the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation," and (iii) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992); see also Jenkins, 478 F.3d at 94.

A policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events. Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (citing Walker, 974 at 297). Moreover, to defeat summary judgment, a plaintiff must identify a specific deficiency in a training program and establish that the deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. Jenkins, 478 F.3d at 94 (quoting Green v. City of New York, 465 F.3d 65, 81 (2d Cir. 2006); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of Canton, 489 U.S. at 391).

Plaintiff here has failed to identify any deficiency in training that was foreseeable, that was "closely related" to his alleged constitutional injury, or that "actually caused" the alleged deprivation of his rights.  He also has taken no discovery (Rule 56.1 Statement at ¶ 23), and therefore can come forward with no evidence to show that the City of New York provides inadequate, flawed, or otherwise deficient training on the subjects of not "manufacturing" or using false, misleading, or unreliable evidence in criminal proceedings; the continuing obligation to correct such evidence; the continuing duty to preserve and make timely disclosures; and the duty not to arrest or prosecute suspects except on probable cause.  <u>See</u> Complaint at ¶¶ 53, 54. Nor has he adduced evidence of a policy or custom of failing adequately to train, supervise, with respect to the disclosure of exculpatory evidence or <u>Brady</u> materials, the conduct of grand jury proceedings, the safeguarding of the rights of suspects or criminal defendants, or the "manufacturing" of false or misleading evidence.  <u>See</u> Complaint at ¶ 60.  Because he has failed to set forth any facts or relevant evidence to establish that the alleged wrong that he claims to have suffered was a consequence of the City's failure to adequately train, supervise, or discipline, the Court should grant summary judgment dismissing plaintiff's claim for municipal liability.  <u>See</u> <u>Saleh</u>, 2007 U.S. Dist. LEXIS 92193 at *29-30.

## POINT II

### IN ANY EVENT, PLAINTIFF CANNOT SHOW AN UNDERLYING VIOLATION OF HIS RIGHTS

To advance a federal claim against defendant City of New York, plaintiff also must prove an underlying violation of his constitutional rights.  Plaintiff cannot do so and, accordingly, his <u>Monell</u> claim fails as a matter of law for this independent reason.  Where plaintiff cannot show an underlying violation, he cannot pursue a claim for <u>Monell</u> liability.  <u>See</u>, <u>e.g.</u>, <u>Dwares</u>, 985 F.2d at 100.  Indeed, he cannot pursue theories of false arrest or imprisonment,

malicious prosecution, conspiracy, or a violation of his due process rights under the circumstances of this case given the admissions set forth in his complaint and the evidence in the record in this case.

To state a claim for false arrest, a plaintiff must show that "'(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)); Broughton v. State, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 93 (1975).[5]  Probable cause exists where there is "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995), cert. denied, 517 U.S. 1189 (1996).   Generally, probable cause exists if information is received from an eyewitness. Miloslavsky v. AES Eng'g Society, 808 F. Supp. 351 (S.D.N.Y. 1992), aff'd, 993 F.2d 1534 (2d Cir. 1993), cert. denied, 510 U.S. 817 (1993). The existence of probable cause is a complete defense to an action for false arrest. Weyant, 101 F.3d at 852.  As noted above, in his complaint, plaintiff alleges that, before he was arrested, he was identified in a show-up by two witnesses as the perpetrator of the crime.  Complaint at ¶ 18; Rule 56.1 Statement at ¶¶ 2, 3.   Plaintiff's claim for false arrest is fatally flawed, because he cannot show an intentional confinement without justification, as he is required to do. See, e.g.,

---

[5] There is no difference between the alleged false arrest and false imprisonment claims.  False arrest is an unlawful detention brought about by means of an arrest rather than in some other way.  See, e.g., Fernandez v. City of New York, 2003 U.S. Dist. LEXIS 13122 at *10 n.1 (S.D.N.Y. July 29, 2003) (citing Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996) (other citations omitted).

Covington v. City of New York, 171 F.3d 117, 122 (2d Cir. 1999). Therefore, there can be no false arrest claim.

The existence of probable cause also is a complete defense to an action for malicious prosecution. Weyant, 101 F.3d at 852. Here, plaintiff has not alleged any facts that would support an absence of probable cause. In these circumstances, a reasonably prudent person would be led to believe plaintiff guilty, establishing probable cause. See, e.g., Fulton v. Robinson, 289 F.3d 188, 198 (2d Cir. 2002). Further, under New York law, a grand jury indictment creates a presumption of probable cause for the purposes of a malicious prosecution claim. Green v. Montgomery, 219 F.3d 52, 60 (2d Cir. 2000) (citing Marshall v. Sullivan, 105 F.3d 47, 54 n.2 (2d Cir. 1996)). To rebut that presumption, plaintiff must demonstrate that the indictment was procured by fraud, perjury, the suppression of evidence, or other conduct undertaken in bad faith in the grand jury. Rothstein v. Carriere, 373 F.3d 275, 283 (2d Cir. 2004); Green, 219 F.3d at 60 (citing Bernard, 25 F.3d at 104); Colon v. City of New York, 60 N.Y.2d 78, 83 (1983). The presumption of probable cause arising from a grand jury indictment holds despite the government's subsequent dismissal of the case due to later-obtained evidence. Johnston v. Town of Greece, 983 F. Supp. 348, 351, 359 (W.D.N.Y. 1997).

Plaintiff was indicted by a grand jury on or about August 7, 1996. Rule 56.1 Statement at ¶ 5. According to plaintiff, he presented twelve witnesses at trial who testified that he was not the at the scene of the crime or was not the perpetrator of the crime. Complaint at ¶ 21; Rule 56.1 Statement at ¶ 6. He was nevertheless found guilty by a jury in May of 1998. Complaint at ¶ 23; Rule 56.1 Statement at ¶ 10. His conviction was affirmed by the New York State Appellate Division, First Department. Complaint at ¶ 24; Rule 56.1 Statement at ¶¶ 11, 12. The New York Court of Appeals considered and denied plaintiff's application for leave to appeal. Rule 56.1 Statement at ¶ 13.

Plaintiff's malicious prosecution claim also is flawed because he has alleged no facts to support a finding of malice. See L.B. v. Town of Chester, 232 F. Supp. 2d 227, 236 (S.D.N.Y. 2002). There is no evidence of any personal animus toward plaintiff. See Hernandez v. City of Rochester, 260 F. Supp. 2d 599, 615 (W.D.N.Y. 2003). Multiple witness identifications amply reflect that probable cause could not have been so plainly lacking as to permit an inference of malice. As plaintiff has alleged no facts to support an inference of malice, as he must, see Oparaji v. City of New York, 1997 U.S. Dist. LEXIS 23686 at *5-6 (E.D.N.Y. Mar. 25, 1997), aff'd, 153 F.3d 920 (1998), his claim is flawed for this independent reason.

Nor can he show that a City employee failed to act reasonably and according to law or otherwise denied him his rights to due process of law. See Local 342, Long Island Pub. Serv. Employees v. Town Board, 31 F.3d 1191, 1194-97 (2d Cir. 1994). He has put forth no facts to support that similarly-situated persons have been treated differently based on an impermissible consideration such as race, or that she was intentionally singled out or selectively mistreated. See Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000); Bryant v. City of New York, 2003 U.S. Dist. LEXIS 21642 at *46-47 (S.D.N.Y. Dec. 2, 2003), aff'd, 404 F.3d 128 (2d Cir. 2005). To the extent that plaintiff alleges that there was information that would have exonerated him if it had timely been acted upon of disclosed, he has alleged no facts and adduced no evidence to support such a claim.

To sustain a claim for deprivation of a procedural due process right, plaintiff must identify a right, show that he was deprived of that right, and show that the deprivation was effected without due process. Local 342, Long Island Pub. Serv. Employees, 31 F.3d at 1194-97 (citing Mehta v. Surles, 905 F.2d 595, 598 (2d Cir. 1990) (per curiam)). However, plaintiff has alleged no facts to show that he was deprived of any rights without due process. On the contrary, based on plaintiff's allegations, there was probable cause for his arrest based on the

11

identifications of two witnesses.  <u>See</u> Complaint at ¶ 18.  Plaintiff was prosecuted after a grand jury had returned an indictment.  Rule 56.1 Statement at ¶¶ 5-10.  Not only was there probable cause for plaintiff's arrest and prosecution, but he also had an opportunity to defend himself in court and present witnesses at trial, and did so with the assistance of counsel.  Complaint at ¶¶ 21, 26; Rule 56.1 Statement at  ¶¶ 6-9.  He also had an opportunity to appeal his conviction.  Rule 56.1 Statement at ¶¶ 11-14.  As a result, the Appellate Division, First Department concluded, <u>inter alia</u>, that the jury verdict against plaintiff was based on legally sufficient evidence.  Rule 56.1 Statement at ¶ 12.  He made an application for leave to appeal to the New York State Court of Appeals, which was considered and denied by a state court judge.  Rule 56.1 Statement at ¶¶ 13, 14.  These procedures afforded plaintiff his rights for the purposes of a due process claim and he cannot pursue any claim based on a denial of these rights.

Although plaintiff recites a litany of his other procedural rights that purportedly were violated (<u>see</u> Complaint at ¶ 47), none appear to be alleged with particularly, to be grounded in any factual support in the record in this case, or to give rise to a claim for relief.  For example, plaintiff alleges that an attempt was made to coerce him into signing a statement at the precinct after his arrest.  Complaint at ¶ 19.  He further alleges, however, that he refused to sign a statement.  Complaint at ¶ 19.  As he signed no statement that was actually used against him in a criminal trial or other proceeding, he can advance no § 1983 claim for denial of his constitutional right against self-incrimination.  <u>See</u> <u>Deshawn E. v. Safir</u>, 156 F.3d 340, 346 (2d Cir. 1998) (constitutional right against self-incrimination actionable in § 1983 case only when statements obtained by coercion are actually used by prosecutors against a defendant in a criminal proceeding) (citing <u>Weaver v. Brenner</u>, 40 F.3d 527, 535 (2d Cir. 1994); <u>Neighbour v. Covert</u>, 68 F.3d 1508, 1510-11 (2d Cir. 1995), <u>cert. denied</u>, 516 U.S. 1174 (1995); <u>Higazy v. Millenium Hotels</u>, 346 F. Supp. 2d 430, 447 (S.D.N.Y. 2004) (stating that even a coerced confession cannot

be the basis for § 1983 liability when that confession was never used in a criminal case) (citing Chavez v. Martinez, 538 U.S. 760, 766 (2003)). Moreover, a violation of this right is addressed in a Huntley hearing and not in a § 1983 action for damages. See, e.g., Deshawn, 156 F.3d at 346; Higazy, 346 F. Supp. 2d at 451. Accordingly, this Court cannot remedy an alleged denial of this right.

Plaintiff's substantive due process right entitles him to protection against arbitrary and oppressive government action, "whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate government interest." County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998); see also Bryant, 2003 U.S. Dist. LEXIS 21642 at *22-23. The substantive due process guarantee of the Fourteenth Amendment protects individuals from "conscience-shocking" exercises of power by government actors. See Johnson v. Newburn Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001). Nevertheless, plaintiff can make no such showing, and summary judgment should be granted. See Pierre v. City of New York, 2007 U.S. Dist. LEXIS 60707 at *41-46 (E.D.N.Y. Aug. 17, 2007).

Lastly, to the extent, if any, that plaintiff intends to advance a conspiracy claim against the City of New York, he does not allege the elements of such a claim with sufficient particularity. Nor can he prove the elements of a conspiracy. He has not alleged and cannot prove an agreement between a state actor and a private party to act in concert to inflict an unconstitutional injury and an overt act in furtherance of that goal for the purpose of a § 1983 claim. See, e.g., Webb v. Goord, 340 F.3d 105, 110-111 (2d Cir. 2003). Vague allegations of conspiracy without specific factual content should be dismissed. Ciambriello v. County of Nassau, 292 F.3d 307, 325 (2d Cir. 2002). Under § 1985, plaintiff must prove an agreement to deprive a person or class of persons of the equal protection of the laws, an overt act, and an

injury. See, e.g., Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). A conspiracy must be motivated by class-based invidious discriminatory animus. Mian v. Donaldson Lufkin & Jenrette Sec., 7 F.3d 1085, 1088 (2d Cir. 1993). Conclusory allegations of conspiracy under § 1985 also should be dismissed. Id. Moreover, a conspiracy claim fails in the absence of an underlying violation. See D'Angelo-Fenton v. Town of Carmel Police Dep't, 470 F. Supp. 2d 387, 397, 398 (S.D.N.Y. 2007). This claim, if alleged with more particularity, also might be barred by the intra-enterprise conspiracy doctrine, based on which members of a single organization or entity, such as New York City employees, cannot as a matter of law conspire with one another. See, e.g., Smith v. City of New York, 290 F. Supp. 2d 317, 320 (E.D.N.Y. 2003); Linder v. City of New York, 263 F. Supp. 2d 585, 591 (E.D.N.Y. 2003).

**POINT III**

### THIS COURT SHOULD DISMISS OR DECLINE JURISDICTION OVER ALL OF PLAINTIFF'S STATE LAW CLAIMS

Although plaintiff asserts state law claims (Complaint at ¶¶ 64 to 79), those claims are flawed for several reasons. Among other things, they are barred for plaintiff's failure to comply with conditions precedent to suit. Moreover, the arguments set forth above with respect to plaintiff's federal claims against the officers apply equally to the state law claims, and the latter should be dismissed on the merits for the same reasons. Alternatively, the Court should decline jurisdiction over all state law claims.

As an initial matter, the state law claims fail for plaintiff's failure to comply with notice of claim requirements within 90 days of the incident giving rise to the claim, which is a condition precedent to suit. See New York General Municipal Law §§ 50-e and 50-i; Ferlito v. County of Suffolk, 2007 U.S. Dist. LEXIS 85523 at *8-11 (E.D.N.Y. Nov. 19, 2007). Although a document purporting to be a notice of claim was received by the Comptroller's Office of the

City of New York on or about November 2, 2006 (Rule 56.1 Statement at ¶ 21), the claim was disallowed for failure to provide the information required by General Municipal Law § 50-e. Rule 56.1 Statement at ¶ 22.  Where a party fails to provide the information specified in the statutory notice requirement – such as time, place, and nature of the claim, cause of action, and the underlying facts – the  Court should grant a motion to dismiss.  See Ferlito, 2007 U.S. Dist. LEXIS at *9-11.

A New York State law claim for false arrest is essentially the same as a § 1983 claim for false arrest, which rests on a Fourth Amendment right to be free from unreasonable seizures.  See, e.g., Weyant, 101 F.3d at 852 (citations omitted); Posr v. Doherty, 944 F.2d 94 (2d Cir. 1991).  The same applies to claims for malicious prosecution.  See, e.g., Washington v. County of Rockland, 373 F.3d 310, 315 (2d Cir. 2004) (citations omitted) (courts borrow the elements of a § 1983 claim for malicious prosecution from state law); Singer, 63 F.3d at 114 (same).

Plaintiff alleges a state law claim against the City of New York on a theory of a negligent hiring, training, and supervision.  Complaint at ¶¶ 74-76.  As set forth above, plaintiff cannot show a violation of his constitutional rights.  Consequently, any derivative claims against the City must fail.  See, e.g., Rodick v. City of Schenectady, 1 F.3d 1341, 1348 (2d Cir. 1993). Plaintiff also alleges a claim against the City of New York based on the Unjust Conviction and Imprisonment Act, § 8-b of the Court of Claims Act.  See Complaint at ¶¶ 64-67.  However, this statute authorizes a claim for damages as against the State of New York, not the City of New York.  See N.Y. Ct. Claims Act § 8-b(2).  The state law claims thus fail.

Under common law, a municipality is also entitled to interpose an immunity-to-suit defense.  When official action involves the exercise of discretion or expert judgment in policy matters, and is not ministerial, a municipal defendant generally is not liable for

consequences of that action. <u>See</u> <u>Mon v. City of New York</u>, 78 N.Y.2d 309, 574 N.Y.S.2d 529, 534 (1991) (citations omitted).    A municipality cannot be held liable for the negligent performance of a governmental function. <u>Dixon v. Village of Spring Valley</u>, 6 A.D.3d 489, 774 N.Y.S.2d 574, 576 (2d Dep't 2004).    Thus, governmental immunity attaches to discretionary decisions such as those involving employee discipline. <u>Doe v. State of New York</u>, 267 A.D.2d 913, 700 N.Y.S.2d 554, 557 (3d Dep't 1999).    The City of New York is entitled to the benefit of this defense as to plaintiff's state law claims.

Alternatively, absent a viable federal claim, the Court should decline jurisdiction over the state law claims. <u>See</u> <u>Pitchell v. Callan</u>, 13 F.3d 545, 549 (2d Cir. 1994) (approving lower court statement that "it is axiomatic that a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims"); <u>see also</u> <u>Bryant</u>, 2003 U.S. Dist. LEXIS 21642 at *47 (dismissing pendent state claims after granting summary judgment as to federal claims). There is no basis to proceed against the City of New York based on wholly derivative state law claims without a showing that this defendant has violated a federal right. <u>See</u>, <u>e.g.</u>, <u>Bright v. City of New York</u>, 1985 U.S. Dist. LEXIS 21042 at *5-6 (S.D.N.Y. Apr. 4, 1985) (citing <u>Aldinger v. Howard</u>, 427 U.S. 1 (1976)).

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment should

be granted in all respects.

Dated:        New York, New York
              May 20, 2008

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the City of New York
                              Attorney for Defendant City of New York
                              100 Church Street
                              New York, NY 10007
                              (212) 227-4071


                              By: _____/S/_____
                                  SUSAN P. SCHARFSTEIN

LEXSEE 1985 U.S. DIST. LEXIS 21042

**HAROLD FREEMAN BRIGHT, HAROLD BRIGHT JUNIOR, Plaintiffs, - against - CITY OF NEW YORK, EDWARD I. KOCH, Individually and as Mayor of New York, et al, Defendants**

**No. 83 Civ. 7775-CSH**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1985 U.S. Dist. LEXIS 21042*

**April 4, 1985**

**OPINION BY: [*1] HAIGHT**

**OPINION**

MEMORANDUM OPINION

AND ORDER

HAIGHT, District Judge:

Plaintiffs, Harold Freeman Bright ("Bright") and his son, Harold Bright Jr. ("Junior") brought this action pursuant to *42 U.S.C. §§1981, 1983, 1985* and *1988* alleging violations of their civil rights.

They now make two motions for leave to file amended complaints pursuant to *F.R.Civ.P. 15(a)*. The first proposed amended complaint ("Motion I") adds Bright's alleged "common-law" wife, Mrs. Dawn Johannes, as a party plaintiff and asserts a derivative claim for loss of consortium on her behalf based on defendants' alleged wrongdoing to Bright. It also asserts causes of action on behalf of Junior for assault and intentional infliction of emotional distress. Finally, it reorganizes and clarifies the pleadings in the original complaint regarding Bright's claims and adds new causes of action on behalf of Bright for malicious prosecution, false arrest and imprisonment. The second amended complaint ("Motion II") redesignates some of the defendant police officers, who are described in the first proposed amended complaint only as, e.g. "Lieutenant" "H" "Doe," by their proper names.

Defendants do not oppose Motion [*2] II, and it is therefore granted on consent. Defendants also do not oppose that portion of Motion I that reorganizes and clarifies the pleadings in the original complaint concern-

ing Bright's claims, and that portion of the motion is therefore also granted on consent.

However, defendants do oppose the amendments concerning the claims of Junior and Mrs. Johannes, and the proposed additional state law claims on behalf of Bright. Although leave to amend is ordinarily to be "freely given," *Foman v. Davis, 371 U.S. 178, 182 (1962)*, such leave will not be granted where amendment would prejudice opposing parties, or where amendment would prove futile because the proposed claims are either frivolous or would be immediately subject to a successful motion to dismiss. *Kaster v. Modification Systems, Inc., 731 F.2d 1014, 1018 (2d Cir. 1984); SS. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Development Fund Co., 608 F.2d 28, 42 (2d Cir. 1979)*. Defendants assert that this Court should deny leave to amend the complaint to include the proposed claims of Junior and Mrs. Johannes either on grounds of prejudice or futility. More specifically, defendants claim that the proposed [*3] claims are state law claims over which this Court lacks jurisdiction or, in the alternative, that those claims are barred by plaintiffs' failure timely to file a notice of their claims against the City.

A. Claims of Mrs. Dawn Johannes

In the proposed amended complaint, Mrs. Johannes seeks to be added as a new party plaintiff in order to assert a cause of action for loss of consortium as a result of the alleged unlawful assault and arrest of her "common-law" husband Bright.

Defendants rightly point out that loss of consortium is a state law tort claim that is not cognizable under *section 1983* as deprivation of a right, privilege or immunity secured by the Constitution or federal law. See, e.g., *Stanley v. City of New York, 587 F.Supp. 393, 396 (E.D.N.Y. 1984); Walters v. Village of Oak Lawn, 548*

*F.Supp. 417, 419 (N.D.Ill. 1982); Leopold v. Birkett, 523 F.Supp. 525, 526 (E.D.N.Y. 1981).* There is thus no basis for this Court to exercise pendent or ancillary jurisdiction over Mrs. Johannes' state law claim on the basis of her husband's claim. Plaintiffs point out that her claims derive from a common nucleus of operative fact and suggest that judicial economy **[*4]** would be served by hearing all such related claims in one court at one time.

This argument, as a ground for expanding federal jurisdiction to include related state law claims of a new party, has not found favor with the Supreme Court. In *Aldinger v. Howard, 427 U.S. 1 (1976),* the Court affirmed dismissal of a state law claim against a particular defendant in a *section 1983* action. The Court held since there was no federal claim against pendent jurisdiction over the state law claim against him. In rejecting the idea of "pendent party" jurisdiction, *427 U.S. at 15,* the Court said:

> "From a purely factual point of view, it is one thing to authorize two parties, already present in federal court by virtue of a case over which the courthas jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction. But it is quite another thing to permit a plaintiff, who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to join an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction, simply **[*5]** because his claim against the second defendant 'derive from a common nucleus of operative fact.' Ibid. True, the same considerations of judicial economy would be served insofar as plaintiff's claims 'are such that he would ordinarily be expected to try them all in one judicial proceeding....' Ibid. But the addition of a completely new party would run counter to the well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress."

*427 U.S. at 14-15.*

Even though Aldinger addressed the question of pendent jurisdiction over state law claims against a party defendant, I find the Court's rationale in rejecting such jurisdiction equally authoritative with regard to the ques-

tion of federal court jurisdiction over state law claims by a proposed new party plaintiff. The only case cited by plaintiffs in direct support of their request for pendent jurisdiction over Mrs. Johannes' claims, *Drollinger v. Milligan, 552 F.2d 1220 (1977),* is entirely inapposite as that case dealt only with issues of standing, not jurisdiction. I conclude that the claims of Mr. Johannes may **[*6]** not be joined with the claims of her husband under the pendent jurisdiction of this Court. This holding is supported by other courts who have considered the issue in light of Aldinger. See, e.g., *Walters, 548 F.Supp. at 420; Leopold, 523 F.Supp. at 527.*

That portion of plaintiffs' motion I for leave to amend the complaint to assert claims on behalf of Mrs. Dawn Johannes is denied for lack of subject matter jurisdiction.

B. Claims of Harold Bright Jr.

Defendants oppose Junior's proposed amended claims on the same ground as their opposition to Mrs. Johannes' claim: that Junior raises only state law claims over which this Court lacks jurisdiction. Junior's proposed pleading states claims for assault and for intentional infliction of emotional distress based on his presence at the alleged beating and arrest of his father.

It appears that an individual's claim for emotional distress arising from alleged violations of a loved one's civil rights, standing alone, is not cognizable under *section 1983.* See, *Robinson v. McCorkle, 462 F.2d 111, 114 (3d Cir. 1972)* (parents' claims of physical and emotional distress not actionable under *section 1983* or *1985*); **[*7]** *Buikema v. Hayes, 562 F.Supp. 910 (N.D.Ill. 1983)* (wife's claim for infliction of emotional distress not actionable under *section 1983*).

However, Junior's claim for emotional distress is coupled there with his claim for an assault upon his own person -- a claim which, if true, would constitute a deprivation of his federally protected rights. Since the Court has a valid basis for exercising federal jurisdiction over Junior's claim for assault, I may consider his state law claim for emotional distress under this Court's pendent jurisdiction.

Nevertheless, defendants claim that even if this Court has jurisdiction over Junior's claims, the amendment should not be permitted because of his claims are barred due to his failure to file a notice of claim against the City as required by *N.Y. General Municipal Law §50-e,* and due to the state of limitations on such actions as contained in *N.Y. General Municipal Law §50-i.*

It is undisputed that no notice of claim was filed by Junior as required be *section 50-e,* and that filing of such a notice is a condition precedent to prosecution of a tort claim against the City, its officers or employees. But

plaintiffs argue that this Court should [*8] exercise the discretion vested in it by *section 50-e(5)* to permit Junior to serve a late notice of claim if the City "acquired actual knowledge of the essential facts constituting the claim within (ninety days after the claim arose) or within a reasonable time thereafter" and if the City will not be "substantially prejudiced...in maintaining its defense on the merits." Actual knowledge and lack of perjudice are two of the factors which *section 50-e(5)* permits the Court to take into account in permitting a late notice of claim.

The Court's exercise of its discretion in this regard is expressly limited by the additional requirement set forth in section 50e(5) that any extension granted "shall not exceed the time limited for the commencement of an action by the claimant against the public corporation." The limitation period for commencement of such an action is "one year and ninety days after the happening of the event upon which the claim is based," according to *N.Y. General Municipal Law § 50-i.*

Junior's causes of action arose when he witnessed the alleged beating and arrest of his father on July 26, 1982 (that incident giving rise to a fear of imminent bodily harm to himself which [*9] constitutes Junior's assault claim). The original complaint in this action was served and filed December 6, 1983. Even if the proposed amended complaint is deemed to relate back to the filing of the original complaint, that filing occurred more than one year and ninety days after the event upon which Junior's claims are based.

However, the limitation period contained in *section 50-i* applies only to state law tort claims alleged against the City or any of its officers and employees and is not applicable to federal causes of action commenced under *section 1983.* Since Congress did not provide a federal statute of limitations for *section 1983* actions, the federal courts must borrow the most appropriate analogous state statute limitations. The appropriate state statute of limitations for *section 1983* actions is the three-year limitations period for actions to recover upon a liability created or imposed by statute. *Pauk v. Board of Trustees of City University of New York, 654 F.2d 856, 866 (2d Cir. 1981),* cert. denied, *455 U.S. 1000 (1982).* Thus Junior's *section 1983* claim for assault is not barred by the statute of limitations.

Similarly, Junior's failure timely to file a [*10] notice of his claim pursuant to *section 50-e* is irrelevant since no notice of claim is required for *section 1983* actions. *Cooper v. Morin, 50 A.D.2d 32, 375 N.Y.S.2d 928 (1975).* Therefore, Junior is granted leave to amend the complaint to state a cause of action for assault pursuant to *42 U.S.C. § 1983.*

This Court, having jurisdiction over Junior's *section 1983* claim, may exercise pendent jurisdiction over his claim for intentional infliction of emotional distress, but only if Junior is permitted to file a late notice of claim regarding that issue. As noted above, my discretion to extend the time for filing such notice is expressly limited by the requirement that such an extension may not exceed the one year and ninety day limitation period for the commencement of such an action. Junior's claim for intentional infliction of emotional distress is consequently barred by the statute of limitations and his failure timely to file a notice of claim. That portion of Motion I seeking to leave to amend the complaint to assert a claim on behalf of Junior for emotional distress is denied.

C. Bright's State Law Claims

Defendants claim that Bright's state law claims of malicious prosecution [*11] and false arrest and imprisonment are barred by one year and ninety day limitation period contained in *section 50-i.* The complaint in this action was filed December 6, 1983. The crucial question is when these causes of action arose. Defendants argue that they arose on the date Bright was allegedly beaten and arrested, July 26, 1982; consequently, they assert, Bright's claims are time-barred. Bright correctly counters that a cause of action does not accrue until all of the requisite elements of the cause of action have occurred.

Both the claims of malicious prosecution and false arrest and imprisonment require proof that the criminal proceedings were terminated in favor of the accused. It was not until September 28, 1982 that the charges against Bright were dismissed. Thus these causes of action did not arise, for limitation purposes, until that date. Since the proposed amended complaint may be deemed to relate back to the time of the filing of the original complaint on December 6, 1983, Bright's state law claims are not barred by the statute of limitations. That portion of Motion I seeking leave to amend the complaint to assert causes of action for malicious prosecution and false [*12] arrest and imprisonment on behalf of Bright is granted.

CONCLUSION

Plaintiffs' Motion I for leave to amend the complaint is granted insofar as it seeks to add causes of action for malicious prosecution and false arrest and imprisonment on behalf of Harold Freeman Bright, to add a cause of action for assault under *42 U.S.C. § 1983* on behalf of Harold Bright, Jr., and to reorganize and clarify the pleadings in the original complaint regarding Harold Freeman Bright's claims under *42 U.S.C. § 1983.* In all other respects, plaintiffs' Motion I is denied. Plaintiff's Motion II for leave to amend the complaint to redesig-

1985 U.S. Dist. LEXIS 21042, *

nate defendant police officers originally named as "Doe" by their proper names is granted on consent.

Plaintiffs are directed to serve and file an amended complaint, consistent with this decision, within twenty (20) days of the date of this Order. The parties are directed to proceed in accordance with the Scheduling Order separately entered.

It is *SO ORDERED.*

LEXSEE 2003 U.S. DIST. LEXIS 21642

TIMOTHY BRYANT, MAURICE CASSIDY, JOSEPH DEFILIPPIS, JESSICA DYSON, LEONARD GAY, ROBERT TAKACS, ULRIK TROJABORG, Plaintiffs, v. CITY OF NEW YORK, Defendant.

99 Civ. 11237 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 21642

December 1, 2003, Decided
December 2, 2003, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Bryant v. City of New York, 2005 U.S. App. LEXIS 5376 (2d Cir. N.Y., Apr. 5, 2005)*

**PRIOR HISTORY:** *Bryant v. City of New York, 2002 U.S. Dist. LEXIS 11114 (S.D.N.Y., June 20, 2002)*

**DISPOSITION:**  [*1]  Defendants' motion for summary judgment granted with respect to plaintiffs' federal claims. Jurisdiction over plaintiffs' state law claims declined.

**COUNSEL:** For Timothy Bryant, Maurice Cassidy, Joseph Defilippis, Jessica Dyson, Leonard Gay, Steven Story, Robert Takacs, Ulrik Trojaborg, PLAINTIFFS: Daniel L Alterman, Alterman & Boop, PC, New York, NY USA.

For City of New York, City of New York Police Department, Rudolph Giuliani, Howard Safir, Allan Hoehl, john Doe, DEFENDANTS: Jonathan M Houghton, Corporation Counsel of the City of New York, New York, NY USA.

For Rudolph Giuliani, Howard Safir, Allan Hoehl, DEFENDANTS: Michael Oliver Hueston, Corporation Counsel of the City of NY, New York, NY USA.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

Plaintiffs bring this action against the City of New York pursuant to *42 U.S.C. § 1983* and [*2] New York state law alleging violations of their civil rights arising from arrests made on October 19, 1998. Plaintiffs seek to hold the city liable under *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*, for violation of their constitutional rights under the *First* and *Fourteenth Amendments*, alleging that city policy caused the violations, and under the doctrine of respondeat superior for state law claims of false arrest and imprisonment and malicious prosecution. Plaintiffs seek injunctive and monetary relief.

On July 31, 2002, Defendants filed a motion pursuant to *56 of the Federal Rules of Civil Procedure* for summary judgment on all of Plaintiffs' claims. On October 25, 2002, Plaintiffs filed a cross-motion for partial summary judgment on the state law claims for false arrest and imprisonment. For the reasons set forth below, Defendants' motion for summary judgment is granted as to the federal claims, and the Court declines to exercise jurisdiction over the state claims.

**Background**

On the evening of October 19, 1998, all Plaintiffs attended [*3] an event [1] in memory of Matthew Shepard. Matthew Shepard was a gay college student whose beating and death garnered national media attention. The event, which took place approximately one week after Matthew Shepard's death, was both to honor him and to protest anti-gay violence. (Pl. Mem. at 1.) Although the event, scheduled to begin around 6:00 pm, was expected to draw around 200 people (Def. 56.1 Stmt. P 10-11), the

number of participants rose to over 4000 within about two hours, and the number of mobilized police increased accordingly (NYPD Unusual Incident Report dated Oct. 20, 1998, Houghton Decl. Ex. E (Unusual Incident Rep.) at 2; Pl. Resp. 56.1 Stmt. P 16). The event was to include a march down Fifth Avenue from 59th Street to Madison Square Park, which spans from 26th to 23rd Streets, and conclude in a candlelight vigil. (Def. 56.1 Stmt. P 12; NYPD Manhattan Borough South Detail Report dated Oct. 19, 1998, Houghton Decl. Ex. F P 1; Unusual Incident Rep. at 2.) During the event itself, participants marched on both the sidewalk and in the street. (Def. 56.1 Stmt. PP 31-32, 36, 40.) The march was directed and temporarily diverted by the police at 56th Street (Pl. Resp. 56.1 [*4] Stmt. P 35; Pl. Mem. at 1), where it went west to Sixth Avenue, then proceeded down Sixth Avenue to 54th Street, at which point it was directed back to Fifth Avenue (Def. 56.1 Stmt. P 39; Pl. Resp. 56.1 Stmt. P 39). It continued down Fifth Avenue with another pause at 43rd Street (Deposition of Inspector Thomas Graham, Alterman Decl. Ex. E (Graham Dep.) at 104-05), and eventually continued all the way to Madison Square Park at 26th Street, arriving there around 9 pm (Def. 56.1 Stmt. P 42; Unusual Incident Rep. at 2). Once there, the participants held a candlelight vigil and heard from speakers (Unusual Incident Rep. at 2; Gay Decl. P 11). The event and corresponding police mobilization ended at approximately 10:30 pm. (Unusual Incident Rep. at 2-3.)

> 1   The parties disagree as to the appropriate designation for the event: defendants characterize it as a demonstration (Def. 56.1 Stmt P 8), whereas plaintiffs state that this is an improper label and call it a vigil (Pl. Resp. 56.1 Stmt. P 8). However, both parties have used both labels to describe the event, and the nomenclature is not a material issue.

[*5] During the course of the event, 115 people, including the seven plaintiffs, were arrested by the police. (Def. 56.1 Stmt. P 9; Pl. Resp. 56.1 Stmt. P 187.) Eventually, almost all arrestees were taken to police facilities downtown. [2] All Plaintiffs, except for Plaintiff Gay, were arrested while in the roadway and presumably for blocking traffic. A brief description of the circumstances of each of Plaintiffs' arrests follows.

> 2   Apparently, one arrestee was taken to police facilities in midtown Manhattan due to a misunderstanding between Inspector Graham and the arresting officer. (Graham Dep. at 96-97.)

Plaintiffs Timothy Bryant and Jessica Dyson, who were coworkers, attended the event together after work. (Def. 56.1 Stmt. P 55; Pl. Resp. 56.1 Stmt. P 55.) Police arrested Dyson while she was standing in the roadway of Fifth Avenue near the beginning of the march. (Def. 56.1 Stmt. P 116-17.) While Dyson was being arrested, Bryant went up to the arresting officer to intervene on Dyson's behalf. (Def. 56.1 Stmt. [*6] P 66; Pl. Resp. 56.1 Stmt. PP 64-67.) The police then arrested Bryant. (Def. 56.1 Stmt. P 67; Pl. Resp. 56.1 Stmt. P 67.) Both Bryant and Dyson were handcuffed, led to a van, and eventually taken to Central Booking. (Bryant Decl. PP 10, 14, 19; Dyson Decl. PP 18-19.) Both were in police custody until the following day: Bryant was arraigned around noon (Bryant Decl. P 22) and Dyson was arraigned between 4:30 and 5:30 pm (Dyson Decl. P 33). Bryant and Dyson were each charged with one count of disorderly conduct for obstructing vehicular or pedestrian traffic in violation of *N.Y. Penal Law § 240.20(5)*. (Pl. Mem. at 23.) Bryant appeared at trial on November 17, 1998. (Pl. Resp. 56.1 Stmt. P 68A.) The arresting police officer admitted during his testimony that the accusatory instrument, which said Bryant was sitting in the street, was untrue, and Bryant was found not guilty by the judge. (Pl. Resp. 56.1 Stmt. PP 68A-68G; Bryant 50(h) Testimony, dated Apr. 1, 1999, Houghton Decl. Ex. L at 10.) On November 25, 1998, on motion of the district attorney, the charges against Dyson were dismissed. (Pl. Resp. 56.1 Stmt. P 121L.)

Plaintiff Maurice Cassidy also went to [*7] the event from work. (Def. 56.1 Stmt. P 69.) He marched with the crowd down Fifth Avenue to 56th Street, where he went west to Sixth Avenue, and was eventually approached by an officer who pointed to various marchers saying, "He's one of them," or "She's one of them." (Def. 56.1 Stmt. PP 79-82; Pl. Resp. 56.1 Stmt. PP 77-80.) As Cassidy was standing in the street near the southwest corner of Sixth Avenue and 56th Street, he was handcuffed and placed on a city bus that had been commandeered by the police. (Def. 56.1 Stmt. PP 82-83; Pl. Resp. 56.1 Stmt. P 81.) Cassidy remained on the bus from about 7:15 pm until about 1:00 am (Cassidy Decl. P 16, 26), and his handcuffs were removed around 9:00pm while he was still on the bus. (Cassidy Decl. P 19.) The officer who released the arrestees on the bus at around 1:00 am informed them that their arrests would be voided. (Def. 56.1 Stmt. P 84; Cassidy Decl. P 25.)

Plaintiff Joseph DeFilippis joined the event at Fifth Avenue and turned with the crowd onto 56th Street. (Pl. Resp. 56.1 Stmt. P 97; DeFilippis Decl. P 7.) He was arrested and handcuffed with plastic handcuffs while standing in the roadway at the intersection of Sixth Avenue and 56th [*8] Street (Def. 56.1 Stmt. PP 101-04; DeFilippis Decl. P 12). DeFilippis was placed on a bus with other arrestees. (Def. 56.1 Stmt. P 105.) Another arrestee on the same bus cut off DeFilippis's handcuffs, as well as those of other arrestees, with an Xacto knife

around 8:30 pm, and the police released DeFilippis and the other arrestees from the bus and voided their arrests at approximately 1:15 am. (Def. 56.1 Stmt. PP 106-07; Pl. Resp. 56.1 Stmt. P 106; DeFilippis Decl. PP 30-31.)

Plaintiff Leonard Gay saw the event taking place as he was at the New York Public Library at Fifth Avenue and 40th Street. (Pl. Resp. 56.1 Stmt. P 122.) He followed the crowd, eventually joining them at Madison Square Park. (Def. 56.1 Stmt. P 123; Pl. Resp. 56.1 Stmt. P 123; Gay Decl. P 9.) At the conclusion of the event, Gay walked to the area near 25th Street and Fifth Avenue. (Def. 56.1 Stmt. P 124.) He stood on the sidewalk about three feet from a group of people recording interviews for television. (Pl. Resp. 56.1 Stmt. P 125; Gay Decl. P 16.) A police officer asked Gay for his press credentials, and, when he said he had none, asked him to step away from the press area. (Def. 56.1 Stmt. P 126-29.) After [*9] asking again, the officer told him, "Sir, if you don't step off the sidewalk, you are going to be arrested." (Def. 56.1 Stmt. P 129-30.) Eventually, the officer motioned to a nearby van, and another officer came up and handcuffed and arrested Gay. (Def. 56.1 Stmt. P 134-38.) The officer took Gay to the police van, which took him to One Police Plaza, after which he was placed on a commandeered MTA bus with other arrestees. (Def. 56.1 Stmt. PP 139-40.) While on the bus, the police replaced Gay's metal handcuffs with plastic ones. (Pl. Resp. 56.1 Stmt. PP 141-43.) After being on the bus about an hour, Gay was placed in a cell at One Police Plaza, where his plastic handcuffs were eventually removed. (Def. 56.1 Stmt. PP 144-45; Pl. Resp. 56.1 Stmt. P 145.) The police took Gay to the criminal court building between 7:00 am and 8:00 am the following morning, and he appeared before a judge at approximately 12:15 pm, where he was charged with two counts of disorderly conduct for making unreasonable noise and for refusing to disperse under *N.Y. Penal Law § 240.20(2)and (6).* (Def. 56.1 Stmt. PP 146-48; Pl. Resp. 56.1 Stmt. PP 146-47; Gay's Misdemeanor Criminal Cmplt. [*10] , dated Oct. 20, 1998, Houghton Decl. Ex. T.) Gay accepted a plea of Adjournment in Contemplation of Dismissal (Def. 56.1 Stmt. P 149), and the case was dismissed on October 6, 1999 (Gay Decl. P 42).

Plaintiff Robert Takacs joined the event at 59th Street and Fifth Avenue. (Def. 56.1 Stmt. P 153.) With the crowd, Takacs moved down Fifth Avenue to 56th Street, where he went west to Sixth Avenue and down to 54th Street, and then headed east on 54th back in the direction of Fifth Avenue. (Def. 56.1 Stmt. PP 156-59.) Takacs was arrested while standing in the roadway on 54th Street. (Def. 56.1 Stmt. P 161-62.) Takacs, hindered by parked cars and scaffolding from getting onto the sidewalk, "got loud" when the officer arrested him. (Def. 56.1 Stmt. P 163 (quoting Takacs's 50(h) Testimony,

dated May 18, 1999, Houghton Decl. Ex. V at 8); Pl. Resp. 56.1 Stmt. P 158-60.) A brief struggle ensued, during which other officers, assisting the original arresting officer, forced Takacs to the ground and handcuffed him, as well as stomped on his candle. (Def. 56.1 Stmt. PP 164-66; Pl. Resp. 56.1 Stmt. P 162-66.) The officers then placed Takacs on a commandeered city bus. (Def. 56.1 Stmt. P 167.) The [*11] bus went downtown at approximately 10:00 pm, and Takacs was eventually placed in a cell. (Def. 56.1 Stmt. P 169; Pl. Resp. 56.1 Stmt. P 169.) The police voided Takacs's arrest, and he was released sometime after midnight. (Def. 56.1 Stmt. P 171; Pl. Resp. 56.1 Stmt. P 171.)

Plaintiff Ulrik Trojaborg joined the event at 59th and Fifth Avenue. (Def. 56.1 Stmt. P 172-73.) Trojaborg went with the crowd to Sixth Avenue, continued down to 54th Street, and was stopped by a police officer while in the roadway near 54th Street and Sixth Avenue. (Def. 56.1 Stmt. P 179-83.) Like Takacs, Trojaborg also maintains that he was prevented from getting to the sidewalk by parked cars and scaffolding. (Pl. Resp. 56.1 Stmt. PP 181-82.) He was handcuffed and placed on a city bus, after which he was taken to Central Booking. (Def. 56.1 Stmt. P 184-85.) He was not charged with an offense, and was released at approximately 4:00 am. (Pl. Resp. 56.1 Stmt. P 185.)

Under New York criminal procedure law, police officers, under certain circumstances, may issue a desk appearance ticket to an arrestee rather than holding him or her in custody until a judge is available. The arrestee may then be released and must [*12] return to the criminal court at a future date for arraignment. *See N.Y. Crim. Proc. Law § 150.20(2)(a)* (McKinney 1992); *see also* Preiser, *Practice Commentaries,* McKinney's Vol. 11A Crim. Proc. Law § 150.20, at 682 (1992). In a situation like the one at issue here, the statute contemplates that those arrested will be brought to the stationhouse, where a post arrest evaluation can be made to determine the "necessity for continuing with the costly and liberty restricting physical arrest procedures." Preiser, *Practice Commentaries.* at 682. In 1987, a police officer's ability to issue desk appearance tickets was expanded as part of a bill "primarily devoted to the subject of relieving jail overcrowding in the city of New York." *Id.* at 683. Desk appearance tickets can be made available, based upon a variety of criteria, to persons arrested for a number of offenses, including disorderly conduct. *See N.Y. Crim. Proc. Law § 150.20(2)(a)*; Police Procedures Regarding Issuance of Desk Appearance Tickets, Alterman Decl. Ex. D. The decision to issue a desk appearance ticket or not is at the discretion of the [*13] police. *Id.* In the current case, had the Plaintiffs received a desk appearance ticket, they would arguably have spent a shorter time in police custody after their arrests. (Pl. Mem. at 15-16.)

Plaintiffs assert, and it is assumed for the purposes of this motion, that none of the Plaintiffs had outstanding warrants and all were otherwise eligible to receive desk appearance tickets. (Pl Resp. 56.1 Stmt. P 188; Pl. Mem. at 18.)

No desk appearance tickets were issued to the Plaintiffs or to any other person at Central Booking arrested in connection with the Shepard event. (Pl. Resp. 56.1 Stmt. P 53.) Plaintiffs allege that Chief of Department Louis Anemone made a blanket decision not to issue desk appearance tickets before he left the event, without considering the individual circumstances of each arrestee. (Pl. Mem. at 9, 16-17.) According to Anemone, desk appearance tickets were not issued because the participants in the Shepard event were violating police directives, threatening public and police safety, would continue to engage in illegal activity after release, and were part of a violent, uncontrollable group. (Anemone Dep. at 48-49, 56.) [3] Plaintiffs assert that none of these [*14] reasons applied to them. (Pl. Mem. at 19-20.)

> 3 Anemone also expressed a desire to preserve police manpower. (Anemone Dep. at 70-71.)

**Standard of Review**

Under 56, an action will be dismissed on summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The court must view all evidence in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*).

Once a moving party [*15] presents appropriate support showing that there is no genuine issue of material fact, the nonmoving party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e)*; *see Anderson, 477 U.S. at 256.* The party with the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e).* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).*

**Discussion**

In Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment (Pl. Mem.), Plaintiffs assert that [*16] the denial of desk appearance tickets (DATs) despite their eligibility to receive them was in violation of their constitutional rights. (Pl. Mem. at 3.) Specifically, they claim that this denial deprived them of due process, both by punishing them for the acts of others and by the arbitrary and capricious nature of the decision, and was retaliatory in violation of their *First Amendment* rights. (Pl. Mem. at 15-17 (due process), 20-21 (*First Amendment*).) Additionally, they claim the denial was discriminatory in violation of their rights under the *Equal Protection Clause of the Fourteenth Amendment.* (Pl. Mem. at 3.) Under New York state law, they claim that the arrests violated their rights because they were effectuated without probable cause. (Pl. Mem. at 22.) Accordingly, they assert claims under New York state law for false arrest and false imprisonment as to all the Plaintiffs, as well as claims of malicious prosecution for the prosecutions of Bryant and Dyson. (Pl. Mem. at 22 (false arrest and imprisonment), 34 (malicious prosecution).)

**I. Monell Liability**

A municipality cannot be held liable under *§ 1983* solely under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* [*17] Plaintiffs must establish the fault of the municipality itself. *Oklahoma City v. Tuttle, 471 U.S. 808, 810, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)*; *Monell, 436 U.S. at 690-91.* In other words, the plaintiffs must demonstrate that an official policy or custom of the municipality was the cause of the deprivation of constitutional rights. *Id.* This causation has two components. First, Plaintiffs "must ... prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused [their] injuries beyond merely employing the misbehaving officer." *Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)* (citing *Tuttle, 471 U.S. at 824, n.8*) (plurality opinion). Second, Plaintiffs must establish a "causal connection ... between the policy and the deprivation of [their] constitutional rights." *Id.*

**A. Existence of a municipal policy**

Plaintiffs can demonstrate the existence of the requisite municipal policy by showing that an official or officials with final decision-making authority with respect to the subject matter in question took action or made [*18]

a specific decision which caused the alleged violation of constitutional rights. *Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003); Pembaur v. City of Cincinnati, 475 U.S. 469, 482-84, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986).*

Whether or not an official has final policymaking authority is an issue of state and local law, to be determined by the court before the case goes to a jury. *Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000)* (citing *Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989)).* "The court must 'ask whether [the] governmental official[is a] final policymaker[] for the local government in a particular area, or on [the] particular issue' involved in the action." *Id.* (quoting *McMillian v. Monroe County, 520 U.S. 781, 785, 138 L. Ed. 2d 1, 117 S. Ct. 1734 (1997))* (alterations in *Jeffes*).

Here, Plaintiffs argue that the denial of desk appearance tickets was a decision by an official whose action represented official policy. Under New York criminal procedure law, the police have discretion over whether or not to issue a [*19] desk appearance ticket to a statutorily-eligible arrestee. *N.Y. Crim. Proc. Law § 150.20(2)(a).* Former Police Chief Allan Hoehl, who was present at the event, testified that the decision to deny the desk appearance tickets that night would have been made by either the First Deputy Commissioner, Patrick Kelleher, or by the Chief of Department, Louis Anemone. (Deposition of Police Chief Allan Hoehl, Alterman Decl. Ex. B (Hoehl Dep.) at 10-12, 19-20.) When Chief Anemone was deposed, he stated that, as Chief of Department, he was the chief operating officer for the NYPD, the highest-ranking uniformed officer, and reported directly to the Police Commissioner, Howard Safir. (Deposition of Former Chief of Department Louis Anemone, Alterman Decl. Ex. C (Anemone Dep.) at 9, 12.) During the event, Anemone took over operation command from Chief Hoehl, and remained in command until the conclusion of the event. (Anemone Dep. at 33-34, 99.)

Plaintiffs point to evidence suggesting that Chief Anemone either gave the order not to issue desk appearance tickets after the event or had final review of the decision. (Anemone Dep. at 47-49.) As Commissioner Safir was out of town [*20] at the time of the event (Def. 56.1 Stmt. P 45), Plaintiffs argue, Anemone's decision represented official municipal policy. (Pl. Mem. at 8-10.)

Although Defendants do not concede this issue, they do not brief opposing arguments in their Reply Memorandum, and Plaintiffs have pointed to evidence that could allow the Court to find as a matter of law that Chief Anemone was the final policymaker with respect to the issuance of desk appearance tickets to the seven plaintiffs. (*See* Deposition of Inspector Thomas Graham, Alterman Decl. Ex. E (Graham Dep.) at 160-62 (stating that the chief of department makes the policy regarding issuance of desk appearance tickets).) However, because the claims fail on other grounds, this determination is unnecessary at this time.

## B. Violation of a constitutionally protected right

The second step in establishing *Monell* liability is to show a causal connection between the policy and a constitutional violation. *Vippolis, 768 F.2d at 40.* "A plaintiff may prove the causation element by showing ... that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal [*21] rights ...." *Jeffes, 208 F.3d at 61.* Because Plaintiffs are alleging this sort of direct causation, the causal connection itself is not in question.

What is at issue, however, is whether Plaintiffs have demonstrated that a constitutional violation took place -- a crucial step in holding a municipality liable under *Monell. See, e.g., Los Angeles v. Heller, 475 U.S. 796, 799, 89 L. Ed. 2d 806, 106 S. Ct. 1571 (1986)* (municipality cannot be held liable for police department training policy without showing of constitutional violation); *Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001)* (affirming grant of summary judgment as to municipal liability when individual officers did not violate constitutional rights while making arrest, and village was implicated only by individual defendants' conduct) (citing *Heller, 475 U.S. at 799).*

The plaintiffs' various constitutional claims are addressed below.

## II. Federal Constitutional Claims: Denial of Issuance of Desk Appearance Tickets

Defendants argue that, because only three of the plaintiffs were arraigned, while the other four had their arrests voided, [*22] only the former three were eligible to receive desk appearance tickets in the first place. (Def. R. Mem. at 5-6.) Plaintiffs, on the other hand, assert that the issuance of desk appearance tickets would have shortened the confinement of all Plaintiffs. (Pl. Mem. at 16.) Because summary judgment is granted on other grounds, this point does not need to be discussed.

## A. Substantive Due Process

The Due Process Clause of the *Fourteenth Amendment* "serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams, 474 U.S. 327, 331-32, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 277, 15 L.*

*Ed. 372 (1856)* (discussing the Due Process Clause of the *Fifth Amendment*)). It protects not only against procedural unfairness, but also against "'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Wantanabe Realty Corp. v. City of New York*, 2003 U.S. Dist. LEXIS 11617, No. 01 Civ. 10137, 2003 U.S. Dist. LEXIS 11617, at *42 (S.D.N.Y. July 10, 2003) (quoting *County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)*). **[*23]**

Plaintiffs claim that Anemone's refusal to issue desk appearance tickets was arbitrary and capricious in violation of their due process rights. (Pl. Mem. at 15.) "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994)* (quoting *Bishop v. Wood, 426 U.S. 341, 350, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976)*) (other citations omitted). *See also Daniels, 474 U.S. at 331* ("*The Due Process Clause*, like its forebear in the Magna Carta, ... was 'intended to secure the individual from the arbitrary exercise of the powers of government.'") (quoting *Hurtado v. California, 110 U.S. 516, 527, 28 L. Ed. 232, 4 S. Ct. 111 (1884)* (other citations omitted)). "Moreover, government action might be so arbitrary that it violates substantive due process 'regardless of the fairness of the procedures used.'" *Lowrance, 20 F.2d at 537* (quoting *Foucha v. Louisiana, 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992)*). **[*24]**

Plaintiffs also allege that the refusal to issue desk appearance tickets, because it was based on the supposedly violent and uncontrollable conduct of the other participants in the event, violated their rights to due process by depriving them of their liberty because of the conduct of others. Instead, they argue, the determination should have been made on an individual basis. (Pl. Mem. at 17.) To support their position that Defendants have violated their substantive due process rights, Plaintiffs cite, among other cases, *Scales v. United States, 367 U.S. 203, 224, 6 L. Ed. 2d 782, 81 S. Ct. 1469 (1961)*. In *Scales*, the Supreme Court stated the following:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ..., that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the *Fifth Amendment*.

*Id. at 224-25.*

Imposing criminal liability for the acts of another offends substantive **[*25]** due process. *See id.; see also Ferguson v. Estelle, 718 F.2d 730, 735-36 (5th Cir. 1983)* (interpreting vicarious criminal liability under *Texas Anti-Riot Law*) (citing *Scales, 367 U.S. 203, 6 L. Ed. 2d 782, 81 S. Ct. 1469*). The principle reaches beyond criminal liability. For example, in *St. Ann v. Palisi, 495 F.2d 423, 426 (5th Cir. 1974)*, the 5th Circuit found that suspension of schoolchildren for an altercation their mother had with the assistant principal violated the children's due process rights. "Personal guilt is a fundamental element in the American scheme of liberty." *Id.* In *Tyson v. New York City Housing Auth., 369 F. Supp. 513, 518-19 (S.D.N.Y. 1974)*, the district court, denying a motion to dismiss the claim, applied the notion of personal guilt to the termination of tenants' public housing leases for the acts of the tenants' adult children. *United States v. One 1971 Ford Truck. 346 F. Supp. 613, 619 (C.D. Cal. 1972)*, applied the same notion to a case involving the *Takings Clause of the Fifth Amendment*, in which the federal government seized a truck because of the illegal activities **[*26]** of the owner's son. "Implicit within the concept of due process is that liability may be imposed on an individual only as a result of that person's own acts or omissions, not merely because of his association with any group." *Tyson, 369 F. Supp. at 518.*

A substantive due process claim has two elements:

(1) identification of the constitutional right at stake, and (2) consideration of whether the state action was arbitrary in a constitutional sense. *Lowrance, 20 F.3d at 537* (citations omitted).

**1. Constitutional Violation**

The analysis first requires the identification of the constitutional violation. *See Lowrance, 20 F.3d at 537* (citing *Collins v. City of Harker Heights, 503 U.S. 115, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992)*). "This threshold determination of the right at issue is critical because the seriousness of the official misconduct may determine whether the constitutional line between a procedural and a substantive due process violation has been crossed." *Curro v. Watson, 884 F. Supp. 708, 719 (E.D.N.Y. 1995)* (citing *Lowrance, 20 F.3d at 537*).

The cases **[*27]** cited above each involved a protected property or liberty interest. In *One 1971 Ford Truck*, the government seized a truck because it was used in connection with possession and sale of an unregistered firearm. The owner of the truck, however, was innocent of any wrongdoing, and was connected to the crime only

because his son -- without his father's permission -- used the truck at the time. *One 1971 Ford Truck, 346 F. Supp. at 616-17.* The decision in *Tyson* dealt with the tenants' leases in public housing, and was a related decision to *Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970),* in which the Second Circuit determined that continued tenancy in public housing was subject to due process protection. *Escalera, 425 F.2d at 861-62; Tyson, 369 F. Supp. at 518-19. Palisi,* likewise, involved a constitutionally protected liberty interest in a public education. [4] *495 F.2d at 426-27.* And *Lowrance* involved the liberty interest, defined under state regulations, of a prisoner's right to remain free from administrative confinement unless a corrections officer had reasonable grounds [*28] to believe him a threat to the order, safety, or security of the prison. *Lowrance, 20 F.3d at 537.*

> 4   *Palisi* contains language that could be read to suggest that a "cardinal notion of liberty" could stem solely from the notion of punishment in the absence of personal guilt. *495 F.2d at 426-27.* However, the *Palisi* court did note its belief that the states did not have the power to arbitrarily deny the right to a public education. *See id. at 427.* Furthermore, later treatment of *Palisi* indicates that this protected interest was crucial to the decision. *See Burris v. Willis Indep. Sch. Dist., Inc., 713 F.2d 1087, 1093 n.3 (5th Cir. 1983)* (finding no property right in employment contract renewal with school district, contrasting it with the constitutionally protected right present in *Palisi); Justice v. Nat'l Collegiate Athletic Ass'n, 577 F. Supp. 356, 369-70 (D. Ariz. 1983)* (finding no constitutionally protected property or liberty interest in the right to participate in post-season or televised college athletic competitions).

[*29] New York state law does not create a protected right in the issuance of a desk appearance ticket; its issuance is purely discretionary. "Under New York law, a 'defendant has no constitutional or statutory right to a DAT, and a police officer who has arrested a defendant for a misdemeanor may choose instead to retain custody of the defendant until his arraignment in a local Criminal Court.'" *Greenfield v. City of New York,* No. 99 Civ. 2330, 2000 U.S. Dist. LEXIS 1164, at *30 (S.D.N.Y. Feb. 3, 2000) (quoting *People v. Bracken, 129 Misc. 2d 1048, 494 N.Y.S.2d 1021, 1023 (Crim. Ct. Kings Co. 1985)), aff'd without opinion, 234 F.3d 1262 (2d Cir. 2000). See also People v. Stone, 128 Misc. 2d 1009, 491 N.Y.S.2d 921, 924 (Crim. Ct. Richmond Co. 1985)* ("The issuance of a DAT is at the discretion of the arresting police officer. The defendant has no right to receive a DAT.").

*Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494 (2001),* a land use regulation case, is analogous to the current case. In *Harlen Associates,* the plaintiffs challenged the denial of a special use permit for their [*30] convenience store. *Id. at 497-98.* In affirming the grant of summary judgment, the Second Circuit said that no property right existed in the special use permit, in part because the board making the decision had full discretion whether or not to issue it. *Harlen Assoc., 273 F.3d at 503-04.* The Second Circuit stated that in a land use regulation case, it would apply a strict "entitlement test" to determine whether the property right in question was protected under the substantive component of the Due Process Clause. *Id. at 503.* The court determined that the necessary entitlement "'turns on whether the issuing authority lacks discretion to deny the permit, *i.e.,* is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met.'" *Id. at 504* (quoting *Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)).* Because the issuing board had the discretion to grant or deny special use permits, even though it was required to consider certain standards, the required entitlement was not present that would have given the plaintiffs substantive due process protection. [*31] *Id. at 505.*

In this case, the Plaintiffs suggest that because they met the criteria set forth in the regulations for issuing desk appearance tickets, the police should have issued them. At the very least, they argue the decision was ill-founded. (*See* Pl. Mem. at 18.) A similar argument made in *Harlen Associates* was rejected by the Second Circuit: "Such a result [requiring a permit after the filing of a valid application] is diametrically opposed to the intent of the Village in drafting its zoning law to give the Board discretion and the duty to protect the interests of the community." *Harlen Assoc., 273 F.3d at 504. See also Maybee v. Town of Newfield, 789 F. Supp. 86, 90 (N.D.N.Y. 1992)* (holding that entitlement analysis must focus on the degree of official discretion and not on the probability of favorable action in the particular case) (citing *RRI Realty Corp. v. Incorporated Village of Southampton, 870 F.2d 911 (2d Cir. 1989)).*

In contrast to a land use regulation case, which involves a property interest, the plaintiffs here argue that they were deprived of a liberty interest. (*See* Pl. Mem. at 14 n.3.) [5] However, [*32] the analysis surrounding the existence of a discretionary procedure also affects cases in which a liberty interest is potentially at stake. In *Morel v. Thomas,* the district court, citing *Barna v. Travis, 239 F.3d 169, 171 (2d Cir. 2001)* (per curiam), found that there was no liberty interest in parole under New York state law such as to create full procedural due process protection. *Morel v. Thomas,* No. 02 CV 9622, 2003 U.S. Dist. LEXIS 10935, at *11 (S.D.N.Y. June 25, 2003).

Because the Parole Board had the discretion, after weighing the various factors prescribed by the regulations, to grant or deny parole, the petitioner's due process rights "extended only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds." 2003 U.S. Dist. LEXIS 10935, [WL] at *13. Although the court did not agree with the ultimate decision of the Parole Board, because the Board considered all the evidence before it, the decision did not rise to the level of arbitrariness or capriciousness necessary under a substantive due process analysis. [*33] 2003 U.S. Dist. LEXIS 10935, [WL] at *16 n.8.

     5  As mentioned above, Plaintiffs argue that the issuance of desk appearance tickets would have shortened their confinement following their arrests. (Pl. Mem. at 15-16.) They argue separately that the arrests themselves were unlawful under New York state law. (Pl. Mem. at 21-30.) Those claims, however, are not discussed in this opinion, as the Court will not exercise supplemental jurisdiction over them.

This does not fully address Plaintiffs' argument, because they claim that Anemone did not conduct any individual assessment of the type undertaken in both *Harlen Associates* and *Morel.* However, *Harlen Associates* involved a Mineola, New York, zoning statute, which required that the zoning board consider certain standards in making its decision whether or not to issue the permit. *Harlen Assoc., 273 F.3d at 504. Morel,* likewise, involved the New York state parole statute, which, although creating no legitimate expectancy of release, *Barna, 239 F.3d at 171,* [*34] does contain language imposing obligations regarding the review process itself. The parole statute at issue in *Morel* reads, "The state board of parole shall ... have the power *and duty* of determining which inmates ... may be released on parole ...." *N.Y. Exec. Law § 259-c(1)* (McKinney 2001) (emphasis added).

The statute governing the issuance of desk appearance tickets, in contrast, has no such mandatory language: "Whenever a police officer is authorized ... to arrest a person without a warrant ..., he *may* ... issue to and serve upon such person an appearance ticket." *N.Y. Crim. Proc. Law § 150.20(1)* (emphasis added). The Practice Commentaries do mention a focus upon the individual circumstances of each arrestee. *See Preiser, Practice Commentaries,* at 682-83. As Defendants point out, however, the discussion pertains to the issuance of a desk appearance ticket, and not the denial. (Def. R. Mem. at 8-9.) Both parties agree that Plaintiffs have a constitutionally protected right to due process before

deprived of their liberty. Defendants argue, however, that this right attaches to the arrest as a whole, and not solely [*35] to a discretionary procedure designed to ease the burden on the court and corrections system. (Def. R. Mem. at 9.) The Court agrees.

**2. Arbitrary in a constitutional sense**

Plaintiffs also fall short with respect to the second prong of the substantive due process analysis. Even if the Plaintiffs had a right in the issuance of a desk appearance ticket, Defendants' behavior in denying them did not rise to the level necessary to sustain a substantive due process claim. *See Harlen Assoc., 273 F.3d 494, 505* ("Even if it had a cognizable property right, the Board did not deprive it of any such right in an arbitrary manner."). The scope of substantive due process is limited to behavior that "shocks the conscience" and violates "decencies of civilized conduct." *Wantanabe Realty Corp. v. City of New York,* No. 01 Civ. 10137, 2003 U.S. Dist. LEXIS 11617, at *42 (S.D.N.Y. July 10, 2003) (denying summary judgment because jury could potentially find that City decided to tear down roller coaster in order to accommodate owners of the New York Mets, and that would qualify as outrageously arbitrary) (citing *County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)*). [*36] *Compare Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)* (forcibly pumping suspect's stomach shocked the conscience), *Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992)* (forced administration of antipsychotic drugs absent overriding justification violated substantive due process), *and Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 252 (2d Cir. 2001)* (choking, ramming head into bleachers and against metal fuse box, and punching in face of student by gym teacher shocked the conscience, and violated right to be free from excessive use of force), *with Sundbye v. Ogunleye, 3 F. Supp.2d 254, 261-62 (E.D.N.Y. 1998)* (lewd remarks and coercing plaintiff into signing letter by threatening to take child away not violation of substantive due process because statement that actor had power take child away was accurate), *and McCormack Sand Co. v. Town of N. Hempstead Solid Waste Mgmt., 960 F. Supp. 589, 596 (E.D.N.Y. 1997)* (town's sale of stockpiles of sand when ownership uncertain "not the type of oppression which gives rise to a substantive due [*37] process claim").

"An abuse of official authority may violate the substantive guarantees of the *Due Process Clause* when it is 'clearly unjustified by any legitimate objective of law enforcement.'" *Mahase v. City of New York,* No. 96 CV 6105, 2000 U.S. Dist. LEXIS 2046, at *13 (quoting *County of Sacramento v. Lewis, 523 U.S. at 840*). Here, rather than being irrational, the decision not to issue desk

appearance tickets was based in part, according to Anemone, on a decision that the participants in the demonstration were violating police directives, were a threat to police and public safety, would potentially continue their illegal activity, and were part of an uncontrollable group. (Anemone Dep. at 48-49, 56.) Although Plaintiffs question the validity of these reasons (*See infra*: Pl. Mem. at 19-20), Anemone also stated a desire to preserve police manpower resources and to save paperwork, which Plaintiffs do not address. (Anemone Dep. at 70-71.) It cannot be said, without more, when an event leads to the arrest of 115 people, that a decision not to issue desk appearance tickets violates the Plaintiffs' substantive due process rights. It is not "arbitrary [*38] or conscience-shocking in the constitutional sense." *Lowrance, 20 F.3d at 537.*

### B. *First Amendment* Retaliation Claim

Although grant of a desk appearance ticket is discretionary, as discussed above, both parties agree that a municipality cannot grant or withhold a discretionary privilege with a constitutionally impermissible motive, or use such discretion to otherwise infringe upon constitutionally protected rights. (*See* Pl. Mem. at 13-14; Def. R. Mem. at 7-8, 10.)

A *§ 1983* action is appropriate where a plaintiff can show that the government took negative action on him for exercising his or her constitutional rights. *Smith v. Metro North Commuter R.R.,* No. 98 Civ. 2528, 2000 U.S. Dist. LEXIS 14168, at *13 (S.D.N.Y. Sept. 29, 2000) (applying *First Amendment* standard to private individual punished by public official for protected speech) (citing *Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000)).* Plaintiffs, citing *Speiser v. Randall, 357 U.S. 513, 526, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958),* point out that to deny a desk appearance ticket because an arrestee "would engage in constitutionally-protected [*39] expression" is unconstitutional. (Pl. Mem. at 14.) [6] Defendants do not challenge this. (Def. R. Mem. at 7-8.)

> 6  Plaintiffs also cite *Sherbert v. Verner, 374 U.S. 398, 404, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963),* and *Perry v. Sindermann, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972),* for the same proposition.

Plaintiffs allege that denial of the desk appearance tickets was in retaliation for speech protected by the *First Amendment.* (Pl. Mem. at 3.) A plaintiff asserting a *First Amendment* claim alleging retaliation for exercise of free speech must prove that (1) they had an interest protected by the *First Amendment,* (2) that defendants' actions were motivated by or substantially caused by the exercise of that right, and (3) defendants' actions effectively

chilled the exercise of that right. *Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)* (citing *Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998)). See also Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir. 1998)* [*40] (requiring only first two prongs for *First Amendment* retaliation claim) (citing *Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994)); Friedl, 210 F.3d at 85* (same) (citing *Posr, 180 F.3d at 418).*

Neither party argues that Plaintiffs' participation in the event was not constitutionally protected. Such activity is classic *First Amendment* expression. *See Edwards v. South Carolina, 372 U.S. 229, 237, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963).* The primary issue for the purposes of this motion, therefore, is whether the motivation behind the denial of desk appearance tickets was impermissible.

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a *First Amendment* retaliation claim." *Curley, 268 F.3d at 73* (pointing out that the allegation of mean-spiritedness in plaintiff's complaint would not suffice without further evidence of improper motivation) (citing *Blue v. Koren, 72 F.3d 1075, 1082-83 (2d Cir. 1995)).* In this case, Plaintiffs point to no evidence showing that the motivation behind the denial of desk appearance tickets [*41] was in response to their exercise of *First Amendment* rights.

Plaintiffs point out that Chief Anemone, allegedly the person responsible for the decision not to issue desk appearance tickets, cites a number of reasons for his decision. For instance, Anemone states in his deposition that a decision not to issue desk appearance tickets might have been based on the participants' violation of police directives, possible danger to public and police safety, likelihood that they would continue in their illegal activities, and that they were part of a violent mob. (Pl. Mem. 19-20, Anemone Dep. at 48-49, 56.) [7] Plaintiffs challenge these reasons. First, Plaintiffs point out that only one plaintiff, Gay, was charged with violating a police directive and that none was arrested for conduct threatening public or police safety. (Pl. Mem. at 19.) They also assert that public safety is listed in neither the statute nor the police policies outlining the criteria for issuing desk appearance tickets. *Id.* at 19-20. Furthermore, Plaintiffs state, Anemone made the decision not to issue the desk appearance tickets well after the event had concluded, thus making his articulated worry that they would engage [*42] in further illegal conduct unreasonable. *Id.* at 20. Finally, Anemone's suggestion that the Plaintiffs were part of a violent mob is unconvincing, as none of the Plaintiffs was accused of violence. *Id.*

> 7  Plaintiffs cite the following passages of Anemone's deposition as proof of improper mo-

tive, saying that they were denied desk appearance tickets specifically to prevent them from continuing in the event and engaging in expressive activity. (Pl. Mem. at 21 n.8.)

> Q. And why would they not be eligible for a desk appearance ticket?
>
> A. Their actions during the course of the demonstration; their violation of police direction; their actions to endanger the public safety, not only of themselves; not only the public that was present in the street, but the police officers that had to maintain order indicated to me that they were very likely to continue to engage in this process.
>
> Q. When you say, very likely to engage in this process; do you mean that they were very likely to continue to demonstrate if they were let out?
>
> A. The decision had nothing to do with the demonstration. It had to do with the illegality of their actions.

(Anemone dep. at 48-49.) Anemone stated later that

> The group, from my perspective, was a violent mob. It was out of control. There was very little leadership, or any, that anyone on the police side could detect .... To me, that was the issue; that, you know, they couldn't be controlled. And until they could and abide by some legitimate police requests, we shouldn't allow them to continue .... To me it was crystal clear that they should be not be [sic] given the privilege of a desk appearance ticket because this would probably end up becoming a bigger problem for us later on that evening, early in the morning, at some other point.

(Anemone Dep. at 56.)

[*43] Although Plaintiffs' criticism of Anemone's rationales for declining to issue desk appearance tickets may question the soundness of his decision, it does not provide the type of evidence tending to establish the crucial link between the denial of desk appearance tickets and Plaintiffs' exercise of *First Amendment* rights. In fact, the depositions submitted suggest that desk appearance tickets would have been denied in any event. For example, Anemone testified that the extra manpower required to issue desk appearance tickets would have made the issuance difficult in a situation in which so many people were arrested at once (Anemone Dep. at 70-72), and that he was reluctant to issue desk appearance tickets, no matter what the surrounding circumstances, stating, "my belief is that the arrest and arraignment process are frustrated by the use of the desk appearance ticket, they're not enhanced." *Id.* at 66.

Plaintiffs suggest that it was the modus operandi of Defendants not to issue desk appearance tickets during demonstrations, which, they claim, would be an impermissible burden on *First Amendment* rights. (Pl. Mem. at 21.) To support this conclusion, they cite Anemone's deposition: [*44] "I think it was my decision because I know the way I've operated in the past at demonstrations." (Anemone Dep. at 51.)

At that point, however, Anemone was recalling what factors he may have used in deciding to deny the desk appearance tickets, and shortly thereafter said specifically that he declined to issue desk appearance tickets during demonstrations that were a threat to public safety. *Id.* at 52. Plaintiffs also point to similar testimony of Inspector Graham, at the time a deputy inspector (Graham Dep. at 31), who was present at the event. In his testimony, however, Graham stated that in some demonstrations desk appearance tickets were given, and in some -- more confrontational ones -- they were not, and that he did consider the Shepard event to be confrontational. *Id.* at 145-46. Later in his deposition, Graham states that the decision to issue a desk appearance ticket or not during a demonstration tended to depend on the number of arrests, and not the number of people at the demonstration. *Id.* at 151. [8]

> 8    Arguably, the most compelling evidence is Gay's assertion that the police told him that they would normally get desk appearance tickets, but that superiors at Central Booking were deliberately slowing the process. (Gay Decl. P 40.) Although this is in their 56.1 statement (Pl. Resp. 56.1 Stmt. P 151H), they do not cite it in their brief, and because it is inadmissible hearsay, it cannot be considered for purposes of this summary judgment motion. *See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001)* ("Affidavits

submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.")

[*45] A useful contrast to this case is *Black Jack Distributors, Inc. v. Beame, 433 F. Supp. 1297 (S.D.N.Y. 1977)*, in which desk appearance tickets were withheld from employees of adult bookstores who were arrested on obscenity charges. *Id. at 1306.* The defendants in that case admitted that the purpose of the denial was to discourage the employees from working in the stores. *Id.* The court determined that the desk appearance ticket issuance procedures could not be used so as to discourage the sale of material protected by the *First Amendment. Id. at 1306-07.* Accordingly, the issuance of desk appearance tickets was specifically mentioned in the granting of the preliminary injunction. *Id. at 1309.* Such motivation is not apparent in this case.

In short, Plaintiffs have not pointed to any evidence showing that the motivation behind the denial of desk appearance tickets implicated their *First Amendment* rights. As a result, Defendants' motion for summary judgment with respect to Plaintiffs' *First Amendment* claims is granted.

## C. Equal Protection

"To establish an Equal Protection violation based on selective enforcement, [*46] plaintiffs must show '(1) the person, compared with others similarly situated, was selectively treated, and (2) that such selective treatment was based on impermissible conditions such as race.'" *Mahase v. City of New York, 2000 U.S. Dist. LEXIS 2046, at *21 (quoting Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999)). See also Harlen Assoc., 273 F.3d at 499* (recognizing that equal protection extends to those who do not claim specific class membership but are nonetheless subjected to invidious discrimination); *LaTrieste Rest. & Cabaret v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994)* (adding additional impermissible considerations including religion, exercise of constitutional rights, and malicious intent), *quoted in Harlen Assoc., 273 F.3d at 499.*

After briefly mentioning their claim, Plaintiffs do not address the merits in their memorandum. Additionally, the evidence submitted does not tend to show that police acted with an intent unconstitutional under the *Equal Protection Clause.* Therefore, Defendants' motion for summary judgment with respect to Plaintiffs' [*47] equal protection claim is granted.

## III. State Claims

The remaining claims in Plaintiff's complaint, arising under New York common law, are for false arrest

and imprisonment and malicious prosecution. Because summary judgment is granted dismissing all Plaintiffs' federal claims, the Court, pursuant to *28 U.S.C. § 1367*, declines to exercise jurisdiction over the remaining state law claims. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." *28 U.S.C.A. § 1367(c)(3) (West 1993).* [9]

> [9] Plaintiffs argue that because the case is old, and because substantial discovery has been conducted and concluded, that the Court should retain jurisdiction, even in the event that all federal claims are dismissed. (Pl. Mem. at 33.) They also make the argument that both parties have submitted lengthy materials pertaining to these claims and arguing them on their merits, and particularly that it was the original motion of Defendants that necessitated this work at this stage. (Pl. Mem. at 33; *see, e.g.,* Pl. Mem. at 21-30 (false arrest and imprisonment), 34-36 (malicious prosecution); Def. R. Mem. at 1-8; Pl. R. Mem. in Support of Cross-Motion for Partial Summary Judgment at 1-9.) However, with the consent of both parties, discovery already undertaken may be used in further state court proceedings, as can the work already completed.

[*48] Defendants have filed a motion for summary judgment dismissing these claims, and Plaintiffs have filed a cross-motion on the false arrest and false imprisonment claims. Both of these motions are denied without prejudice as moot.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Defendants' federal claims, and the Court declines to exercise jurisdiction over Plaintiffs' state law claims of false arrest and imprisonment. Defendants' motion for summary judgment on Plaintiffs' state law claims, as well as Plaintiffs' cross-motion for summary judgment on their claims of false arrest and imprisonment, are therefore denied without prejudice as moot. [10]

> [10] Plaintiffs motion for class certification, not yet fully briefed, and stayed pending the determination of this motion is also denied as moot.

So Ordered.

Dated: December 1, 2003

Lawrence M. McKenna

U.S.D.J.

1 of 3 DOCUMENTS

**JOSEPH FERLITO and ANGELO FERLITO, Plaintiffs, -against- THE COUNTY OF SUFFOLK, and P.O. CHRISTIAN HUBERT; and P.O. MICHAEL S. TURANSKY; and STEVEN A. LEVY a/k/a STEVE LEVY, Defendants.**

Civil Action No. 06-5708 (DRH)(AKT)

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 85523*

**November 19, 2007, Decided**
**November 19, 2007, Filed**

**COUNSEL:** [*1] Victor M. Serby, Esq., Attorney for Plaintiffs, Woodmere, NY.

Christine Malafi, Suffolk County Attorney, Attorney for Defendants, Hauppauge, New York, By: Susan A. Flynn, Esq.

**JUDGES:** Denis R. Hurley, Senior District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION**

**MEMORANDUM & ORDER**

**HURLEY, Senior District Judge:**

Plaintiffs, Joseph Ferlito and Angelo Ferlito (collectively "Plaintiffs"), commenced this asserting claims pursuant to *42 U.S.C. § 1983*, as well as New York state law. Plaintiffs' claims all have their genesis in an altercation that apparently took place between the Plaintiffs and Defendants Christian Hubert ("Hubert") and Michael Turansky ("Turansky"), who are Suffolk County Police Officers. Presently before the Court is a motion seeking dismissal of (1) all Plaintiffs' state law claims against Suffolk County and (2) Angelo Ferlito's defamation claim against Defendant Steve Levy ("Levy") and Suffolk County. For the reasons set forth below, the motion is granted in part and denied in part.

*Background*

The relevant facts alleged by Plaintiffs, which are accepted as true for purposes of this motion, are as follows. On July 24, 2005 at East Saltaire Road, Lindenhurst, New York, Plaintiffs were physically assaulted, beaten, [*2] detained and arrested, falsely charged, and incarcerated by Officers Turnsky and Hubert. All this occurred in the presence of Angelo Ferlito's child. As a result of the beating and actions of the police officers, the Plaintiffs were injured. Several months later, on November 17, 2005 the Long Island Press published an article about the July 25, 2005 incident in which Levy is quoted as saying "These brothers have a history of disorderly conduct and were resisting arrest." At the time of the statement, Levy was County Executive for Suffolk County. Angelo Ferlito is an attorney and the words are alleged to be harmful to his reputation as an attorney.

On or about October 19, 2005, Plaintiffs served a notice of claim. Because the content of this notice of claim is at issue on this motion, a description of its content is provided. [1] In its prefatory paragraph, the notice of claim states that the claimants are asserting their claims "against THE COUNTY OF SUFFOLK, New York and Suffolk County Police Officers TURNSKY and HUBERT to the extent said officers are employed or indemnified by THE COUNTY OF SUFFOLK . . . ." Notice of Claim at 1 (capitalization in original). [2] The notice then contains [*3] four sections. The first section contains the name and address of the Plaintiffs and their attorneys. The second section is entitled "nature of the claim(s)" and sets forth the following: "assault, battery, false arrest, defamation, intentional infliction of emotional distress, use of excessive force, malicious prosecution and violations of claimants' rights under *42 U.S.C. § 1983*." *Id.* The third section is entitled "time, place and manner in which the claim arose" and contains a recitation of the events on July 24, 2005. The fourth section sets forth the amount of the claim.

1 According to the parties' papers, a second notice of claim with respect to the November 17,

2005 article was served. The second notice of claim is not at issue on this motion.
    2   The Notice of Claim is Ex. 2 to the Aff. of Susan Flynn.

Thereafter, Plaintiffs filed their complaint asserting the following causes of action: § 1983 claims against Hubert and Turansky (first cause of action) and Suffolk County (second cause of action); battery against Hubert, Turansky and Suffolk County (third cause of action); assault against Hubert, Turansky and Suffolk County (fourth cause of action); negligent, hiring, training and [*4] retaining against Suffolk County (fifth cause of action); "§ 1983 via false arrest" (sixth cause of action); common law false arrest (seventh cause of action) ³; and defamation against Levy and Suffolk County (eighth cause of action).

    3   Not the model of clarity, the complaint does not specify precisely against whom the sixth and seventh causes of action are asserted. Rather, these two causes of action are indiscriminately asserted against "defendants." The Court presumes they are asserted against Hubert, Turansky and Suffolk County.

### Discussion

### I. Motion to Dismiss: Legal Standard

*Rule 8(a)* provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).* The Supreme Court recently clarified the pleading standard applicable in evaluating a motion to dismiss under *Rule 12(b)(6).* In *Bell Atl. Corp. v. Twombly, U.S. , 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007),* the Court disavowed the well-known statement in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which [*5] would entitle him to relief." *Id. at 45-46.* The Twombly Court stated that this language "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *127 S. Ct. at 1969.* Instead, to survive a motion to dismiss under *Twombly,* a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id. at 1974.*

While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id. at 1964-65* (citations and internal quotation marks omitted).

The Second Circuit has stated that *Twombly* does not require a universally heightened standard of fact pleading, but "instead requir[es] a flexible [*6] 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).* In other words, *Twombly* "'require[s] enough facts to 'nudge[plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig., 502 F.3d 47, 2007 WL 2471805, at *2 (2d Cir. 2007)* (quoting *Twombly, 127 S. Ct. at 1974)).* ⁴ As always, the Court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *ATSI Commc'n's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).*

    4   Although *Twombly* did not make clear whether the plausibility standard applies beyond the antitrust context, the Second Circuit has "declined to read *Twombly's* flexible 'plausibility standard' as relating only to antitrust cases." *ATSI Commc'n's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 n.2 (2d Cir. 2007).*

### II. The Parties' Contentions

Defendant Suffolk County moves to dismiss the state law claims asserted against it on the ground that Defendant has failed to comply with [*7] the notice of claim requirements of *New York General Municipal Law 50-e.* According to Suffolk County, the notice of claim "does not contain facts or allegations regarding claims against the County arising out of respondeat superior or joint and several liability." Defs.' Mem. at 4. In addition, the Suffolk County argues that "[t]he failure to provide specific factual allegations concerning a municipality's negligent hiring, training or retention practices in the notice of claim bars the Plaintiffs from asserting those claims in the lawsuit." *Id.*

Suffolk County and Levy also move to dismiss the defamation claim. They argue that the statement at issue (1) is not defamatory; (2) does not support a finding of

slander per se and (3) is substantially true. Levy also asserts he is entitled to qualified immunity.

Plaintiffs counter that the complaint states a claim for defamation and the defendants' contentions are best characterized as affirmative defenses. As to the notice of claim, Plaintiffs claim that because state law claims made in § 1983 cases are within the Court's supplemental jurisdiction, the notice of claim requirements do not apply. In addition, Plaintiffs maintain that the notice **[*8]** of claim "need not expound every legal theory on which the claim is based, but rather must give the municipality enough information so that they can investigate the claims . . . ." Pls.' Mem at 14.

### III. Compliance with New York's Notice of Claim Requirements

Under New York law, a notice of claim is a condition precedent to bringing certain tort actions against a municipality such as Suffolk County for damages sustained by reason of the negligence or wrongful act of the municipality or its officers, agents or employees. *See N.Y. Gen. Mun. Law §50-i; Hardy v. New York City Health & Hosp. Corp.,164 F.3d 789, 793 (2d Cir. 1999).* "[T]he general rule [is] that in a federal court, state notice-of-claim statutes apply to state-law claims." *Id.* (citing *Felder v. Casey, 487 U.S. 131, 151, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988)).* Notwithstanding Plaintiffs' argument to the contrary, the law is clear that "[t]he notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Warner v. Village of Goshen Police Dept., 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). Accord Jones v. Nassau County Sheriff Dept., 285 F. Supp. 2d 322, 327 (E.D.N.Y. 2003).*

The Court now turns to Suffolk **[*9]** County's claim that the notice was deficient. The required contents of a notice of claim is set forth in General Municipal Law § 50-e. In determining the sufficiency of a notice of claim, the relevant inquiry is "whether it includes information sufficient to enable the [municipality] to investigate the claim . . . ." *O'Brien v. City of New York, 54 N.Y.2d 353, 357, 429 N.E.2d 1158, 445 N.Y.S.2d 687 (1981).* Specifically, the notice should include a description sufficient to allow the municipality to "locate the place, fix the time [,] and understand the nature of the [claim]." *Brown v. City of New York, 95 N.Y.2d 389, 393, 740 N.E.2d 1078, 718 N.Y.S.2d 4 (2000).* The circumstances of each case will determine whether the notice complies with the content requirement of *section 50-e. See Levine v. City of New York, 111 A.D.2d 785, 786, 490 N.Y.S.2d 533 (2d Dept. 1985).*

Here, the notice of claim is sufficient as to claims asserted against the County arising out of respondeat superior or joint and several liability. In its prefatory section the notice states that the claims are being asserted against the police officers and Suffolk County "to the extent said officers are employed or indemnified by" Suffolk County. Fairly read, this prefatory statement is sufficient to allege **[*10]** liability on the part of Suffolk County on the basis of respondeat superior or joint and several liability for those state causes of action specified in the notice, i.e., assault, battery, false arrest, defamation, intentional infliction of emotional distress, use of excessive force, and malicious prosecution.

However, the notice does not specify a claim for negligent hiring, training or retaining practices. *Cf. Rivera v. City of New York, 392 F. Supp. 2d 644, 657 (S.D.N.Y. 2005)* (striking cause of action not identified in notice of claim). Moreover, the notice contains no factual allegations with respect to such a cause of action. The facts alleged in the notice of claim are limited to the occurrences of July 24, 2005 and the facts with respect to negligent hiring, training and retention would, of necessity, have occurred prior to that date. Accordingly, the motion to dismiss the claim for negligent, hiring, training and retention for failure to file a notice of claim with respect thereto is granted. *See Urena v. City of New York, 221 A.D.2d 429, 429, 633 N.Y.S.2d 391 (2d Dept. 1995); accord Santoro v. Town of Smithtown, 40 A.D.3d 736, 737, 835 N.Y.S.2d 658 (2d Dept. 2007)* (dismissing claims for which the notice of claim **[*11]** did not contain any factual allegations).

In sum, the motion to dismiss for failure to comply with New York's notice of claim requirements is granted as to the claim for negligent hiring, training and retention (the fifth cause of action) but otherwise denied.

### IV. The Defamation Claim

Angelo Ferlito asserts a claim for defamation based on Levy's alleged statement to a reporter for the Long Island Press that "[t]hese brothers have a history of disorderly conduct and were resisting arrest." According to the complaint, Angelo Ferlito is an attorney and the words spoken by Levy are harmful to his reputation as an attorney, constituting slander per se.

"The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001)* (citations omitted). A defamatory statement of fact is one that "tends to expose the plaintiff to public contempt, ridicule, **[*12]** aversion, or disgrace or induce an evil opinion of him in the minds

Case 1:07-cv-10274-JSR     Document 7-2     Filed 05/20/2008     Page 19 of 30

Page 4
2007 U.S. Dist. LEXIS 85523, *

of right-thinking people to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehardt & Winston, Inc., 42 N.Y.2d 369, 379, 366 N.E.2d 1299, 397 N.Y.S.2d 943 (1977).* "[I]f the language is not of such a nature, that is, if it merely constitutes a general reflection on a person's character or qualitites, it is not a matter of such significance and importance as to amount to actionable defamation even though it may be unpleasant, annoying, or irksome, or may subject the plaintiff to jests or banter so as to affect his feelings." N.Y. Jur. Defam. § 5.

Generally, slander is not actionable unless the plaintiff suffers special damages. *Liberman v. Gelstein, 80 N.Y.2d 429, 434, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992).* Here, no special damages are alleged and therefore the claim cannot be sustained unless Angelo Ferlito has stated a claim falling within one of four exceptions collectively referred to as slander per se. A claim for slander per se is limited to allegations that: "(i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute **[*13]** unchastity to a woman." *Albert, 239 F.3d at 271; Liberman, 80 N.Y.2d at 435.* In determining whether words are slanderous per se, they "should be considered in the context in which they were used and whether they can be readily interpreted as imparting to plaintiff fraud, dishonesty, misconduct or unfitness in his or her business. *Herlihy v. Metropolitan Museum of Art, 214 A.D.2d 250, 261, 633 N.Y.S.2d 106 (1st Dept. 1995).*

The defamation claim must fail. Even assuming that the statement is one that exposes Angelo Ferlito to public contempt, ridicule, aversion or disgrace, the words are not slanderous per se. The words do not charge Angelo Ferlito with a serious crime. "Not every imputation of unlawful behavior is slanderous per se. With the extension of criminal punishment to many minor offenses, it was obviously necessary to make some distinction as to the character of the crime, since a charge of a traffic violation, for example, would not exclude a person from society, and today, would do little, if any, harm to his or her reputation at all. Thus, the law distinguishes between serious and relatively minor offenses and only statements regarding the former are actionable without proof of damage." *Liberman, 80 N.Y.2d at 436* **[*14]** (internal quotations and citations omitted). Under New York Law disorderly conduct is a violation and resisting arrest is a misdemeanor and do not constitute slander per se. *Cf. id.* (holding statement accusing the plaintiff of harassment is not slanderous per se).

Nor is the statement one that tends to injure Angelo Ferlito in his profession. "That exception . . . is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon plaintiff's character or qualities." *Id.* The statement at issue here is unrelated to plaintiff's status as an attorney and therefore does not fall into the "trade, business or profession" exception. *Cf. id.* Accordingly, the claim for defamation (the eighth cause of action) is dismissed.

### Conclusion

The motion to dismiss is granted as to the fifth and eighth causes of action but otherwise denied.

### SO ORDERED.

Dated: Central Islip, New York

November 19, 2007.

/s/

Denis R. Hurley

Senior District Judge

LEXSEE 2003 U.S. DIST. LEXIS 13122

RAMON FERNANDEZ and ADALBERTO FERNANDEZ, Plaintiffs, - against -
THE CITY OF NEW YORK, POLICE OFFICERS ROBERT THOMSON, shield #
3843, HATZIDARN, tax id # 896418, and UNKNOWN JOHN and JANE DOE(S),
all in their official and individual capacities, and ROSS RADTKE, Defendants.

02 Civ. 8195 (JGK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 13122

July 29, 2003, Decided
July 29, 2003, Filed

**DISPOSITION:** [*1] Plaintiffs' motion to dismiss the claims for a violation of *42 U.S.C. § 1983* granted. Remaining claims arise under state law and the Court declined to exercise supplemental jurisdiction, the entire Complaint dismissed.

**COUNSEL:** For Ramon Fernandez, Adalberto Fernandez, PLAINTIFFS: Daniel Cherner, Law Office Dan Cherner, New York, NY USA.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINION BY:** John G. Koeltl

**OPINION**

*OPINION AND ORDER*

**JOHN G. KOELTL, District Judge:**

Plaintiffs Ramon Fernandez and Adalberto Fernandez bring this action pursuant to *42 U.S.C. §§ 1983, 1985, 1986and 1988* against defendants the City of New York (the "City") and New York City Police Department ("NYPD"), Officer Robert Thomson ("Thomson") and Officer Hatzidarn ("Hatzidarn"), and unknown John and Jane Does (Thomson, Hatzidarn and John and Jane Does collectively "NYPD Defendants") (City of New York, NYPD, and NYPD Defendants collectively "City Defendants") in their official and individual capacities, as well as Ross Radtke ("Radtke"). The plaintiffs allege that the City Defendants violated their constitutional rights under the *Fourth, Fifth* and *Fourteenth Amendments* [*2] to the United States Constitution in violation of *42 U.S.C. § 1983*. The plaintiffs claim that the NYPD Defendants

falsely arrested and imprisoned them. The plaintiffs also allege that the NYPD Defendants maliciously prosecuted Ramon Fernandez and engaged in abuse of process against Ramon Fernandez in violation of Ramon Fernandez's constitutional and civil rights. The plaintiffs contend that defendants John and Jane Does failed to properly investigate, supervise, and discipline the actions of the offending officers. The plaintiffs assert that the City was negligent in hiring, training, and failing to supervise the NYPD Defendants. The plaintiffs also bring claims of defamation and private nuisance against Radtke.

The City Defendants now move to dismiss the Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief can be granted.

I.

On a motion to dismiss, the allegations in the Complaint are accepted as true. *Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998)*. In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiffs' favor. *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)*; [*3] *Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)*. The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)*. Therefore, the defendants' present motion should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)*; *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; *Grandon, 147 F.3d at 188*; *Goldman, 754 F.2d*

*at 1065.* The Court applies this standard "with particular strictness" in view of the plaintiffs' allegations of civil rights violations. *Brodeur v. City of New York, 2002 U.S. Dist. LEXIS 4500, 99 Civ. 651, 2002 WL 424688, at *2 (S.D.N.Y. Mar. 18, 2002)* (quoting *Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991))*.

In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the Court may consider [*4] documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc. 282 F.3d 147, 153 (2d Cir. 2002); see also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991); Skeete v. IVF, Inc., 972 F. Supp. 206, 208 (S.D.N.Y. 1997); Vtech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001)*.

For the purposes of this motion, the following facts are accepted as true.

The NYPD Defendants were and still are police officers or personnel of the NYPD employed and acting under the direction of the City. (Compl. P 7.) Defendants John and Jane Doe(s) are the fictitious names of police officers who were involved in the acts complained of and/or who failed to train and supervise properly [*5] the other NYPD Defendants. (Compl. P 7.)

In the year prior to November 16, 2000, the plaintiffs and their mother, Hilda Fernandez, made multiple calls to the NYPD's 114th precinct to complain of excessive noise and improper behavior on the part of Radtke, who lived in an apartment directly above the plaintiffs' apartment. (Compl. P 12.) The Complaint alleges that despite the fact that the NYPD was aware of Radtke's noise and improper behavior, as well as threats that Radtke made while banging on the plaintiffs' apartment door, the NYPD failed to take action against Radtke. (Compl. P 13.) Instead, the City, through the NYPD, claimed that the issue was one for the landlord to address rather than the police. (Compl. P 14.)

In the beginning of November, 2000, Radtke wrote to the NYPD regarding the complaints that the plaintiffs were filing against him. (Compl. P 17.) The letter stated that Radtke and his family were "subjected to harassment and nuisance perpetrated by all three occupants of" the plaintiffs' apartment. (Letter from Ross H. Radtke to New York City Police Department, 114th Precinct dated Nov. 8, 2000 ("Radtke Letter") attached as Ex. A to Declaration of Dan Cherner dated [*6] Mar. 18, 2003). Radtke also wrote that officers from the 114th precinct had

recently visited his apartment repeatedly in response to complaints by the plaintiffs. (Radtke Letter.) On more than three occasions, the officers allegedly instructed the plaintiffs to "never call again." (Radtke Letter.)

Approximately eight to ten days later, on November 16, 2000, the plaintiffs allege that Radtke banged on the plaintiffs' door at 6:30-7:00 p.m. and, when Ramon Fernandez answered, proceeded to threaten and insult Ramon Fernandez before stating "I'll see you in court" and leaving the area. (Compl. PP 15-16.) Defendant Thomson and other NYPD officers arrived at the plaintiffs' apartment about 30 minutes later. (Compl. P 18.) In response to the officers' banging, Adalberto Fernandez opened the apartment door. (Compl. P 19.) The officers entered the apartment pointing to Adalberto Fernandez and stating "arrest him, arrest him." (Compl. P 20.) Adalberto Fernandez asked to officers what they were talking about and defendant Thomson stated that Adalberto Fernandez had punched Radtke in the face. (Compl. P 21.) Adalberto Fernandez denied the allegations against him. (Compl. P 22.) Thomson reacted [*7] aggressively in response, stating "you want some violence, you want some violence," and put his hand on his gun. (Compl. P 22.) The plaintiffs contend that Adalberto Fernandez was effectively under arrest at this time. (Compl. P 23.)

The officers next brought Radtke's son to the plaintiffs' apartment and the son stated that Ramon Fernandez punched Radtke in the face and ransacked Radtke's apartment. (Compl. P 24.) When the officers began to arrest Ramon Fernandez, Adalberto Fernandez asked about the reason for the arrest and Thomson told him that Ramon Fernandez had gone to Radtke's apartment, punched Radtke in the face, and ransacked the apartment. (Compl. P 25.) Thomson also stated that there was blood all over Radtke's apartment. (Compl. P 25.) Adalberto Fernandez told the officers that Ramon Fernandez had not left the apartment and that, instead, Radtke had come to the plaintiffs' apartment to threaten them. (Compl. P 26.) Adalberto Fernandez also reminded the officers that the plaintiffs had made several complaints about Radtke to the police. (Compl. P 26.) The officers proceeded to arrest Ramon Fernandez despite the plaintiffs' allegation that the officers knew that Radtke lacked [*8] credibility and could not be believed. (Compl. P 27.) Radtke refused medical treatment or an ambulance. (Compl. P 28.)

Ramon Fernandez was charged with third degree assault and second degree harassment on November 16, 2000. (Compl. P 28.) In support of the charges against Ramon Fernandez, Thomson stated in a criminal complaint that Radtke told him that Ramon Fernandez struck Radtke with a closed fist causing Radtke to sustain bruising and swelling and substantial pain to his mouth.

(Criminal Complaint dated Nov. 17, 2000 ("Criminal Complaint") attached as Ex. B to Declaration of Genevieve E. Nelson dated Feb. 13, 2003.) The criminal complaint was supported by Radtke's sworn confirming declaration that affirmed that the statements by Thomson were true to Radtke's personal knowledge. (Criminal Complaint.) The assault charge was reduced on March 21, 2001 to attempted assault in the third degree. (Compl. P 29.) On August 12, 2002, after a trial, Ramon Fernandez was found not guilty of attempted assault in the third degree and guilty of second degree harassment. (Compl. P 30.)

The plaintiffs allege that Radtke continued to make noise during the evenings and mornings between November 16, 2000 and [*9] June, 2002 in order to intentionally interfere with the plaintiffs' use and quiet enjoyment of their residence. (Compl. P 31.)

II.

The City Defendants seek to dismiss the Complaint on the ground that the plaintiffs have pleaded sufficient facts to establish probable cause, thus defeating the plaintiffs' claims for false arrest, false imprisonment, and malicious prosecution. [1] A false arrest claim under 42 U.S.C. § 1983 resting on the *Fourth Amendment* right to be free from unreasonable seizures, including arrest without probable cause, "is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)* (citations omitted). Under New York law, "a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without justification." *Id.* (citations omitted). Probable cause constitutes such justification, and therefore probable cause "is a complete defense to an action for false arrest." *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003);* [*10] *L.B. v. Town of Chester, 232 F. Supp. 2d 227, 233 (S.D.N.Y. 2002).*

> 1  In this case, there is no difference between the alleged false arrest and false imprisonment claims. "False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment." *Covington v. City of New York, 171 F.3d 117, 125 (2d Cir. 1999)* (Glasser, J., dissenting); *see also Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996)* (describing false arrest as "a species of false imprisonment"). The Court will therefore address the allegations together as a claim for false arrest.

To sustain a *§ 1983* claim based on malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty. *See Singer v. Fulton County Sheriff, 63 F.3d 110, 116 (2d Cir. 1995);* [*11] *see also Jenkins v. City of New York, 1999 U.S. Dist. LEXIS 15353, 98 Civ. 7170, 98 Civ. 7338, 1999 WL 782509, at *10 (S.D.N.Y. Sept. 30, 1999), aff'd, 216 F.3d 1072 (2d Cir. 2000).* To state a claim for malicious prosecution under New York State law, "a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)* (quoting *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)); see also Jenkins, 1999 U.S. Dist. LEXIS 15353, 1999 WL 782509, at *11.* Thus, the existence of probable cause to commence a proceeding is also a complete bar to a claim of malicious prosecution. *See Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003); see also Jenkins, 1999 U.S. Dist. LEXIS 15353, 1999 WL 782509, at *11; Fun-nye v. Paragon Sporting Goods, 2001 U.S. Dist. LEXIS 3337, 98 Civ. 7731, 2001 WL 300740 (S.D.N.Y. Mar. 27, 2001).*

Probable cause to arrest exists "when the arresting officer has knowledge or reasonably trustworthy [*12] information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer, 63 F.3d at 119* (internal quotations marks omitted). The amount of evidence required to establish probable cause to arrest "need not reach the level of evidence necessary to support a conviction ... but it must constitute more than rumor, suspicion, or even a strong reason to suspect." *United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983)* (internal citations and quotation marks omitted).

"When a putative victim precisely identifies the alleged perpetrator of a crime and there is independent evidence to support at least some of the victim's assertions, a person of reasonable caution is warranted in believing that an offense has been committed by the alleged perpetrator." *Marin v. Viggiani, 1993 U.S. Dist. LEXIS 14056, 92 Civ. 3836, 1993 WL 404098, at *6 (S.D.N.Y. Oct. 5, 1993).* Probable cause can also be established by information from an eye witness "who it seems reasonable to believe is telling the truth." *Miloslavsky v. AES Eng'g Soc., Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992), aff'd,* [*13] *993 F.2d 1534 (2d Cir. 1993)* (table). The Court of Appeals has explained that "an arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to

effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2nd Cir. 1995).* "Information about criminal activity provided by a single complainant can establish probable cause when the information is sufficiently reliable and corroborated. Yet, even if bystander witnesses are considered presumptively reliable, a report of a crime alone will not necessarily establish probable cause." *Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994)* (internal citations omitted). However, "once a police officer has a reasonable basis for believing that there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).*

Taking the facts alleged in the Complaint as true, the NYPD Defendants have established [*14] the existence of probable cause that defeats the plaintiffs' allegations. The facts as alleged in the Complaint cannot be interpreted otherwise. Cf. *Posr v. Court Officer Shield # 207, 180 F.3d 409, 415-17 (2d Cir. 1999); Bullard v. City of New York, 240 F. Supp. 2d 292, 298-99 (S.D.N.Y. 2003).*

The plaintiffs allege, in substance, that Thomson and other NYPD officers came to their apartment in response to an alleged assault as reported by Radtke and his son. The NYPD Defendants thereafter brought Radtke's son to the plaintiffs' apartment and the son stated that Ramon Fernandez had punched Radtke in the face and ransacked Radtke's apartment. There are no allegations in the Complaint that undercut the son's veracity or eyewitness testimony, and the NYPD Defendants were entitled to rely on his testimony in establishing probable cause. Moreover, Thomson also indicated that there was corroborating physical evidence for the son's story when he told Adalberto Fernandez that "there was blood all over defendant RADTKE's apartment." (Compl. P 25.) In a dispute between neighbors that resulted in physical violence with a complaint of physical harm by the victim [*15] and support by a witness, the police were not required to walk away or risk personal liability for effecting an arrest.

The plaintiffs argue that the officers should have doubted Radtke's and his son's allegations on the ground that Adalberto Fernandez stated that his brother had not left the plaintiffs' apartment. The Second Circuit Court of Appeals has found probable cause, however, "where a police officer was presented with different stories from an alleged victim and the arrestee." *Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001).* As a result, Adalberto Fernandez's differing account of what occurred does not necessarily negate probable cause. As the Court has already explained, once a police officer has established a basis for probable cause, "he is not required to explore and eliminate every theoretically plausible

claim of innocence before making an arrest." *Ricciuti, 124 F.3d at 128.*

The plaintiffs also contend that their history of complaints against Radtke made clear that Radtke was simply retaliating against the plaintiffs by complaining to the NYPD Defendants. But the Court cannot find that the defendants should have drawn [*16] such a conclusion. Allegations of bad blood simply do not undercut Radtke's assertion, or that of his son, that Ramon Fernandez took the dispute to a physically violent level, especially in view of the corroborating evidence of the bloody and ransacked Radtke apartment. Moreover, faced with such allegations of physical violence, it is unreasonable to suggest that the police should merely turn a blind eye.

Adalberto Fernandez also alleges that he was the victim of false arrest. As the Court has explained, the existence of probable cause defeats this claim. Moreover, the elements of a claim for false arrest or false imprisonment under New York law are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Weyant, 101 F.3d at 853* (alteration in original) (quoting *Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995); see also Bernard, 25 F.3d at 102.* Adalberto Fernandez cannot sustain a claim for false arrest because he has not alleged that he was actually confined [*17] or seized. *See Sheppard v. Beerman, 18 F.3d 147, 153 (2d Cir. 1994)* (affirming district court's dismissal of unlawful seizure claim under *Fed. R. Civ. P. 12(c)* when plaintiff failed to alleged that his person was seized); *Bower v. Weisman, 639 F. Supp. 532, 540-41 (S.D.N.Y. 1986)* (dismissing false imprisonment claim when plaintiff failed to allege actual physical confinement).

Adalberto Fernandez claims that he was in custody and not free to leave when Thomson confronted him in the plaintiffs' apartment. However, the Complaint states only that officers entered his apartment stating "arrest him, arrest him" and pointing at Adalberto Fernandez. (Compl. P 20.) There is no indication that Adalberto Fernandez was ever physically restrained in any way or told that he could not leave despite the confrontational comments by defendant Thomson. *See Bower, 639 F. Supp. at 541* ("even if the conduct of [the defendants] caused [the plaintiff] to feel like a prisoner, this is not enough to sustain a cause of action for false imprisonment since [the plaintiff] has not alleged actual physical confinement") (internal citation omitted). Furthermore, [*18] the Complaint implies that the NYPD Defendants quickly thereafter focused their attention on Ramon Fernandez, whom they did, in fact, arrest, and there is no indication that the officers had any further interest in Adalberto Fernandez. To assert successfully a *§ 1983*

claim, a plaintiff must demonstrate a violation of his constitutional rights. *See Murphy, 118 F.3d at 944; Singer, 63 F.3d at 119.* Here, the relevant right is the *Fourth Amendment* right to be free from unreasonable seizures. Because no such seizure occurred, that right was not violated and the claim must fail.

The defendants also argue that Ramon Fernandez's malicious prosecution claim should be dismissed because his prosecution did not terminate in the plaintiff's favor. "One element that must be alleged and proved in a malicious prosecution claim is termination of the prior criminal proceeding in favor of the accused." *DiBlasio v. City of New York, 102 F.3d 654, 658 (2d Cir. 1996)* (quoting *Heck v. Humphrey, 512 U.S. 477, 484, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994)).* The plaintiff, however, characterizes the prosecution as a failure for purposes [*19] of the malicious prosecution claim. The plaintiff notes that although he was originally charged with third degree assault and second degree harassment, the first charge was later reduced to attempted assault in the third degree before Ramon Fernandez was ultimately acquitted of the assault charge altogether by a jury. The plaintiff was, however, convicted on the original second degree harassment charge. Ramon Fernandez thus argues that the acquittal is a favorable termination notwithstanding the guilty verdict on the harassment charge and emphasizes that second degree harassment is merely a violation under New York State law.

Despite Ramon Fernandez's efforts to argue otherwise:

> The charge on which he was convicted, namely, harassment in the second degree, is neither technical nor innocuous because it constitutes a violation and not a crime. It is a criminal charge nonetheless and the conviction, as a matter of law, precludes a determination that the underlying criminal prosecution terminated in his favor.

*Pugach v. Borja, 175 Misc. 2d 683, 670 N.Y.S.2d 718, 723 (Sup. Ct. 1998).* In this case, both of the charges against Ramon Fernandez originated out [*20] of the same course of conduct against Radtke. *See Id. at 722* ("charges were related in the sense that they originated out of the relationship between the parties and the pattern of conduct allegedly undertaken" by the defendant). The charge for which Ramon Fernandez was acquitted was "so closely intertwined with the offense of conviction that there is also no reasonable basis to conclude that the acquittal ... is sufficiently distinct to support a claim of malicious prosecution." *Pichardo v. New York Police*

*Dept., 1998 U.S. Dist. LEXIS 18025, No. 98 Civ. 429, 1998 WL 812049, at *4 (S.D.N.Y. Nov. 18, 1998).* [2]

> 2 Moreover, there is no reason to believe from the facts alleged in the Complaint that this is a case where the Court must be concerned that prosecutors set about "securing an indictment for an easily provable minor offense and adding to it more serious charges with the hope that proof of probable cause would insulate the prosecutor from liability for malicious prosecution on the unproved serious ones." *DiBlasio, 102 F.3d at 658; see also Bowles v. State of New York, 37 F. Supp. 2d 608, 612 n.3 (S.D.N.Y. 1999).*

[*21] The plaintiffs' claims for false arrest, false imprisonment, and malicious prosecution are therefore dismissed.

III.

The defendants move to dismiss the plaintiffs' abuse of process claim. To prove abuse of process the plaintiffs must show:

> (1) regularly issued process compelling the performance or forbearance of some prescribed act, (2) the person activating the process must have been motivated to do harm without economic or social excuse or justification, and (3) the person activating the process must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of process.

*Bernard, 25 F.3d at 104; see also Savino, 331 F.3d at 76.* The plaintiffs have failed to allege facts sufficient to support an abuse of process claim.

The plaintiffs simply do not allege that the defendants sought a "collateral advantage or corresponding detriment to the plaintiff." The Complaint is devoid of any allegation of "extortion, blackmail or retribution", or of any intention on the part of the defendants to bring an illegitimate detriment to the plaintiffs. *Reisner v. Stoller, 51 F. Supp. 2d 430, 456 (S.D.N.Y. 1999);* [*22] *Chrysler Corp. v. Fedders Corp., 540 F. Supp. 706, 728 (S.D.N.Y. 1982)* (citation omitted). There are no allegations that the NYPD Defendants had any illegitimate collateral motive whatsoever. The claim for abuse of process is therefore dismissed.

IV.

The defendants argue, in the alternative, that defendant Thomson is entitled to qualified immunity on the false arrest, malicious prosecution, and abuse of process claims. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).* "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." *McEvoy v. Spencer, 124 F.3d 92, 97 (2 Cir. 1997)* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987)* [*23] (internal quotation marks, ellipses, and brackets omitted)); *see also Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002); Funnye, 2001 U.S. Dist. LEXIS 3337, 2001 WL 300740, at *8.*

The right not to be arrested without probable cause is a clearly established right. *Cook v. Sheldon, 41 F.3d 73, 78 (2d Cir. 1994)* ("It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause."). The same is true of the right to be free from malicious prosecution and abuse of process. *See id. at 79-80.* Nevertheless, "even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995)* (citing *Anderson, 483 U.S. at 641*, and *Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987)).*

An officer has qualified immunity for an alleged false [*24] arrest "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Posr, 180 F.3d at 416* (quoting *Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)).* Thompson argues that, even if there was no probable cause to arrest Ramon Fernandez, it was objectively reasonable for him to believe that probable cause existed. [3]

3    As the Court has already explained, Adalberto Fernandez was never detained and his constitutional rights were never violated. Therefore, Officer Thomson cannot be liable to Adalberto Fernandez and it is unnecessary to reach the issue of his qualified immunity.

The Court must determine whether the plaintiffs could prevail if they are able to prove the facts alleged in the Complaint. *Posr, 180 F.3d at 416.* In this case, Thomson was informed by a putative complainant and eye witness that Ramon Fernandez [*25] had assaulted Radtke and ransacked Radtke's apartment. There was no reason to doubt the witnesses, especially in view of the blood in Radtke's apartment corroborating the account. Thomson had probable cause to arrest Ramon Fernandez and his actions were objectively reasonable in so doing. He is therefore entitled to qualified immunity on the false arrest and malicious prosecution claims. *See Savino, 331 F.3d at 75, 76* (defendants entitled to qualified immunity on false arrest claim when probable cause existed for plaintiff's arrest). Moreover, under the facts as alleged, the plaintiffs do not assert a claim for abuse of process. Therefore, Thomson is entitled to qualified immunity on the abuse of process claim as well. *See Savino, 331 F.3d at 78* (defendants entitled to qualified immunity on abuse of process claim where defendants were entitled to summary judgment on the merits of the claim).

V.

The defendants also move to dismiss the claim of municipal liability against the City. In order to impose § 1983 liability upon a municipality, the plaintiffs must identify a municipal "policy" or "custom" that caused the plaintiffs' injuries. *See Monell v. Dept. of Social Servs. of the City of New York, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978);* [*26] *see also Board of the County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997).* The plaintiff must demonstrate that the municipality was the "moving force" behind the injuries alleged. *Brown, 520 U.S. at 404; Monell, 436 U.S. at 692.* Because the Court finds that neither Ramon Fernandez nor Adalberto Fernandez suffered any constitutional injury, the Court need not reach the *Monell* claim. There was no constitutional violation for which the City could have been liable.

VI.

Because the Court is dismissing the plaintiffs' claims under the federal constitution, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, and those claims are dismissed. *See 28 U.S.C § 1367(c)(3); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001); Morse v. University of Vermont, 973 F.2d 122, 128 (2d Cir. 1992); Lieberman v. Fine, Olin & Anderman, P.C., 2002 U.S. Dist. LEXIS 1554, No. 00 Civ. 6533, 2002 WL 142198, at *4 (S.D.N.Y. Jan. 31, 2002); Irish Lesbian and Gay Org. v. Bratton, 882 F. Supp. 315, 319* [*27] *(S.D.N.Y), aff'd. 52 F.3d 311 (2d Cir. 1995).*

*CONCLUSION*

For the reasons explained above, the motion to dismiss the claims for a violation of *42 U.S.C. § 1983* is granted. Because the remaining claims arise under state law and the Court declines to exercise supplemental jurisdiction, the entire Complaint should be dismissed. The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated: July 29, 2003**

**John G. Koeltl**

**United States District Judge**

LEXSEE 1997 U.S. DIST. LEXIS 23686 AT *5-

**MAURICE OPARAJI, Plaintiff, -against- THE CITY OF NEW YORK and ROBERT WESTON, Defendants.**

**96 Cv. 6233**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 23686*

**March 21, 1997, Decided
March 25, 1997, Filed**

**DISPOSITION:**    **[*1]**  City's motion to dismiss granted and the complaint dismissed as against both defendants.

**COUNSEL:** For MAURICE OPARAJI, plaintiff: Michael J. Resko, New York, NY.

**JUDGES:** I. Leo Glasser, U.S.D.J.

**OPINION BY:** I. Leo Glasser

**OPINION**

*MEMORANDUM AND ORDER*

GLASSER, United States District Judge:

*SUMMARY*

This is an action brought by plaintiff Maurice Oparaji under *42 U.S.C. §§ 1981* and *1983* and New York state law seeking damages and other relief from defendants the City of New York and Robert Weston. The case is now before the court on the City's motion to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons that follow, the motion should be granted and the complaint should be dismissed as to both defendants.

*FACTS*

The following facts are accepted as true for purposes of this motion.

Plaintiff is a native of Nigeria and a naturalized United States citizen. Defendant Weston, who does not appear on this motion, is the owner of an automotive and gas station in Queens, New York. Compl. P 12. On or about July 17, 1995, Weston, through one of his employees, told plaintiff that plaintiff's car had failed the New York State Emissions and **[*2]** Inspection test. *Id.* Plaintiff was also told, falsely, that the car would require $ 295 in repairs in order to pass inspection but that he could pay $ 65 for a fraudulent inspection sticker. *Id.* Plaintiff refused that offer and filed a complaint against Weston with the New York State Department of Motor Vehicles. *Id.*

On or about July 25, 1995, plaintiff left the United States for Nigeria in connection with his employment with the Nigerian-based Gospel Missionary Foundation International, Inc. ("GMFI"). He remained in Nigeria until April 1, 1996. Compl. P 13. While plaintiff was in Nigeria, Weston made a false complaint to the New York City Police Department ("NYPD") accusing plaintiff of intentionally damaging three gas pump hoses at Weston's gas station on July 31, 1995. Compl. P 14. After conducting an investigation, the NYPD obtained an arrest warrant and arrested plaintiff at his home on April 8, 1996. Compl. P 15. Plaintiff claims the NYPD's investigation was flawed, and a proper investigation would have revealed that he was in Nigeria at the time of the incident. *Id.*

Following his arrest, plaintiff was incarcerated for approximately 48 hours during which he **[*3]** allegedly contracted tuberculosis. Compl. P 17. He was arraigned on April 10, 1996 on charges of criminal mischief in violation of *New York Penal Law § 145.00(1)*, and was thereafter released from custody on his own recognizance. He returned to court four more times before the charge against him was dismissed on or about June 12, 1996. Compl. P 18. Because plaintiff was unable to travel to Nigeria during the pendency of his criminal case, he lost his job with GMFI. Compl. P 20.

The complaint in this action asserts five claims based on the events described above. The first claim, under § 1983, charges the City with malicious prosecution and false arrest in violation of plaintiff's *Fourth Amendment* rights. The second charges that plaintiff's arrest and prosecution were motivated by racial animus in violation of *42 U.S.C. § 1981*. Plaintiff's third claim appears to relate back to the first as it charges the City with maintaining a policy, practice, or custom of failing to adequately train its police officers to avoid engaging in malicious prosecution. The fourth claim is against the City for common law malicious prosecution. The fifth claim asserts various causes [*4] of action against Weston under New York state law. Jurisdiction over the federal claims is founded on *28 U.S.C. §§ 1331* and *1343(3)-(4)* and over the pendent state law claims on *28 U.S.C. § 1367*.

## DISCUSSION

### I. *Legal Standard*

In analyzing a motion to dismiss for failure to state a claim, the court must view the complaint in the light most favorable to plaintiff and accept all allegations contained therein as true. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. Dismissal of a complaint under *Fed. R. Civ. P. 12(b)(6)* is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994)*(quoting *Conley v. Gibson, 355 U.S. 41, 45-46. 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*.

### II. *The Malicious Prosecution Claims*

Malicious prosecution claims brought under *§ 1983* are governed by state law. *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)*. A cause of action for malicious prosecution in New [*5] York has four elements: (1) the initiation of an action by the defendant against the plaintiff; (2) begun with malice; (3) without probable cause; (4) that terminates in favor of the plaintiff. *See e.g., O'Brien v. Alexander, 101 F.3d 1479, 1484 (2d Cir. 1996)*; *Russell v. Smith, 68 F.3d at 36*. The City contends that plaintiff has failed to allege facts showing that the criminal action against plaintiff was begun with malice and without probable cause.

Malice in this context does not have to be actual spite or hatred; it means only "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996)*(quoting *Nardelli v. Stamberg, 44 N.Y.2d 500, 502-03, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978)*. Taking plaintiff's version of events as accurate, there are no facts alleged from which

one could infer that any City police officer acted due to a wrong or improper motive. To the contrary, the complaint alleges that the police acted reasonably in that they were informed [*6] of the unlawful destruction of property at Weston's gas station, they conducted an investigation, obtained an arrest warrant and arrested plaintiff pursuant thereto. As elaborated upon below, plaintiff's naked assertion that "racial bias" motivated the arresting officers finds no support from the facts set forth in the complaint.

Nor has plaintiff alleged facts sufficient to raise an inference that City police officers acted without probable cause. It has been recognized that "information provided by an identified citizen accusing another of a crime is legally sufficient to provide the police with probable cause to arrest." *People v. Banks, 151 A.D.2d 491, 542 N.Y.S.2d 280 (2d Dep't. 1989)*; *see also Woodard v. Hardenfelder, 845 F. Supp. 960, 967 (E.D.N.Y. 1994)*("Probable cause exists where officer receives 'information from some person -- normally the putative victim or eyewitness -- who it seems reasonable to believe is telling the truth.'")(quoting *Thomas v. Culberg, 741 F. Supp. 77, 80 (S.D.N.Y. 1990)*); *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)*(probable cause exists even where it is based upon mistaken [*7] information, so long as the arresting officer was reasonable in relying on that information). As the investigating officers were informed by Weston that plaintiff had vandalized his gas station, they clearly had probable cause to obtain a warrant for plaintiff's arrest. The argument advanced in plaintiff's Memorandum of Law which suggests that the investigating officers "knew, the day following the incident alleged in the criminal complaint, that [plaintiff] was out of the country," *see* Pl. Mem. of Law at 4-5, is not attended by any citation to the complaint and indeed the complaint makes no such allegation. Moreover, an officer executing an arrest warrant is not 'required by the Constitution to investigate independently every claim of innocence.'" *Katz v. Morgenthau, 709 F. Supp. 1219, 1229 (S.D.N.Y. 1989)*(quoting *Baker v. McCollan, 443 U.S. 137, 145-46, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)*).

Because plaintiff has failed to adequately plead two essential elements, his malicious prosecution claims under *§ 1983* and New York state law should be dismissed. To the extent plaintiff has attempted to assert a claim of false arrest under *§ 1983* [*8] he has also failed because probable cause is a complete defense to such an action. *Bernard, 25 F.3d at 102 (2d Cir. 1994)*. [1]

    1  The opening paragraph of the complaint also makes reference to a violation of plaintiff's rights under the *Fourteenth Amendment*. However, the Second Circuit has held that "the *Fourteenth*

Amendment right to substantive due process will not support a federal claim for malicious prosecution." *Singer v. Fulton County Sheriff, 63 F.3d 110, 114 (2d Cir. 1995), cert. denied, 517 U.S. 1189, 116 S. Ct. 1676, 134 L. Ed. 2d 779 (1996).*

### III. Municipal Liability Under § 1983

Even if plaintiff had adequately plead a malicious prosecution claim, his *§ 1983* claims against the City would still have to be dismissed. It is well established that a municipality may not be held liable under *§ 1983* for actions of its employees based on a theory of respondeat superior. *Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* **[\*9]** In order to establish municipal liability for unconstitutional acts by municipal employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy, custom or practice. *Id.; Oklahoma City v. Tuttle, 471 U.S. 808, 817, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)*("The city may only be held accountable if the deprivation was the result of municipal 'custom or policy.'")(citing *Monell*).

With regard to pleading claims of municipal liability under *§ 1983*, the Second Circuit has instructed that,

> the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.. . . Similarly, the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury. A single incident alleged in a complaint, especially if it involved actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy.

*Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)* **[\*10]** (internal citations omitted).

Here, plaintiff alleges only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights. *See* Compl. PP 27-29; Pl. Mem. of Law at 7. Plaintiff's complaint, even if read liberally, does not contain a single fact in support of this conclusory allegation. Accordingly, plaintiff has failed to state a claim against the City under *§ 1983*.

### IV. § 1981

Neither party addresses in its memoranda plaintiff's second claim which asserts a violation of *42 U.S.C. § 1981* by the City through its police officers. *Section 1981* bars certain racially motivated and purposefully discriminatory acts. It provides:

> all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every **[\*11]** kind, and to no other.

At least one district court in this Circuit has held that in order to assert a *§ 1981* claim against a municipal entity, a plaintiff must allege a violation of *§ 1983* and meet the requirements of *Monell. See Philippeaux v. North Central Bronx Hospital, 871 F. Supp. 640, 656 (S.D.N.Y. 1994), aff'd. mem. 104 F.3d 353 (2d Cir. 1996), cert. denied, 520 U.S. 1105, 117 S. Ct. 1410, 137 L. Ed. 2d 312, 1997 WL 85499 (1997).* As noted above, plaintiff has failed to do either. However, even if plaintiff had stated a valid *§ 1983* claim against the City under *Monell*, his claim under *§ 1981* would still have to be dismissed.

To state a claim under *§ 1981*, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin, & Jenrette Secs., 7 F.3d 1085, 1087 (2d Cir. 1993).* "Under *§ 1981*, the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating **[\*12]** factor for the defendant's actions must be specifically pleaded in the complaint to withstand dismissal under *Rule 12(b)(6).*" *Yusuf v. Vassar College, 827 F. Supp. 952, 955 (S.D.N.Y. 1993), aff'd in part, rev'd in part, 35 F.3d 709 (2d Cir. 1995).*

The complaint in this case is wholly devoid of any facts from which an intent to discriminate against plaintiff on the basis of race may be inferred. Beyond mentioning that plaintiff was born in Nigeria, there are no allegations that refer to the race of any of the participants in the events described and absolutely nothing which suggests that the police or the City harbored any bias toward plaintiff. Plaintiff's mere conclusory allegations

of racial animus will not suffice. *See Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987)*(complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights "instead of a litany of general conclusions that shock but have no meaning."). Therefore, plaintiff's *§ 1981* claim should be dismissed.

### V. Pendent Jurisdiction

The exercise of pendent jurisdiction is a matter committed to the sound discretion **[*13]** of the trial court. *Perez v. Ortiz, 849 F.2d 793, 798 (2d Cir. 1988)*. It is well-settled that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)*. In addition, federal courts have a duty to confirm that subject matter jurisdiction exists at every stage of a litigation, and must dismiss even *sua sponte* if it appears at any time that subject matter jurisdiction is lacking. *United Food &*

*Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994)*.

Dismissal of plaintiff's claims against the City leaves the court with no independent jurisdictional basis over his state law claims against Weston. Accordingly, they should be dismissed as well.

### CONCLUSION

For the foregoing reasons, the City's motion to dismiss should be granted and the complaint should be dismissed as against both defendants.

SO ORDERED.

Dated: March *21st*, 1997

Brooklyn, New York

I. Leo Glasser, **[*14]** U.S.D.J.

LEXSEE 2007 U.S. DIST. LEXIS 60707

**DELPHINE PIERRE, AS MOTHER AND NATURAL GUARDIAN OF CHRIS-
TOPHER SYLLA, AND COLLEEN GLASGOW, AS MOTHER AND NATURAL
GUARDIAN OF ANDREW GLASGOW, Plaintiffs, VERSUS THE CITY OF NEW
YORK, POLICE OFFICER JOHN HACHADOORIAN, SERGEANT MICHAEL
WHITE, AND POLICE OFFICERS JOHN AND JANE DOES # 1-10, Defendants.**

**No 05-CV-5018 (JFB) (KAM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK**

*2007 U.S. Dist. LEXIS 60707*

**August 17, 2007, Decided
August 17, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, in part,
Costs and fees proceeding at *Pierre v. City of New York,
2008 U.S. Dist. LEXIS 29107 (E.D.N.Y., Apr. 9, 2008)*

**COUNSEL:** [*1] For Delphine Pierre, as Mother and
Natural Guardian of Christopher Sylla, Colleen Glasgow,
as Mother and Natural Guardian of Andrew Glasgow,
Plaintiffs: Rose M. Weber, LEAD ATTORNEY, Law
Offices of Jon L. Norinsberg, New York, NY.

For City of New York, P.O. John Hachadoorian, Tax ID
No. 906398, Sgt. Michael White, Defendants: Michael
A. Cardozo, Corporation Counsel of the City of New
York; David M. Hazan, LEAD ATTORNEY, New York
City Law Department, New York, NY.

**JUDGES:** JOSEPH F. BIANCO, United States District
Judge.

**OPINION BY:** JOSEPH F. BIANCO

**OPINION**

MEMORANDUM AND ORDER

August 17, 2007

JOSEPH F. BIANCO, District Judge:

On October 27, 2005, plaintiffs Delphine Pierre,
mother and natural guardian of Christopher Sylla, and
Colleen Glasgow, mother and natural guardian of An-
drew Glasgow (collectively, "plaintiffs"), commenced
the instant civil rights action against defendants the City
of New York, New York Police Department ("NYPD")
Officer John Hachadoorian ("Officer Hachadoorian"),

NYPD Sergeant Michael White ("Sgt. White"), and
NYPD Officers John and Jane Does # 1-10 [1] (collec-
tively, "defendants"), alleging claims under *42 U.S.C. §
1983* and the *First, Fourth, Fifth, Eighth* and *Fourteenth
Amendments* for false arrest, [*2] malicious prosecution,
and malicious abuse of process, as well as a claim of
municipal liability.

> 1    Although discovery is now complete, plain-
> tiffs have failed to serve or to identify the John
> and Jane Does listed as defendants in the com-
> plaint. The Court concludes that plaintiffs were
> provided with ample time to attempt to identify
> the John Doe defendants, and therefore dismisses
> plaintiffs' claims against John and Jane Does 1-10
> without prejudice. *See Jeanty v. County of Or-
> ange, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y.
> 2005).*

On January 19, 2007, defendants moved for sum-
mary judgment pursuant to *Federal Rule of Civil Proce-
dure 56.* For the reasons that follow, defendants' motion
is granted.

I. BACKGROUND

A. Facts

The following facts are taken from the parties' depo-
sitions, declarations, exhibits and respective Local 56.1
statements of facts. [2] Upon consideration of a motion for
summary judgment, the Court construes the facts in the
light most favorable to the non-moving party. *See Capo-
bianco v. City of New York, 422 F.3d 47, 50 (2d Cir.
2005).* Thus, with regard to defendants' motion for sum-

mary judgment, the Court shall construe the facts in favor of plaintiffs.

2    Where one party's 56.1 statement **[*3]** is cited, the fact is not contested by the other party.

On March 12, 2003, Showkat Hussein ("Hussein") purchased food at a deli in Astoria, Queens. (Defs.' 56.1 PP 10-11.) When Hussein exited the deli, he was carrying the food in a package. (*Id.* P 11.) Immediately after Hussein exited the store, five or six teenagers surrounded him. (*Id.* P 12.) One of the teenagers was carrying a four-foot-long metal stick. (*Id.*) The individual carrying the stick raised it above Hussein's head and tried to hit Hussein. (*Id.*) Another teenager said, "Motherf**** Indian, give me what you have." (*Id.*) Hussein threw his package of food at the teenagers and said "All I have is this." (*Id.* P 15.) Hussein then ran towards his car, which was parked one or two blocks from the deli. (*Id.* PP 15-16.) Hussein got into his car, locked the doors, and called 911. (*Id.* P 17.)

According to defendants, Hussein told the 911 operator that he had been robbed by a group of boys, one of whom tried to hit him with a metal rod. (*Id.* P 18.) Hussein also allegedly told the 911 operator that he had thrown his food at the teenagers after they asked him to give them all he had. (*Id.* P 19.) Defendants further alleged that Hussein told **[*4]** the 911 operator that he needed help and that he was concerned that the teenagers would cause other problems. (*Id.* P 20.) Plaintiffs dispute that Hussein made any of these statements to the 911 operator. (Pl.'s Response to Defs.' 56.1, PP 18-20.)

From his car, Hussein could see the deli and the teenagers who had surrounded and threatened him. (Defs.' 56.1 P 21.) He continued to watch the teenagers walk down the street together. (*Id.* P 22.) While the teenagers were approximately one-and-a-half blocks away from Hussein, and while Hussein was still on the phone with the 911 operator, he decided to exit his car and follow the teenagers on foot. (*Id.* P 23.) According to Hussein, he was trying to follow the teenagers so that he could identify them to the police. (*Id.* P 24.) The 911 operator asked for the location of the teenagers, and Hussein continuously updated her as he followed them. (*Id.* P 25.) Hussein remained on the phone with the 911 operator until a police vehicle arrived. (*Id.* P 26.)

At the same time, Officer Hachadoorian and Sgt. White, plainclothes officers, were driving in an unmarked police vehicle. (*Id.* P 27.) At approximately 4:30 p.m., the officers received radio notification **[*5]** of a robbery in progress at 35th Street and 30th Avenue in Queens, New York. (*Id.* P 28.) The radio notification was the result of Hussein's 911 call. (*Id.* P 29.) When the officers arrived at 35th Street and 30th Avenue, a marked

police car had already arrived, and was being flagged down by Hussein. (*Id.* P 30.) The marked police car turned on its lights and the teenagers began to run. (*Id.* P 31.) Hussein then told the police officers "[t]hose are them, the boys," and he pointed in the direction that the teenagers were running. (*Id.*) Officer Hachadoorian and Sgt. White exited their police vehicle and interviewed Hussein. (*Id.* P 32.)

Hussein told the police officers what had happened, and said that he had seen all of the teenagers who were involved in the incident. (*Id.* PP 33-35.) Hussein also stated that he knew in which direction the teenagers had gone because he had followed them for a distance of three to four blocks. (*Id.* P 36.) According to Hussein, when the teenagers ran, they split into approximately three groups. (*Id.* P 37.) One group ran to the stairs of the 7 subway train, another group ran to a public bus stop, and a third group ran northbound on the street. (*Id.* P 38.) Hussein **[*6]** then led Officer Hachadoorian and Sgt. White to a public bus located about one to two blocks away from where the officers initially spoke to Hussein. (*Id.* P 39.) Hussein saw some of the teenagers who had surrounded him get onto a public bus. (*Id.* P 40.) Hussein told Officer Hachadoorian and Sgt. White that he had seen the teenagers get onto the bus, and ran onto the bus. (*Id.* P 41.) The officers then followed Hussein onto the bus. (*Id.* P 42.)

Hussein initially did not see the teenagers, but as he moved towards the rear of the bus, he saw them trying to hide from him. (*Id.* P 43.) According to Hussein, he was able to recognize the teenagers' faces, the color of their clothing, and their individual shirts, jackets, pants, shoes, hats and hair styles. (*Id.*) On the bus, Hussein pointed out to the officers three of the teenagers who had allegedly threatened and robbed him. (*Id.* P 44.) These three individuals were Peter Yannah ("Yannah"), Andre Riley ("Riley"), and plaintiff Andrew Glasgow ("Glasgow"). [3] (*Id.* P 45.) Hussein told Officer Hachadoorian that he recognized the teenagers from their faces and clothing. (*Id.* P 46.) Hussein also identified Riley as the teenager who had been holding **[*7]** the metal rod. [4] (*Id.* P 47.) The officers asked Yannah, Riley and Glasgow to get off the bus with them. [5] (*Id.* P 48.) Hussein also exited the bus. (*Id.* P 49.) Outside of the bus, Officer Hachadoorian again asked Hussein whether he was sure that the teenagers whom he had identified on the bus were the same ones who had been involved in the earlier incident, and Hussein stated that they were the same individuals. (*Id.* P 50.) Yannah, Riley and Glasgow were then placed under arrest. (*Id.* P 51.) After the three individuals were handcuffed, Officer Hachadoorian again asked Hussein whether he was sure that these were the same teenagers who had threatened him. (*Id.* P 52.) Hussein responded

"[y]es, they were. Yes, they were, but there are still more." (Id.)

> 3   Plaintiffs deny that Glasgow threatened or robbed Hussein. (Pls.' Response to Defs.' 56.1 P 44.)
> 4   Defense counsel stated at oral argument that both Yannah and Riley later pled guilty to the charges levied against them in relation to this incident.
> 5   Plaintiffs contend that the officers ordered the teenagers off the bus. (Pls.' Response to Defs.' 56.1 P 48.)

After Yannah, Riley and Glasgow were handcuffed, Officer Hachadoorian and Sgt. White **[*8]** returned to their unmarked police car and began to canvass the area for other individuals who matched the description of those who had attacked Hussein. (Id. P 54.) The officers drove in the direction in which Hussein had indicated that the individuals fled. (Id. P 55.) According to plaintiffs, while the officers were driving around the area, Christopher Sylla ("Sylla") entered his first-floor apartment, on Newtowne Avenue, with a friend, Shannon McBean ("McBean"), with whom he had left school that afternoon. (Sylla Deposition, at 61.) Sylla and McBean then heard banging on the door. (Id. at 62.) McBean went to investigate, and returned to tell Sylla that police officers had asked him to come outside. (Id. at 63-64.) Sylla walked outside of the building, where he was confronted by Officer Hachadoorian and Sgt. White. [6] (Id. at 64.) A marked police van and a marked police vehicle arrived at Sylla's building, and another officer or officers brought Hussein over to where Sylla, McBean, Officer Hachadoorian and Sgt. White were standing. (Id. PP 57-58.) Officer Hachadoorian asked Hussein to look at Sylla and McBean, and to tell him if either one had been involved in the earlier incident. (Id. P 59.) Hussein identified only one of the teenagers, Sylla, as having been involved in the incident. (Id. P 60.) **[*9]** According to Hussein, he remembered seeing Sylla's face. (Id.) Officer Hachadoorian then asked Hussein to double-check to make sure that they had the right individual, and to make sure that McBean had not been involved. (Id. P 61.) Hussein assured Officer Hachadoorian that McBean had not been involved, and that Sylla had been involved. (Id.) Sylla was placed under arrest and transported to the 114th Precinct. (Id. P 62.)

> 6   According to defendants, the officers stopped plaintiff Sylla as he was walking with another individual towards a building. (Defs.' 56.1 P 56.) Defendants aver that the officers suspected that Sylla was one of the teenagers who had threatened Hussein based upon the general description that Hussein had given them of the age, general

height and weight, and clothing of the perpetrators. (Id.) Defendants also state that there was a clothing description that was provided to the officers over the radio, and that Sylla matched all of the descriptions. (Id.)

Sylla told his mother, Delphine Pierre ("Pierre") that he had been around 30th Avenue and 31st Street, when he saw some teenagers being "loud." (Id. P 66.) Sylla also told Pierre that he saw an individual waving a stick **[*10]** at a man, and that Sylla saw the man open his cell phone, but that he did not know who the man had called. (Id.) Sylla told his mother that he had explained to the police that he had witnessed the incident with Hussein, but was not part of the group of people who threatened him. (Id. P 72.)

Glasgow testified that, on the date of the incident, he had walked to a bus stop from school with Yannah and Riley. (Id. P 67.) Glasgow stated that, after he got onto the bus with Yannah and Riley, police came onto the bus with an Indian man who pointed out Riley and Yannah, who were both standing, and said "[t]hat is them." (Id. P 69.) Glasgow also stated that, after Riley and Yannah got off the bus, the Indian man looked around the bus, pointed at Glasgow, who was seated, and said "[t]hat is him too." (Id. P 70.) Colleen Glasgow, Glasgow's mother, testified that her son told her that he and his friends had been horsing around and running towards the bus when they saw it approaching. (Id. P 73.) Colleen Glasgow had told Officer Hachadoorian that her son was friends with both Sylla and Yannah. (Id. P 74.)

Hussein met with a prosecutor who took a statement from him, which he signed. (Id. P 77.) On March 24, 2003, a Family Court Complaint was signed and sworn by Hussein against Sylla, Glasgow and Yannah. (Id. P 68; Hazan Decl., Ex. 16.) On April 1, 2003, an initial conference was held with regard to Sylla and Glasgow. (Defs.' 56.1 P 79.) **[*11]** Sylla and Glasgow were each charged with "an act that would be Robbery in the Second Degree if either were an adult." (Id.) On May 4, 2005, Judge Fran L. Lubow dismissed both cases. (Id. P 80.)

## B. Procedural History

Plaintiffs filed this action on October 27, 2005, naming the City of New York, Officer Hachadoorian, and Police Officer John and Jane Does # 1-10. On January 28, 2006, plaintiffs filed an amended complaint, adding Sgt. White as a defendant and alleging claims under *42 U.S.C. §§ 1983* and *1988*, and under the *First, Fourth, Fifth, Eighth,* and *Fourteenth Amendments* for false arrest, malicious prosecution, malicious abuse of process and municipal liability. On January 19, 2007, defendants filed a motion for summary judgment under *Federal*

*Rule of Civil Procedure 56*. Oral argument was held on July 9, 2007.

## II. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to *Federal Rule of Civil Procedure 56(c)*, a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving **[*12]** party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006)*. The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005)*. The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*). **[*13]** As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *477 U.S. at 249-50* (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id. at 247-48*. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984)* (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996)* (internal quotations omitted).

## III. DISCUSSION

### A. Plaintiffs' Claims Under *42 U.S.C. § 1983*

To prevail on a claim under *section 1983*, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. *42 U.S.C. § 1983*. "*Section 1983* itself creates **[*14]** no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993)* (citing *City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)*). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the *Fourth* and *Fourteenth Amendment* right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003)* (quoting *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)* (false arrest) and citing *Conway v. Village of Mount Kisco, 750 F.2d 205, 214 (2d Cir. 1984)* (malicious prosecution)).

#### 1. False Arrest

The Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under *Section 1983.*" *Weyant, 101 F.3d at 852* (quoting *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)* and citing *Broughton v. State, 37 N.Y.2d 451, 335 N.E.2d 310, 315, 373 N.Y.S.2d 87 (N.Y. 1975)* (holding that, under New York law, "[j]ustification may be established **[*15]** by showing that the arrest was based on probable cause") and *Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)* ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.")). In general, probable cause is established where "the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Singer, 63 F.3d at 119* (quoting *O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993)* (citation omitted)); *see also Weyant, 101 F.3d at 852* (citing *Dunaway v. New York, 442 U.S. 200, 208 n.9, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)* (additional citations omitted). Furthermore, "the validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. County of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998)* (citing *Pierson v. Ray, 386 U.S. 547, 555, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton,*

*483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).* Moreover, **[*16]** a determination of probable cause is based upon the "totality of the circumstances, [and] 'where law enforcement authorities are cooperating in an investigation . . ., the knowledge of one is presumed shared by all.'" *Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989)* (quoting *Illinois v. Andreas, 463 U.S. 765, 771 n.5, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983))* (additional citations omitted); *see also Bernard, 25 F.3d at 102* (citing *Illinois v. Gates, 462 U.S. 213, 230, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1982)).* "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant, 101 F.3d at 852* (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir. 1994)* (citations omitted). Furthermore, an officer who merely observes or assists in an arrest, even if he is not the "arresting officer" may be liable for failing to intercede to prevent an arrest without probable cause. *See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)* ("A law enforcement officer has an affirmative duty **[*17]** to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.") (citations omitted).

> 7  In New York State, "a police officer may arrest a person for . . . a crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." *N.Y. Crim. Proc. Law § 140.10(1)(b).* "'Reasonable cause to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it." *N.Y. Crim. Proc. Law § 70.10.*

Defendants contend that Officer Hachadoorian and Sgt. White had probable cause to arrest plaintiffs Sylla and Glasgow for (1) menacing in the third degree, *N.Y. Penal Law § 120.15;* (2) robbery in the second and third degrees, *N.Y. Penal Law §§ 160.10, 160.05;* (3) grand larceny in the fourth degree, *N.Y. Penal Law § 155.30;* (4) criminal facilitation in the fourth degree, *N.Y. Penal Law § 115.00;* and **[*18]** (5) attempting to commit a crime, *N.Y. Penal Law § 110.00,* on the basis of Hussein's description of the incident and his identification of Sylla and Glasgow as two of the individuals who participated in the attack. As set forth below, the Court finds that the officers had probable cause to arrest both plain-

tiffs for robbery in the second degree. Moreover, even assuming *arguendo* that a rational jury could conclude that there was no probable cause to arrest Glasgow and Sylla, it is clear that police officers of reasonable competence could disagree as to whether there was probable cause to believe that Glasgow and Sylla had violated the law. Therefore, plaintiffs' claims of false arrest are dismissed, in any event, based upon the defense of qualified immunity.

(a) The Arrests

(i) Andrew Glasgow

After responding to a "radio run" for a robbery in progress, Officer Hachadoorian and Sgt. White located Hussein, who was flagging down the police car. (Hachadoorian Deposition, at 19-28.) Hussein told Hachadoorian that, after coming out of a store from buying food, he was surrounded by a group of teenagers. (*Id.* at 28.) One of the teenagers was armed with a metal rod and told Hussein "give us what **[*19]** you have -- what do you have, give us what you have." (*Id.* at 28.) Hussein also told the officers that one of the teenagers had been carrying a metal rod, and that this teenager swung the rod at him, stopping short of hitting Hussein in the head. (*Id.* at 29.) Hussein said that the teenagers were scaring him and preventing him from leaving, and that, eventually, he handed over his food and ran from the location. (*Id.* at 28-29, 32-33.) According to Hachadoorian, Hussein then directed the officers to a bus. (*Id.* at 38.) Hachadoorian testified at his deposition that Hussein "stated that he saw the children go on the bus, the kids who robbed him go on the bus and he left us and walked -- and proceeded onto the bus." (*Id.* at 43.) Officer Hachadoorian and Sgt. White followed Hussein onto the bus, where Hussein "proceeded to a point on the bus and stopped and pointed out three individuals on the bus." (*Id.* at 49.) Officer Hachadoorian testified that, at that point, "[Hussein] pointed the boys out and stated these are the boys, these are the ones that robbed me." ' (*Id.*) Hussein explained to Officer Hachadoorian that he remembered the faces and clothing of the teenagers from the incident. (*Id.* at 49-50.) **[*20]** According to Officer Hachadoorian, the officers, Hussein, and the three teenagers, one of whom was Glasgow, stepped off of the bus. (*Id.* at 51-52.) Officer Hachadoorian then asked Hussein "if he was sure if these were the three kids that were involved." (*Id.* at 52.) Hussein responded "yes, he was." (*Id.*) Officer Hachadoorian then placed the three individuals under arrest and put handcuffs on them. (*Id.*) After the handcuffs were on, Officer Hachadoorian again asked Hussein "if he was sure if these were the boys." (*Id.* at 56.) Hussein responded that they were. (*Id.*)

> 8  While plaintiffs contend that Glasgow "never heard Mr. Hussein tell a police officer that he had

been robbed," (Pls.' Resp. to Defs.' 56.1 Stmt. P 53 (citing Glasgow Deposition, at 139-40)), it is undisputed that Hussein told the 911 operator that he had been robbed (Hussein Deposition, at 24) and told Officer Hachadoorian and Sgt. White that one of the youths had demanded "give us what you have," and that Hussein had handed over his food to them. (Hachadoorian Deposition, at 28.) Therefore, the Court finds that, although Glasgow did not hear Hussein state, in Glasgow's presence, that he had been robbed, Hussein had stated [*21] as much to the police prior to the apprehension of Glasgow at the bus stop.

(ii) Christopher Sylla

According to Officer Hachadoorian, after Glasgow had been arrested, Hussein stated that there were "more" perpetrators to be found and went running. (Id. at 56-58.) Officer Hachadoorian presumed that Hussein had gone to find the remaining perpetrators. (Id. at 57-58.) Officer Hachadoorian and Sgt. White got into their police car to search the neighborhood for the complainant or any "additional parties involved." (Id. at 58.) Officer Hachadoorian testified that he and Sgt. White came across two young black males crossing a street. (Id. at 61.) He stopped the car, then both of the officers got out of the car, identified themselves and asked the teenagers to talk with them for a moment. " (Id. at 61-62.) At this point, according to Officer Hachadoorian, the two officers and the two teenagers were standing outside of an apartment building. (Id. at 61-62.) Officer Hachadoorian then told the teenagers about the incident involving Hussein, and stated that they matched the general description of the perpetrators. (Id. at 62.) Another officer radioed to Officer Hachadoorian that he had located Hussein [*22] and would be driving to the apartment building so that Hussein could see the two teenagers. (Id. at 63-67.) Officer Hachadoorian then told the teenagers that Hussein would be coming by, and stated "[i]f he doesn't recognize you as being involved, if you weren't involved in the crime, you'll go on your way." (Id. at 68.) When Hussein arrived at the scene in a police van, Officer Hachadoorian asked him to look through the window of the van and determine whether either of the teenagers standing in front of the apartment building had been involved in the incident. (Id. at 68-72.) Hussein looked through the window and told the officer that one of the teenagers was involved, and that he remembered the individual's face. (Id. at 72-73.) Officer Hachadoorian then asked Hussein to "double check" and he "made sure we identified the correct boy." (Id. at 74.) According to Officer Hachadoorian, Hussein "was sure on one and he was sure that the other one was not involved." (Id.) The individual identified as having been involved in the incident was Sylla. (Id. at 83.)

9    According to plaintiffs, Sylla was not walking down the street when he was stopped by the officers. (Sylla Deposition, at 59-63.) [*23] Sylla testified that he was inside of his apartment when he heard banging on the door. (Id. at 63-64.) His friend went to investigate the banging, then returned and told Sylla that police officers wanted to talk with him outside. (Id. at 63-64.) However, the Court finds that this discrepancy in the alleged facts is not material to the probable cause analysis.

(c) Probable Cause to Arrest Glasgow and Sylla

Based upon the undisputed record, as recounted above, the Court concludes that Hussein's description of the incident to the officers, combined with his identification of Glasgow and Sylla as two of the perpetrators, provided probable cause for Officer Hachadoorian and Sgt. White to arrest Glasgow and Sylla for robbery in the second degree. [9]

10    The fact that plaintiffs were actually arrested only for robbery in the second degree, rather than any of the other charges suggested by defendants, does not affect the probable cause inquiry: "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer [*24] at the time of the arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) (citing Devenpeck v. Alford, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) (holding that the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause, and rejecting the view that probable cause must be predicated upon the offense invoked by -- or an offense similar to the offense invoked by -- the arresting officer)).

Under New York Penal Law § 160.10, "[a] person is guilty of robbery in the second degree when he forcibly steals property and when . . . [h]e is aided by another person actually present." See, e.g., In re Louis C., 6 A.D.3d 430, 774 N.Y.S.2d 567 (N.Y. App. Div. 2004) (holding that juvenile had committed acts constituting robbery in the second degree where defendant participated in an incident where a group of three other youths surrounded the victim as he exited a restaurant, demanded money, punched the victim in the jaw and struck him with a skateboard, and where the victim later discovered that he was missing money from his pocket); Matter of Joseph J., 205 A.D.2d 777, 614 N.Y.S.2d 39

*(N.Y. App. Div. 1994)* (finding that juvenile had committed acts constituting [*25] robbery in the second degree where he arrived at the crime scene with seven other youths, one of whom punched the victim and took his property and two of whom punched and kicked the victim while the other youths, including the defendant, surrounded the victim). The acts alleged here -- being present in the group of boys surrounding Hussein, asking Hussein to give up what he had, prompting Hussein to throw his food at the boys, and standing alongside an individual wielding a metal rod over Hussein's head -- clearly constitute robbery in the second degree within the meaning of the statute.

Moreover, with respect to the basis for probable cause, Hussein, the victim, contacted the police regarding the crime against him, followed the attackers, and identified Glasgow and Sylla as two of the teenagers who had participated in the robbery, thereby providing probable cause for the police officers to arrest them. It is well-established that "[w]hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir. 2001) [*26] (citing *Singer,* 63 F.3d at 119); *see also Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000) ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); *McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir. 1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded."). Moreover, "[t]he veracity of citizen complain[an]ts who are the victims of the very crime they report to the police is assumed." *Miloslavsky v. AES Eng'g Soc'y, Inc.,* 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing *Adams v. Williams,* 407 U.S. 143, 148, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)), aff'd, 993 F.2d 1534 (2d Cir. 1993); *accord Lee v. Sandberg,* 136 F.3d 94, 103 n.5 (2d Cir. 1997) (quoting *Miloslavsky* with approval); *see also* 2 Wayne LaFave, *Search and Seizure: A Treatise On The Fourth Amendment* § 3.4(a), at 205 (4th ed. 2007) (noting that the Supreme Court has "proceeded as if veracity may be assumed [*27] when information comes from the victim of . . . criminal activity") (citing *Chambers v. Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970)).

Plaintiffs contend that (1) the circumstances of the incident should have raised questions regarding Hussein's veracity; and (2) that the police officers should have verified Hussein's account with independent corroborating evidence before arresting Glasgow and Sylla. (Pls.' Br., at 5-7.) The Court is not persuaded by either argument.

First, plaintiffs argue that because the incident took place as it was getting dark, lasted for only a few seconds, and involved a threat of imminent violence to the victim, "[a] jury could certainly find that, under those circumstances, it was preposterous for defendants to believe that Mr. Hussein had the time, ability and presence of mind to memorize the faces of the teenagers." (Pls.' Br., at 6.) At oral argument, counsel for plaintiffs emphasized that Hussein was distraught and upset when he reported the events to the police, and therefore was unable to properly identify his attackers. However, these circumstances are not sufficient for the police officers to have doubted or discredited Hussein's account of the crime or his assertions [*28] that Glasgow and Sylla were involved. In fact, courts have been reluctant to doubt the veracity of a complaining victim based upon the short duration of an encounter or a victim's emotional distress as a result of a crime. *See, e.g., Chavis v. Henderson,* 638 F.2d 534, 536 (2d Cir. 1980) (finding forty-five seconds to be sufficient time to support a reliable identification); *Torrez v. Sabourin,* No. 00-CV-3286 (AGS), 2001 U.S. Dist. LEXIS 5265 (S.D.N.Y. Apr. 19, 2001) (finding probable cause to arrest where the incident only lasted "a few seconds," holding that "'the endurance of the . . . encounter . . . does not require a different result") (quoting *Warren v. Miller,* 78 F. Supp. 2d 120, 136 (E.D.N.Y. 2000)); *Grant v. City of New York,* 848 F. Supp. 1131, 1135 (S.D.N.Y. 1994) (declining to find that the officers had cause to doubt victim's claim that the plaintiff had raped her where the plaintiff "was upset, [but] she was not incoherent or drunk"); *Fazzino v. Chiu,* 771 F. Supp. 518 (D. Conn. 1991) (finding probable cause where reporting victim was "crying, shaking, and afraid"). In this case, the victim stated to police that he had observed the teenagers who had surrounded him, followed [*29] the teenagers as they left the scene, and then identified them to the police as his attackers. Under these circumstances, the time of day, length of the attack, and the victim's emotional distress did not provide a basis to raise doubt as to the victim's veracity and, therefore, did not undermine the clear existence of probable cause to arrest Glasgow and Sylla.

Second, the police officers were under no obligation to investigate Hussein's claims or his identifications of his attackers any further at the time of Glasgow and Sylla's arrests. *Ricciuti,* 124 F.3d 123, 128 ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest."); *Curley,* 268 F.3d at 70 ("Although a better procedure may have been for the officers to inves-

tigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him."); *Cornett v. Brown, No. 04-CV-0754 (DGT) (LB), 2006 U.S. Dist. LEXIS 22415, at *23 (E.D.N.Y. Mar. 30, 2006)* ("[W]hile an arresting officer may not disregard information known to him in [*30] making an arrest, he is not required 'to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.") (quoting *Jocks, 316 F.3d at 135-36); Grant, 848 F. Supp. at 1135* (holding that the police had no further obligation at the time of plaintiff's arrest to investigate victim's claim once they had a reasonable belief that probable cause to arrest existed). As one court explained:

> [F]urther investigation might have proven the victim's story to be subject to question or that plaintiff's alibi was reliably corroborated. Probable cause is, however, determined at the time of the arrest. The question is not what might have been developed from further investigation, but whether the facts known when, and on which, defendant acted were sufficient to constitute probable cause. In other words, the relevant inquiry is not whether the statement on which defendant acted was true but whether defendant was truly told information which constituted a lawful basis on which to have found probable cause.

*Fazzino, 771 F. Supp. at 521.* Therefore, the Court rejects plaintiffs' argument that the police officers [*31] needed to conduct further investigation of Hussein's allegations, and concludes, for the reasons set forth *supra*, that the defendants had probable cause to arrest plaintiffs.

#### (d) Qualified Immunity

In any event, even assuming *arguendo* that Officer Hachadoorian and Sgt. White did not have probable cause to arrest Glasgow and Sylla, the Court concludes that the defendants are entitled to qualified immunity as to the plaintiffs' false arrest claims. An arresting officer is entitled to qualified immunity on a claim of false arrest if either: "(a) it was objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *O'Neill, 986 F.2d at 649-50* (quotation marks and citation omitted); *see also Lennon v. Miller, 66 F.3d 416, 424-25 (2d Cir. 1995).* "The right not to be arrested or prosecuted without probable

cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).*

It is well-settled that "the issue of the reasonableness of an arrest or a search for purposes of a *Fourth Amendment* inquiry is distinct [*32] from the issue of objective reasonableness for purposes of a qualified immunity inquiry." *Provost, 262 F.3d 146, 168 n.5* (citing *Anderson, 483 U.S. at 641* ("It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the *Fourth Amendment* that [the] search was objectively legally unreasonable.")) (additional citation omitted). In *Anderson v. Creighton*, the Supreme Court held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable." *483 U.S. at 641.*

This standard, often referred to as "arguable probable cause," has been defined by the Second Circuit as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law.

*Cerrone v. Brown, 246 F.3d 194, 203 (2d Cir. 2001)* [*33] (quotation marks and citations omitted). Furthermore, "an 'arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McClellan v. Smith, 439 F.3d 137, 147-48 (2d Cir. 2006)* (quoting *Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987)).*

For the same reasons that the Court concludes that probable cause existed to arrest plaintiffs, the Court also finds that the police officers, at the very least, had arguable probable cause to arrest plaintiffs. Plaintiffs do not contest that Hussein informed the police that he had been surrounded, threatened and asked to surrender his property, and that Hussein identified Glasgow and Sylla as two of his attackers. Accordingly, in light of "well established law" providing that probable cause to arrest may be based upon information provided by crime victim (absent any objective factors undermining the victim's

veracity), *see supra*, a reasonable officer in the same position as Officer Hachadoorian and Sgt. White "could have reasonably believed that probable **[*34]** cause existed" to arrest Glasgow and Sylla. *Cerrone*, 246 F.3d at 203. Accordingly, at a minimum, defendants are entitled to the defense of qualified immunity as to the false arrest claims, and summary judgment is therefore granted in defendants' favor as to such claims.

### 2. Malicious Prosecution

The Court also finds that plaintiffs' malicious prosecution claims are without merit. "'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules.'" *Alicea v. City of New York, No. 04-CV-1243 (RMB), 2005 U.S. Dist. LEXIS 28129, at *17 (S.D.N.Y. Nov. 15, 2005)* (quoting *Conway v. Mt. Kisco, 750 F.2d 205, 214 (2d Cir. 1984)*). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks, 316 F.3d at 136* (quoting *Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)*) (internal **[*35]** quotation marks omitted)). In addition to the required state law elements, "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the *Fourth Amendment*." *Washington v. County of Rockland, 373 F.3d 310, 316 (2d Cir. 2004)* (quoting *Singer, 63 F.3d at 117*).

As explained *supra*, there was probable cause to arrest Glasgow and Sylla for robbery in the second degree. Because no additional facts were uncovered following Glasgow and Sylla's arrest to vitiate the existing probable cause to arrest, the officers also had probable cause to prosecute the plaintiffs for robbery in the second degree. [11] Moreover, even if a jury could conclude that there was no probable cause to prosecute Glasgow and Sylla, it is clear that police officers of reasonable competence could disagree as to whether Glasgow and Sylla had committed robbery in the first degree against Hussein, thus establishing arguable probable cause to prosecute him under *New York Penal Law § 160.10*, and thereby entitling defendants to qualified immunity.

---

11   It is well-settled that

> If there was probable cause **[*36]** to arrest the plaintiff, . . . then the same probable cause "is a bar to claims of malicious prose-

cution directed at the arresting officer under § 1983 . . . unless that officer, following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause."

*Joyner v. Morales, No. 04-CV-569 (AKH), 2005 U.S. Dist. LEXIS 6540, 2005 WL 883327, at *4 (S.D.N.Y. April 15, 2005)* (quoting *Moscoso v. City of New York, 92 F. Supp. 2d 310, 313 (2000)*).

Moreover, as set forth below, plaintiffs have failed to demonstrate (1) that defendants initiated criminal proceedings against them; or (2) that criminal proceedings against them were terminated in their favor. Accordingly, even if, assuming *arguendo* plaintiffs were able to establish that probable cause did not exist, their malicious prosecution claims would nevertheless fail.

In this case, the defendants merely effectuated the arrests of plaintiffs. "The independent, discretionary actions of the [prosecutor] served to break any causal connection between [defendants] and the prosecution commenced against [p]laintiff[s]." *Stephenson v. Rosa, 03-CV-8503, 2006 U.S. Dist. LEXIS 7390, at *8 (E.D.N.Y. Feb. 24, 2006)*. Plaintiffs **[*37]** have not demonstrated that defendants either deceived or unduly pressured the prosecutor, nor that the police officers were the complaining witnesses. In fact, the attorney assigned to the case by the New York City Law Department, Lori B. Iskowitz, declared that she "made the decision on behalf of [the Law Department] to prosecute Mr. Sylla and Mr. Glasgow with what would be Robbery in the Second Degree had they been adults. . . . The legal charges in the petitions which were filed were determined by the [Law Department] and not by the New York City Police Department or any police officers." (Hazan Decl., Ex. 19.) Therefore, it cannot be said that defendants initiated the action. *See, e.g., Webster v. City of New York, 333 F.Supp. 2d 184, 198 (S.D.N.Y. 2004)* (denying summary judgment where the defendant police officers were complaining witnesses).

In addition, plaintiffs have failed to establish that the criminal proceedings commenced against them were terminated in their favor. *See Murphy, 118 F.3d at 947*. It is well-settled that "[w]here the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, . . . only when its final disposition is such **[*38]** as to indicate the innocence of the accused." *Id. at 948* (citing *MacFawn v. Kresler, 88 N.Y.2d 859, 666 N.E.2d 1359, 644 N.Y.S.2d 486 (N.Y. 1996)*; *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)* ("In the absence of

Case 1:07-cv-10274-JSR    Document 7-3    Filed 05/20/2008    Page 10 of 33

2007 U.S. Dist. LEXIS 60707, *                                    Page 10

a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence.")). In this instance, the cases against plaintiffs were dismissed because Hussein, the complaining witness, failed to appear at Family Court to testify. (Hazan Decl., Ex. 19.) A termination for this reason fails to demonstrate the innocence of plaintiffs, and thus, does not constitute a termination in plaintiffs' favor.

Therefore, plaintiffs' malicious prosecution claims against the defendants must be dismissed.

### 3. Abuse of Process

In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law. *See Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994).* A malicious abuse of process claim may be asserted where a defendant "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside **[*39]** the legitimate ends of the process." *Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (quoting Cook, 41 F.3d at 80).* Plaintiffs' abuse of process claims fail because there is no evidence in the record that defendants aimed to achieve an objective other than Glasgow and Sylla's prosecution and conviction. [12] *Savino, 331 F.3d at 77* ("[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."); *Pierre-Antoine v. City of New York, No. 04-CV-6987 (GEL), 2006 U.S. Dist. LEXIS 28963, 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006)* (dismissing plaintiffs' abuse of process claim based on failure to allege or provide evidence of collateral purpose outside legitimate ends of the process); *see also Brewster v. Nassau County, 349 F.Supp.2d 540, 550 (E.D.N.Y. 2004)* (same); *Curiano v. Suozzi, 63 N.Y.2d 113, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (N.Y. 1984)* ("A malicious motive alone . . . does not give rise to a cause of action for abuse of process."). Moreover, even if plaintiffs were able to demonstrate **[*40]** that material questions of fact exist as to a "collateral objective" on the part of defendants, the Court finds that, because Officer Hachadoorian and Sgt. White had probable cause to prosecute plaintiffs, they cannot demonstrate that defendants intended to do harm "without excuse or justification." *Savino, 331 F.3d at 76.* While probable cause is not an element of an abuse of process claim, under New York law, "a showing of probable cause at the time process issued suffices . . . to establish 'excuse or justification' for the purposes of a defense to abuse of process." *Granato v. City of New York, No. 98-CV-667 (ILG),*

*1999 U.S. Dist. LEXIS 18550, at *28 (E.D.N.Y. Oct. 18, 1999) (citing Berman v. Silver, Forrester & Schisano, 156 A.D.2d 624, 549 N.Y.S.2d 125, 127 (N.Y. App. Div. 1989)* (sustaining entry of summary judgment on a claim for abuse of process where the record demonstrated that the defendants had "probable cause" to commence an action for specific performance)); *accord Pierre-Antoine, 2006 U.S. Dist. LEXIS 28963, 2006 WL 1292076, at *8.* Therefore, because defendants had probable cause -- and thus, "excuse or justification" -- to prosecute plaintiffs, the Court grants defendants' motion for summary judgment as to plaintiffs' **[*41]** abuse of process claims.

> 12   Plaintiffs argue that they would present evidence at trial that the prosecution of Glasgow and Sylla was intended to satisfy police department quotas, and that this intention satisfies the "collateral purpose" requirement of an abuse of process claim. (Pls.' Br., at 12.) According to plaintiffs, they are unable to provide such evidence at the summary judgment stage because discovery in this case was bifurcated. (Pls.' Br., at 12 n.5.) However, even if plaintiffs were able to raise a material question of fact as to the "collateral purpose" element of the abuse of process claims, for the reasons set forth *infra*, the Court finds that plaintiffs cannot establish the second element of their abuse of process claims -- intent to do harm "without excuse or justification." *Savino, 331 F.3d at 76.*

### 4. Due Process

The Court also finds plaintiffs' due process claims under the *Fourteenth Amendment* to be without merit. "Due process requires probable cause for an arrest, and when police officers acting in bad faith make an arrest without probable cause, the person arrested has suffered a deprivation of liberty without due process of law." *United States v. McDermott, 918 F.2d 319, 325 (2d Cir. 1990).* **[*42]** Accordingly, as the Court finds that Officer Hachadoorian and Sgt. White had probable cause to arrest plaintiffs, summary judgment as to plaintiffs' due process claims is granted. *See Clark v. Dowty, No. 05-CV-1345 (WWE), 2007 U.S. Dist. LEXIS 49184, at * 18 (D. Conn. Jul. 9, 2007)* ("Because the Court has already found that probable cause existed for the arrest of plaintiff, there was no violation of his substantive or procedural due process rights regarding this claim.") (citing *Lucky v. City of New York, No. 03-CV-1983 (DLC), 2004 U.S. Dist. LEXIS 18672, at *18 (S.D.N.Y. Sept. 21, 2004)* (where there was probable cause for plaintiff's arrest, there was no violation of substantive due process), *aff'd, 140 Fed. Appx. 301 (2d Cir. 2005); N.Y.S. Nat'l Org. For Women v. Pataki, 261 F.3d 156, 172-73 (2d Cir. 2001)* ("Because no constitutional violation has been shown,

the plaintiffs' procedural due process claims are dismissed with prejudice."); *Little v. City of New York*, 487 F. Supp. 2d 426, 442-43 (S.D.N.Y. 2007) ("[N]o reasonable juror could conclude that [defendant] deprived plaintiff of his liberty without due process because . . . [defendant] had probable cause for the arrest.").

5. **[*43]** Cruel and Unusual Punishment

With respect to plaintiffs' *Eighth Amendment* claims, the Court notes as a threshold matter that, because plaintiffs' opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone. *See Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03-CV-6614 (WHP), 2006 U.S. Dist. LEXIS 7368, 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (finding claim abandoned by virtue of plaintiffs' failure to address it in opposition to defendant's summary judgment motion on the claim); *see also De-Vito v. Barrant*, No. 03-CV-1927 (DLI), 2005 U.S. Dist. LEXIS 22444, 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (same); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *Arias v. NASDAQ/AMEX Mkt. Group*, No. 00-CV-9827 (MBM), 2003 U.S. Dist. LEXIS 166, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment **[*44]** on two of his claims); *see also Local Civ. Rule 7.1* ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default."). In any case, the Court finds this claim to be without merit for the reasons set forth below.

The *Eighth Amendment* prohibits cruel and unusual punishment by those "entrusted with the criminal-law function of government." *Whitley v. Albers*, 475 U.S. 312, 318-19, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). However, this prohibition applies only to individuals who have been *convicted* of crimes, which is not the case here. *Id.* ("The *Cruel and Unusual Punishments Clause* 'was designed to protect those convicted of crimes,' and consequently the Clause applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 664, 671 n.40, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)); *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 n.6, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) ("[T]he State does not

acquire the power to punish with which the *Eighth Amendment* **[*45]** is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (quoting *Ingraham, 430 U.S. at 671-672, n. 40*); *Katzman v. Khan*, 67 F. Sup. 2d 103, 111 (E.D.N.Y. 1999) ("The *Eighth Amendment* . . . applies only after conviction.") (citing *Whitley, 475 U.S. at 318-19*). Therefore, summary judgment is granted as to plaintiffs' *Eighth Amendment* claims.

6. Equal Protection

The Court finds that plaintiffs have failed to establish their claim that defendants violated the *Equal Protection Clause of the Fourteenth Amendment*. The *Equal Protection Clause* provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Constit. amend. XIV, § 1. To prevail on a claim of racial discrimination under the *Equal Protection Clause*, a plaintiff must prove that a government actor intentionally discriminated against him on the basis of race. *Brown v. City of Oneota, 221 F.3d 329, 337 (2d Cir. 1999)* (citing *Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)*). Intentional discrimination may be shown by evidence of defendants' use of an express racial classification, defendants' intentional application **[*46]** of a facially neutral law in a discriminatory manner, or a facially neutral statute or policy that has an adverse effect and was motivated by discriminatory animus. *Brown, 221 F.3d at 337* (citing *Adarand Contructors, Inc. v. Pena, 515 U.S. 200, 213, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995), Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S. Ct. 1064, 30 L. Ed. 220 (1886), Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)*, and *Johnson v. Wing, 178 F.3d 611, 615 (2d Cir. 1999)*). The substance of plaintiffs' Equal Protection claim is that plaintiffs were "arrested without probable cause because they are 'minority male teenagers.'" (Pls.' Br., at 13.) As explained *supra*, the Court finds that defendants had probable cause to arrest plaintiffs, and therefore, this assertion is without merit. Moreover, while plaintiffs assert that full discovery has not been completed with regard to these assertions, the existing record, which includes the deposition testimony of Glasgow, Sylla, Hussein, Officer Hachadoorian, and Sgt. White -- all of which corroborate defendants' assertion that Hussein specifically identified plaintiffs as two of his attackers -- provides no evidence to support plaintiffs' claims of racial discrimination. **[*47]** Therefore, plaintiffs' conclusory and speculative claims of intentional discrimination on the basis of race cannot withstand summary judgment, and defendants' motion as to these claims is granted.

7. *Monell* Liability

Plaintiffs also assert a *§ 1983* claim pursuant to *Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*, against the City of New York. Under *Monell,* a municipal entity may be held liable under *§ 1983* where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell, 436 U.S. at 694-95; Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004)* (citing *Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733-36, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)*, and *Monell, 436 U.S. at 692-94).* "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996)* (citing *Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)).* A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson, 375 F.3d at 226* **[*48]** (quoting *Kern, 93 F.3d at 44).* However, a municipal entity may only be held liable where the entity *itself* commits a wrong: "a municipality cannot be held liable under *§ 1983* on a *respondeat superior* theory." *Monell, 436 U.S. at 691.* Specifically, plaintiffs allege that the New York Police Department engages in the following unconstitutional practices: (1) disproportionately arresting minority males; (2) making baseless arrests in order to satisfy productivity goals, such as arrest quotas; (3) failing to train officers regarding unreliable witness identification and cross-racial identification. (Pls.' Br., at 15.) However, as the Court finds that no constitutional violation was committed against plaintiffs, *see supra,* no *Monell* claim can lie against the City of New York pursuant to *§ 1983. See, e.g., Vippolis v. Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)* ("A plaintiff who seeks to hold a municipality liable in damages under *section 1983* must prove that the municipality was, in the language of the statute, the 'person who . . . subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights.") (citing *42 U.S.C. § 1983).* Therefore, the Court grants defendants' **[*49]** motion for summary judgment as to plaintiffs' *Monell* claims. [13]

> 13    Likewise, with regard to the individual defendants, to the extent that they are being sued in their official capacities, the claims against them are duplicative of the *Monell* claim against the City of New York. *Tsotesi v. Bd. of Educ., 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003)* (citing *Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)); see also Monell, 436 U.S. at 691* (holding that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Therefore, the *Monell* claims against Officer Hachadoorian and Sgt White in their official capacities are dismissed.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED, in its entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: August 17, 2007

Central Islip, New York

1 of 1 DOCUMENT

**WAHEED SALEH, Plaintiff, -against- THE CITY OF NEW YORK, KEVIN NICHOLSON, KISHON HICKMAN, and JOHN DOES I-II, Defendants.**

**06 Civ. 1007 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 92193*

**December 17, 2007, Decided**
**December 17, 2007, Filed**

**COUNSEL:** [*1] For Waheed Saleh, Plaintiff: Barry Howard Goldstein, Joseph Daniel Keller, Mark Scott Germann, LEAD ATTORNEYS, O'Melveny & Myers LLP, New York, NY; Kenneth Kimerling, Tushar Jasvant Sheth, LEAD ATTORNEYS, Asian American Legal Defense, Flushing, NY.

For The City of New York, Kevin Nicholson, Kishon Hickman, Defendants: Jennifer Amy Rossan, NYC Law Dept. Off. of the Corporation Counsel (Bklyn), Brooklyn, NY.

**JUDGES:** Sidney H. Stein, U.S.D.J.

**OPINION BY:** Sidney H. Stein

**OPINION**

SIDNEY H. STEIN, U.S. District Judge.

Plaintiff Waheed Saleh brings this action pursuant to *42 U.S.C. § 1983*, alleging that defendants -- the City of New York and four law enforcement officers -- deprived him of his right to petition the government for a redress of grievances in violation of the *First Amendment to the U.S. Constitution*. Defendants now move pursuant to *Rule 56 of the Federal Rules of Civil Procedure* for summary judgment in their favor. Because Saleh's retaliation claim against the individual officers cannot be resolved as a matter of law based on the evidentiary record before this Court, defendants' motion is denied with respect to the individual defendants. Saleh has failed, however, to produce sufficient evidence for a jury to [*2] find the City of New York liable for the alleged acts of retaliation; therefore, defendants' motion for summary judgment is granted with respect to the City of New York.

**I. BACKGROUND**

The following facts are undisputed. Waheed Saleh entered the United States on November 24, 2000 and, as a visitor, was authorized to stay in this country for six months. (Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") P 5; Pl.'s Response to Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") P 5.) At the conclusion of that six-month period, however, Saleh did not return to his home country; nor had he obtained permission to remain in the United States. (Defs.' 56.1 P 6; Pl.'s 56.1 P 6.)

Two and one half years later -- on November 25, 2003 -- Police Officer Kishon Hickman of the New York City Police Department ("NYPD") issued Saleh a summons for disorderly conduct. (Defs.' 56.1 P 12; Pl.'s 56.1 P 12.) A subsequent record check indicated that Saleh was the subject of several open warrants, and acting on that information, Hickman arrested him. (Defs.' 56.1 P 13; Pl.'s 56.1 P 13.) Within two weeks, Hickman issued Saleh another summons, this time for double parking. [*3] (Defs.' 56.1 P 14; Pl.'s 56.1 P 14.) [1] Saleh, in turn, lodged a complaint against Hickman with the Civilian Complaint Review Board ("CCRB") on December 19, 2003, alleging essentially that Hickman was harassing him. (Defs.' 56.1 P 15; Pl.'s 56.1 P 15.) Over the course of the next year, Saleh received at least one more summons, for disorderly conduct, from the NYPD. (Defs.' 56.1 PP 17, 19; Pl.'s 56.1 PP 17, 19.)

> 1  Hickman may have issued Saleh a third summons, but the record is unclear on that issue. (See Ex. 1 to Decl. of Joseph D. Keller dated Aug. 10, 2007 at 148-51.)

On December 20, 2004 -- one year after filing the CCRB compliant -- Saleh was arrested for overstaying his visa, and the Bureau of Immigration and Customs

Enforcement ("ICE") placed him in removal proceedings. [2] (Defs.' 56.1 PP 8, 11; Pl.'s 56.1 PP 8, 11.) Thereafter, Saleh continued to file complaints against Hickman, including two with the NYPD Internal Affairs Bureau in June 2005, again alleging harassment by Hickman. (Defs.' 56.1 PP 25-26; Pl.'s 56.1 PP 25-26.)

> 2 The parties dispute whether Saleh was arrested by ICE alone (Defs.' 56.1 P 10) or by ICE in conjunction with the NYPD (Pl.'s 56.1 P 10).

Saleh then commenced [*4] this *section 1983* action in early 2007, alleging that Hickman and three other NYPD officers -- defendants Kevin Nicholson and two officers whose names he does not know -- contacted federal immigration authorities in retaliation for Saleh's filing of the December 19, 2003 CCRB complaint. (Compl. P 26.) Saleh contends that the officers' report of his immigration status violated his rights to freedom of speech and to petition the government secured by the *First Amendment to the U.S. Constitution*. [3] The City of New York is named as a defendant in this action pursuant to the doctrine of municipal liability.

> 3 Saleh also asserted a claim pursuant to the New York State Constitution, but that claim has been withdrawn. (Pl.'s Mem. in Opposition to Summary Judgment at 25.)

After full discovery in this action, defendants now move for summary judgment pursuant to *Fed. R. Civ. P. 56.* They contend that, as a matter of law, (1) Saleh cannot prove the necessary elements of his retaliation claim, (2) the individual defendants are entitled to qualified immunity, and (3) no evidence supports municipal liability.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if the evidence [*5] shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56;* see *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); LaFond v. Gen. Physics Serv. Corp., 50 F.3d 165, 171 (2d Cir. 1995).* An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* When determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004);* see also *LaFond, 50 F.3d at 171.*

Nevertheless, the party opposing summary judgment "must offer some hard evidence" in support of its factual assertions, *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998),* such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party,'" *Golden Pac. Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004)* (quoting [*6] *Anderson, 477 U.S. at 249).* Evidence that is "merely colorable" or "not significantly probative" is insufficient to prevent a court from granting summary judgment. *Anderson, 477 U.S. at 249-50.* Thus, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).*

### B. Saleh's Retaliation Claim Does Not Fail as a Matter of Law.

Defendants contend that Saleh cannot prove all the elements of his retaliation claim based on the record in this action. To prevail on a retaliation claim, a plaintiff must show: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004)* (quoting *Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001)).* The parties do not contest the existence of the first element, but the second and third elements are very much in dispute.

Defendants maintain that the second element -- that defendants took adverse action against Saleh -- cannot be established [*7] unless Saleh shows that his speech was actually chilled by the alleged retaliatory act, but Saleh cannot do so, according to defendants, because the factual record unequivocally contradicts such a showing. With respect to the third element, defendants urge two reasons for the Court to find insufficient causation: First, they contend that because probable cause supported reporting Saleh to ICE -- i.e., defendants' reasonable belief that Saleh had overstayed his visa -- a fact-finder is barred from concluding that it was Saleh's filing of the CCRB complaint that caused defendants to report him to ICE. Second, defendants assert that ICE's investigation of Saleh was sufficiently independent of defendants' alleged retaliatory act to break the causal chain.

For the reasons described below, however, this Court does not find that Saleh is barred as a matter of law from proving his retaliation claim at trial, and therefore defendants are not entitled to summary judgment on that basis.

*1. Saleh Need Not Prove That His Speech Was Actually Chilled to Prevail on His Retaliation Claim.*

As set forth above, the second element of Saleh's re-taliation claim is that defendants took adverse action against [*8] him. See *Gill, 389 F.3d at 380.* Defendants contend that an act cannot constitute adverse action unless it actually chills plaintiff's speech. Saleh is unable to show that his speech was actually chilled, according to defendants, because, far from being chilled, he in fact continued filing complaints against NYPD officers -- including defendant Hickman -- even after his immigra-tion status was allegedly reported to ICE. Defendants conclude, therefore, that Saleh's retaliation claim must fail as a matter of law.

Saleh disputes defendants' interpretation of the re-cord. Pointing to evidence -- including his own deposi-tion testimony -- that he contends would permit a jury to find that his speech was chilled notwithstanding his post-retaliatory complaints against the NYPD, Saleh frames the issue as a disputed question of fact to be resolved at trial.

This Court, however, need not determine whether Saleh is able to put forth sufficient evidence to show that his speech was actually chilled by defendants' conduct because no such requirement governs his retaliation claim.

In *Gill,* the U.S. Court of Appeals for the Second Circuit explained that certain retaliation claims -- spe-cifically, claims against [*9] public officials -- call for a "subjective test to gauge both the nature and the extent of the alleged injury," while others -- claims by prisoners -- call for an "objective test without regard for whether the plaintiff himself was actually chilled." *389 F.3d at 381.* When a subjective test provides the appropriate standard, a court must conduct an inquiry into whether plaintiff's speech was actually chilled by the retaliatory conduct. *Id.* Under the objective test, however, the relevant inquiry is whether the alleged retaliatory conduct "would deter a [person] of ordinary firmness from vindicating his or her constitutional rights," *id. at 384,* and not whether that particular plaintiff's speech was actually chilled.

The specific question facing the Second Circuit in *Gill* was whether a prisoner must satisfy a subjective or objective test to prevail on a claim of retaliation for filing an administrative grievance. The court offered three pos-sible rationales in support of its decision to apply an ob-jective standard: First, the court distinguished between retaliation claims alleging punishment for past speech and those complaining of suppression of future speech. The court explained that when [*10] the gravamen of a retaliation action is that the defendant tangibly punished the plaintiff for his speech, an objective standard is war-ranted. *Id. at 382.* When the case focuses instead on whether the defendant's actions quelled the plaintiff's inclination to speak again in the future, a subjective stan-dard provides the proper test. *Id.* Second, the court fo-cused on injury: when the only injury alleged is the chill-ing of speech itself, a subjective test should govern the claim. An objective test is more appropriate, however, when other, more tangible injuries are also claimed. *Id.* Third -- and most directly relevant to Saleh's action -- the court observed:

> [W]here a plaintiff alleges that the pro-tected conduct at issue is the prior filing of a grievance or lawsuit against the de-fendant, it would be unfair in the extreme to rule that plaintiff's bringing of the sub-sequent claim in itself defeated his claim of retaliation. If bringing the action dem-onstrates that the plaintiff has not been chilled -- and has failed to meet the sub-jective test -- then such a plaintiff could never seek redress for retaliation.

*Id. at 383.* On this basis -- which the court considered its "most narrow approach," [*11] *id. at 384* -- an objective standard governs cases where "the plaintiff brings suit based on an allegation that the defendant retaliated for the plaintiff's prior suit or grievance," *id. at 383.*

All three rationales set forth by Judge Calabresi in *Gill* support the application of an objective standard here. First, this case is about punishment for past speech, not the inhibition of future speech. The premise of Saleh's retaliation claim is that defendants alerted federal offi-cials to Saleh's problematic immigration status in an at-tempt to strike back at him for his having complained about police misconduct. This action centers, therefore, on defendants' alleged retaliatory attempts to punish Saleh for his complaint and not on their attempts to limit Saleh's prospective speech. Accordingly, this considera-tion points to the application of an objective standard to the claim.

Second, Saleh complains of a tangible injury: ICE commenced removal proceedings against him allegedly as a result of defendants' report to ICE. Because Saleh's claim entails an injury that is not only "the putative chill-ing itself," *id. at 382,* the second *Gill* consideration also supports the application of an objective [*12] test.

The third consideration provides additional -- per-haps the strongest -- ground for adopting an objective standard in this case. If a subjective test governed retalia-tion claims involving the right to petition the government for a redress of grievances, it would have the perverse effect of barring all such claims. This is so because an individual retaliated against for filing a prior grievance would face a catch-22: he can file a retaliation lawsuit, demonstrating that his right to petition the government

has not, in fact, been chilled, and thereby defeat his claim; or he can prove actual chilling -- and thereby preserve his right to sue -- only so long as he does not file suit. See *id.* at 383; *Lashley v. Wakefield, 367 F. Supp. 2d 461, 467 (W.D.N.Y. 2005); Walker v. Pataro, No. 99 Civ. 4607, 2002 U.S. Dist. LEXIS 7067, at \*30 (S.D.N.Y. Apr. 23, 2002).* Under this regime, a retaliation lawsuit such as Saleh's is self-defeating because its very existence runs athwart of the subjective test for adverse action. An objective standard, then, provides the only workable means of determining whether a defendant's conduct constitutes adverse action in retaliation suits premised on a violation [\*13] of the right to petition the government.

Having examined Saleh's retaliation claim pursuant to the three rationales presented by the Second Circuit in Gill, this Court concludes that an objective standard governs the question of whether defendants' alleged conduct constitutes adverse action. Under this standard, Saleh must show that the alleged retaliatory conduct "would deter a [person] of ordinary firmness from vindicating his or her constitutional rights," *Gill, 389 F.3d at 384*, and need not prove that his exercise of his *First Amendment* right to petition the government was actually chilled by defendants' conduct. Therefore, defendants are not entitled to summary judgment on the basis of Saleh's purported inability to show actual chilling.

*2. The Existence of Probable Cause Has No Bearing on Saleh's Retaliation Claim.*

Defendants also contend that the rule announced by the U.S. Supreme Court in *Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006),* bars Saleh's claim. In Hartman, the Supreme Court held that plaintiffs cannot establish causation in retaliatory prosecution actions unless they can allege and prove the absence of probable cause. *Id. at 265-66.* Defendants [\*14] contend that Saleh cannot prove the absence of probable cause for the removal proceedings initiated against him, and therefore, his retaliation claim fails to satisfy the requirement set forth by the Hartman Court.

Defendants misread *Hartman* -- or Saleh's complaint -- as neither the holding nor the reasoning of that decision governs Saleh's claim. By its terms, the holding in *Hartman* applies only to retaliatory prosecution claims. *Id. at 265.* Saleh, however, has not filed a claim for retaliatory prosecution; indeed, he has not even filed a claim for "retaliatory removal," which would perhaps present a closer question of whether Hartman governed this case. Saleh contends instead that the defendants reported his immigration status to ICE to punish him for filing a grievance against Officer Hickman. Thus, Saleh does not allege that he has been prosecuted in retaliation for his CCRB report; he alleges only that defendants

lodged a retaliatory report against him with ICE. His claim, therefore, does not entail a retaliatory prosecution or any similar proceeding and for that reason, does not fall squarely within the scope of *Hartman.*

Nor does the Supreme Court's rationale in *Hartman* suggest [\*15] that this Court impose here the requirement that the absence of probable cause be alleged and proven. Recognizing the "complexity of causation" presented by retaliatory prosecution claims, *id. at 265,* the Supreme Court observed, "[s]ome sort of allegation, then, is needed both to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action, and to address the presumption of prosecutorial regularity," *id. at 263.* The problems posed by retaliatory prosecution claims, according to the Supreme Court, are two-fold: first, the retaliatory animus of the non-prosecuting defendant must be linked to the presumably independent acts of the prosecutor, who is immune from liability for the decision to prosecute; and second, plaintiffs must overcome the "longstanding presumption of regularity accorded to prosecutorial decisionmaking." *Id. at 262-63.*

Neither of these concerns is implicated by Saleh's claim. First, the retaliatory animus and retaliatory act at issue here are both attributable to the same defendants -- the policemen -- and therefore this case does not raise the difficulty of connecting "the retaliatory animus of one person and the action of another." [\*16] *Id. at 262.* Second, Saleh's claim does not challenge the presumption of prosecutorial regularity because the claim turns on the motive animating defendants' alleged report of Saleh's immigration status to ICE, and not the legitimacy of any prosecutorial decision-making. Accordingly, the rationale supporting the *Hartman* decision does not encompass Saleh's retaliation claim.

Because retaliatory prosecution claims pose unique difficulties that are absent from this case, *Hartman's* requirement that a lack of probable cause be shown does not apply to Saleh's claim and therefore provides no basis to grant summary judgment in defendants' favor. [4]

4    Even if the existence of probable cause could defeat Saleh's claim, defendants have not shown that probable cause supported their report to ICE. See *infra* Part II.C.

*3. The Actions of ICE Do Not Break the Chain of Causation.*

For similar reasons, the Court finds that the independent acts of ICE do not disrupt the chain of causation that Saleh must establish to prove retaliation. Defendants contend that the decision to initiate removal proceedings was made independently by ICE and therefore cannot be attributed to defendants' conduct. In support of their

[*17] position, defendants rely on *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999), in which the Second Circuit observed, "It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment."

As discussed above, however, Saleh does not contend that the commencement of removal proceedings against him constitutes the adverse action at issue in this case. Instead, Saleh bases his retaliation claim on defendants' alleged report to ICE, and therefore must establish a causal connection between his protected speech -- filing the CCRB complaint against Hickman -- and the alleged adverse action -- defendants' report of his immigration status to ICE. See *Gill*, 389 F.3d at 380; cf. *Contreras v. Corinthian Vigor Ins. Brokerage*, 103 F. Supp. 2d 1180, 1186 (N.D. Cal. 2000) ("[R]eport[s] to the INS or the SSA of a former employee's undocumented status . . . constitute adverse actions under the [Fair Labor Standards Act]."). With respect to this causal connection, ICE's decision to commence removal proceedings against Saleh is irrelevant. Because it has no bearing [*18] on Saleh's ability to prove proximate cause in this action, ICE's independent decision to commence removal proceedings does not entitle defendants to summary judgment.

C. Defendants Are Not Entitled to Qualified Immunity.

The individual defendants also invoke qualified immunity in an attempt to defeat Saleh's retaliation claim. They contend that no reasonable NYPD officer could have known, based on contemporaneous caselaw, that the U.S. Constitution barred reporting an alien to ICE in retaliation for filing a police misconduct complaint. That contention is unpersuasive.

Qualified immunity shields governmental actors "'from suits for damages . . . unless their actions violate clearly-established rights of which an objectively reasonable official would have known.'" *Zieper v. Metzinger*, 474 F.3d 60, 67 (2d Cir. 2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)) (alteration in original). To determine whether a defendant can avail himself of qualified immunity, a court must engage in a two-step inquiry. First, it must "determine whether the facts alleged, taken most favorably to plaintiffs, demonstrate a violation of a constitutional right." *Id. at 67*. Second, the court examines [*19] "whether the defendants' actions violated clearly established constitutional rights of which a reasonable person would have known." *Id.*

Having conceded the first inquiry for the purpose of their qualified immunity analysis, defendants urge that (1) Saleh's right to be free of retaliation under the circumstances of this case was not clearly established and,

in the alternative, (2) no reasonable police officer would have known of such a right.

*1. The Existence of Probable Cause Is Relevant Only to the Right to Be Free of Retaliatory Arrests and Prosecutions.*

Defendants contend that Saleh had no clearly established constitutional right to be free of the type of retaliation at issue in this case because Second Circuit law permits police officers to retaliate so long as they have probable cause for their retaliatory acts. In support of this position, defendants rely on *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001), in which the Second Circuit held that the existence of probable cause eviscerates a retaliatory arrest claim. Defendants maintain that because they had probable cause to suspect that Saleh had violated federal immigration laws, they could report him to ICE in retaliation [*20] for filing a CCRB complaint without violating the Constitution. Their position here is similar to their argument based on the Supreme Court's *Hartman* decision, which addressed retaliatory prosecution rather than retaliatory arrest; and it fails for the same reasons.

The absence of probable cause is required in retaliatory prosecution and retaliatory arrest claims because of the causal difficulties inherent in proving such claims. See *Hartman*, 547 U.S. at 265. As noted above, the presumption of prosecutorial regularity militates strongly against an inquiry into subjective motive when probable cause justifies an arrest or a prosecution, and as a result, "[a]n individual does not have a right under the *First Amendment* to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government." *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992). This rule applies, however, only to claims of retaliatory arrest and prosecution. It does not afford police officers license to retaliate against the public in any manner they choose so long as probable cause supports their retaliatory acts.

The reason that the [*21] absence of probable cause is required for claims of retaliatory arrest and prosecution, but not for other retaliation claims, is that the presumption of prosecutorial regularity attaches to arrests and prosecutions, but not necessarily to other police conduct. Making arrests and conducting prosecutions are core duties of law enforcement, and both functions entail the exercise of considerable discretion. In light of the discretion entrusted to law enforcement officers, "courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996). Activity beyond these "official duties," however, entails no such presumption. In *Kerman v. City of New York*, 261 F.3d

*229, 242 (2d Cir. 2001)*, for example, the Second Circuit did not require a plaintiff complaining of police retaliation in the form of an "involuntary overnight trip to Bellevue [Hospital]" to prove the absence of probable cause for that hospitalization. Instead, the case called for a "subjective motivation analysis" into the officer's "state of mind" to determine whether the plaintiff was hospitalized in retaliation for his criticism of the [*22] police. *Id.*

Similarly, no presumption of regularity applies here because, unlike making arrests and facilitating prosecutions, NYPD officers do not report the immigration status of individuals they encounter to ICE as part of their regular duties. First, NYPD officers are not charged with enforcing the nation's immigration laws. *Section 3-02(b)of Title 43 of the Rules of the City of New York* ("RCNY") states:

> Each agency shall designate one or more officers or employees who shall be responsible for receiving reports from such agency's line workers on aliens suspected of criminal activity and for determining, on a case by case basis, what action, if any, to take on such reports. No such determination shall be made by any line worker, nor shall any line worker transmit information respecting any alien directly to federal immigration authorities.

A "line worker," defined as "a person employed by any City agency whose duties involve contact with the public," *43 RCNY § 3-01*, encompasses each defendant NYPD officer in this case.

Second, Saleh offers strong evidence that Hickman and Nicholson had never before contacted ICE under circumstances similar to those at issue in this case. (See Decl. [*23] of Joseph D. Keller ("Keller Decl.") dated Aug. 10, 2007, Ex. 2 (Hickman Tr.) at 123, 144-45; Ex. 3 (Nicholson Tr.) at 74; Ex. 4 (Doepfner Tr.) at 72.) Unlike arrests and prosecutions, contacting ICE is not among the regular, routine functions of the NYPD or even of the defendant officers themselves. Accordingly, there is no reason to impose an absence of probable cause element here, and defendants cannot rely on the existence of probable cause to excuse a retaliatory report to ICE.

Even if the existence of probable cause blocked Saleh's claim, defendants have not shown that probable cause to support a report to ICE existed here, based on the undisputed facts of this case. Defendants contend that because Saleh was, in fact, unauthorized to remain in the United States, they had probable cause to report him to

ICE. (Defs.' Mem. at 8-9, Defs.' Reply at 19-20.) Probable cause, however, does not depend on whether defendants were ultimately right about Saleh's immigration status; rather it requires a showing that defendants had "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that" Saleh [*24] was in the United States unlawfully. *Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003)* (internal quotation marks omitted). Defendants advance, however, only conclusory and post-hoc representations that probable cause existed. They do not even attempt to set forth what "trustworthy information" gave rise to their belief that Saleh was in the United States illegally. Accordingly, defendants have not shown, based on the undisputed facts of this case, that probable cause supported a report of Saleh's immigration status to ICE. [5]

> 5   To the extent that defendants base probable cause on a voluntary admission by Saleh of his immigration status (see Keller Decl., Ex. 3 (Nicholson Tr.) at 10), Saleh denies that the admission occurred (see Keller Decl., Ex. 1 (Saleh Tr.) at 256), raising a factual issue for trial.

*2. A Reasonable Officer Would Have Known that Reporting Saleh to ICE in Retaliation for Filing a Police-Misconduct Complaint Violated the Constitution.*

Turning to defendants' second proposition -- that no reasonable person would have known that reporting Saleh to ICE violated the Constitution -- the Court rejects that contention as well. The Second Circuit has explained that "defendants [*25] are entitled to qualified immunity if it would not have been clear to a reasonable officer in their position that their conduct was unlawful." *Zieper, 474 12.3d at 68.* Defendants urge that a reasonable NYPD officer would have no reason to believe that alerting ICE to the presence of illegal aliens constitutes a constitutional violation. By so framing the issue, however, defendants miss the point. This case is not about whether NYPD officers can alert ICE when they encounter illegal aliens, but whether they can retaliate against individuals who file police-misconduct grievances by making referrals to ICE.

With respect to such retaliation, the law is clear: "[t]he rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).* When officials take adverse action against those who exercise this right, they can be held liable for a constitutional violation. *Id. at 194-95.* A defendant's ability to justify the purported adverse action on non-retaliatory grounds is irrelevant because "'[a]n act in retaliation for the exercise of a constitutional right is actionable [*26] under *section 1983*

even if the act, when taken for different reasons, would have been proper.'" *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (quoting *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987)); see also *Kerman*, 261 F.3d at 242 (*section 1983* claim against police officers can be based on "involuntary overnight trip to Bellevue" Hospital in retaliation for exercising *First Amendment* rights).

Accordingly, it may be sound practice for NYPD officers to alert ICE when they encounter unlawful aliens under normal circumstances, but when they do so for retaliatory purposes, they run afoul of the Constitution. [6] In light of this firmly established law, it would have been clear to a reasonable officer that reporting Saleh to ICE in retaliation for filing a CCRB complaint violated the *First Amendment to the Constitution*. Accordingly, the individual defendants are not entitled to qualified immunity. [7]

    6 In an analogous scenario involving retaliation for union activity, the Supreme Court explained, "It is only when the evidence establishes that the reporting of the presence of an illegal alien employee is in retaliation for the employee's protected union activity that the [National [*27] Labor Relations] Board finds a violation of § 8(a)(3) [of the National Labor Relations Act]. Absent this specific finding of antiunion animus, it would not be an unfair labor practice to report or discharge an undocumented alien employee." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 895-96, 104 S. Ct. 2803, 81 L. Ed. 2d 732 (1984).
    7 Whether defendants actually reported Saleh to ICE and whether retaliatory animus motivated defendants' alleged report remain contested factual questions to be resolved at trial. The Court takes no position on such disputed issues of fact. Indeed, those facts will constitute the core of any trial.

**D. Saleh Has Not Identified Sufficient Evidence to Support a Finding of Municipal Liability.**

Saleh seeks to impose liability on the City of New York for failing to train NYPD officers -- including defendants Hickman and Nicholson -- to respect the rights of immigrants. Inadequate police training "'may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). [*28] In order to prove that New York City's failure to train constitutes deliberate indifference, Saleh must satisfy three requirements:

First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id. at 94* (internal citations and quotation marks omitted).

To defeat summary judgment, "plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Id.* (quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)). Saleh, however, has failed to identify any deficiency in training that is "closely related" to his constitutional injury. He has brought forth no evidence whatsoever showing [*29] that the City of New York provides inadequate, flawed or otherwise deficient training on the impermissibility of retaliating against individuals who complain of police misconduct.

Instead, Saleh accuses the city of failing to train NYPD officers regarding proper procedures for interacting with immigrants. As discussed above, however, this is not a case about immigrant relations or NYPD-ICE protocols. This is a retaliation case rooted in Saleh's *First Amendment* right to petition the government for a redress of grievances, and it is of no moment that the retaliatory act in this case came in the form of a report to ICE rather than in some other manner. Were it otherwise, all retaliation training would be deficient unless every conceivable manifestation of adverse action were enumerated and specifically prohibited. The strictures of municipal liability are not so exacting. See *Green, 465 F.3d at 82* (rejecting failure-to-train theory because defendant's guidelines "specifically and clearly informed" personnel of general principle at issue such that defendant did not have "a further training obligation").

Because Saleh has failed to set forth any facts establishing that the retaliation he [*30] suffered was a consequence of the city's failure to adequately train its police officers, the City of New York is entitled to summary judgment dismissing Saleh's retaliation claim.

**III. CONCLUSION**

2007 U.S. Dist. LEXIS 92193, *

For the reasons stated above, (1) Saleh's retaliation claim cannot be resolved as a matter of law based on the undisputed facts of this case, (2) the individual defendants are not entitled to qualified immunity, and (3) Saleh has failed to identify sufficient evidence to impose liability on the City of New York. Accordingly, defendants' motion for summary judgment of dismissal should be granted as to the City of New York and denied as to the individual defendants.

Dated: New York, New York

December 17, 2007

/s/ Sidney H. Stein

Sidney H. Stein, U.S.D.J.

LEXSEE 1996 U.S. DIST. LEXIS 11689

**JAMES WOO, Plaintiff, -against- CITY OF NEW YORK, JOHN DISKIN, ROBERT HARROP, STEPHEN DALY and WILLIAM McGUINNESS, Defendants.**

**93 Civ. 7007 (AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 11689*

**August 12, 1996, Decided**
**August 14, 1996, FILED**

**SUBSEQUENT HISTORY:**    **[\*1]** As Amended September 6, 1996.

**DISPOSITION:**    Summary judgment for defendants Harrop, Daly and McGuinness on all claims granted. Summary judgment to defendant Diskin on Woo's § 1981 and § 1985(3) claims and the § 1983 claim for false arrest and malicious prosecution granted. Summary judgment for the City on Woo's § 1983 Monell claim granted. Summary judgment as to the state law respondeat superior claim against the City and defendant Diskin's cross-claim for indemnification against the City denied.

**COUNSEL:** For JAMES WOO, plaintiff: Paul A. Shneyer, Shneyer Shen, p.c., New York, NY. James Woo, Pro se, New York, NY.

For CITY OF NEW YORK, ROBERT HARROP, defendants: Felicia Dunn Jones, O. Peter Sherwood, Corporation Counsel of the City of N.Y., New York, NY USA. Felicia Dunn-Jones, PAUL A. CROTTY, Corporation Counsel of the City of NY, New York, NY. For JOHN DISKIN, defendant: Barbara Susan Albom, Lysaght, Lysaght & Kramer, P.C., Lake Success, NY. For STEPHEN DALY, defendant: Felicia Dunn-Jones, Corporation Counsel of the City of N.Y., New York, NY.

For JOHN DISKIN, cross-claimant: Barbara Susan Albom, Lysaght, Lysaght & Kramer, P.C., Lake Success, NY.

For CITY OF NEW YORK, cross-defendant: Felicia Dunn Jones, O. Peter Sherwood, Corporation Counsel of the City of N.Y., New York, NY USA. Felicia Dunn-

Jones, PAUL A. CROTTY, Corporation Counsel of the City of NY, New York, NY.

For JOHN DISKIN, counter-claimant: Barbara Susan Albom, Lysaght, Lysaght & Kramer, P.C., Lake Success, NY.

For JAMES WOO, counter-defendant: Paul A. Shneyer, Shneyer Shen, p.c., New York, NY.

**JUDGES:** ANDREW J. PECK, United States Magistrate Judge

**OPINION BY:** ANDREW J. PECK

**OPINION**

*OPINION AND ORDER*

**ANDREW J. PECK, United States Magistrate Judge:**

Plaintiff James Woo's action against police officer John Diskin, several other police officers and the City of New York arises from his arrest and alleged beating by off-duty police officer Diskin on August 10, 1992. Plaintiff Woo asserts claims pursuant to *42 U.S.C. §§ 1981, 1983, 1985(3)* and *1986* and for assault, battery, false arrest and malicious prosecution. Plaintiff Woo currently is pro se, having fired his counsel after the close of discovery and filing of the pretrial order. Woo filed the Third Amended Complaint while pro se, but it merely adds a claim against Captain **[\*2]** McGuinness and otherwise repeats the Second Amended Complaint, which was prepared by counsel. (*See* City 3(g) PP 1-8.)

Defendants have moved to dismiss (as to defendant McGuinness), and for summary judgment as to the other

defendants, pursuant to *Fed. R. Civ. P. 12(b)(6)* and *56.* [1] The parties have consented to decision of this case by a Magistrate Judge pursuant to *28 U.S.C. § 636(c).*

> 1  Corporation Counsel moved on behalf of defendants Robert Harrop, Stephen Daly, William McGuinness and the City of New York. Officer Diskin is separately represented.

Defendants have not moved for summary judgment as to the state and *42 U.S.C. § 1983* claims against Officer Diskin for assault and battery.

For the reasons set forth below, the Court grants summary judgment dismissing all of plaintiff Woo's claims against defendants Harrop, Daly and McGuinness. The Court also grants the City summary judgment dismissing all of Woo's claims against the City except the state law respondeat superior claim. Additionally, [*3] the Court dismisses plaintiff Woo's *§ 1981* and *§ 1985(3)* claims against defendant Diskin, and the *§ 1983* and state law claims against Diskin for false arrest and malicious prosecution. The Court denies the City's motion for summary judgment on Officer Diskin's cross-claim for indemnification. (For a list of the surviving claims, *see* the "Conclusion" section below.)

## FACTS

On August 10, 1992 at approximately 11:00 p.m., off-duty police officer Diskin and plaintiff Woo had an altercation near the 59th Street Bridge exit ramp on East 60th Street between First and Second Avenues in Manhattan. (City 3(g) P 9; "Plaintiff's Statement Pursuant to Rule 3(g) in Opposition to Summary Judgment" ["Woo 3(g)"] P 3; Diskin 3(g) PP 2-3; Declaration of Joseph P. Baumgartner, Diskin's counsel, dated 2/16/96, P 4; Joint Pretrial Order, dated 10/23/95 [hereafter, "PTO"], Stipulated Facts PP 4-8.) The parties agree on little else about the event, and the Court thus will present the two conflicting stories.

### Woo's Version of the August 10, 1992 Incident

Plaintiff Woo, a taxi driver, was lawfully driving eastbound on 60th street from Second Avenue towards First Avenue [*4] as Officer Diskin's unmarked car approached him driving in the wrong direction. (Woo 3(g) PP 3, 5; Woo 3/6/96 Aff. P 5; PTO, Woo Contentions of Fact PP 3-4; Woo Dep. at 71.) After Woo tapped his horn, Diskin stopped his car, walked to the passenger side of Woo's taxi, and "spat a mouthful of saliva onto plaintiff's face." (Woo 3(g) P 6; Woo Aff. P 5; Woo Dep. at 71-72.) Officer Diskin screamed "Don't you honk at me!" and returned to his car. (Woo 3(g) P 7; Woo Aff. P 5; Woo Dep. at 72.) Woo did not know Diskin was a police officer. (Woo 3(g) P 32; Woo Aff. P 8.)

Woo drove his taxi in front of Diskin's car in an effort to prevent Diskin from leaving. (Woo 3(g) P 8; Woo Aff. P 6; Woo Dep. at 72.) Woo's bumper hit Diskin's bumper with sufficient force that the noise caused some people in neighboring buildings to look out their windows. (*Id.*) Officer Diskin again got out of his car, and lunged for the passenger side door latch of Woo's car. (Woo 3(g) P 9.) Woo became fearful of Officer Diskin, who was 6'2" and 210 pounds, and so Woo backed up his taxi and tried to drive forward around Diskin's car in order to escape. (*Id.* PP 10-11.) In so doing, Woo's left front bumper [*5] collided with Diskin's right rear bumper, but without damage. (*Id.* P 12.) Woo also hit a car coming off the bridge, causing slight damage to the bumper. (*Id.* P 13.)

Officer Diskin yanked open Woo's door and Woo held up a tire iron which he had under his seat. (*Id.* P 14; Woo Dep. at 73-74.) Officer Diskin pulled the tire iron from Woo's hand and threw it to the ground. (Woo 3(g) P 15.) Woo admits that the tire iron came in contact with Officer Diskin's body as he grabbed it from Woo. (Woo Dep. at 74.) Officer Diskin pulled out a revolver, and Woo raised both hands overhead. (Woo 3(g) P 16; Woo Dep. at 74.) After glancing around, Diskin struck Woo's left eye with his gun, and when he saw blood, said "I hope you lose your eye!" (Woo 3(g) PP 17-18; Woo Dep. at 74-75.) Diskin pulled Woo out of the taxi and onto the ground, with Woo's face on the pavement. (Woo 3(g) P 19; Woo Dep. at 75.) Throughout this entire confrontation, Woo asserts that Officer Diskin never identified himself as a police officer. (Woo 3(g) P 32.)

Sergeant Daly arrived within minutes, handcuffed Woo, and had a private conversation with Officer Diskin. (*Id.* P 20; Woo Dep. at 75.) Officer Harrop, who [*6] was Sergeant Daly's driver, arrested Woo. (Woo 3(g) P 21.) Woo was taken to the 19th Precinct for processing and three hours later was driven to Metropolitan Hospital. (*Id.* P 22; Woo Dep. at 76.)

### The City's and Diskin's Version of the Incident

At the time of the incident, defendant Diskin was off-duty, dressed in civilian clothes, and driving his private car (a red Volkswagen) to work at the 19th Precinct located on 67th Street between Lexington and Third Avenues. (City 3(g) PP 9-10; Diskin 3(g) PP 2-3; Diskin Dep. at 82-83, 96.) Diskin was scheduled to begin work at 11:15 p.m. (City 3(g) P 11; Diskin Dep. at 82-83.)

Diskin exited the 59th Street Bridge exit ramp at East 60th Street. (City 3(g) P 11; Dunn-Jones Aff. Ex. B: Diskin Dep. at 58.) Diskin claims that his car was travelling in the correct direction and was struck broadside by Woo. (PTO, Diskin's Contentions of Fact PP 16-17.) [2] At some point, Diskin's car and Woo's yellow taxi came to a stop. (City 3(g) P 12; Diskin Dep. at 99.) Diskin alleges

that Woo's taxi hit his car. (*See* Baumgartner Dec. PP 4-8; Diskin Dep. at 108.) Diskin got out of his car and approached Woo's taxi. (City 3(g) P 15; Baumgartner [*7] Dec. P 4.) Woo put his taxi in reverse and backed up in a westerly direction down East 60th Street. (City 3(g) P 16.) In so doing, Woo's driver's side mirror hit Diskin on the forearm. (*Id.* P 17; Diskin Dep. at 51-56.) Woo put his taxi in drive, drove around a triangular cement island, and Woo's front bumper hit Diskin's rear bumper. (City 3(g) P 18.) Woo backed up and struck a vehicle driven by motorist Felicia Maisonave. (*Id.* P 19; *see* Baumgartner Dec. P 5.)

2 However, at least one police report appears to reflect that Diskin was travelling in the wrong direction on 60th Street. (Dunn-Jones Aff. Ex. G: "Name Identification Card".) Additionally, Officer Ortiz reported that he had, on several occasions, stopped Diskin off-duty and admonished him for going the wrong way on East 60th Street, and that when he responded to the Woo incident scene, Officer Diskin's car was facing the wrong way. (Dunn-Jones Aff. Ex. J: Sergeant Edward Incle's Investigating Officer's Report dated 3/11/94.)

Diskin pulled [*8] open the driver's side door of Woo's taxi. (City 3(g) P 20.) Woo picked up a tire iron from the taxi's front seat and swung it at Diskin, striking him in the chest area several times. (City 3(g) PP 21-22; Diskin 3(g) P 4; Diskin Dep. at 121-23.) Diskin identified himself as a police officer (Baumgartner Dec. P 5; Diskin Dep. at 156). [3] took his revolver out and poked the barrel of the gun into Woo's face. (City 3(g) P 23; Baumgartner Dec. P 5; Diskin Dep. at 156.) Diskin held Woo face down on the ground and placed Woo under arrest for assault. (City 3(g) PP 24-25; Diskin 3(g) P 5; Diskin Dep. at 28-29, 37.) Shortly thereafter, uniformed police officers arrived and handcuffed Woo. (City 3(g) P 26; Diskin 3(g) P 6; Baumgartner Dec. P 6; Diskin Dep. at 93.)

3 The City does not assert that Diskin identified himself as a police officer at any time during the confrontation. The City also does not assert that Diskin was acting under color of state law. (*Compare* PTO, Stipulations of Fact P 3; PTO, Woo Contentions of Fact P 2; PTO, Diskin Contentions of Fact P 2; *with* PTO, City Contentions of Fact.)

[*9] *Woo's Arrest and the Police Investigations Following the Incident*

Sergeant Daly, a Patrol Sergeant at the 19th Precinct, responded to the scene and spoke with Diskin. (City 3(g) P 27; Diskin Dep. at 99-100.) Officer Diskin

informed Sergeant Daly that Woo had assaulted him and had struck his vehicle. (City 3(g) P 28; Diskin Dep. at 99-100.) Sergeant Daly obtained the names, addresses and telephone numbers of four witnesses to the incident and submitted them to Captain McGuinness and the New York County District Attorney's Office. (City 3(g) P 30; Dunn-Jones Aff. Ex. C: Police Report of Captain William McGuinness.) Captain McGuinness contacted the witnesses by telephone that evening. (City 3(g) P 31; Dunn-Jones Aff. Ex. C.) [4]

4 The four witnesses interviewed were (1) Felicia Maisonave, (2) Andrew Eaton, (3) Luana Mango, and (4) Clark Berkhoudt. (*Id.*) None of the witnesses saw the occurrence from beginning to end. (*See* Woo 3(g) Ex. S: Police Report of Sergeant Edward Incle, dated 5/24/94; Dunn-Jones Aff. Ex. C at P 7; Dunn-Jones Aff. Ex. G: Investigation Bureau Reports.)

[*10] Officer Diskin was driven by a police car to Beth Israel Hospital. (City 3(g) P 32.) Woo was driven by police car to the 19th Precinct station house, where his arrest was processed. (City 3(g) P 33; Woo 3(g) P 22.) Three hours later, Woo was driven to Metropolitan Hospital. (Woo 3(g) P 22.) Woo was interviewed at the hospital by Captain McGuinness. (City 3(g) P 34; Dunn-Jones Aff. Ex. C, P 9.)

On August 18, 1992, Woo was arraigned at Metropolitan Hospital and charged with two counts of second degree assault, possession of a weapon in the fourth degree, and resisting arrest. (City 3(g) P 35; PTO, Stipulated Facts PP 18-22.)

*The Dismissal of the Charges Against Woo*

On February 8, 1993, the Criminal Court (New York County) dismissed all charges against Woo pursuant to Criminal Procedure Law § 30.30, New York's speedy trial provision. (Dunn-Jones Aff. Ex. D: Affidavit of Assistant District Attorney Andrew M. Lankler, dated 12/13/95. P 2; *see* Diskin 3(g) PP 22-29; PTO, Stipulated Facts P 23.)

*Woo's Complaint*

Woo's third amended complaint alleges ten causes of action: (1) assault (against Diskin); (2) battery (Diskin); (3) false arrest (all defendants); [*11] (4) malicious prosecution (all defendants); (5) respondeat superior (the City); (6) 42 U.S.C. § 1983 municipal liability (the City); (7) 42 U.S.C. § 1983 (all defendants); (8) 42 U.S.C. § 1981 (Diskin); (9) 42 U.S.C. § 1985(3) (all defendants); and (10) 42 U.S.C. § 1986 (McGuinness).

*ANALYSIS*

**I. *THE CITY IS GRANTED SUMMARY JUDGMENT ON WOO'S 42 U.S.C. § 1983 CLAIM SINCE WOO HAS FAILED TO ESTABLISH THAT THE CITY MAINTAINED A POLICY OR CUSTOM OF UNCONSTITUTIONAL BEHAVIOR***

It is well established that a municipality may not be held liable under § 1983 solely upon the basis of respondeat superior. *E.g., Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978); Covington v. City of New York, 916 F. Supp. 282, 288 (S.D.N.Y. 1996)* (Peck, M.J.); *Zamakshari v. Dvoskin, 899 F. Supp. 1097, 1109 (S.D.N.Y. 1995)* (Peck, M.J.). Thus, in order to hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that the violation of constitutional rights resulted from a municipal custom or policy. *E.g., Pembaur* [*12] *v. City of Cincinnati, 475 U.S. 469, 478-83, 106 S. Ct. 1292, 1297-300, 89 L. Ed. 2d 452 (1986); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983); Covington v. City of New York, 916 F. Supp. at 288.* Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City. *Monell v. Department of Social Services, 438 U.S. at 694 n.58, 98 S. Ct. 2037 n58; Batista v. Rodriguez, 702 F.2d at 397.*

In *Covington v. City of New York*, the Court summarized the law in this area as follows:

> A plaintiff asserting liability against a supervisor under § 1983 need not show that the municipality had an explicitly stated rule or regulation. *See Villante v. Department of Corrections of the City of New York, 786 F.2d 516, 519 (2d Cir. 1986).* Rather, the inference that such a policy existed may be drawn from plaintiff's proffer of circumstantial evidence, such as evidence that the municipality (1) so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within the jurisdiction, *see, e.g., City* [*13] *of Canton, Ohio v. Harris, 489 U.S. 378, 387-92, 109 S. Ct. 1197, 1204-06, 103 L. Ed. 2d 412 (1989),* or (2) had notice of but repeatedly failed to make any meaningful investigation into (*i.e.*, were deliberately indifferent to) charges of misconduct by lower level employees (*e.g.*, charges that police officers used excessive force), *see, e.g., Fiacco v. City of Rensselaer, New York, 783 F.2d 319, 327-28 (2d Cir. 1986), cert.*

*denied, 480 U.S. 922, 107 S. Ct. 1384, 94 L. Ed. 2d 698 (1987).*

916 F. Supp. at 288.

In his third amended complaint, plaintiff Woo alleges that:

> Upon information and belief, defendants have in the past falsely arrested individuals, committed assault and battery against such individuals and solicited improper prosecutions of such individuals, and allowed police officers to make false entries in official police department records to cover up and hide assaults and batteries by police officers.

> Defendant City of New York has failed to take the steps to discipline, train, supervise or otherwise correct the improper illegal conduct of defendant officers.

(Cplt. PP 73-74.) Further, in his 3(g) statement, plaintiff [*14] Woo argues that "the Police Department of the City of New York has a policy, custom or practice which causes and deprives plaintiff's civil rights. The Department does not effectively and objectively investigate wrongdoing claims against officers." (Woo 3(g) P 43; *see also* PTO, Woo Contentions of Fact PP 25-27.)

Plaintiff Woo has failed to present evidence of even a single incident of such police misconduct or failure to train, much less the existence of an official policy or custom. The Court notes that while Mr. Woo is now pro se, he was represented by counsel throughout the discovery process, and had ample opportunity to develop evidence regarding prior incidents of false arrest or excessive force in the police department.

Conclusory allegations by a plaintiff of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent the production of evidence to back up such an allegation. *See, e.g., Furlow v. City of New York, 1994 U.S. Dist. LEXIS 18316, 90 Civ. 3956, 1994 WL 714340 at *10 (S.D.N.Y. Dec. 21, 1994)* (summary judgment for defendants on *Monell* claim finding that "but for general, conclusory allegations in [plaintiff's] [*15] complaint, [plaintiff] has produced no evidence from which a reasonable jury could infer that the City failed to train effectively the officers involved or that the actions of the individual officers were representative of any policy or custom of the City."); *Golino v. City of New Haven, 761 F. Supp.*

Case 1:07-cv-10274-JSR    Document 7-3    Filed 05/20/2008    Page 25 of 33

Page 5
1996 U.S. Dist. LEXIS 11689, *

*962, 972-73* (D. Conn.) (summary judgment for defendant police chief on *Monell* claim, holding that plaintiff's own alleged unconstitutional arrest alone does not establish a policy or custom), *aff'd, 950 F.2d 864 (2d Cir. 1991), cert. denied, 505 U.S. 1221, 112 S. Ct. 3032, 120 L. Ed. 2d 902 (1992)*.

Plaintiff Woo points only to his own alleged assault and false arrest and the Police Department's alleged "cover up" that followed it as evidence of the Police Department's policy. Even if Woo were to prevail at trial on his claim that he was falsely arrested and assaulted, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir. 1991); see also, e.g., Nocera v. New York City Fire Commissioner, [*16] 921 F. Supp. 192, 204 (S.D.N.Y. 1996)* ("Proof of a single incident of unconstitutional activity is insufficient to demonstrate the existence of a policy."); *Gayle v. Ward, 1989 U.S. Dist. LEXIS 14301, 88 Civ. 0843, 1989 WL 146791 at *3 (S.D.N.Y. Nov. 30, 1989)* (summary judgment for defendants Ward and Koch where "not even the barest facial showing" of wrongdoing on their part; "The inference [of an official policy] may not be drawn from an isolated instance of wrongdoing, however, unless the single instance is singularly egregious and evidences 'acquiescence in a prior pattern of misconduct.'"); *Anderson v. City of New York, 657 F. Supp. 1571, 1575 (S.D.N.Y. 1987)* ("More recently, however, the Supreme Court held that a single incident -- even one involving excessive force -- could not prove the existence of a policy of insufficient training.") (citing *Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985); Landesman v. City of New York, 501 F. Supp. 837, 841-42 (E.D.N.Y. 1980)* ("We agree that, absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from [*17] a single incident of illegality such as a first arrest without probable cause or with excessive force.'") (quoting *Turpin v. Mailet, 619 F.2d 196, 202 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S. Ct. 577, 66 L. Ed. 2d 475 (1980)*).

The Court also needs to consider, however, evidence of prior complaints against certain of the defendant officers that the City candidly submitted. The City admits that as "of the date of plaintiff's arrest, there existed one substantiated or conciliated civilian complaint against defendants Diskin and Daly and one departmental charge against Harrop." (City Br. at 21.) The civilian complaint against Officer Diskin involved an allegation that, while on duty and in uniform, Diskin shoved a taxi driver to whom he later issued a parking ticket. (*Id.*) The complaint was investigated by the Civilian Complaint Review Board and found to be substantiated. (*Id.*) Thereafter, Diskin was punished by the Police Department with a Command Discipline. (*Id.*)

Officer Harrop was brought up on departmental charges for failing to report the misconduct of another officer. (*Id.*) He pled guilty to the charge and was penalized with the loss of ten vacation [*18] days. (*Id.* at 21-22.) The City further acknowledges that, prior to Woo's arrest, a civilian complaint of discourtesy against Daly was filed with the Civilian Complaint Review Board. (*Id.* at 22.) The complaint was classified as "conciliated" and Daly received Sensitivity Training. (*Id.*)

Thus, at the time of plaintiff Woo's arrest, the four defendant officers collectively had three complaints in their records. The Police Department responded in all three instances by disciplining the officers. Plaintiff Woo has not alleged that any of these incidents evidenced that the Police Department had a policy of failing to discipline officers for these offenses. Moreover, none of these instances involved alleged false arrest and excessive force. Thus, these three incidents do not suffice to establish that the City had a policy of failing to investigate or discipline its officers. *See, e.g., Stengel v. City of Hartford, 652 F. Supp. 572, 574 (D. Conn. 1987)* (allegation that officer had not been disciplined for two prior complaints insufficient because plaintiff failed to allege how investigation insufficient).

Woo attempts to buttress his *Monell* claim with incidents [*19] that occurred subsequent to his arrest as evidence of the City's alleged failure to train or discipline its officers. Woo points to a civilian charge pending against Officer Diskin for making harassing phone calls that occurred in February and March 1993. (Woo Aff. P 21.)

Plaintiff Woo, however, cannot establish that incidents that occur after the event in question caused his injury. *See, e.g., Sango v. City of New York, 1989 U.S. Dist. LEXIS 18212, 83 CV 5177, 1989 WL 86995 at *20 n.2 (E.D.N.Y. July 25, 1989)* ("conduct occurring after the incident at issue lacks the requisite 'affirmative link' to plaintiffs' injuries -- that is plaintiffs cannot establish causation. . . . Evidence of a municipal policymaker's response to misconduct can be helpful in determining the municipal policy existing before the incident . . . . but it cannot alone serve as the predicate for municipal liability."); *Anderson v. City of New York, 657 F. Supp. 1571, 1576 (S.D.N.Y. 1987)* ("Plaintiff, however, must link the behavior in question to the policy of failure to discipline -- for example, the officer must have known of the policy at the time he allegedly committed the civil rights violations."); *Tompkins [*20] v. Frost, 655 F. Supp. 468, 472 (E.D. Mich. 1987)* (where plaintiff claimed that the county ratified the officer's conduct by failing to investigate an alleged incident of excessive force, court held

that "wrongful conduct after an injury cannot be the proximate cause of the same injury").

Thus, Woo has failed to produce any evidence from which a reasonable juror could infer that the City had a policy or practice of either failing to investigate or failing to train its officers concerning the use of excessive force and false arrest.

**II. ALL DEFENDANTS ARE GRANTED SUMMARY JUDGMENT ON WOO'S 42 U.S.C. § 1983 AND STATE LAW CLAIMS BASED ON MALICIOUS PROSECUTION AND FALSE ARREST, SINCE THE DISMISSAL OF WOO'S CRIMINAL PROCEEDING ON SPEEDY TRIAL GROUNDS IS NOT A TERMINATION IN PLAINTIFF'S FAVOR**

Woo's third amended complaint asserts a claim pursuant to *42 U.S.C. § 1983* for malicious prosecution and false arrest, and state law claims for malicious prosecution and false arrest, against Officer Diskin, Officer Harrop, Sergeant Daly and Captain McGuinness. (Cplt. PP 60-67, 78-80.) [5] Defendants have moved for summary judgment on these claims on the ground that there was no [*21] favorable termination of Woo's criminal proceeding on the merits, since the criminal case was dismissed pursuant to *New York Criminal Procedure Law § 30.30.* (City Br. at 9-13.) The Court agrees. [6]

    5    Although the complaint does not specify that the *42 U.S.C. § 1983* claim against defendants Harrop, Daly and Diskin is based upon false arrest and malicious prosecution, the Court has made that inference, since those claim are the only constitutional violations the three defendants are alleged to have committed. (*See* Cplt. PP 60-67.) The *§ 1983* claim against Officer Diskin also includes a claim for use of excessive force, and Officer Diskin has not moved for summary judgment on that part of the *§ 1983* claim. The *§ 1983* excessive force claim against Officer Diskin obviously raises disputed questions of material fact as to whether the force used in the incident was justified or excessive under the circumstances.
    6    The City has also moved to dismiss the false arrest claims as against Captain McGuinness on statute of limitations grounds. (*See* City Br. at 7-8.) A false arrest claim accrues at the time of arrest -- here, no later than August 18, 1992 -- and has a three-year statute of limitations. *See, e.g., Covington v. City of New York, 916 F. Supp. 282, 285 (S.D.N.Y. 1996)* (Peck, M.J.) (citing cases). The three-year statute of limitations therefore expired on August 18, 1995. Woo was granted permission to serve his third amended complaint on Captain McGuinness on November 15, 1995.

(*See* 11/15/95 oral arg. Tr. at 17.) That is after the expiration of the three-year limitation period. Woo cannot benefit from *Fed. R. Civ. P. 15(c)(3)*, because he clearly knew Captain McGuinness' identity, since he interviewed Woo at the hospital. (*See* Woo 3(g) P 41.) Thus, the state false arrest and *§ 1983* false arrest claims must be dismissed against Captain McGuinness on the additional ground of the statute of limitations.

The statute of limitations does not preclude the malicious prosecution claim (and the City has not raised the statute of limitations as a defense to that claim), because a malicious prosecution claim does not accrue until the criminal proceedings are concluded. *See, e.g., Covington v. City of New York, 916 F. Supp. at 286 n.2* (citing *Murphy v. Lynn, 53 F.3d 547, 548 (2d Cir. 1995); Singleton v. City of New York, 632 F.2d 185, 193 (2d Cir. 1980), cert. denied, 450 U.S. 920, 101 S. Ct. 1368, 67 L. Ed. 2d 347 (1981)*).

[*22] A "claim for malicious prosecution brought under *§ 1983* is governed by state law." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).* Thus, under both *§ 1983* and "under New York law, a plaintiff suing for malicious prosecution must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) *termination of the proceeding in plaintiff's favor*; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions. . . . *Termination of the criminal charges in plaintiff's favor is an essential element of the claim.*" *Id.* (emphasis added; citing, *inter alia, Hollender v. Trump Village Cooperative, Inc., 58 N.Y.2d 420, 425-26, 461 N.Y.S.2d 765, 768, 448 N.E.2d 432 (1983)); see also Covington v. City of New York, 94 CV 3382, 1995 WL 322222 at *3 (E.D.N.Y. May 23, 1995).*

Plaintiff bears the burden of establishing that a decision is indicative of his innocence:

        An acquittal is the most obvious example of a favorable termination. In many instances, however, criminal proceedings are terminated in a manner that does not establish either guilt or innocence. *In the absence [*23] of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence.*

*Russell v. Smith, 68 F.3d at 35 (2d Cir. 1995)* (emphasis added).

Plaintiff Woo has not met his burden. Defendants have submitted an affidavit from Assistant District At-

torney Andrew M. Lankler, who prosecuted the criminal case against Woo, stating that on February 8, 1993, all criminal charges against Woo were dismissed under the New York speedy trial statute, CPL § 30.30. (Dunn-Jones Aff. Ex. D; Lankler Aff. P 2; *see also* PTO, Stipulated Facts P 23.)

In *Singleton* v. *City of New York*, the Second Circuit held that, in order to assert a § 1983 claim based on malicious prosecution, the plaintiff must demonstrate that the underlying criminal proceeding terminated "in some manner indicating that the person was not guilty of the offense charged." 632 F.2d 185, 195 (2d Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S. Ct. 1368 (1981). The Second Circuit held that a hung jury and an "adjournment in contemplation of dismissal" pursuant to N.Y. CPL § 170.55 does not constitute termination in favor of the defendant, since such a dismissal "leaves open [*24] the question of the accused's guilt." *Id.*, 632 F.2d at 193-95.

The *Singleton* rule also applies to state law malicious prosecution actions. In *Hollender* v. *Trump Village*, the New York Court of Appeals held that:

> In a malicious prosecution action, it is for the one who brings the suit to establish that the criminal proceeding allegedly instigated by the defendant terminated in favor of the accused. Indeed, it is "only when [the] * * * final disposition is such as to indicate * * * * innocence" that this burden is met. So viewed, the Appellate Division's dismissal of the malicious prosecution claim was correct. For the adjournment in contemplation of dismissal, being as unadjudicative of innocence as it was of guilt, by its very nature operated to bar recovery.

58 N.Y.2d at 425-26, 461 N.Y.S.2d at 768 (asterisks in original; citations, including to *Singleton*, omitted).

Because the plaintiff in a malicious prosecution action has the burden of proving that disposition of the criminal case indicates innocence, and because a speedy trial dismissal (like an adjournment in contemplation of dismissal) is unadjudicative of innocence as guilt, the courts [*25] have dismissed § 1983 and state law malicious prosecution actions where the criminal charges were dismissed for a speedy trial violation. "This Court has previously held that dismissal of proceedings on speedy trial grounds is, as a matter of law, not a favorable termination for purposes of a § 1983 . . . malicious prosecution suit." *Rodriguez* v. *State of New York*, 1996 U.S. Dist. LEXIS 5353, 95 Civ. 3639, 1996 WL 197749 at *2 (S.D.N.Y. April 23, 1996) (citing cases); *see also,*

*e.g., Covington* v. *City of New York*, 1995 WL 322222 at *3-4 ("Because a dismissal for failure to comply with New York's speedy trial requirement is no more probative of innocence than it is of guilt, the court concludes that, for purposes of establishing a malicious prosecution claim, the proceedings were not terminated in plaintiff's favor."); *Martin* v. *Adler*, 135 Misc. 2d 383, 389, 515 N.Y.S.2d 400, 405 (Sup. Ct. Rockland Co. 1987) ("because the charges were dropped for neglect to prosecute, the merits were never reached; the absence of an affirmative finding of innocence thus forecloses a cause of action for malicious prosecution to the plaintiffs."). [7]

> 7 But see *Davis* v. *New York City Police Officers*, 1996 U.S. Dist. LEXIS 1363, 93 Civ. 7963, 1996 WL 54358 at *2 (S.D.N.Y. Feb. 8, 1996) (determination of whether speedy trial dismissal is favorable to criminal defendant raises fact questions that rarely is amenable to summary judgment). *Davis* relied on *Loeb* v. *Teitelbaum*, 77 A.D.2d 92, 432 N.Y.S.2d 487 (2d Dep't 1980), and other lower state court decisions from that period (or earlier). *Davis*, 1996 U.S. Dist. LEXIS 1363, 1996 WL 54358 at *2 n.4. In *Witcher* v. *Children's Television Workshop*, 187 A.D.2d 292, 294-95, 589 N.Y.S.2d 454, 456 (1st Dep't 1992), the First Department declined to follow *Loeb*, finding that *Loeb's* conclusions "appear contrary to the more recent pronouncements of the Court of Appeals," including *Hollender* v. *Trump Village*.

[*26] In *Roesch* v. *Otarola*, 980 F.2d 850 (2d Cir. 1992), the Second Circuit extended its holding in *Singleton* to include § 1983 claims sounding in false arrest or false imprisonment. "The policy considerations that motivated the Court in *Singleton* are equally appropriate in the context of a *section 1983* claim sounding in false imprisonment or false arrest." *Id.* at 853-54. The Court explained its reasoning for such an extension as follows:

> "Having decided that the criminal charge at issue in the state court was not disposed of in a manner favorable to the [appellant], thereby precluding the [appellant] from pressing his malicious prosecution claim in this *section 1983* action, it would be anomalous to allow the [appellant] to challenge here the existence of probable cause for his arrest and incarceration for that *same* criminal charge."

980 F.2d at 853 (emphasis and brackets in original, quoting *Konon* v. *Fornal*, 612 F. Supp. 68, 71 (D. Conn. 1985)). And in *Rodriguez* v. *State of New York*, 1996

*U.S. Dist. LEXIS 5353, 1996 WL 197749* at *2, Judge Stein held that dismissal on speedy trial grounds is "not a favorable termination for purposes of a § 1983 false arrest [*27] or malicious prosecution suit." [8]

> [8]  *But see Hollender v. Trump Village*, 58 N.Y.2d at 425, 461 N.Y.S.2d at 768 (upholding dismissal of malicious prosecution claim where criminal charges ended with adjournment in contemplation of dismissal, but reversing dismissal of false imprisonment charge; Court noted that while on malicious prosecution action, the plaintiff has the burden of showing that the criminal charge ended in his favor, on false imprisonment claim "the burden of establishing that the detention was privileged is on those charged with the commission of the tort"); *cf. Martin v. Adler*, 135 Misc. 2d at 389, 515 N.Y.S.2d at 404-05 (upholding false arrest claim while granting motion to dismiss malicious prosecution claim where underlying criminal charges were dropped for failure to prosecute). Despite this seemingly contrary New York Court of Appeals decision as to false arrest, this Court is required to follow the Second Circuit's more recent holding in *Roesch* that the Court should treat malicious prosecution and false arrest claims the same in deciding whether the prior criminal proceeding terminated in plaintiff's favor.

[*28] Thus, plaintiff Woo fails to state a claim pursuant to *42 U.S.C. § 1983* or state law against any defendant for false arrest or malicious prosecution.

### III. ALL DEFENDANTS ARE GRANTED SUMMARY JUDGMENT ON WOO'S §§ 1981, 1985(3) AND 1986 CLAIMS, BECAUSE WOO HAS FAILED TO PRESENT ANY EVIDENCE OF DISCRIMINATORY INTENT [9]

> [9]  The Court notes with some surprise that, although the City apparently intended to move for summary judgment on the *42 U.S.C. §§ 1981, 1985(3)* and *1986* claims along with the other claims, they failed to address them in their motion papers. By Order dated July 25, 1996, the Court noted that its review of the record indicated that summary judgment might be appropriate on those claims and directed plaintiff Woo to file any papers opposing summary judgment. After requesting and receiving an extension of time to file papers, Mr. Woo filed a 1-page letter that merely cited to three cases, but contained no evidence of alleged racial animus or conspiracy by any defendant. The cases cited by Mr. Woo are of no help to him on the summary judgment motion.

In *White v. Frank*, 680 F. Supp. 629, 640 (S.D.N.Y. 1988), appeal dismissed, 855 F.2d 956 (2d Cir. 1988), the Court upheld allegations of conspiracy in a complaint against a motion to dismiss. On summary judgment, however, Mr. Woo must submit evidence, not allegations, and he has not done so. *Hampton v. Hanrahan*, 600 F.2d 600, 623-24 (7th Cir. 1979), involved a civil rights action by the Black Panther Party in which the evidence of racially motivated conspiracy included F.B.I. documents indicating an intent to "neutralize" the Panthers as a political voice on racial issues. Finally, in *Bell v. City of Milwaukee*, 746 F.2d 1205, 1262 (7th Cir. 1984), the evidence showed that police officers accidentally killed a black youth, then planted a knife on him to justify the shooting, and conspired to cover up the shooting. *Id. at 1215-16, 1256.* The officers also made racially derogatory comments. *Id. at 1215, 1217, 1259.* Obviously, these cases cannot, and do not, supply what is missing from Mr. Woo's case here -- any evidence of racial motivation or from which such motivation can be inferred.

The Court will expect less sloppy and more thorough papers from Corporation Counsel in the future.

### [*29] A. § 1981 Claim

In his complaint, plaintiff Woo asserts a claim under *42 U.S.C. § 1981* [10] against Officer Diskin on the grounds that:

> Defendant Diskin has admitted acting discriminatorily against Asians and other minorities, and upon information and belief, has violated the rights of other minorities and violated Mr. Woo's rights as described herein because of discriminatory animus in violation of *42 U.S.C. § 1981.*

(Cplt. P 81.)

> 10  *42 U.S.C. § 1981(a)* provides:
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . .

Although § 1981 applies principally to contract disputes, it has also been used in some circuits (including this one) to remedy racially motivated abuse of state authority. *See, e.g., Rivera v. United States, 728 F. Supp. 250, 261 (S.D.N.Y. 1990)* (citing cases), *aff'd, 928 F.2d 592 (2d Cir. 1991).*

[*30] The law is clear that in order to state a claim under § 1981, the plaintiff must plead and prove facts which establish that defendants' actions were racially motivated and purposefully discriminatory. *E.g., General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150, 73 L. Ed. 2d 835 (1982); Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988).* Moreover, in order to survive summary judgment on a § 1981 claim, a plaintiff must provide more than conclusory assertions of discrimination. *E.g., Patterson v. General Motors Corp., 631 F.2d 476, 482 (7th Cir. 1980), cert. denied, 451 U.S. 914, 101 S. Ct. 1988, 68 L. Ed. 2d 304 (1981); Rodriguez v. City of New York, 1988 U.S. Dist. LEXIS 6516, 85 CV 1873, 1988 WL 68853 at *2 (E.D.N.Y. May 13, 1988).*

Beyond the conclusory allegations in the complaint, however, plaintiff Woo has not produced a scintilla of evidence that Officer Diskin's activities were racially motivated. In fact, the Court can not even find in the record any proof of Woo's allegation in his complaint that Officer Diskin admitted to "acting discriminatorily against Asians and other minorities." (Cplt. P 82.) Plaintiff Woo has [*31] failed to present any evidence, for example, that Diskin (i) made any discriminatory statements towards Woo during the confrontation, (ii) had assaulted other minorities in the past or (iii) had made derogatory racial comments in the past. In fact, plaintiff Woo failed to even make mention of Officer Diskin's discriminatory motivation in either his 3(g) statement or his motion papers.

Thus, the Court grants summary judgment for defendant Diskin because of the lack of any support for plaintiff's allegations. *See Rodriguez v. City of New York, 1988 U.S. Dist. LEXIS 6516, 1988 WL 68853 at *3* (summary judgment for defendant police officers on § 1981 claim because plaintiff failed to submit evidence of any racial motivation to injure plaintiff by officer involved in his arrest and alleged beating); *see also, e.g., Smith v. Savings Bank of Rockland County, 1992 U.S. Dist. LEXIS 17487, 91 Civ. 3088, 1992 WL 350743 at *4* (S.D.N.Y. Nov. 16, 1992) (summary judgment for defendant on § 1981 claim since plaintiff produced no evidence of discriminatory intent except an unsubstantiated hearsay statement and conjecture); *Harrington v. Local 338 Retail, Wholesale and Chain Store Food Employees Union, AFL-CIO, 1988 U.S. Dist. LEXIS 4417, 82 Civ. 8106, [*32] 1988 WL 52873 at *1 (S.D.N.Y. May 17,* 1988) (summary judgment for defendant because *"section 1981 requires a showing that defendant itself intentionally discriminated against plaintiff, not merely that it acquiesced in or failed to prevent the discriminatory conduct of plaintiff's employer"*).

**B. § 1985(3) Claim**

The Second Circuit has held that:

The four elements of a § 1985(3) claim are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087-88 (2d Cir. 1993), cert. denied, 116 S. Ct. 88 (1995).*

"The scope of § 1985(3) is narrower than that of § 1983." *Blankman v. County of Nassau, 819 F. Supp. 198, 205 (E.D.N.Y.), aff'd, 14 F.3d 592 (2d Cir. 1993)).* Additionally, plaintiff must show that the conspiracy was "motivated by 'some racial or perhaps otherwise [*33] class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian v. Donaldson, 7 F.3d 1085 at 1088* (quoting *United Bhd. of Carpenters, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 829, 103 S. Ct. 3352, 3356, 77 L. Ed. 2d 1049 (1983)); see also, e.g., Blackman v. County of Nassau, 819 F. Supp. at 205.* The Supreme Court has held that "'discriminatory purpose' . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L. Ed. 2d 870 (1979).*

As previously noted, plaintiff Woo has failed to produce any evidence whatsoever, beyond conclusory statements, that Officer Diskin or any of the other defendant officers beat, arrested or prosecuted Woo because he was Asian. Beyond Woo's conclusory allegation in his complaint that "Defendants were motivated by racial animus in their conduct against the plaintiff" (Cplt. P 86; *see also* PTO, Woo Contentions of Fact P 14), Woo has failed to produce any evidence of underlying [*34] facts supporting this allegation. Absent any evidence of discriminatory animus, the Court must dismiss Woo's § 1985(3) claim. *See, e.g., Presnick v. Berger, 837 F.*

Case 1:07-cv-10274-JSR    Document 7-3    Filed 05/20/2008    Page 30 of 33

Page 10
1996 U.S. Dist. LEXIS 11689, *

Supp. 475, 480 (D. Conn. 1993) (summary judgment for defendants on § 1983(3) claim where "plaintiff failed to make any factual allegations to support a claim of a civil rights violation" and "there is no evidence whatsoever on this record of any racial or otherwise class-based invidiously discriminatory animus."); Thornton v. City of Albany, 831 F. Supp. 970, 981 (N.D.N.Y. 1993) (summary judgment for defendants on § 1985(3) claim when plaintiff's only evidence of discriminatory animus was a race neutral comment by police officer); Smith v. Savings Bank of Rockland County, 1992 U.S. Dist. LEXIS 17487, 1992 WL 350743 at *5 (summary judgment for defendant on § 1985(3) claim for plaintiffs' failure to produce any evidence of discriminatory intent).

### C. § 1986 Claim

Section 1986 provides, in pertinent part, that

> every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in *section 1985* of this title, are about to be committed, and having power to prevent or aid in [*35] preventing the commission of the same neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages cased by such wrongful act . .

42 U.S.C. § 1986.

Courts within this Circuit have interpreted § 1986 as "'merely giving a remedy for misprision of a violation of 42 U.S.C. § 1985.'" Levy v. City of New York, 726 F. Supp. 1446, 1455 (S.D.N.Y. 1989) (quoting Williams v. St. Joseph Hospital, 629 F.2d 448, 452 (7th Cir. 1980)); Spencer v. Casavilla, 717 F. Supp. 1057, 1062 n.1 (S.D.N.Y. 1989). Thus, since plaintiff Woo has failed to state a claim under § 1985, defendants, a fortiori, are entitled to summary judgment dismissing Woo's § 1986 claim. See, e.g., Dacey v. Dorsey, 568 F.2d 275, 277 (2d Cir.), cert. denied, 436 U.S. 906, 98 S. Ct. 2238, 56 L. Ed. 2d 405 (1978); Thornton v. City of Albany, 831 F. Supp. at 981-82 ("Having held that plaintiff's § 1985(3) cause of action must be dismissed, the court also must, a fortiori, dismiss plaintiff's § 1986 claim."); Levy v. City of New York, 726 F. Supp. at 1455.

### IV. THE [*36] CITY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RESPONDEAT SUPERIOR CLAIM IS DENIED BECAUSE FACTUAL ISSUES REMAIN

Plaintiff Woo's fifth cause of action asserts common law liability by the City for the actions of the defendant police officers under the doctrine of respondeat superior. (See Cplt. PP 68-70.) "Although respondeat superior [does] not apply to the § 1983 claims, 'plaintiff's common-law causes of action may proceed on a theory of respondeat superior.'" Mendoza v. City of Rome, New York, 872 F. Supp. 1110, 1119 (N.D.N.Y. 1994) (quoting Johnson v. Town of Colonie, 102 A.D.2d 925, 925, 477 N.Y.S.2d 513, 514 (3d Dep't 1984)).

Because the Court has granted the summary judgment motions of defendants Harrop, Daly and McGuinness as to all claims, the Court considers only the City's respondeat superior liability as to Diskin's alleged assault and battery of Woo. See Johnson v. Town of Colonie, 102 A.D.2d at 925, 477 N.Y.S.2d at 514 ("the wrong of the servant serves as the basis of liability of the master to the injured party.") (quoting Geltzer v. Russell, 49 A.D.2d 823, 824, 373 N.Y.S.2d 566, 568 (1st Dep't 1975)).

In order for the [*37] City to be liable under the doctrine of respondeat superior for Officer Diskin's conduct, plaintiff Woo must establish that Diskin was acting "in furtherance of the duties he owes to his employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities." Perez v. City of New York, 1996 U.S. Dist. LEXIS 2812, 94 Civ. 2061, 1996 WL 103836 at *2 (S.D.N.Y. 1996) (citing Lundberg v. State of New York, 25 N.Y.2d 467, 470, 306 N.Y.S.2d 947, 950, 255 N.E.2d 177 (1969)). If Diskin's "'conduct is brought on by a matter wholly personal in nature, the source of which is not job-related, his actions cannot be said to fall within the scope of his employment.'" Perez v. City of New York, 1996 U.S. Dist. LEXIS 2812, 1996 WL 103836 at *2 (quoting Stavitz v. City of New York, 98 A.D.2d 529, 531, 471 N.Y.S.2d 272, 274 (1st Dep't 1984)).

A police officer is empowered to use only such force as is reasonably necessary to make an arrest. N.Y. Penal Law § 35.30(1) (McKinney 1987). An arresting officer who uses excessive force will be liable for assault and battery. See, e.g., Jones v. State of New York, 33 N.Y.2d 275, 280, 352 N.Y.S.2d 169, 172, 307 [*38] N.E.2d 236 (1973) (citing cases).

In assessing the City's liability for Officer Diskin's conduct under a respondeat superior theory, the issue is whether Diskin's alleged assault and battery was "in the course of the officer's employment or outside it, to accomplish a purpose foreign to it." Perez v. City of New York, 1996 U.S. Dist. LEXIS 2812, 1996 WL 103836 at *2 (quoting Mott v. Consumers' Ice Co., 73 N.Y. 543, 547 (1878)).

If Officer Diskin is found by the jury to have used excessive force, the jury will need to decide if he used that force pursuant to his obligation to the Police Department, or for personal reasons. There is conflicting factual evidence as to: who started the incident, whether plaintiff Woo or defendant Diskin violated traffic regulations, whether Woo assaulted Diskin with a tire iron and whether Diskin identified himself as a police officer. The Court finds that whether Officer Diskin acted within the scope of his employment or because of a personal traffic confrontation during his confrontation with plaintiff Woo is a disputed question of fact for the jury to determine. [11] *See, e.g., Gallose v. Long Island Railroad Co., 878 F.2d 80, 84 (2d Cir. 1989)* [*39] ("Normally, whether an employee is acting within the scope of employment is a question 'to be resolved by the jury from all the surrounding circumstances.'") (quoting *Powers v. New York Central R.R., 251 F.2d 813, 816 (2d Cir. 1958)*); *Tenczar v. Richmond, 172 A.D.2d 952, 953, 568 N.Y.S.2d 232, 233 (3d Dep't 1991)* ("Because an employee's 'scope of employment' is heavily dependent on factual considerations, the question is ordinarily one for the jury."); *Perez v. City of New York, 1996 U.S. Dist. LEXIS 2812, 1996 WL 103836 at *3-4* (summary judgment denied as to respondeat superior claim against City because fact dispute existed as to whether police officer acted in furtherance of any duty he owed the City or for purely personal reasons); *Frazier v. State of New York, 64 N.Y.2d 802, 803, 486 N.Y.S.2d 919, 920, 476 N.E.2d 318 (1985)* (same).

11    The City produced a Police Department Legal Bureau Bulletin dated March 5, 1987 about indemnification for off-duty arrests. (Dunn-Jones Reply Declaration, dated 4/19/96, Ex. AA.) That Bulletin notified officers of Corporation Counsel's position that the City will not represent or indemnify an officer who is sued as a result of an arrest or altercation arising from an off-duty traffic infraction because "enforcing traffic regulations off-duty generally is not within the scope of a New York City police officer's employment. Rather, the Corporation Counsel's position is that the off-duty officer used police authority improperly to resolve what was really only a personal matter." (*Id.* at p. 3.) While this memorandum indicates that Officer Diskin will have difficulty prevailing on the cross-claim, it is not enough, by itself, to entitle the City to summary judgment on the cross-claim.

**[*40]  V. THE CITY'S MOTION TO DISMISS DEFENDANT DISKIN'S CROSS-CLAIM FOR INDEMNIFICATION AS PREMATURE IS DISMISSED**

The City next moves to dismiss Defendant Diskin's cross-claim for indemnification against the City on the grounds that (1) this Court does not have jurisdiction to hear the cross-claim, (2) the cross-claim is premature, and (3) Diskin's actions were not within the scope of his employment. (City Br. at 30.) Since the Court has already determined that whether Diskin's actions were within the scope of his employment is a question for jury resolution (*see* Section IV, above), the Court will address the City's remaining two arguments.

**A. This Court Has Jurisdiction to Hear the Indemnification Cross-Claim**

New York General Municipal Law ("GML") § 50-k(2) requires the City of New York to represent an employee in any proceeding which arises from

> any alleged act or omission which the corporation counsel finds occurred while the employee was acting within the scope of his public employment and in the discharge of his duties and was not in violation of any rule or regulation of his agency at the time the alleged act or omission occurred.

Thus, [*41] pursuant to GML § 50-k(2) and 50-k(3), the Corporation Counsel may decide not to represent an employee if he finds that the employee violated any rules or regulations or was not acting within the scope of his or her employment. [12]

12    GML § 50-k(3) states:

> The City shall indemnify and save harmless its employees in the amount of any judgment obtained against such employees . . . provided that the act or omission from which judgment or settlement arose occurred while the employee was acting within the scope of his public employment and in the discharge of his duties and was not in violation of any rule or regulation of his agency at the time the alleged damages were sustained; the duty to indemnify and save harmless . . . shall not arise where the injury or damages resulted from the intentional wrongdoing or recklessness on the part of the employee.

The employee may challenge the Corporation Counsel's decision not to represent him or her under Article 78 of the New York Civil Practice Law and Rules. [*42] *CPLR § 7803(3); see, e.g., Williams v. City of New York, 64 N.Y.2d 800, 801-02, 486 N.Y.S.2d 918, 919, 476 N.E.2d 317 (1985).*

The City maintains that the issue of whether an Article 78 proceeding is the exclusive means of challenging the Corporation Counsel's determination to deny indemnification has not been directly answered. (City Br. at 31.) The City's research, however, appears to be out of date. In *Harris v. Rivera, 921 F. Supp. 1058 (S.D.N.Y. 1995)*, Judge Scheindlin reviewed the statutory language and case law under GML § 50-k and concluded that "[a] city employee may pursue a claim for indemnification by bringing an action in any court that has jurisdiction to hear the claim." *Id. at 1061.* Judge Scheindlin further held that "it is within the Court's discretion to exercise [supplemental] jurisdiction" over the state indemnification cross-claim where, as here, the indemnification cross-claim arises from the same nucleus of operative facts as the federal claims, *i.e.*, here, Diskin's alleged assault on plaintiff Woo. *Id. at 1061-62.* Judge Scheindlin concluded that "judicial economy dictates trying the issues in the same court and to the [*43] same jury," with careful jury instructions to minimize any confusion. *Id. at 1062. See also Turk v. McCarthy, 661 F. Supp. 1526, 1536 (E.D.N.Y. 1987)* (defendant police officer's GML § 50-k cross-claims are "tightly interwoven with the federal law issues" and Court therefore exercised pendent jurisdiction over those claims).

This Court agrees with Judge Scheindlin's conclusion that a federal district court has supplemental jurisdiction to hear the indemnification cross-claim where, as here, the federal claim and the cross-claim involve the same common nucleus of operative facts: here, the circumstances and liability resulting from Officer Diskin's alleged assault of Woo. Thus, the Court will exercise jurisdiction over Officer Diskin's cross-claim.

**B. *The Indemnification Cross-Claim is Not Premature***

The Court also rejects the City's argument that Officer Diskin's indemnification cross-claim is premature. (*See* City Br. at 32-34.)

"Claims for indemnification do not generally ripen until a judgment in the underlying action is paid." *Harris v. Rivera, 921 F. Supp. at 1062.* However, courts have created a broad exception to this rule:

"where indemnification [*44] is asserted in a third-party action . . . for the sake of fairness and judicial economy, the CPLR allows third-party actions to be commenced in certain circumstances before they are technically ripe, so that all parties may establish their rights and liabilities in one action."

*Id.* (quoting *Mars Assoc. v. New York City Educ. Const. Fund, 126 A.D.2d 178, 191-92, 513 N.Y.S.2d 125, 133* (1st Dep't 1987) (quoting *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp., 51 A.D.2d 140, 146, 379 N.Y.S.2d 873, 880* (4th Dep't 1976))).

Judicial economy dictates that Officer Diskin's cross-claim against the City be litigated at the same time as Woo's primary claim. *See, e.g., Geltzer v. Russell, 49 A.D.2d 823, 824, 373 N.Y.S.2d 566, 568-69* (1st Dep't 1975) (refusing to dismiss defendant police officer's claim for indemnification against the village that employed him). Thus, the City's motion to dismiss Diskin's indemnity cross-claim is denied. [13]

> 13    Because of this disposition, the Court need not address Officer Diskin's argument that the City's motion to dismiss the cross-claim is untimely under the Court's scheduling orders. (*See* Diskin Br. at 10-11.)

**[*45]    VI. *WOO'S NEGLIGENT RETENTION CLAIM ALLUDED TO IN THE PRETRIAL ORDER IS PRECLUDED FOR FAILURE TO PLEAD IT IN ANY COMPLAINT***

Finally, the City has moved to preclude plaintiff Woo's "negligent retention" claim referred to in the pretrial order (PTO, Woo Contentions of Fact PP 26-28), but not asserted in Woo's complaint. (*See* City Br. at 23-25; City Reply Br. at 6.)

Plaintiff Woo filed the original and two amended complaints while represented by counsel and filed a third amended complaint (prepared while represented by counsel) after dismissing counsel. Woo has failed even to request leave of court to file a fourth amended complaint, but simply alluded to the "negligent retention" claim in factual contentions in the pretrial order.

The Court agrees with the City that, at this late date, when discovery is complete and the case essentially is trial ready, it would greatly prejudice the City to allow plaintiff Woo to pursue such a claim. Therefore, plaintiff Woo will not be permitted to pursue this unpled claim at trial. [14]

> 14    Because of this disposition, the Court need not reach the City's argument that the claim must be dismissed because it was not referred to in Woo's Notice of Claim against the City. (*See* City Br. at 23-25.)

**[*46] *CONCLUSION***

For the foregoing reasons, this Court grants summary judgment for defendants Harrop, Daly and McGuinness on all claims. Additionally, the Court grants

1996 U.S. Dist. LEXIS 11689, *

summary judgment to defendant Diskin on Woo's *§ 1981* and *§ 1985(3)* claims and the *§ 1983* claim for false arrest and malicious prosecution. The Courts grants summary judgment for the City on Woo's *§ 1983 Monell* claim. The Court, however, denies summary judgment as to the state law respondeat superior claim against the City and defendant Diskin's cross-claim for indemnification against the City.

For the convenience of the parties, especially pro se plaintiff Woo, the Court summarizes the claims that remain in the case, as follows:

. The first cause of action, for assault -- against defendant Diskin.

. The second cause of action, for battery -- against defendant Diskin.

. The fifth cause of action, for respondeat superior -- against the City.

. The seventh cause of action, for *§ 1983* liability -- against defendant **[*47]** Diskin, limited to excessive force.

All claims except those listed directly above, are no longer in the case.

A further pretrial conference will be held on September 11, 1996 at 10:30 a.m. in Courtroom 20D (500 Pearl Street).

SO ORDERED.

Dated: New York, New York

August 12, 1996

Andrew J. Peck

United States Magistrate Judge