UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

LAWRENCE FOWLER,

                                        Plaintiff,

                    -against-


THE CITY OF NEW YORK, ROBERT T.
JOHNSON, District Attorney, Bronx County, and
the STATE OF NEW YORK, ELIOT SPITZER,
Governor,

                                        Defendants.


------------------------------------------------------------------------x

**DECLARATION OF
SUSAN P.
SCHARFSTEIN**


07 CV 10274 (JSR)


(filed by ECF)

      **SUSAN P. SCHARFSTEIN**, declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct.

      1.     I am an attorney in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, counsel for defendant City of New York. As such, I am familiar with the facts stated below and submit this declaration to place the relevant information and documents on the record in support of defendant's motion for summary judgment dismissing this action in all respects pursuant to Rule 56 of the Federal Rules of Civil Procedure.

      2.     Attached hereto as Exhibit A is a copy of the Complaint in this action that was filed with the Court on November 13, 2007.

      3.     Attached hereto as Exhibit B is a copy of plaintiff's arrest report for his July 25, 1996 arrest.

4.      Attached hereto as Exhibit C is a copy of the grand jury indictment reflecting that plaintiff was indicted on charges of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon on August 7, 1996.

5.      Attached hereto as Exhibit D is a copy of a letter dated April 3, 1998, reflecting that Bronx County Assistant District Attorney Daniel McCarthy disclosed to plaintiff's counsel information concerning witness Ricky Rivera pursuant to Brady v. Maryland in connection with the underlying criminal matter.

6.      Attached hereto as Exhibit E are copies of a court order and warrant dated April 14, 1998, reflecting that Ricky Rivera was to be transferred from a correctional facility in Massachusetts to New York by the Bronx County District Attorney's office to testify as a witness at plaintiff's trial in the underlying criminal matter.

7.      Attached hereto as Exhibit F is a copy of a transcript of an April 15, 1998 hearing reflecting that a request was made to Bronx County State Supreme Court Justice Edward M. Davidowitz to transfer witness Ricky Rivera from a correctional facility in Massachusetts to New York to testify at plaintiff's trial in the underlying criminal matter, and that the state court judge approved the request.

8.      Attached hereto as Exhibit G is a copy of the transcript of the testimony of witness Ricky Rivera on April 30, 1998, and May 1, 1998, at plaintiff's trial in the underlying criminal case.

9.      Attached hereto as Exhibit H is a copy of the decision in People v. Fowler, 272 A.D.2d 127, 708 N.Y.S.2d 852 (1st Dep't 2000), reflecting the Appellate Division, First Department's analysis and conclusion that, inter alia, there was legally sufficient evidence to support plaintiff's conviction.

10.     Attached hereto as Exhibit I is a copy of a request to the New York State Court of Appeals by counsel for plaintiff for leave to appeal the May 9, 2000 decision of the Appellate Division.

11.     Attached hereto as Exhibit J is a copy of the decision of the New York Court of Appeals denying plaintiff's request for leave to appeal his conviction to the Court of Appeals.

12.     Attached hereto as Exhibit K is a copy of correspondence dated May 30, 2006, from Bronx County Assistant District Attorney Daniel McCarthy to New York State Supreme Court Justice Edward M. Davidowitz and counsel for plaintiff reflecting that potentially exculpatory information had just come to the attention of the District Attorney's office as a result of an ongoing investigation by the United States Attorney's Office for the Southern District of New York.

13.     Attached hereto as Exhibit L is a copy of the affidavit of plaintiff's counsel in support of plaintiff's motion to vacate judgment pursuant to New York Criminal Procedure Law § 440.10, based on information that was received by the Bronx County District Attorney's office in June of 2006.

14.     Attached hereto as Exhibit M is a copy of an order of New York State Supreme Court Justice Edward M. Davidowitz dated August 2, 2006, vacating plaintiff's conviction pursuant to New York Criminal Procedure Law § 440.10 based on newly discovered evidence, and ordering plaintiff released from the custody of the New York State Department of Corrections.

15.     Attached hereto as Exhibit N is a copy of a certificate of disposition for the underlying criminal matter arising out of plaintiff's arrest on July 25, 1996.

16.    Attached hereto as Exhibit O is a copy of a document that purports to be a notice of claim, which was received by the Comptroller's Office of the City of New York on or about November 2, 2006.

17.    Attached hereto as Exhibit P is a copy of a document reflecting that the purported notice of claim was disallowed for failure to provide the information required by § 50-e of the New York General Municipal Law.

18.    Attached hereto as Exhibit Q is a copy of correspondence dated May 8, 2008, from the United States Attorney's Office for the Southern District of New York, stating, inter alia, that the U.S. Attorney's office represents that "[t]here is absolutely no basis to believe that the information [exculpating Lawrence Fowler in the 1996 murder of Lamar Jones] was known to the NYPD or to the Bronx District Attorney's Office at the time of the Fowler trial, and indeed [the U.S. Attorney's office is] virtually certain that the information was not and could not have been known to the NYPD or to the Bronx County District Attorney's Office at that time, or at any time until [the U.S. Attorney's office] communicated on the matter with the Bronx District Attorney's Office [in approximately June of 2006]."  A copy of that correspondence was presented to this Court at the hearing held on May 8, 2008 hearing.

19.    Plaintiff has served no requests for discovery in this action, including discovery related to any alleged policy, custom, or practice of the City of New York.

Dated:    New York, New York
          May 20, 2008

_____/S/_____
SUSAN P. SCHARFSTEIN

4

Index No. 07 CV 10274 (JSR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAWRENCE FOWLER,

                                        Plaintiff,

                 -against-

THE CITY OF NEW YORK, ROBERT T. JOHNSON, District
Attorney, Bronx County, and the STATE OF NEW YORK, ELIOT
SPITZER, Governor,

                                        Defendants.

**DECLARATION OF SUSAN P. SCHARFSTEIN**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
Attorney for Defendant City of New York
100 Church Street
New York, N.Y. 10007

*Of Counsel: Susan P. Scharfstein (SS 2476)*
*Tel: (212) 227-4071*
*NYCLIS No.:*

*Due and timely service is hereby admitted.*

*New York, N.Y.* ............................................................... , *200 . . .*

................................................................................ *Esq.*

*Attorney for* ......................................................................

JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------------------x

LAWRENCE FOWLER,                                      :

                        Plaintiff,             :       **COMPLAINT**

               -against-                 :       Index No. _____

THE CITY OF NEW YORK,                                 :
ROBERT T. JOHNSON, District
Attorney, Bronx County, and the                      :
STATE OF NEW YORK,
ELIOT SPITZER, Governor,                             :

                 Defendants.              :

------------------------------------------------------------x

PLAINTIFF, LAWRENCE FOWLER, by his attorney, Pamela D. Hayes,

complaining of the defendants, respectfully alleges, upon information and belief, as

follows:

## NATURE OF THE ACTION

1.      This is a civil action, pursuant to Federal Civil Rights and New York State

law, seeking monetary damages for plaintiff's false arrest, false imprisonment, malicious

criminal prosecution on false charges of Murder 2°, and related charges, involving an

incident in Bronx County on July 26, 1996. Defendant served 10 years unlawfully in

prison from that date until his release on August 20, 2006, after his judgment of

conviction was vacated.

## JURISDICTION, VENUE and CONDITIONS PRECEDENT

2.    This action arises under 42 U.S.C. §§ 1983, 1985 and 1988, and State law.

3.    Jurisdiction for plaintiff's federal claims is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

4.    Supplemental jurisdiction to adjudicate plaintiff's related State law claims is conferred by 28 U.S.C. § 1367.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

6.    This action has been timely commenced.

7.    Plaintiff filed timely notice of claim (which defendant has disallowed).

## THE PARTIES

8.    Plaintiff, LAWRENCE FOWLER, at all relevant times was, and is, a resident of the State of New York, County of the Bronx.

9.    Defendant, CITY OF NEW YORK, is a municipal corporation of the State of New York and is a resident of the Southern District of New York.

10.    Defendant, RICHARD T. JOHNSON, is the District Attorney of Bronx County, and was at all relevant times District Attorney in the District Attorney's Office, Bronx County.  He is named here in his official capacity.

11.    Defendant, Eliot Spitzer, Governor, State of New York, in his official capacity.

12.    At all times material to this Complaint, defendants City of New York,

2

the Bronx County District Attorney and the State of New York, acted toward Plaintiff 'under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment by defendant City of New York, and State of New York.

13. At all times material to this Complaint, Defendants City of New York, and State of New York, acted toward Plaintiff within the scope of their employment.

14. The District Attorney's Office of Bronx County is an agency of Bronx County, a constituent county of the City of New York, and the State of New York.

15. The District Attorney and Assistants District Attorney of Bronx County are agents and employees of the City of New York. The Corrections Officers were agents of the government of the City and State of New York.

16. Plaintiff is a citizen of Bronx, New York, who was a messenger who rode a bike to facilitate deliveries as part of his employment.

17. On July 26, 1996 plaintiff was riding his bike on the way home, when he was picked up on 156th Street and Morris Avenue in the Bronx, on the corner of his block.

18. Plaintiff was stopped and taken with his bike back to a detective car which was parked on Morris Avenue. As plaintiff was talking to the police officers a marked patrol car went by. In the car were two individuals who identified plaintiff. Plaintiff was then told to turn around because he was under arrest. Defendant was then taken into

3

custody and taken to Lincoln Hospital where he sat outside and was then taken to the 44th Precinct.

19.    While plaintiff was in a cell the police took pictures of him.  Plaintiff was then taken to a room within the precinct where the police tried to coerce him into signing a statement.  Plaintiff refused to sign the statement and was taken to the Bronx House.

20.    Plaintiff was arrested for 2nd Degree Murder of a 12 year old boy who was in the courtyard of a building located on Park Avenue, off 161st Street, in Bronx County.

21.    Plaintiff provided 12 witnesses at trial (11 of whom were alibi witnesses and one witness "Rickey" who was present at the scene and was the intended victim of the shooting.  Plaintiff also presented eye witness testimony from a Ms. Gonzales who lived in the building of the courtyard.  All of defendant's witnsses swore plaintiff was not the individual who shot Lamont Jones, because he was not there, or they testified that it was someone else.

22.    The decedent's mother was a probation officer with the City of New York.

23.    Plaintiff was found guilty by a jury during May, 1998, and sentenced to 25 years to life.

24.    Plaintiff appealed his conviction but it was affirmed by the Appellate Division, First Department.  A Writ was denied by the New York State Court of Appeals. Plaintiff did not file a Federal Writ of Habeas Corpus, to that denial.

25.     Throughout the years Plaintiff investigated the case to find evidence to support a CPL 440.10 Motion.  The information was presented to the Bronx County District Attorney's Office, over the years.

26.     In June, 2006 ADA Dan McCarthy of the Bronx District Attorney's Office called Plaintiff's lawyer and informed her his office might have information regarding plaintiff's claim of actual *innocence.*

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### THE UNDERLYING INCIDENT, TRIAL AND PLAINTIFF'S INCARCERATION, THE APPEAL, THE VACATUR OF JUDGMENT OF CONVICTION

27.     Plaintiff was on work release as a result of a plea of guilty to manslaughter and robbery in New York and Bronx Counties.  Plaintiff had received an aggregate term of 8 1/3-to-25 years on the manslaughter and 7 1/2-to-15 years on the robbery.  These counts were to be served concurrently.

28.     Plaintiff applied for work release and was granted that status.  Plaintiff was employed by Express Carrier where he was employed as a messenger.  Plaintiff worked five days a week, eight hours per day.  Plaintiff stayed at Fulton Correctional Facility two days per week.  The other five days were spent at his home located at 301 East 156th Street, No. 1B, Bronx, New York 10451.  Plaintiff had a Parole Officer who visited him at home and a counselor who he conferred with at the facility.

29.     Plaintiff was serving on work release since April, 1994,.  He was returned

5

upstate in 1995 as a result of the "Gulianni & Pataki" revamp of work release. Plaintiff appealed the decision as an Article 78 "Ex Post Facto Ruling" which the Department of Corrections agreed with, and as a result Plaintiff was sent back to Fulton in May of 1996.

30.     Plaintiff went back to his old job as a messenger before this travesty happened.

31.     Plaintiff utilized a bike to deliver his packages for work. He had exculpating information which would have supported his 440.10 Motion.

32.     On August 2, 2006 the trial Court, Honorable Edward Dandowitz granted Plaintiff's CPL 440.10 Motion and vacated his conviction, pursuant to § 8b of the New York Court of Claims Act for Unjust Conviction and Imprisonment.

33.     On August 20, 2006 plaintiff was released from prison as a result of the vacatur of his conviction.

34.     On November 2, 2006 plaintiff filed a Notice of Claim with defendant City of New York.

35.     Plaintiff served 10 years and one month for a crime he did not commit.

## PLAINTIFF'S INJURIES AND DAMAGES

36.     As a direct and proximate consequence of the aforementioned actions by the defendants, plaintiff:

        (a)     Was detained against his will, formally arrested, tried, and imprisoned for 10 years;

6

(b)     Was subjected to degrading, dehumanizing and emotionally destructive behavior while he was in jail and prison.

(c)     Suffered and continue to suffer mental and emotional distress and harm;

(d)     Was denied the opportunity to pursue normal relationship with and to enjoy the companionship, society and service of his fiancee, and his children.

(e)     Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation;

(f)     Incurred debts for the costs of his CPL 440.10 Motion which exceeded $75,000.00;

(g)     Lost thousands of dollars in employment income and permanent impairment of earning power;

(h)     And incurred other items of attendant damages.

## AS AND FOR A FIRST CAUSE OF ACTION

[42 U.S.C. § 1983; All Individual Defendants]

37.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-36 of this Complaint, and hereby incorporate them as though fully set forth herein.

38.     The individual defendants, and others named and unnamed herein [hereafter referred to as "defendants'], individually, in concert with each other, and pursuant to their conspiratorial agreement, caused plaintiff to be confined and falsely

arrested.

39.    Defendants intended to confine plaintiff.

40.    Plaintiff was conscious of his confinement and did not consent thereto.

41.    Plaintiff's confinement was not otherwise privileged.

42.    Defendants, individually, in concert with each other, and pursuant to their tacit or conspiratorial agreement, initiated, and/or caused the initiation and continuation, of criminal proceedings against plaintiff.

43.    The initiation and continuation of the criminal prosecution resulted in plaintiff being deprived of his liberty.

44.    There was no probable cause for the commencement or the continuation of the criminal proceeding.

45.    Defendants acted with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for plaintiff's rights under the Constitution of the United States, and laws of the State of New York.

46.    The prosecution eventually terminated in plaintiff's favor.

47.    The aforesaid conduct of defendants operated to deprive plaintiff of his rights under the Constitution and the laws of the United States:

     (a)    Not to be deprived of liberty or property or to be arrested, detained or imprisoned except upon probable cause to believe them guilty of a crime (Fourth and Fourteenth Amendments);

     (b)    To timely disclosure to appropriate law enforcement authorities and/or to the defense of all evidence favorable to the defense (Due

Process Clauses of the Fifth and Fourteenth Amendments);

( c )    Not to be arrested, indicted, prosecuted, detained or imprisoned through the use of false, fabricated, misleading, or inherently unreliable "evidence," or through the wrongful withholding of material evidence favoring the defendant -- in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments, the right to grand jury indictment under the Fifth and Fourteenth Amendments, the right to a fair trial under the Fifth, Sixth and Fourteenth Amendments, the right to reasonable bail under the Fifth, Eighth and Fourteenth Amendments, and the right to be free of unreasonable search and seizure and deprivation of liberty or property under the Fourth and Fourteenth Amendments.

48.    The foregoing violations of plaintiff's federal constitutional rights by defendants were a direct, proximate and substantial cause of plaintiff's false arrest and imprisonment and malicious criminal prosecution.

49.    The foregoing violations of plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the defendants' employment and authority.

50.    Defendants committed the foregoing violations of plaintiff's rights knowingly, intentionally, wilfully, and/or with deliberate indifference to plaintiff's constitutional rights or to the effect of such misconduct upon plaintiff's constitutional rights.

51.    By reason of the foregoing, all the individual defendants are liable to plaintiff for violating, acting in concert to violate, aiding and abetting each other to violate, and/or conspiring to violate, plaintiff's federal constitutional rights, pursuant to

9

42 U.S.C. § 1983.

## AS AND FOR A SECOND CAUSE OF ACTION
[*Monell*/42 U.S.C. § 1983 Claim Against Defendant
City of New York]

52.    Plaintiff repeats and realleges each and every allegation contained in ¶¶

1-51 of this Complaint, and hereby incorporate them as though fully set forth herein.

53.    The foregoing violations of plaintiff's federal constitutional rights and state

rights and resultant injuries were further directly, proximately and substantially caused by

conduct, chargeable to defendant City of New York, amounting to deliberate indifference

to the constitutional rights of persons, including plaintiff, subject to investigation by the

New York City Police Department or the Bronx County District Attorney's Office, and/or

to prosecution by such D.A.' s Office, namely

    (a)   the institution and implementation of grossly negligent, reckless
        and/or deliberately inadequate or unlawful policies, procedures,
        regulations, practices and/or customs concerning

        i.    the duty not to manufacture for use in criminal investigations
            or proceedings, or to use in such matters, false, misleading or
            unreliable evidence, testimony, statements and argument;

        ii.   the continuing obligation to correct false, inaccurate,
            incomplete or misleading evidence, testimony, statements and
            argument, whenever such misconduct is discovered to have
            occurred;

        iii.  the continuing duty to preserve and to make timely disclosure
            to the appropriate parties, including prosecutorial authorities
            and/or the defense, during criminal investigations, grand jury
            proceedings, and/or prosecutions, of all material evidence or
            information favorable to a person suspected, accused or

convicted of criminal conduct;

    iv.    the duty not to arrest or prosecute a criminal suspect except upon probable cause to believe him guilty of an offense, and/or

    b.    Deliberate indifference by policymaking officials at the New York City Police Department and the Bronx County District Attorney's Office with respect to their obligation to properly instruct, train, supervise and discipline their employees, including the individual defendants in this case, with respect to such matters.

54.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the defendant City of New York, including, but not limited to, the District Attorney of Bronx County and the New York City Police Commissioner, who knew

    a.    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases,

    b.    that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations, and

    c.    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of a criminal suspect or accused and cause him constitutional injury.

55.    Despite their knowledge of said policies, procedures, regulations, practices

11

and/or customs, the supervisory and policymaking officers and officials of the defendant
City, as a matter of policy, perpetuated, or failed to take preventative or remedial
measures to terminate, said policies, procedures, regulations, practices and/or customs,
did not discipline or otherwise properly supervise the individual personnel who engaged
in them, did not effectively instruct, train and/or supervise such personnel (including the
defendants herein) with regard to the proper constitutional and statutory requirements in
the exercise of their authority, but instead sanctioned the policies, procedures,
regulations, practices and/or customs, described above, with a deliberate indifference to
the effect of said policies, procedures, regulations, practices and/or customs upon the
constitutional rights of residents and citizens of the State of New York.

56.    The aforesaid policies, procedures, regulations, practices and/or customs
of defendant City were collectively and individually a substantial factor in bringing about
the aforesaid violations of plaintiff's rights under the Constitution and laws of the United
States and in causing their damages.

57.    Under the principles of municipal liability for federal civil rights violations,
the City's Police Commissioner (or his authorized delegates), with offices at One Police
Plaza, New York, New York, has final responsibility for training, instructing, supervising
and disciplining police personnel with respect to the investigation and prosecution of
criminal matters, the obtaining and safeguarding of material evidence, the disclosure of
evidence to prosecutorial authorities or defendants, and the rights of criminal suspects

and defendants, including the rights not to be subject to false arrest, malicious

prosecution, and the manufacture or use in criminal proceedings of false or misleading

evidence or testimony in violation of due process of law.

58.    The Police Commissioner, personally and/or through his authorized

delegates, at all relevant times had final authority, and constitutes a City policymaker for

whom the City is liable, with respect to the above-mentioned areas.

59.    During all times material to this Complaint, the Police Commissioner owed

a duty to the public at large and to plaintiff, which he knowingly and intentionally

breached, or to which he was deliberately indifferent, to implement policies, procedures,

customs and practices sufficient to deter and to avoid conduct by his subordinates

violating the aforementioned constitutional rights of criminal suspects or defendants and

of other members of the public.

60.    Under the principles of municipal liability for federal civil rights violations,

the District Attorney of Bronx County (or his authorized delegates) has final

managerial responsibility for training, instructing, supervising and disciplining attorneys

and other employees in his office regarding their conduct in the investigation and

prosecution of criminal matters, including, but not limited to, the disclosure of

exculpatory evidence or *Brady* material to appropriate authorities and to the defense, the

conduct of grand jury proceedings, and the safeguarding of the rights of criminal

suspects and defendants, including the rights not to be subject to false arrest, malicious

13

prosecution, and the manufacture and use of false or misleading evidence, testimony, or argument in violation of due process of law.

61.    The District Attorney of Bronx County, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

62.    During all times material to this Complaint, the Bronx County District Attorney owed a duty to the public at large and to plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs and practices adequate to deter and to avoid conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

63.    By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of plaintiff's constitutional rights and their resultant injuries.

## AS AND FOR A THIRD CAUSE OF ACTION
[State Law False Arrest and Imprisonment Claim Against All Defendants]

64.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-63 of this Complaint, and hereby incorporate them as though fully set forth herein.

65.    Defendants intended to confine, or to cause the confinement, of plaintiff.

66.    Plaintiff was conscious of his confinement and did not consent thereto.

14

67.    Plaintiff's confinement was not otherwise privileged.

## AS AND FOR A FOURTH CAUSE OF ACTION
[State Law Malicious Prosecution Claim Against All Defendants]

68.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-67 of this Complaint, and hereby incorporate them as though fully set forth herein.

69.    Defendants initiated, and/or caused the initiation and continuation, of criminal proceedings against plaintiff.

70.    The initiation and continuation of the criminal prosecution resulted in plaintiff being deprived of his liberty.

71.    There was no probable cause for the commencement or the continuation of the criminal proceeding against plaintiff.

72.    Defendants acted with actual malice toward plaintiff.

73.    The prosecution terminated in plaintiff's favor.

## AS AND FOR A FIFTH CAUSE OF ACTION
[State Law Negligent Hiring, Training and Supervision Claim
Against Defendants City of New York, Defendant
Robert T. Johnson, as District Attorney, Bronx County]

74.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-73 of this Complaint, and hereby incorporate them as though fully set forth herein.

75.    The agents, servants and employees of Defendants City of New York, Robert T. Johnson, District Attorney Bronx County, and the State of New York acted within the scope of their authority and employment in this matter.

15

76.     By virtue of the foregoing, defendants City of New York, are liable to

plaintiff for his false arrest and imprisonment and malicious prosecution because of such

defendant's deliberate, reckless and/or negligent failure to adequately hire, train and

supervise their agents, servants and employees with respect to their employment duties.

## AS AND FOR A SIXTH CAUSE OF ACTION

[State Law: Unjust Conviction and Imprisonment Under the
New York State Court of Claims Act, Section 8-b, Against the
City of New York, Robert T. Johnson, District Attorney, Bronx
County, and the State of New York]

77.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-

76 of this Complaint and hereby incorporate them as though fully set forth herein.

78.     The agents, servants and employees of defendants City of New York,

Robert T. Johnson, as the District Attorney of Bronx County, and the State of New York,

acted within the scope of their authority and employment in this matter.

79.     By virtue of the foregoing, the above named defendants are liable to

plaintiff for unjust and wrongful conviction, because of defendants' deliberate behavior

resulting in plaintiff's conviction and wrongful confinement for over 10 years.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all issues in this action.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

I.      For compensatory damages in the amount of $5,000,000;

II.     For punitive damages against the individual defendants in the

16

additional amount of $15,000,000;

III.    For reasonable attorneys' fees, together with costs and

disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

IV.    For pre-judgment interest as allowed by law;

V.    For such other and further relief as to this Court may seem just and

proper.

Respectfully submitted,

PAMELA D. HAYES, ESQ. (PH-2737)
200 West 57th Street
Suite 900
New York, New York 10019
(212) 752-7600 (Phone)
(212) 980-2968 (Fax)
Email: pdhayesesq@aol.com

*Attorney for Plaintiff*

DATED:    New York, New York
           October 31, 2007

```
NEW YORK CITY POLICE DEPT ARREST REPORT RUN DATE 04/21/08 RUN TIME 08:11:41
```

```
************************************************************************
DEFENDANT INFORMATION                         ARREST ID: B96043865
NAME:FOWLER        LAWRENCE     SEX:M RACE:BLACK      DOB:12/15/58 AGE: 37
AKA: _____ CITZ? YES POB:NEW YORK          PHONE:(718)292-6799

ADDR: 301   E156 STREET  BRONX,    NY      RES PCT: UNK-IN NYC
SKIN TONE: LIGHT  HGT: 5'09" WGT: 147 EYE COLOR: BROWN  HAIR COLOR:BLACK
SOC STATUS: SINGLE    SOC SEC #: ___-__-____    DEFT/VICT RELAT: NONE
PHYSICAL COND: APPARENTLY NORMAL      TYPE DRUG USED: NONE
OCCUPATIONAL AREA: NONE
LICENSE/PERMIT-TYPE(EXC DRIVER,OPR,REG): _____ NO: _____
CALLS: NO: _____ NAME: _____ NO: _____ NAME: _____
ORACLE# 16481934 NYSID# 4916801M FAX# B0033961 ARR.PROC: A/O,PRIS.PRESENT,C
```

```
************************************************************************
NARRATIVE: AT T/P/O, THE C/W WAS SHOT BY THE DEFT CAUSING HIS
           DEATH.
           _____
************************************************************************
CHARGES INFORMATION
                 ATT  LAW   SEC SUB  CLS TYPE CTS      DESCRIPTION
TOP CHARGE-->    N   PL   125.25 01   F   A   01  MURDER 2
TOTAL CHARGES    N   PL   265.09 02   F   B   01  CRM USE F/ARM-1
COUNT = 02       __  ___  _____ __   __  __  ___ _____
                 __  ___  _____ __   __  __  ___ _____
************************************************************************
ARREST RELATED INFORMATION          | DAT? NO
                                     |
TIME 21:50 DATE 07/25/96 CMD 044     ********************************
WEAPON POSS/USED:HANDGUN               ARREST LOC: 2 EAST 169 STREET BX
NUM OF ASSOC:00
PROPERTY VOUCHERS:      NONE
```

```
************************************************************************
COMPLAINANT/UF-61/VICTIM INFORMATION
IS COMPL A CORP? NO   OR PSNY? NO   OR DISABLED? NO    TOTAL VICTIMS = 01
COMPL NAME: JONES       LAMAR      SEX: M RACE: BLACK           AGE: 16
ADDR: 1330 WEBSTER AVE BRONX, NY APT# 15C      TEL NUM: (___)___-____
AIDED NO: 003049 AIDED CMD: 044 ACC NO: _____ ACC CMD: ____
UF-61:  NO:011685 CMD:044 SECTOR:G  JURISDICTION: N.Y. POLICE DEPT
TIME & DATE OF OCCURRENCE:     21:20  ON  07/25/96  METHOD: _____
PREMISES:STREET                  LOCATION:3211 PARK AVE BX, NY
************************************************************************
ARRESTING OFFICER INFORMATION
NAME:FITZGERALD     ROBERT  G RANK:DT3 TAX NUMBER: 863510   SHIELD:00624
DEPT:NYPD CMD:BXD 044 CHART: DET DUTY CT        SQUAD: 44   ASSN:INVST

OFFICER:  INJURED? NO    ASSIGNED? NO    ON DUTY? YES   IN UNIFORM? NO
USED FORCE? NO  TYPE:_____ REASON:_____
```

NYC 000202

I N D I C T M E N T

S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K

C O U N T Y   O F   B R O N X

PEOPLE OF THE STATE OF NEW YORK
                    AGAINST

(J)  FOWLER, LAWRENCE – AFO/VFO
        DEFENDANT: 96X044063

INDICTMENT #: 3817-96

GRAND JURY #: 45737/96

COUNTS

    MURDER IN THE SECOND DEGREE
        (  2 COUNTS  )
    MANSLAUGHTER IN THE FIRST DEGREE
    CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE
    CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE

DATE 3-5-99
I hereby certify that the foregoing
...

AUG 1 3 1996

AUGUST 7, 1996

A TRUE BILL

_____
        FOREPERSON

ROBERT T. JOHNSON
DISTRICT ATTORNEY

NYC 000125

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT LAWRENCE FOWLER OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, LAWRENCE FOWLER, ON OR ABOUT JULY 25, 1996, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE THE DEATH OF A PERSON, DID CAUSE THE DEATH OF LAMAR JONES BY SHOOTING HIM.

SECOND COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT LAWRENCE FOWLER OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, LAWRENCE FOWLER, ON OR ABOUT JULY 25, 1996, IN THE COUNTY OF THE BRONX, UNDER CIRCUMSTANCES EVINCING A DEPRAVED INDIFFERENCE TO HUMAN LIFE, DID RECKLESSLY ENGAGE IN CONDUCT WHICH CREATED A GRAVE RISK OF DEATH TO ANOTHER PERSON, AND THEREBY CAUSED THE DEATH OF LAMAR JONES, BY SHOOTING HIM.

THIRD COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT LAWRENCE FOWLER OF THE CRIME OF MANSLAUGHTER IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, LAWRENCE FOWLER, ON OR ABOUT JULY 25, 1996, IN THE COUNTY OF THE BRONX, DID CAUSE THE DEATH OF LAMAR JONES, WHILE ACTING WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO THAT PERSON, BY SHOOTING HIM.

FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT LAWRENCE FOWLER OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, LAWRENCE FOWLER, ON OR ABOUT JULY 25, 1996, IN THE COUNTY OF THE BRONX, DID POSSESS A LOADED FIREARM THAT BEING A HANDGUN WITH INTENT TO USE UNLAWFULLY AGAINST ANOTHER.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

FIFTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT LAWRENCE FOWLER OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, LAWRENCE FOWLER, ON OR ABOUT JULY 25, 1996, IN THE COUNTY OF THE BRONX, DID POSSESS A LOADED FIREARM, THAT BEING A HANDGUN, SUCH POSSESSION NOT BEING IN THE DEFENDANT'S HOME OR PLACE OF BUSINESS.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

ROBERT T. JOHNSON

DISTRICT ATTORNEY

G R A N D   J U R Y   R E P O R T

C O U N T Y :   B R O N X

INDICTMENTS#            GRAND JURY # 45737/96  FINDING: INDICTED

DEFENDANTS                          CORRESPONDING DOCKETS

1. FOWLER, LAWRENCE                 96X044063

INDICTMENT CHARGES:

  MURDER IN THE SECOND DEGREE
    P.L. 125.25(1)
  MURDER IN THE SECOND DEGREE
    P.L. 125.25(2)
  MANSLAUGHTER IN THE FIRST DEGREE
    P.L. 125.20(1)
  CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE
    P.L. 265.03
  CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE
    P.L. 265.02(4)


        SCHEDULED ARRAIGNMENT DATE:

        ARRAIGNMENT PART:

        OTHER ASSOCIATED INDICTMENTS:

                        DATE COMPLETED: AUGUST 7, 1996

                        ADA: JONATHAN SENNETT

                        BUREAU: GRAND JURY EVALUATION BUREAU

NYC 000128



## OFFICE OF THE DISTRICT ATTORNEY, Bronx County

**ROBERT T. JOHNSON**
*District Attorney*

198 East 161st Street
Bronx, New York 10451

(718) 590-2000

April 3, 1998

Pamela D. Hayes, Esq.
245 Fifth Avenue
New York, New York 10016
**VIA TELEFAX**

RE:  PSNY v. LAWRENCE FOWLER
IND. 5827/96

Dear Ms. Hayes:

This letter will confirm our conversation today in furtherance of my obligation pursuant to the teaching of Brady v. Maryland. As I indicated, detectives from my office interviewed one Ricky Rivera on April 1, 1998. Rivera indicated that he was the intended target of the shooting which resulted in the death of Lamar Jones, for which your client stands indicted. He further stated that the shooter was one "Cliff" (last name unknown) who resides in the area of 161st Street and Park Avenue in the Bronx. In addition, it was Rivera's belief that the shooting was the result of an on-going drug dispute between himself and rival neighborhood drug dealers.

Rivera is presently incarcerated at the Massachusetts Department of Correction (Concord, Massachusetts). The following information serves to identify him:

INMATE NAME:    RICKY RIVERA
INMATE PIN:     288171
COMMITMENT:     W64-227

I am in possession of the notes of Det. John Tierney of this office, who conducted the interview of Mr. Rivera and will provide you with a copy on Monday, April 6, 1998, as we discussed.

000143

If you have any questions or desire any further information, please don't hesitate to contact me at 718-590-2462.

Sincerely yours,

Daniel T. McCarthy
Assistant District Attorney

cc: Hon. Edward Davidowitz
    Bronx Supreme Court

PRESENT:  HON. EDWARD M. DAVIDOWITZ, J.S.C.

STATE OF NEW YORK
SUPREME COURT : COUNTY OF THE BRONX
----------------------------------------X   Indictment No.5827-96
                                        :
THE PEOPLE OF THE STATE OF NEW YORK,    :   Edward M. Davidowitz, J.S.C.
                                        :
                    Plaintiff           :   JUDICIAL CERTIFICATE AND
                                        :   REQUEST TO SECURE THE
                                        :   ATTENDANCE OF <u>RICKY RIVERA</u>
                                        :   PURSUANT TO THE UNIFORM ACT
        -against-                       :   TO SECURE ATTENDANCE OF
                                        :   WITNESS FROM WITHOUT THE
                                        :   STATE IN CRIMINAL CASES
                                        :
LAWRENCE FOWLER,                        :   CPL ARTICLE 650.20
                                        :
                    Defendant.          :   MASSACHUSETTS - M.G.L.A. 233
                                        :   §13A, 13B, 13C AND 13D
----------------------------------------X

TO THE SUPERIOR COURT OF MASSACHUSETTS FOR THE COMMONWEALTH OF
MASSACHUSETTS:

      The petitioner, Lawrence Fowler, by his attorney, Pamela D.
Hayes, having applied to this Court for a certificate pursuant to
the above captioned "Uniform Act", codified as Article 650.20 of
the Criminal Procedure Law of the State of New York and M.G.L.A.
233 §13A, 13B, 13C and 13D, certifying the necessity for the
attendance of Ricky Rivera as a witness in this proceeding, and the
Court having heard Pamela D. Hayes Esq. and Daniel T. McCarthy,
Assistant District Attorney for Bronx County, in relation to the
Application, the Court hereby certifies, requests and orders as
follows:
      1.   A criminal trial is pending in the Bronx County Supreme
Court in which the petitioner, Lawrence Fowler, seeks the
attendance of Ricky Rivera as a witness.
      2.   Mr. Ricky Rivera, whose attendance for the purpose of
giving testimony is sought by the petitioner, is a material witness
within the meaning of the Uniform Act.

3.    Mr. Rivera is not within the jurisdiction of the State of New York.   He resides in Massachusetts and is in custody at the Massachusetts Department of Correction, 913 Elm Street, Concord, Massachusetts.  He is described as follows:  Male Hispanic, age 18.

4.    Mr. Rivera's presence is required for a period of no more than 21 days commencing on April 21, 1998.

5.    It would not cause undue hardship for the witness to present him before this Court for the purpose of giving testimony. Moreover, should the Massachusetts Court issue the subpoena requested herein, the witness would be lodged with the New York City Department of Corrections.   The Bronx District Attorney's Office will arrange for his transportation, lodging and expenses.

6.    It is therefore REQUESTED that the Superior Court of Massachusetts for Middlesex County, cause said Ricky Rivera to appear before the said Court for a hearing to determine whether or not the said Court should issue a subpoena with a copy of this certificate attached, requiring the said Ricky Rivera to appear before the Honorable Edward M. Davidowitz at the Supreme Court of Bronx County at 851 Grand Concourse, 7th Floor, Bronx, New York, at 10:00 a.m. on April 21, 1998.

7.    For the purpose of this hearing it is recommended, in lieu of notification of the hearing, that the witness be forthwith brought before the Superior Court.

8.    It is hereby REQUESTED that the Superior Court of the State of Massachusetts order that the said witness, Ricky Rivera, following a hearing, be taken into custody forthwith and delivered to members of the Bronx County District Attorney's Office at the Massachusetts Department of Corrections at Concord, to assure his attendance.  This recommendation is made because there are good grounds for believing that the said witness cannot appear in New York State to give testimony, since he is presently confined.

9.    It is also RECOMMENDED that the Superior Court for the State of Massachusetts determine whether it is necessary for the said witness to be kept in custody to assure the attendance of material witnesses in the State of New York, would be sufficient to assure his attendance at these proceedings.

10.    It is therefore ORDERED that the District Attorney of Bronx County take custody of said witness Ricky Rivera and transport and bear all expenses to and from the State of Massachusetts to the State of New York.

_____

J.S.C.

COUNTY COURT STATE OF NEW YORK
BRONX COUNTY
----------------------------------------X
                                        :
THE PEOPLE OF THE STATE OF NEW YORK     :    Indictment No.5827-96
                                        :
        -against-                       :    WARRANT TO TAKE PROSPECTIVE
                                        :    WITNESS INTO CUSTODY FOR
LAWRENCE FOWLER,                        :    PURPOSE OF CONDUCTING
                                        :    PROCEEDING TO DETERMINE
                                        :    WHETHER HE SHOULD BE
            Defendant.                  :    ADJUDGED A MATERIAL WITNESS
                                        :
----------------------------------------X

### IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK

TO:   DISTRICT ATTORNEY'S OFFICE - BRONX COUNTY and
      THE MASSACHUSETTS DEPARTMENT OF CORRECTIONS
      WITHIN THE CONFINES OF THE JURISDICTION OF
      OF THIS COURT

        An indictment having been filed on the 7th day of August in
the Supreme Court of the State of New York, County of the Bronx,
charging Lawrence Fowler with the crime of Murder in the second degree
and other related charges, and the defendant having made an application
for an Order adjudging Ricky Rivera to appear at a trial at the County
Courthouse in the Bronx, New York on April 20, 1998, at 9:30 A.M. to
testify in the trial of People of the State of New York vs. Lawrence
Fowler as a material witness and is appearing from the allegations of
the aforesaid application that there is reasonable cause to believe that
Rick Rivera would be unlikely to respond to such order, since he is
incarcerated within the custody of the Massachusetts Department of
Corrections at Concord, Massachusetts.

        **YOU ARE, THEREFORE, COMMANDED** forthwith to take the above-
named Ricky Rivera into custody within the State of Massachusetts and
bring him before this court in order that he may testify in the above
stated trial, pursuant to CPL §640.10 and Massachusetts statute (MGLA
c.233 §§ 13A to 13D.

Dated:     Bronx, New York
           April 14, 1998

HON. EDWARD M. DAVIDOWITZ
ACTING SUPREME COURT JUSTICE
BRONX, NEW YORK

EDWARD M. DAVIDOWITZ J.S.C.

1              Proceedings

2    SUPREME COURT OF THE STATE OF NEW YORK

3    TRIAL TERM :   PART 27 :   COUNTY OF BRONX

4    - - - - - - - - - - - - - - - - - - - - - - - - - -X
     PEOPLE OF THE STATE OF NEW YORK      Ind. 5827/96

5

6        -against-                           Excerpt of
                                             hearing
7

     LAWRENCE FOWLER,

8
                 Defendant(s)
9    - - - - - - - - - - - - - - - - - - - - - - - - - -X
                     April 15, 1998
10                   851 Grand Concourse
                     Bronx, New York, 10451
11

12

     BEFORE:          HONORABLE EDWARD M. DAVIDOWITZ,
13                     J U S T I C E.

14

15

     APPEARANCES:
16
                       ROBERT JOHNSON, ESQ.,
17                     Bronx District Attorney
                       For the People
18            BY:  DANIEL McCARTHY, ESQ.
                       Assistant District Attorney.
19

20

21

                       PAMELA D. HAYES, ESQ.
22                     Attorney for Defendant.

23

24                     - - - - - - - - - - - - - -

25                     BETH ABRAMOWITZ, RPR
                       Senior Court Reporter

2

```
 1              Proceedings
 2         THE COURT:  Okay, basically tell us
 3    what it is that you were notified you
 4    need in order to secure the attendance of
 5    this man in New York.
 6         MS. HAYES:  In Massachusetts.  I
 7    spoke to an individual by the name of
 8    Assistant District Attorney Kennedy, Leo
 9    Kennedy.  And, he informed me that in
10    order to proceed to have him help us,
11    what we would need is the Court to make
12    findings of fact stating that this
13    individual is a, is needed for the trial
14    and that you have made that
15    determination.  After that I have to send
16    him all that together with an order which
17    I have up to a Massachusetts judge who
18    will look at the Court's determination
19    and make a finding as to whether or not
20    he will sign the writ.  Once that is
21    done, they will send it to Concord.  Once
22    that is done they will notify us, then I
23    will notify Mr. McCarthy and they can go
24    get Mr. Rivera.
25         THE COURT:  The only thing I would
```

3

| | |
|---|---|
| 1 | Proceedings |
| 2 | ask the district attorney to do, I am |
| 3 | asking, is once all of this has been |
| 4 | done, if there's someone you can call to |
| 5 | expedite it. |
| 6 | MR. McCARTHY:  I will do my best, |
| 7 | Judge.  As I told you, I will accommodate |
| 8 | the Court in whatever way is necessary to |
| 9 | not hold up the proceedings.  With the |
| 10 | understanding that this is not my |
| 11 | application and I don't seek to get |
| 12 | involved in any way with the paperwork. |
| 13 | THE COURT:  What I am asking you to |
| 14 | do, once the application has been |
| 15 | processed in accordance with the |
| 16 | procedure that Ms. Hayes just gave us, if |
| 17 | you can somehow speak to someone and say |
| 18 | please we need this person as a witness. |
| 19 | MR. McCARTHY:  I will be pleased to |
| 20 | grease the skids in whatever way I can. |
| 21 | MS. HAYES:  To let you know, A.D.A. |
| 22 | Kennedy, he seemed pretty good that he |
| 23 | would speed it up along and this wouldn't |
| 24 | be taking a long time because I told him |
| 25 | we need him for next week and he probably |

4

```
 1                      Proceedings
 2      would be here for about three weeks.
 3            THE COURT:  Off.
 4            (Discussion held off the record.)
 5            THE COURT:  In order for me to make
 6      these findings of fact, you need to give
 7      me reasons why this man is a material
 8      witness for your trial, critical witness
 9      for your trial.
10            MS. HAYES:  Your Honor, on Monday, I
11      think it was, April 6th, I received a
12      telephone call from Mr. McCarthy of the
13      Bronx County District Attorney's Office
14      notifying me that he had some Brady
15      material.  He outlined the Brady material
16      which he had informing me that one of his
17      detectives, a Detective Tierney, had
18      spoken with an individual by the name of
19      Ricky Rivera.  Ricky Rivera is a male
20      Hispanic born on February 27, 1980.  And,
21      he had spoken to this individual in
22      Concord, Massachusetts at the
23      Massachusetts Department of Corrections.
24            He informed me at that point that
25      Ricky Rivera had told Detective Tierney
```

5

| | |
|---|---|
| 1 | Proceedings |
| 2 | of the Bronx D.A.'s Office that on the |
| 3 | 25th of July, 1996 he was in the |
| 4 | courtyard of 3211 Park Avenue with an |
| 5 | individual by the name of Lamar Jones; |
| 6 | that they were talking, that all of a |
| 7 | sudden a person by the name of Cliff |
| 8 | pulled up on bikes, and he was with |
| 9 | another person on a bike, and that they |
| 10 | started shooting.  He stated to Detective |
| 11 | Tierney that he was in fact the intended |
| 12 | victim, that he knew Cliff, that they had |
| 13 | been from a rival drug gang or they had |
| 14 | some type of beef about drugs in a drug |
| 15 | tiff and it was Cliff who shot him.  He |
| 16 | said he was with Lamar, they moved over |
| 17 | out of the way of the shooting.  He |
| 18 | didn't realize that Lamar had gotten |
| 19 | shot.  And, when he got in the hallway he |
| 20 | found out that Lamar was struck. |
| 21 | Consequently, he describes this Cliff as |
| 22 | a male black, light skinned, braids, in a |
| 23 | gang who likes to have a .380 revolver. |
| 24 | And that's what he told Detective |
| 25 | Tierney.  So, since he was there, he was |

6

|     |                                                      |
|-----|------------------------------------------------------|
| 1   | Proceedings                                          |
| 2   | with Lamar, he knows who did it, it's                |
| 3   | clearly Cliff, not Lawrence.  I think                |
| 4   | that's the testimony, that's the                     |
| 5   | testimony the jury should hear and weigh             |
| 6   | that in their determination as to whether            |
| 7   | or not Mr. Fowler is the person who                  |
| 8   | killed Lamar Jones.                                  |
| 9   | THE COURT:  Okay, you have nothing                   |
| 10  | to add?                                              |
| 11  | MR. McCARTHY:  I have nothing to                     |
| 12  | add, Judge.  I think that's a fair                   |
| 13  | statement of things as they unfolded.  I             |
| 14  | should indicate and I think this record              |
| 15  | should note that Ricky Rivera to some                |
| 16  | degree in the course of his discussions              |
| 17  | with Detective Tierney implicated himself            |
| 18  | in drug dealing activities and other                 |
| 19  | violent activities and potentially                   |
| 20  | another homicide in the 44 Precinct upon             |
| 21  | which there is still an open case.  And              |
| 22  | he did tell Detective Tierney he would               |
| 23  | refuse to testify if called.  That's                 |
| 24  | another issue and I understand that.                 |
| 25  | THE COURT:  That's something else.                   |

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. McCARTHY:  Right.  But, I think |
| 3 | this record that's going to be made part |
| 4 | of the application for his arrival here |
| 5 | should reflect that as well. |
| 6 | THE COURT:  It should also reflect, |
| 7 | therefore, that when he comes here I will |
| 8 | arrange for an attorney to be assigned to |
| 9 | represent him and to advise him and to |
| 10 | work out whatever parameters have to be |
| 11 | worked out with respect to his |
| 12 | testimony. |
| 13 | In accordance with the provisions of |
| 14 | Article 650 of the Criminal Procedure Law |
| 15 | I am going to adopt the statements that |
| 16 | you made, the narrative that you made, |
| 17 | and adopt it as a finding that Mr. |
| 18 | Rivera, in my judgment, is a material and |
| 19 | necessary witness in this state for the |
| 20 | trial and I will issue an order. |
| 21 | directing, therefore, that he attend in |
| 22 | this court where the trial is pending on |
| 23 | the terms and conditions that I just set |
| 24 | forth and that is that he will be |
| 25 | represented by an attorney who will, if |

8

| 1 | Proceedings |
|---|---|

2    he wishes, be present at the time that he

3    testifies.  We will also arrange for

4    provision for his return at the

5    conclusion of his testimony and take, of

6    course, proper safeguards to maintain his

7    custody.  I am referring specifically to

8    the fact that Mr. Rivera indicated or

9    advised Detective Tierney that he was in

10   the courtyard at the time that the

11   shooting occurred.  He also said that a

12   man named Cliff who, with whom he was,

13   with whom he had an ongoing drug dispute,

14   they were apparently rival drug dealers,

15   came by on a bicycle started shooting

16   into the courtyard and as a result of

17   this shooting Lamar Jones was killed.

18   And, that the man identified as Cliff is

19   not the defendant in this case.

20        Off.

21        (Discussion held off the record.)

22        THE COURT:  To the extent that I

23   didn't refer to your narrative, I

24   incorporate all of your narrative as a

25   finding of fact in support of this

9

```
 1              Proceedings

 2     application and support of my order

 3     directing that he be brought to this

 4     state.

 5          I ask you to prepare whatever orders

 6     have to be executed.  I will sign them

 7     tomorrow and perhaps you can FAX them up

 8     to the District Attorney's Office.

 9          MS. HAYES:  Yes, sir.  I will take

10     care of that.

11          THE COURT:  That concludes the

12     session for today.

13          (Hearing is adjourned to Thursday,

14     April 16, 1998.)

15              * * * * * * * * * * * * * * * * * *

16     This is to certify that the foregoing is

17     a true and accurate transcript of the

18     stenographic minutes taken within.

19

20

21     _____

22     BETH ABRAMOWITZ, RPR
       Senior Court Reporter

23

24

25
```

1

690

2     SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF THE BRONX:TRIAL TERM PART 27
3
      - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
4
      THE PEOPLE OF THE STATE OF NEW YORK,    :    T R I A L
5
              -against-                       :    Indictment No.
6                                                  5827-96
      LAWRENCE FOWLER,                        :
7
                                                   AGNES SANTIAGO
8                               Defendant.    :    JOSE SANTIAGO
                                                   DR. JON PEARL
9     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X    RICKY RIVERA

10                                            851 Grand Concourse
                                              Bronx, New York  10451
11                                            April 30th, 1998

12    B e f o r e :

13                 HONORABLE EDWARD M. DAVIDOWITZ,

14                                                          J. S. C.

15
      A P P E A R A N C E S :
16

17    FOR THE PEOPLE:              OFFICE OF ROBERT T. JOHNSON,
                                   BRONX DISTRICT ATTORNEY
18                                 851 Grand Concourse
                                   Bronx, New York  10451
19                                 BY:  DANIEL McCARTHY.
                                        JONATHAN SENNETT
20                                 ASSISTANT DISTRICT ATTORNEY

21

22    FOR THE DEFENDANT:           PAMELA D. HAYES, ESQ.
                                   245 Fifth Avenue
23                                      Suite 1905
                                   New York, New York   10016
24

25                                      FAYE MOORE
                                        Senior Court Reporter

|   | Proceeding | 794 |

1
2    THE COURT:  Let me just say, as far as the
3    other documents are concerned, we are not talking
4    about his personal property.  The other documents
5    that may have come with him from Massachusettes we
6    are going to endorse the court order and order
7    these things to be brought to court and to be
8    turned over to me and then I will then give them
9    to his attorney to examine them.  In that
10   connection if there's  anything recovered in these
11   documents that would cause Ms. Hayes to reopen her
12   direct examination  I  would  give  you  that  right.
13   And  if  there's  anything in those documents that
14   would cause  Mr. McCarthy  to  reopen his
15   cross-examination I would give you that part as
16   well.  You both have that?
17        MS. HAYES:   Yes, Your Honor.
18        MR. McCARTHY:   Yes.
19        THE COURT:   The other thing is that we have
20   agreed basically that I would tell this jury when
21   they come down that Mr. Rivera is currently in
22   jail in Massachusettes and that he has requested
23   that his attorney, Mr. Kallor, who I will
24   introduce to the jury,  to be present during his
25   testimony.  He has that right and they are not to

Proceeding                795

draw any adverse interest from that fact.  And

that I also give  him the right to consult with

Mr. Kallor any time that he wish to.  There will

be a simple statement by the defendant that he

exercises whatever is going to be worked out.

    MR. KALLOR:  He is not very sophisticated so

it has to be explained.

    THE COURT:  The statement is in effect, he's

taking the Fifth, that's the phrase that he will

use.  Basically that means that he is exercising

his Fifth Amendment privilege not to answer

questions on the ground that his answers may tend

to incriminate him.  Okay.

                (R-E-C-E-S-S.)

    (The witness Ricky Rivera  is present and

represented by Bruce Kallor, Esq., 1220 Lexington

Avenue, New York, New York 10028.)

    THE COURT:  Mr. Rivera, you are here today as

a witness for the defense.  You know that?

    THE WITNESS:    Yes.

    THE COURT:  Now, in that concession, because

of the fact that you are in jail and because of

the circumstances involving this case, I have

assigned Mr. Kallor to represent you.  He's your

1                      Proceeding              796

2       lawyer, right?

3            THE WITNESS:  (Affirmative nod.)

4            THE COURT:  You have the right at any time

5       you want to during the course of the  questioning

6       to speak to Mr. Kallor about any of the questions

7       that are asked of you, right?

8            THE WITNESS:  (Affirmative nod.)

9            THE COURT:  I have also told Mr. Kallor if

10      there comes a time where you feel it is

11      appropriate for you to decline to answer because

12      of your Fifth Amendment rights, you are simply

13      going to say I take the Fifth.  You have any other

14      questions you want to ask me?

15           THE WITNESS:   No.

16           THE COURT:  Mr. Kallor is going to remain

17      here with you throughout your testimony, right?

18           THE WITNESS:  Right.

19           THE COURT:  Jury down.

20           (Whereupon the jurors enter the courtroom at

21      three forty PM.)

22            THE CLERK:   Case on trial continued.  Note

23      the presence of defendant, his attorney, the

24      assistant district attorneys and all jurors.

25           THE COURT:  Okay, folks, the next witness is

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-Defense-Direct                797
 2              a gentleman name Ricky Rivera, and he's seated
 3              here in the witness box.  Now, he has asked and
 4              requested that his attorney, whose name is Mr.
 5              Kallor, Bruce Kallor, be seated behind him,  be
 6              present with him during the course of his
 7              testimony.  He is here.  I have given Mr. Rivera
 8              the right if he wishes to consult with Mr. Kallor
 9              at any time he wishes to do so.  Okay, so that I
10              want you to understand.
11                    All right.   Let's proceed.
12                    (Whereupon the witness is sworn at  three
13              forty PM by the clerk.)
14   R I C K Y      R I V E R A, having been called as a
15   witness  by  and  on behalf of the Defense, having been
16   first duly sworn by the clerk was examined and testified
17   as follows:
18                    THE COURT OFFICER:   Defense witness gives
19              his name as Ricky Rivera, resident of the
20              Commonwealth of Massachusettes.
21                    THE COURT:    Proceed please.
22   DIRECT EXAMINATION
23   BY MS. HAYES:
24      Q.      Good afternoon, Mr.  Rivera.  Can I ask you in
25   a loud clear voice to tell the jury what you name is.
```

```
 1                    Rivera-Defense-Direct                798
 2        A.        Ricky Rivera.
 3        Q.        Are you known by any other nickname?
 4        A.        No.
 5        Q.        Does anybody call you Little Ricky?
 6        A.        No.
 7        Q.        Okay.  Calling your attention to July 25th,
 8   1996, were you living in Bronx County?
 9        A.        Yes.
10        Q.        In the Bronx?
11        A.        Yes.
12        Q.        Where were you living at?
13        A.        3209 Park Avenue.
14        Q.        3209 Park Avenue?
15        A.        Yes.
16        Q.        Is that between 161st Street and 162nd Street
17   and Park?
18        A.        Yes.
19        Q.        Is that the courtyard building?
20        A.        Yeah.
21        Q.        Now, I call your attention to approximately
22   nine PM on the evening of the 25th, did you have occasion to
23   be outside?
24        A.        Yes.
25        Q.        Where in particular were you around nine
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-Defense-Direct              799

 2      seventeen, nine eighteen that evening?

 3           A.       Top steps of the courtyard.

 4           Q.       Where?

 5           A.       Top steps of the courtyard.

 6           Q.       And who were you with?

 7           A.       Lamar.

 8           Q.       Lamar.  Do you know Lamar's last name?

 9           A.       Jones.

10           Q.       Lamar Jones?

11           A.       Yes.

12           Q.       And how do you know Lamar Jones?

13           A.       From school.

14           Q.       From school?

15           A.       Yes.

16           Q.       And do you know anybody else in Lamar's family?

17           A.       His uncle.

18           Q.       His uncle.  And what is Lamar's uncle's name?

19           A.       Adam.

20           Q.       Adam.  Are you and Lamar's uncle friends or

21      were you friends  at that time?

22           A.       Yes.

23           Q.       Did you all hang out together?

24           A.       Yes.

25           Q.       Now, I show you what has been marked
```

```
 1                        Rivera-Defense-Direct                 800
 2   Defendant's Exhibit B in evidence, I ask you to look at that
 3   picture and tell me if you recognize it?
 4                    (Photograph handed to the witness.)
 5        A.        Yes.
 6        Q.        What do you recognize that picture to be of?
 7        A.        Courtyard.
 8        Q.        And is that the courtyard where you were
 9   living at at that time?
10        A.        Yes.
11        Q.        Specifically what building were you living?
12        A.        3209.
13        Q.        Can you see it in that picture?
14        A.        Yes.
15        Q.        Turn the picture towards the jury and show
16   them which building?
17        A.        (Indicating.)
18                    THE COURT:  Indicating the entrance of the
19            building in the middle of the picture toward the
20            rear.
21        Q.        Okay, Mr. Rivera, would you please mark 3209
22   where you were living.
23        A.        (Witness complies.)
24                    THE COURT:  Over the entrance or next to it.
25        Q.        And just write "Ricky".
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                          Rivera-Defense-Direct                 801
 2                    THE COURT:  He's marked 3209 that's it.
 3         Q.         You don't have to write it.  That's okay.
 4                    Now mark Ricky where you and Lamar were
 5    standing?
 6         A.         (Witness complies.)
 7                    THE COURT:  Show it to the jurors.
 8                    He's pointed --- Turn it around and show it
 9              to me.
10                    That's an entrance to the courtyard.  The
11              steps to the courtyard.
12         A.         Yes.
13         Q.         Now, around nine eighteen, nine twenty,  did
14    something happen while you were standing in the courtyard
15    with Lamar?
16         A.         Yeah.
17         Q.         What happened?
18         A.         Two kids rode up on a bike.
19         Q.         Now, two kids rode up on a bike.
20                    THE COURT:  One bike or two bikes there?
21         Q.         Two bikes?
22         A.         Two bikes.
23         Q.         Describe these kids?
24         A.         I can't recall, to the best of my knowledge I
25    can't.
```

| | | Rivera-Defense-Direct | 802 |

1

2    Q.      Excuse me?

3    A.      The best of my knowledge I can't recall it.

4    Q.      Can you tell what race they were?

5    A.      Yes, they was dark skin.

6    Q.      Dark skin?

7    A.      Yes.

8    Q.      When you say dark skin using me as an example

9    were they my complexion?

10    A.      Yes.

11    Q.      Were both of them dark skin?

12    A.      One was light skin.

13    Q.      One was light skin.  And the person who was

14    light skin, what complexion would you say he was?

15    A.      My complexion.

16    Q.      Around your complexion.

17    So two kids rode up on a bike and what happened?

18    A.      One, the dark skin kid pulled out.  I seen

19    something shine and he pulled out and started  shooting.

20    Q.      You said that you saw something shiny?

21    A.      Yes.

22    Q.      And he started shooting.  What did you see

23    that was shiny?

24    A.      Something like it was chrome.

25    Q.      Chrome?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Rivera-Defense-Direct                    803

A.        Yeah.

Q.        It appeared to be chrome to you?

A.        Yes.

Q.        And tell us what you heard?

A.        I just seen two kids on a bike, and one
pulled out.

Q.        And when he pulled out the gun the chrome
thing what happened?

A.        He started shooting and I had called Lamar's
name.

Q.        When you say he started shooting how did it
sound?  How did the shots sound?

A.        Rapidly.

Q.        Now, have you ever heard automatic gunfire?

A.        Excuse me?

Q.        Have you ever heard automatic gunfire, like an
automatic weapon being shot?

A.        Yes.

Q.        Have you ever heard like a single action
gunfire?

A.        Yes.

Q.        What type of gunfire did it sound like to you?

A.        Three eighty.

Q.        Like a three eighty.  Is a three eighty, a

```
 1                      Rivera-Defense-Direct              804

 2     single action or is that an automatic?

 3          A.        Automatic.

 4          Q.        Now, when these people ---

 5                    How many people were shooting?

 6          A.        One.

 7          Q.        I think you said it was the dark skin person?

 8          A.        Yes.

 9          Q.        Have you ever seen these people before?

10          A.        From around the way.

11          Q.        You had seen them from around the way?

12          A.        Yes.

13          Q.        And you describe them as kids; is there a

14     reason that you describe them as kids?

15          A.        Yes.

16          Q.        Why?

17          A.        They were around my age.

18          Q.        They appeared to be around your age?

19          A.        Yes.

20          Q.        How old are you?

21          A.        Eighteen.

22          Q.        How old were you then, two years ago?

23          A.        Sixteen.

24          Q.        You were sixteen years old?

25          A.        Yes.
```

```
 1                    Rivera-Defense-Direct              805

 2         Q.         All right.  Now, I am going to ask you to look

 3    at Defendant's A in evidence, and look at this picture and

 4    tell me if you could see where the two people were standing,

 5    where the dark skin guy started firing the gun?

 6         A.         (Witness writing something.)

 7                    THE COURT:  What have you marked?

 8                    THE WITNESS:  A line.

 9                    THE COURT:  A line.  Could you hand that to

10              me, I'm sorry.

11                    MS. HAYES:  Could you use a triangle.  And

12              mark it like heavy the two triangles.

13         A.         (Witness complies.)

14                    THE COURT:  Can I see it now please.  And

15              then I will ask you to show this to the jury.

16              Okay.  So they were standing to the left of this

17              little railing, is that right?

18                    THE WITNESS:  Yes.

19                    THE COURT:  Show that to the jury.  He has

20              marked a triangle where the two people were.

21                    Has the jury seen it?

22                    (Whereupon the photograph is shown to the

23              jurors.)

24         Q.         And you have indicated that by two triangles,

25    correct?
```

```
1                         Rivera-Defense-Direct                    806
2          A.       Yes.
3          Q.       Do you recall whether either of these kids had
4     on glasses?
5          A.       No.
6                         THE COURT:  I didn't hear the answer.
7          A.       No.
8          Q.       "No", you don't recall or "no" they didn't
9     have glasses?
10         A.       Did not have glasses.
11         Q.       Did not have on glasses?
12         A.       No.
13         Q.       Could you recall anything about their hair?
14         A.       One of them had braids.
15         Q.       One had braids.  Which one had braids?
16         A.       The dark skin one.
17         Q.       The dark skin one.  Now, do you recall, you
18    said that you had seen them in the neighborhood and they
19    were your age, do you recall any names that you associated
20    with these individuals?
21         A.       Just one.
22         Q.       Which one was that?
23         A.       Cliff.
24         Q.       And which one was Cliff?
25         A.       I am not sure.
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
1                    Rivera-Defense-Direct              807
2        Q.        Now, after the shots rang out what happened?
3        A.        Shots rang out I had called Lamar.
4                  THE COURT:  What did you do with Lamar?
5                  THE WITNESS:  I had called Lamar name out,
6            and we started running in 3211.  And he was in
7            back of me.  And when I got upstairs to the fifth
8            floor, 5D, I looked back and I realized Lamar
9            wasn't in back of me.  And then I had looked out
10           the window and I heard screaming.
11       Q.        Now, when you heard the screaming, when you
12   looked out the window did you see anybody?
13       A.        No.
14       Q.        Okay, when you -- Strike that.
15                 Not when you looked out the window, where were
16   you  when  you were looking out in the courtyard at that
17   time?
18       A.        Right on top of 3211, fifth floor.
19       Q.        You were on the roof?
20       A.        No.
21       Q.        Where?
22       A.        In the house.
23       Q.        And when you were on top of 3211 could you see
24   anybody in the courtyard at that point?
25       A.        Little kids.
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-Defense-Direct              808

 2        Q.          All right.  And at that point what were they

 3   doing?

 4        A.          They were screaming.

 5        Q.          All right, do you know a lady name Pepsi?

 6        A.          Yes.

 7        Q.          Do you know a lady name, a young lady name

 8   Priscilla?

 9        A.          Yes.

10        Q.          Who is Priscilla?

11        A.          Pepsi's daughter.

12        Q.          Now, do you know another name for Pepsi?

13        A.          No.

14        Q.          What her real name is?

15        A.          No, Ma'am.

16        Q.          But Priscilla is Pepsi's daughter, right?

17        A.          Yes.

18        Q.          And do you know where they live?

19        A.          3211.

20        Q.          And do you know where their windows were?

21        A.          Yes.

22        Q.          Okay, I ask you to look at Defendant's A in

23   evidence, look at that picture and tell me if you can see

24   Pepsi's windows?

25        A.          (Witness writing something.)
```

1                      Rivera-Defense-Direct              809

2          Q.       Okay.  And where you have made the triangles

3     are those Pepsi's windows?

4          A.       Yes.

5          Q.       And is that under where it says "Priscilla's

6     windows"?

7          A.       Yes.

8          Q.       Those are the same family's windows, right?

9          A.       Yes.

10         Q.       Okay, did there ever ----

11                  MS. HAYES:   Can I show it to the jury,

12              Judge?

13                  THE COURT:  Yes.

14                  (Whereupon the photograph is shown to the

15              jurors.)

16         Q.       Now, did you ever leave the courtyard after

17     the shooting, after you had went upstairs?

18         A.       Excuse me?

19         Q.       Did you ever leave the courtyard?  Did you

20     ever leave from 3211 Park Avenue, that's the courtyard; did

21     you ever leave the building?

22         A.       I went to my building 3209.

23         Q.       And did you ever leave 3209?

24         A.       Yes.

25         Q.       How did you leave 3209?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-Defense-Direct              810

 2        A.       The next day I left.

 3        Q.       Ha?

 4        A.       The next day I left.

 5        Q.       Did you stay in the building the entire time

 6   after the shooting?

 7        A.       Yes.

 8        Q.       Did you ever see anybody inside a window in

 9   Pepsi's house?

10        A.       Yes.

11        Q.       Who did you see?

12        A.       Pepsi.

13        Q.       Where was she standing?

14        A.       Sitting.

15        Q.       She was sitting.  And where was she sitting?

16        A.       The middle window.

17        Q.       And was that after the shooting?

18        A.       Before.

19        Q.       Before.  Now, Mr. Rivera, you are in jail

20   serving a sentence in Massachusettes, is that correct?

21        A.       Yes.

22        Q.       And you are at the Concord Correctional

23   Facility?

24        A.       Yes.

25        Q.       And how did you come to get here to Bronx
```

1                      Rivera-Defense-Direct                    811

2   County, back to Bronx County?

3        A.        Some Bronx  DA  detectives had came and got

4   me.

5        Q.        Now, somebody  had  to  come and get you,

6   right?

7        A.        Yes.

8        Q.        You couldn't leave on your own, right?

9        A.        No.

10       Q.        Did you have to go before a judge in

11  Massachusettes to be brought back to New York?

12       A.        Yes.

13       Q.        Okay and did that happen?

14       A.        Yes.

15       Q.        Okay.  Now, see this gentleman over here?

16       A.        Yes.

17       Q.        Have you ever seen him before today?

18       A.        No.

19       Q.        Was he the person, the dark skin man who was

20  shooting at you on July 25th, 1996?

21       A.        No.

22       Q.        Was he the light skin man that was shooting at

23  you in front of 3211 Park Avenue?

24       A.        No.

25       Q.        On July 25th?

1                   Rivera-Defense-Direct                    812

2       A.        Nope.

3       Q.        Did you ever see Lamar Jones after that day

4  anymore?

5       A.        No, Ma'am.

6                 FROM THE AUDIENCE:   You're a liar.   You're

7            a liar.

8                 THE COURT:   Please don't do that.

9            I am going to direct the jury to please

10           disregard all of that.   That was an outburst, it

11           is unfortunate but you disregard it and

12           concentrate only on the evidence that you hear

13           from the witness stand.

14      Q.        Mr. Rivera, when was the first time that you

15  spoke to me about this case?

16                MR. McCARTHY:   Objection.

17                THE COURT:   No, I will permit you to say when

18           was the first time you spoke to her.

19      A.        Yesterday.

20      Q.        And was that in the presence of your lawyer?

21      A.        Yes.

22      Q.        And prior to that had you spoken to people

23  from the Bronx County district attorney's office?

24      A.        Yes.

25      Q.        And did they come up to your jail place to

```
 1                    Rivera-Defense-Direct              813

 2    speak to you?

 3        A.      Yes.

 4        Q.      Was Mr. Sennett one of the people who came?

 5        A.      Yes.

 6        Q.      You how many other people came to speak to

 7    you?

 8        A.      Two other people.

 9        Q.      Two other people.  And were all three of them

10    speaking to you at the same time?

11        A.      One.

12        Q.      Who was speaking to you?

13        A.      Detective.

14        Q.      It wasn't Mr. Sennett?

15        A.      He had said a few words.

16        Q.      Oh he said a few words?

17        A.      Yes.

18                MS. HAYES:  Thank you.

19                THE COURT:   Cross-examination.

20    CROSS-EXAMINATION

21    BY MR. McCARTHY:

22        Q.      You testified that there were two guys

23    shooting at you?

24        A.      Right.

25        Q.      Ms. Hayes just asked you if the dark skin guy
```

1                        Rivera-People-Cross                    814

2      was shooting at you and you said no.  And then she asked you

3      if the light skin guy was shooting at you and you said it

4      wasn't the light skin guy?

5           A.        Yes.

6           Q.        So how many guys were shooting at you?

7           A.        One.

8           Q.        And this is the sixteen year old guy with a

9      silver three eighty?

10          A.        Yes.

11          Q.        Okay.  Now, would you tell the jurors what you

12     mean by three eighty?

13          A.        Three eighty automatic.

14          Q.        And automatic means you know the difference,

15     do you not, between a revolver type gun and an automatic or

16     semi-automatic?

17          A.        Yes.

18          Q.        And a semi-automatic would be the kind of gun

19     that when it is  fired the shells eject from it, right?

20          A.        Yes.

21          Q.        That's the kind of gun we are talking about

22     that someone was shooting at you?

23          A.        Yes.

24          Q.        What are you in jail in Massachusettes for?

25          A.        For attempted murder.

```
 1                        Rivera-People-Cross                815

 2           Q.        What happened with that?

 3           A.        Nothing happened.

 4           Q.        Who did you try to murder?

 5           A.        Some kid.

 6           Q.        You know his name?

 7           A.        Lance Tatter.

 8           Q.        Why did you try to murder him?

 9           A.        Personal problems.

10           Q.        What kind of problems?

11           A.        He tried to murder me.

12           Q.        How did he try to murder you?

13           A.        He pulled out on me.  He pulled a gun out on

14    me.

15           Q.        And you had a gun yourself?

16           A.        Yes.

17           Q.        And did you actually shoot him?

18           A.        Yeah.

19           Q.        Where did you hit him?

20           A.        In the chest.

21           Q.        Were you trying to kill him?

22           A.        Yes.

23           Q.        Did he hit you when he shot at you?

24           A.        No.

25           Q.        Did he get a chance to get a shot off?
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-People-Cross                816
 2         A.      Nope.
 3         Q.      So, when he pulled out, you pulled out faster
 4  and you shot him?
 5         A.      Right.
 6         Q.      Why did you pull out on him?
 7         A.      Excuse me?
 8         Q.      Why did he pull an automatic and try to kill
 9  you?
10         A.      I have no idea.
11         Q.      Well, you knew his name, right?
12         A.      Yes.
13         Q.      And you said that you had a personal problem
14  with him?
15         A.      Yes.
16         Q.      What was the personal drug problem?
17         A.      Over drugs.
18         Q.      Okay.  Were you dealing drugs in
19  Massachusettes?
20                 (Defendant confers with attorney.)
21         A.      Plead the Fifth.
22         Q.      When you say it was over drugs, what do you
23  mean by that?
24         A.      Over drugs.
25         Q.      How?
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-People-Cross                817
 2      A.        Plead the Fifth.
 3                MR. McCARTHY:   I want to talk to you about
 4           that at the bench, Judge.
 5                THE COURT:  Come on up.
 6                (Whereupon there was an off the record
 7           discussion.)
 8                (Counsel confers with the witness.)
 9      Q.        You said that after the shooting you ran into
10   3211, am I right?
11      A.        Yes.
12      Q.        You ran up to the fifth floor?
13      A.        Yes.
14      Q.        You didn't live there did you?
15      A.        No.
16      Q.        Who lived on the fifth floor?
17      A.        A friend of mine.
18      Q.        What's the person's name?
19      A.        Danny.
20      Q.        Danny what?
21      A.        I don't know his last name.
22      Q.        And you stayed in the house all through the
23   night until the next day?
24      A.        No.
25      Q.        You went up to the roof?
```

```
 1                    Rivera-People-Cross              818
 2        A.        After.  After I seen everybody downstairs then
 3    I went over the roof.
 4        Q.        Then where did you go?
 5        A.        To my house.
 6        Q.        3209?
 7        A.        Yes.
 8        Q.        Did you go down from the roof?
 9        A.        Yes.
10        Q.        And by then ----
11                  How long did it take the cops to get there do
12    you know?
13        A.        Not, best of my knowledge I don't.
14        Q.        After you went back to 3209 did you go into
15    your house then?
16        A.        Yes.
17        Q.        And when did you next come out of your  house?
18        A.        Next morning.
19        Q.        And okay you said that you were with a Lamar
20    Jones, right?
21        A.        Yes.
22        Q.        And you knew Lamar didn't you?
23        A.        Yes.
24        Q.        Okay.  He was a good kid, right?
25        A.        Yes.
```

```
1                        Rivera-People-Cross                819
2            Q.        You went to school with him?
3            A.        Yes.
4            Q.        And were you talking with him before this
5    happened?
6            A.        Yes.
7            Q.        Were there other people in the courtyard?
8            A.        Yes.
9            Q.        How many?
10           A.        Like a couple of kids, two or three.
11           Q.        Younger than you?
12           A.        Yes.
13           Q.        And then you and Lamar?
14           A.        Yes.
15           Q.        Any adults?
16           A.        No.
17           Q.        Okay.   So, would you say that you were a
18   friend of Lamar's?
19           A.        Yes.
20           Q.        Okay.  So when did you call 911?
21           A.        I never called 911, I didn't have no phone.
22           Q.        Didn't you know Lamar was hurt?
23           A.        No.
24           Q.        When did you find out?
25           A.        When I heard everybody screaming.
```

```
 1                    Rivera-People-Cross                820
 2         Q.      You said that you ran into 3211, isn't that
 3    so?
 4         A.      Yes.
 5         Q.      And you were with Lamar?
 6         A.      Yes.
 7         Q.      Who was ahead you or him?
 8         A.      Me.
 9         Q.      Okay.  Then where did you go?
10         A.      To the top, fifth floor.
11         Q.      Was Lamar with you?
12         A.      I thought he was.
13         Q.      Were you worried about him?
14         A.      Yes.
15         Q.      So did you go back down to see what had
16    happened?
17         A.      No.
18         Q.      You said there was no phone, did your friend
19    Danny have a phone?
20         A.      No.
21         Q.      How many apartments are in that location?
22         A.      Fifth floor?
23         Q.      Say on each floor?
24         A.      Four.
25         Q.      And how tall is the building?
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                          Rivera-People-Cross                    821

2          A.        Excuse me?

3          Q.        How tall is the building, how many flights?

4          A.        Five.

5          Q.        So there's at least twenty apartments in

6    there, is that fair?

7          A.        Yes.

8          Q.        Okay.  And did you knock on anybody's door to

9    use the phone to get help for Lamar?

10         A.        No.

11         Q.        How come?  You never came down to see what was

12   going on after this happened, right?

13         A.        No.

14         Q.        How come?

15         A.        Scared.

16         Q.        Well, this guy your age with the three eighty,

17   was he shooting at you?

18         A.        Yes.

19         Q.        That wasn't the first time anybody had been

20   shooting at you was it?

21         A.        No.

22

23                        (TO BE CONTINUED.)

24

25

822

d-LB                    RIVERA-PEOPLE-CROSS

1

2       Q.      How any times had people been shooting

3    at you before that?

4       A.      Two or three times.

5       Q.      It's two or three?

6       A.      Three times.

7       Q.      Had you ever been shot?

8       A.      Yes.

9       Q.      How any times?

10       A.      Once.

11       Q.      Where?

12       A.      Back.

13       Q.      Now, when that happened, were you shot

14    in the back because you were running away?

15       A.      No.

16       Q.      How was it you got shot in the back?

17       A.      In a car.

18       Q.      A car passed by?

19       A.      No, I was in the car.

20       Q.      Somebody shot you in the back?

21       A.      No.

22       Q.      How did it happen?

23       A.      I was in a Honda Civic.  It went

24    through the back panel, hit me in the back.

25       Q.      Was somebody trying to kill you?

823

```
 1    d-LB              RIVERA-PEOPLE-CROSS
 2         A.    Yes.
 3         Q.    And aside from yourself, were there
 4    some people trying to kill other members of your
 5    family too?
 6         A.    Yes.
 7         Q.    Didn't somebody shoot at your mom not
 8    too long before this happened?
 9         A.    Yes.
10         Q.    And do you have a brother?
11         A.    Yes.
12         Q.    More than one?
13         A.    One.
14               THE COURT:  Ask he question.
15         Q.    Do you have more than one brother?
16         A.    No.
17         Q.    How many?
18         A.    One.
19         Q.    That's Pauli?
20         A.    Yes.
21         Q.    Someone tried to kill Pauli too, right?
22         A.    I guess so.
23         Q.    Well, do you know?
24         A.    Excuse me?
25         Q.    Do you know if someone was shooting at
```

824

```
  1    d-LB                RIVERA-PEOPLE-CROSS
  2    Pauli?
  3         A.    Yes.
  4         Q.    Do you look like Pauli?
  5         A.    Not really.
  6         Q.    Was Pauli with your mom when someone
  7    shot at Pauli?
  8         A.    Yes.
  9         Q.    Now, the other times when someone tried
 10    to kill you, did you call 911?
 11         A.    No.
 12         Q.    Did you tell the police about it?
 13         A.    No.
 14         Q.    Any of them?
 15         A.    No.
 16         Q.    Is that because you were going to take
 17    care of it yourself?
 18         A.    Plead the Fifth.
 19         Q.    Well, I mean, someone was trying to
 20    kill you, right?
 21         A.    Yes.
 22         Q.    And after this shooting -- you didn't
 23    get hit when Lamar got hit, did you?
 24         A.    No.
 25         Q.    But you were so afraid, you went inside
```

```
 1    d-LB              RIVERA-PEOPLE-CROSS
 2    and stayed there overnight; is that true?
 3         A.    No.
 4         Q.    You weren't afraid?
 5         A.    Yes, I was afraid.  I ain't stayed
 6    overnight at 3211.
 7         Q.    You didn't--
 8               THE COURT:   You went into 3211.
 9               THE WITNESS:  I did not stay overnight
10         at 3211.
11               THE COURT:  You went to 3209 where you
12         lived?
13               THE WITNESS:  Yes.
14         Q.    And you remained there?
15         A.    Yes.
16               THE COURT:  Until the next morning?
17         A.    Yes.
18         Q.    This is the question:  You ran inside
19    when the shooting happened, correct?
20         A.    Yes.
21         Q.    You went upstairs, then you went to the
22    roof, and then you walked across the roof to 3209,
23    right?
24         A.    Yes.
25         Q.    And you never came back out of the
```

826

d-LB                 RIVERA-PEOPLE-CROSS

building until the next morning; isn't that true?

    A.    Yes.

    Q.    Because someone was trying to kill you;

isn't that true?

    A.    Yes.

    Q.    Now, were you worried being on the

street that someone was trying to kill you?

    A.    Yes.

    Q.    And were you watching people when they

were coming around looking suspicious just in case

they might try to shoot you?

    A.    Yes.

    Q.    So when you were talking with Lamar,

which way were you facing?

    A.    Facing towards the entrance.

    Q.    Towards?

    A.    Toward the entrance.

    Q.    Meaning where the sidewalk is?

    A.    Yes.

    Q.    Now, inside the courtyard the night

this happened, it's kind of dark; isn't it?

    A.    Yes.

    Q.    Are you a lot taller now than you were

then?

827

1     d-LB                RIVERA-PEOPLE-CROSS

2          A.     Yes.

3          Q.     How tall were you back on July 25,

4     1996, in relation to Lamar?

5          A.     Couple inches taller.

6          Q.     But not real tall like you and I,

7     right?

8          A.     Yes.

9          Q.     What direction was Lamar facing when

10    this shooting happened?

11         A.     Facing towards the--

12         Q.     Towards what?

13         A.     The sidewalk.

14         Q.     So were you looking towards the

15    sidewalk?

16         A.     Yes.

17         Q.     Now, you said these guys came up on

18    bikes; is that right?

19         A.     Yes.

20         Q.     What kind of bikes?

21         A.     Mountain bikes.

22         Q.     Would that be black mountain-type bikes

23    with straight handle bars, you know what I mean,

24    as opposed to curved bars?

25         A.     No.  I couldn't see.  I just seen the

828

1      d-LB              RIVERA-PEOPLE-CROSS

2      black bike.  Look like a black mountain bike.  I

3      couldn't see the handle bar.

4                  MR. McCARTHY:  Can we show the witness

5            what we have marked previously as People's

6            15, Judge?

7                  THE COURT:  Yes, we can.

8      Q.     Is that the kind of bike?

9      A.     Yes.

10     Q.     Is that the bike, do you know?

11     A.     No.

12     Q.     How do you know it's not the bike?

13     A.     I can't recall.  I don't know because I

14     couldn't see the handle bars.  So I am not really

15     sure if that's the bike or not.

16     Q.     What made you described it as black

17     mountain bike?  What made you describe it as

18     mountain bike?

19     A.     Because it was dark, it was a dark

20     color.

21     Q.     You mean any dark bike is a mountain

22     bike to you?

23     A.     Yes.

24     Q.     Now, one of the things that made you

25     run was that you saw a gun come out; correct?

```
 1     d-LB              RIVERA-PEOPLE-CROSS
 2         A.    I ain't seen a gun, I seen something
 3     shining.
 4         Q.    Where did it come from?
 5         A.    Waistline.
 6         Q.    Show the jury how the person with that
 7     shiny gun pointed at you?
 8         A.    Like this (indicating).
 9               THE COURT:  He removed his hand from
10         his waist, and then in a pointing motion
11         stretched his arm out in front of him, and
12         pointed his arm, and pointed his finger
13         directly at the front.
14         Q.    Pulled out and pointed at you?
15         A.    Yes.
16         Q.    Now, did you start moving when that
17     happened?
18         A.    I started moving when I seen -- started
19     moving before he pointed at me.
20         Q.    So even before he had that shiny object
21     out, you were already breaking out towards 3211;
22     is that true?
23         A.    Yes.
24         Q.    Okay.  So how long would you say it was
25     that you were looking at these guys on the
```

830

1    d-LB                RIVERA-PEOPLE-CROSS

2    mountain bike with the shiny object?

3          A.    One or two seconds.

4          Q.    Like that right (indicating)?  Before

5    he even had the gun straight out, you were already

6    moving; is that true?

7          A.    Yes.

8          Q.    What did you do with Lamar?

9          A.    Excuse me?

10         Q.    What did you do with Lamar?

11         A.    I screamed his name.

12         Q.    Did you grab him?

13         A.    No.

14         Q.    Did you duck behind him?

15         A.    No.

16         Q.    Now, in the courtyard there when this

17   happened, did you have a gun in the courtyard when

18   this guy pulled out on you?

19         A.    Plead the Fifth.

20         Q.    You refuse to answer that question

21   whether you had a gun on you when the shooting

22   started?

23         A.    Plead the Fifth.

24               THE COURT:  He refused to answer.

25               MR. McCARTHY:  I request, Judge, that

831

1    d-LB                RIVERA-PEOPLE-CROSS

2        you compel that answer pursuant to 50.20 of

3        the Criminal Procedure Law.

4            THE COURT:  I am sorry.  His lawyer

5        just advised him he can answer the question.

6        You can answer the question.

7        A.    No, sir.

8        Q.    So you didn't have a gun?

9        A.    No.

10       Q.    But you owned a gun though, right?

11       A.    No.

12       Q.    Didn't you have a gun in your

13   apartment?

14       A.    Excuse me?

15       Q.    Didn't you have a gun upstairs in your

16   apartment?

17       A.    Plead the Fifth.

18           THE COURT:  I ask he be compelled to

19       answer, Judge.

20           THE COURT:  Come up a moment.

21           (An off-the-record discussion was held

22       between the Court and counsel at the bench.)

23           THE COURT:  Based upon -- if you wish

24       some explanation from your lawyer, you can

25       ask him, but I am directing you to answer the

832

1    d-LB              RIVERA-PEOPLE-CROSS
2         that question.
3              THE COURT:  Answer the question, sir?
4         A.    No, I did not have a gun.
5              MR. McCARTHY:  Judge, I want to be
6         heard on this.
7              THE COURT: The question is whether you
8         had a gun in your apartment.
9              THE WITNESS:  No, sir.
10        Q.    Did you own a gun at that time?
11        A.    No, sir.
12             MR. McCARTHY:  I'd like to be heard on
13        this, Judge?
14             THE COURT:  Come up.
15             (An off-the-record discussion was held
16        between the Court and counsel at the bench.)
17             THE COURT:  Come on back up, Mr.
18        Rivera.
19             THE COURT:  I am going to give you a
20        little instruction.  Anytime the District
21        Attorney ask you a question, and says either
22        before or after he asks the question that he
23        is asking this question pursuant to Article
24        50 of the Criminal Procedure Law -- let's
25        make it that one because it's convenient --

833

1    d-LB              RIVERA-PEOPLE-CROSS

2         you have to answer the question.

3              If you have any question about that,

4         Mr. Kallor will explain it to you.  Anytime

5         he says something about Article 50 of the

6         Criminal Procedure Law, you must answer the

7         question, okay.  You understand?

8              (The defendant confers with his

9         attorney.)

10        Q.    Do you understand that if I ask you

11   questions that you might give an answer that

12   incriminate you in a crime, you don't have to

13   answer?  You know that, right?

14        A.    Yes.

15        Q.    So that if you take the Fifth

16   Amendment, you don't have to answer that

17   question.  You understand that, am I right?

18        A.    Yes.

19        Q.    And that's why your attorney is here

20   with you to advise you about that, correct?

21        A.    Yes.

22        Q.    Do you also understand now that if I

23   ask questions that you don't want to answer and I

24   ask the Judge to give you immunity, you have to

25   answer, and you can be prosecuted for anything you

834

1    d-LB              RIVERA-PEOPLE-CROSS

2    say.  You understand that?

3         A.    Yes.

4         Q.    You had a drug spot that you were

5    working on the corner of 161st Street and Park

6    Avenue on July of 1996, correct?

7         A.    Plead the Fifth.

8              MR. McCARTHY:  I ask you to compel the

9         answer pursuant to Article 50, Judge.

10             THE COURT:  You must answer the

11        question.

12        A.    Yes.

13        Q.    Okay.  Now, what kind of drugs were you

14   selling?

15        A.    Plead the Fifth.

16             MR. McCARTHY:  He has to answer that,

17        Judge.

18             THE COURT:  All questions relating to

19        this last question about drugs People are

20        offering immunity.

21             MR. McCARTHY:  Absolutely, correct.

22             THE COURT:  You are now being given

23        immunity for any questions that is now going

24        to be asked of you with respect to the sale

25        of drugs and with respect to this drug spot

835

```
 1    d-LB                RIVERA-PEOPLE-CROSS
 2         that you said that you were running from that
 3         location.  You understand me?  It means you
 4         can't be prosecuted for any answer that you
 5         give.
 6                  THE WITNESS:  Yes.
 7                  THE COURT:  Now, ask the question,
 8         please.
 9         Q.    What kind of drugs do you sell?
10         A.    Crack, cocaine.
11         Q.    And where was the spot located?
12         A.    Corner store.
13         Q.    That's the store that's just around the
14    corner from the courtyard, right?
15         A.    Yes.
16         Q.    And these people who were trying to
17    kill you in that month were people connected with
18    trying to take over your drug business; isn't that
19    true?
20         A.    Yes.
21         Q.    How many people did you have working
22    for you?
23         A.    One.
24         Q.    Who was doing the selling?
25         A.    The person that was working for me.
```

836

1    d-LB              RIVERA-PEOPLE-CROSS

2        Q.    Because you didn't want to be the one

3    on the corner that maybe sell to an undercover and

4    you get locked up, right?

5        A.    Yes.

6        Q.    Now, this person working for you, do

7    you that person's name?

8        A.    I don't know.

9        Q.    You don't know the name of the person

10   working for you?

11       A.    No.

12       Q.    What is the street name?

13       A.    Black.

14             THE COURT:  I didn't hear that.

15             THE WITNESS: Black.

16       Q.    Was your drug business open every day?

17       A.    Yes.

18       Q.    How long every day were you in

19   operation?

20       A.    Eleven hours.

21       Q.    Eleven?

22       A.    Yes.

23       Q.    So you had someone working for you for

24   eleven hours a day selling drugs on the corner of

25   161st Street and Park Avenue; is that right?

1    d-LB              RIVERA-PEOPLE-CROSS

2         A.    Yes.

3         Q.    And you don't know that person's name?

4         A.    No.

5         Q.    Well, how much money were you bringing

6    in every day selling drugs with this person whose

7    name you don't know?

8         A.    Not much.

9         Q.    How much?

10        A.    Five to 700.

11              THE COURT:  What was that?

12              THE WITNESS:  500 to 700 a day.

13        Q.    What does that come out to a week?

14        A.    Like $2,000, 3,000.

15        Q.    How much?

16        A.    $2,000, $3,000 a week.

17        Q.    How much you were clearing and how much

18   you were moving?

19        A.    Plead the Fifth.

20              MR. KALLOR:  May we approach?

21              THE COURT:  Yes.

22              (An off-the-record discussion was held

23        between the Court and counsel at the bench.)

24              THE COURT:  Okay.  After all, you don't

25        have to answer the last week.

838

1    d-LB                RIVERA-PEOPLE-CROSS

2         Q.    So, you would give five to seven

3    hundred dollars worth of the crack a day to

4    someone whose name you don't know; is that what

5    you are telling the jury?

6         A.    Yes.

7         Q.    Who were you getting crack from?

8         A.    Some kids.

9         Q.    What is his name?

10        A.    I don't know.

11        Q.    Where does he live?

12        A.    Downtown Manhattan.

13        Q.    Now, who are these guys who are trying

14   to kill you?

15        A.    I don't know.  Kids from around the

16   block.

17        Q.    Well, you knew that there were drugs

18   spots across 161st Street and the project, right?

19        A.    Yes.

20        Q.    And by the way that would -- where

21   would the spots be, on the other side of the

22   street?  Can you read that map?

23        A.    Right here (indicating).

24        Q.    Corner of 161st and Park, on the other

25   side?

839

1    d-LB              RIVERA-PEOPLE-CROSS

2        A.    Yes.

3        Q.    And going down into the project, there

4    were some spots in the project too, right?

5        A.    Yes.

6        Q.    301 East 156th is a drug spot?

7        A.    Excuse me?

8        Q.    You see where it says 301 and with a

9    green "X," that's a drugs spot, right?

10             MS. HAYES:  Objection.

11             THE COURT:  Have you ever seen drugs

12   sell from that location before.

13             THE WITNESS:  No, sir.

14       Q.    Well, did you know that there were

15   drugs dealers operating in that area too?

16       A.    No, sir.

17             MR. McCARTHY:  Judge, I have a

18             photograph I'd like to have marked for

19             identification as People's 23 for

20             identification.

21             MS. HAYES:  Your Honor, could I see

22             those photographs?

23             (Whereupon, People's Exhibit Number 23

24             was marked for identification.)

25             COURT OFFICER:  So marked for

840

1    d-LB                 RIVERA-PEOPLE-CROSS

2        identification.

3            MR. McCARTHY:  Can we show it to the

4        witness, Judge?

5            THE COURT:  Yes.

6            (Document handed to the witness.)

7    Q.    You know that guy?

8    A.    No, sir.

9    Q.    Put the it down.  Now, I asked this

10   before.  In Massachusetts you said that you tried

11   to murder somebody over a beef over drugs.  You

12   remember that, or I asked you that question and

13   you wanted to take the Fifth?  You remember that?

14   A.    Yes.

15   Q.    I'd ask you to -- I want to know about

16   that beef, and I'd ask the Judge to compel an

17   answer to that pursuant to Article 50?

18           MS. HAYES:  I would object.  He can't

19       compel it in Massachusetts.

20           THE COURT:  Only Mr. Kallor can

21       object.  Come up for a second.

22           (An off-the-record discussion was held

23       between the Court and counsel at the bench.)

24           THE COURT:  That question at this time

25       is being withdrawn.

841

1    d-LB                RIVERA-PEOPLE-CROSS

2        Q.    Okay.  Now, in July of 1996, someone

3    was trying to kill you over your drugs spot; is

4    that true?

5        A.    Yes.

6        Q.    And how were they trying to kill you?

7        A.    What you mean?

8        Q.    They were shooting at you?

9        A.    Yes.

10        Q.    And you said it was a number of times?

11        A.    Yes.

12        Q.    And in the drugs business sometimes

13    they might try to kill your family too; isn't that

14    true?

15        A.    Yes.

16        Q.    In Massachusetts, are you in the

17    general population?

18        A.    Yes.

19        Q.    Do you have P.C. in Massachusetts?

20        A.    Yes.

21        Q.    What is P.C. for?  What does that mean?

22        A.    Protective custody.

23        Q.    What is that for?

24        A.    From people who got problems.

25        Q.    In jail, right?

842

1    d-LB              RIVERA-PEOPLE-CROSS

2         A.    Yes.

3         Q.    Including people who were snitches,

4    right?

5         A.    Yes.

6         Q.    What is a snitch?

7         A.    Somebody that rats somebody else out.

8         Q.    And it's bad to be a snitch in jail;

9    isn't it?

10        A.    It's bad to be a snitch, period.

11        Q.    So that's why when someone tries to

12   kill you on the street, you don't tell the cops

13   right?

14        A.    Yes.

15        Q.    You take care of it yourself;

16   isn't that true?

17        A.    Plead the Fifth.

18        Q.    Had you started carrying a gun on the

19   streets of the Bronx in July 1996 because people

20   were trying to kill you?

21        A.    Plead the Fifth.

22             MR. McCARTHY:  I ask you to compel that

23        answer.

24             THE COURT:  Yes.

25             We are giving him immunity for any

843

1    d-LB              RIVERA-PEOPLE-CROSS

2         answer he makes to that question, so you can

3         answer it.

4         A.    Yes.

5         Q.    What kind of gun?

6         A.    .38.

7         Q.    A revolver?

8         A.    Yes.

9         Q.    Now, a big one or a small one?

10        A.    Plead the Fifth.

11             THE COURT:   Yes, basically, Mr. Kallor

12        is asking me to put on the record that any

13        questions that you are now asking with

14        respect to this gun, he has been given

15        immunity for.

16             MR. McCARTHY:   Yes, only with respect

17        to possession of gun, not the use of it.

18             THE COURT:   To the possession of the

19        gun.  Any questions that is asked of you

20        regarding possession of this or any other

21        gun, you are receiving immunity, just to

22        possession.  Okay.

23        Q.    I big gun or a small one?

24        A.    Small.

25        Q.    Because it was easier to hide in your

844

1    d-LB                RIVERA-PEOPLE-CROSS

2    clothes in the warm weather, right?

3        A.    Yes.

4        Q.    Now, this person that you said was a

5    young dark-skinned kid with a 380 trying to kill

6    you, is that the guy who was trying to kill you on

7    the other occasions?

8        A.    No.

9        Q.    Who was trying to kill you on these

10   other occasions?

11       A.    Some other cat.

12       Q.    Do you know who?

13       A.    As to my knowledge, I don't know.

14       Q.    Did you see him -- let's go back.   How

15   many times did somebody try to kill you before

16   July 25, 1996?

17       A.    Three times.

18       Q.    When was the first time?

19       A.    January 2nd.

20       Q.    January 2nd of 1996?

21       A.    Yes.

22       Q.    Where did that take place?

23       A.    In Park Avenue.

24             THE COURT:   I am sorry, where?

25             THE WITNESS:   Courtyard on Park Avenue.

845

1    d-LB              RIVERA-PEOPLE-CROSS

2                      THE COURT:  This building?

3                      THE WITNESS:  Yes.

4         Q.     In the same courtyard?

5         A.     Yes.

6         Q.     Somebody shot at you?

7         A.     Yes.

8         Q.     Daytime or nighttime?

9         A.     Daytime.

10        Q.     And did you see him pull out on you?

11        A.     Yes.

12        Q.     Were you armed?

13        A.     No.

14        Q.     So you ran?

15        A.     Yes.

16        Q.     As soon as they pulled out, you turned

17   and ran, right?

18        A.     Yes.

19        Q.     And how long did it take, a second or

20   two for you to run?

21        A.     Two seconds.

22        Q.     Now, what did that person look like?

23        A.     Light-skinned dude.

24        Q.     Was it the light-skined guy on the

25   other bike?

846

```
 1     d-LB                RIVERA-PEOPLE-CROSS

 2          A.    No.

 3          Q.    The second time someone tried to kill

 4     you, when was that?

 5          A.    I can't recall it.

 6          Q.    Can you give us any idea of how close a

 7     time it was to the first one?

 8          A.    Two months later.

 9          Q.    March or April maybe?

10          A.    No.  Yeah, like -- no, the second time

11     they shot me.

12          Q.    That's when you got shot?

13          A.    Yes.

14          Q.    Where did you get shot?

15          A.    My back spine.

16          Q.    And you still have a bullet in there,

17     right?

18          A.    Yes.

19          Q.    How did you get shot?  That's when you

20     were in the car?

21          A.    Yes.

22          Q.    Did you see who shot you?

23          A.    No.

24          Q.    Did you have any idea from whatever you

25     saw that it was the same guy who had tried to kill
```

1    d-LB                RIVERA-PEOPLE-CROSS

2    you the first time?

3         A.    Excuse me.

4         Q.    Was there anything that led you to

5    believe that the guy who shot you in the back was

6    the same guy who tried to shoot you in January?

7              MS. HAYES:  Objection.  Speculation,

8         Your Honor.

9              THE COURT:  Overruled.

10        A.    Repeat the question again.

11        Q.    Sure.  Do you have any reason to

12   believe that the guy who tried to kill you in

13   January is the same guy who shot you in the spine

14   couple months later?

15        A.    No.

16        Q.    Okay.  Meaning it was like a different

17   guy?

18        A.    Yes.

19        Q.    Okay.  So there is two different guys

20   trying to kill you, right?

21        A.    Yes.

22        Q.    When was the third time someone tried

23   to kill you?

24        A.    When they were shooting at me and it

25   caught Lamar.

```
 1    d-LB              RIVERA-PEOPLE-CROSS

 2         Q.    I didn't hear?

 3         A.    When they were shooting at me and they

 4    caught Lamar.

 5         Q.    That was the third time?

 6         A.    Yes.

 7         Q.    And the one in Massachusetts is the

 8    fourth someone tried to kill you?

 9         A.    Yes.

10         Q.    Any other in between?

11         A.    No.

12         Q.    Okay.  Now, so between January and July

13    of 1996, three totally different people were

14    trying to kill you, right?

15         A.    Yes.

16         Q.    And you in your mind associated them

17    with other drug dealers who wanted your spot?

18         A.    No.

19         Q.    Okay.  Who did you associate it with?

20         A.    Across the street, same people.

21         Q.    Okay.  In other words, the same

22    operation was trying to take over your spot,

23    right?

24         A.    Yes.

25         Q.    And that operation had a lot of
```

849

1    d-LB              RIVERA-PEOPLE-CROSS

2    different people associated with it?

3         A.    Yes.

4         Q.    Because it would be fair to say that

5    the drugs business often have people who work as

6    enforcers, and people who sell, and people who

7    hide stashes, right?

8         A.    Yes.

9         Q.    But in your drugs business it's you and

10   the guy whose name you don't know?

11        A.    Yes.

12        Q.    And when I say enforcers, that would be

13   a person who goes out and maybe -- not that there

14   is any particular beef -- but shoots at people

15   because it's good business, right?

16        A.    Yes.

17        Q.    So, in fact, the night that Lamar got

18   shot, that would be the type of person shooting at

19   you, an enforcer type of person, right?

20             MS. HAYES:  Objection.

21             THE COURT:  Overruled.

22        A.    I guess so.

23        Q.    Well, I mean the guy that you shot in

24   Massachusetts -- how much time are you doing, by

25   the way?

1    d-LB              RIVERA-PEOPLE-CROSS

2         A.    Seven to 9:00 years.

3         Q.    When are you coming up for parole?

4         A.    2004.

5         Q.    So you have a long way to go yet?

6         A.    Yes.

7         Q.    And you don't want to be a snitch

8    inside, right?

9         A.    No.

10        Q.    This guy that you shot in

11   Massachusetts, was it personal?

12        A.    Yes.

13        Q.    It wasn't business?

14        A.    No.

15        Q.    Now, did you know of anybody who had

16   any reason to want to hurt Lamar Jones?

17        A.    No.

18        Q.    Including yourself.

19        A.    Excuse me?

20        Q.    Including yourself.

21        A.    Yes.

22        Q.    Now, wasn't there somebody else who was

23   looking to kill you back in July of 1996 because

24   of a rape?

25        A.    Plead the Fifth.

851

1    d-LB              RIVERA-PEOPLE-CROSS

2        Q.    I ask you to compel that answer?

3              THE COURT:    Okay.  Once again, you are

4        given immunity for any answer that you would

5        make to any questions relating to the subject

6        of a rape that is the subject of this

7        question.

8              MR. KALLOR:  My client withdraws his

9        his invocation of his Fifth Amendment right

10       as to that question.

11             THE COURT:    Okay.  Go ahead.

12             MR. McCARTHY:  We need an answer, I

13       guess.

14       A.    Can you repeat it.

15       Q.    Did someone try to kill because of a

16  rape you had done?

17       A.    No.

18       Q.    Had you had an incident with a

19  girlfriend of a guy by the name of Joey or Doe

20  Boy?

21       A.    No.

22       Q.    In July of 1996, under any

23  circumstances, had you had sex with any females

24  against their will?

25       A.    No.  I don't rape people.

852

d-LB                RIVERA-PEOPLE-CROSS

Q.    You sell drugs, right?

A.    Yes.

Q.    And, by the way, when you say you sell
drugs, you were never caught for being -- how long
was your drug business in operation?

A.    Like a year.

Q.    And you really didn't care who you were
selling drugs to as long as they came up with the
money, right?

A.    No.

Q.    Kids?

A.    Nope.

Q.    No, you didn't care?

A.    Yes, I did care if it was a kid or not.

Q.    So you had like -- so kids you didn't
sell to?

A.    Yes.

Q.    What is a kid in your mind?

A.    Somebody my age, younger.

Q.    Sixteen, under sixteen?

A.    Yes.

Q.    So if you look young and want to buy
crack from you, would you have to produce proof or
anything?

1    d-LB             RIVERA-PEOPLE-CROSS

2        A.    No.

3        Q.    Now, other than that, you didn't care,

4    right?

5        A.    Yes.

6        Q.    And every day, however many sales you

7    made or the guy you don't know who was working for

8    you, you never got caught for any of it, right?

9        A.    No.

10        Q.    Now, with respect to these people here

11    in the Bronx who were trying to kill you in 1996

12    -- when did you leave town by the way?

13        A.    In July.

14        Q.    How soon after Lamar got killed?

15        A.    Like a month, three weeks.

16        Q.    Three weeks after Lamar got killed?

17        A.    Yes, three weeks to a month.

18        Q.    What day was it that Lamar got killed,

19    do you know?

20        A.    Excuse me?

21        Q.    What day was it that Lamar got killed?

22        A.    I don't know.

23        Q.    What time was it that he got killed?

24        A.    Around like 9:00.

25        Q.    How do you remember that?

854

1    d-LB              RIVERA-PEOPLE-CROSS

2         A.    Excuse me.

3         Q.    How do you remember it was like around

4    9:00?

5         A.    Because I had a watch on.

6         Q.    Was it before 9:00, would you say, or

7    after 9:00?

8         A.    After 9:00.

9         Q.    How much after?

10        A.    Couple minutes past.

11        Q.    Now, with respect to the people who

12   were trying to kill you in the Bronx in July of

13   1996, you didn't report any of those things to the

14   police, did you?

15        A.    No.

16        Q.    And your family didn't report any of

17   those things to the police; isn't that true?

18        A.    Yes.

19             MS. HAYES:  Objection.

20             THE COURT:  Sustained.

21        Q.    To your knowledge, no one reported any

22   of those things to the police; is that fair?

23        A.    Yes.

24        Q.    And one of the reasons for that is that

25   you were going to take care of business yourself;

855

1    d-LB                RIVERA-PEOPLE-CROSS

2    isn't that true?

3          A.    Plead the Fifth.

4          Q.    Do you know a guy name Webb?

5          A.    Yes.

6          Q.    Who is Webb?

7          A.    One of the kids from around the way.

8                THE COURT:  From where.

9                THE WITNESS:  From around the way.

10         Q.    Is that one of the guys who was trying

11   to kill you?

12         A.    That's what the word on the street was.

13         Q.    Was he part--

14               MS. HAYES:  I am sorry, I didn't hear

15         the last answer.

16               THE COURT:  That's the word around the

17         street he said.

18         Q.    And didn't somebody shoot him in the

19   head with a .44 Magnum last summer?

20         A.    That's what I heard from the streets.

21         Q.    Were you in town then?

22         A.    I was in Massachusetts.

23         Q.    You know when that happened?

24         A.    Excuse me?

25         Q.    Do you know when that happened?

1    d-LB                RIVERA-PEOPLE-CROSS

2         A.    I heard it happened in Cortlandt

3    Avenue.

4         Q.    Cortlandt Avenue?

5         A.    Cortlandt somewhere.

6         Q.    You know Courtlandt.  Is that the

7    street that kind of goes down from 161st?

8         A.    Yes.

9         Q.    In fact, Cortlandt is shown on this

10   map, isn't it, right by East 156th Street.  You

11   see it?

12        A.    Yes.

13        Q.    Is 301 East 156th right between Park

14   and Cortlandt; isn't it?

15        A.    Yes.

16        Q.    Do you know who shot Webb in the head

17   with a .44 Magnum?

18        A.    No.

19             MR. McCARTHY:  I am going to have some

20        continued cross, Judge, but there are some

21        other documents I have been waiting on.  And

22        maybe it's a good time.

23             THE COURT:  Come up please.

24             (An off-the-record discussion was held

25        between the Court and counsel at the bench.)

1    d-LB              RIVERA-PEOPLE-CROSS

2              THE COURT:  All right folks, there may

3         be some continued cross examination of Mr.

4         Rivera tomorrow.  Both sides basically are --

5         well, there will be some additional redirect

6         and possibly some additional cross

7         examination.

8              Now, I am going to recess.  I want to

9         try to start at 10:00 tomorrow.  It's

10        particularly important.  Why is it

11        particularly important?  It's important

12        because tomorrow is law day, and I am,

13        together with other judges, going to a school

14        in the morning part in the Bronx to celebrate

15        law day.  And I will to be here at 11:00,

16        sometime after 11:00 o'clock.  So that means

17        we only have about an hour or so to work in

18        the morning, and then we have to recess while

19        I make arrangements to go to the school with

20        others.  So that's why I'd like to get

21        started at 10:00.  I have this commitment.

22        There is not very much I can do about it.

23        It's interesting to go to visit schools.

24             So tomorrow morning 10:00 o'clock.  Be

25        upstairs 9:30.  As soon as we get settled we

858

1    d-LB                RIVERA-PEOPLE-CROSS

2        will resume.  In the meantime, don't discuss

3        the case with anyone else, don't form any

4        judgements or conclusions.  See you tomorrow

5        morning 10:00 o'clock.  Thank you.

6                    (Whereupon, the proceedings was

7        adjourned until May 1.

8        *           *           *           *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

858

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX:TRIAL TERM PART 27

------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,    :    T R I A L

        -against-                         :    Indictment No.
                                             5827-96
LAWRENCE FOWLER,                        :


                             Defendant.  :    RICKY RIVERA
                                              DONALD MAY
------------------------------------------X

                             851 Grand Concourse
                             Bronx, New York  10451
                             May 1st, 1998

B e f o r e :

              HONORABLE EDWARD M. DAVIDOWITZ,

                                              J. S. C.


A P P E A R A N C E S :


FOR THE PEOPLE:              OFFICE OF ROBERT T. JOHNSON,
                             BRONX DISTRICT ATTORNEY
                             851 Grand Concourse
                             Bronx, New York   10451
                             BY:  DANIEL McCARTHY.
                                  JONATHAN SENNETT
                             ASSISTANT DISTRICT ATTORNEY


FOR THE DEFENDANT:           PAMELA D. HAYES, ESQ.
                             245 Fifth Avenue
                                Suite 1905
                             New York, New York   10016


                             FAYE MOORE
                             Senior Court Reporter

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Proceeding                    859

1

2          THE CLERK:  Case on trial continued.  Note

3     the presence of defendant and his counsel and the

4     assistant district attorneys.

5          THE COURT:  There was some discussion

6     yesterday about the district attorney's request to

7     question the witness--

8          Mr. Kallor,  come up.

9          MR. KALLOR:  Bruce Kallor present for Ricky

10    Rivera.

11         THE COURT:  --to question the witness about

12    other matters or other crimes that he may have

13    committed here or may have committed in

14    Massachusettes.  And in support of that the DA

15    gave me a citation or referred me to a United

16    States Supreme Court case, citation which

17    escapes me, which involved the New York, New

18    Jersey Water Front Commission.  I read the case.

19    I also read another case that was given to me

20    today entitled Common Reality against Steinberg

21    reported at 404 Massachusettes 602.  I have read

22    both.  I told you all at the bench that I was

23    concerned about these  kinds of questions because

24    I am completely unfamiliar with Massachusettes

25    law.  And the case that was given to me does not

Proceeding                    860

1

2    enlighten me on such issues as the extent of

3    immunity that a witness has in Massachusettes or

4    whether it is consistent with the type of

5    transaction or use immunity that we have here in

6    New York.    And if it is use immunity, whether

7    they follow the principle of law called derivative

8    use of immunity or not.    Because of that fact

9    there has been a significant number of questions

10   which affect the witness' credibility in past bad

11   acts.    And in the abundance of precaution I

12   decided not to permit those questions.

13                ( R E C E S S.  )

14   (Whereupon the witness appears, Ricky Rivera, and

15   his attorney Bruce Kallor is present.)

16         THE COURT:   Jury in.

17         (Whereupon the jurors enter the courtroom at

18   eleven-0-five AM.)

19         THE CLERK:     Case on trial continued.

20   Note the presence of defendant, his counsel and

21   the assistant district attorneys.   All jurors are

22   present.

23         THE COURT:  Good morning, jurors.

24         THE JURORS:  Good morning.

25         THE COURT:  All right, we will get it started

```
 1                        Rivera-Defense-Cross              861
 2            now, I have to leave early because I told you that
 3            it is law day and we are going to hear as much as
 4            we can and then we will recess until two o'clock
 5            this afternoon.
 6                    Continue your cross-examination, Mr.
 7            McCarthy.
 8                    MR. McCARTHY:  Thank you, Judge.
 9            R I C K Y      R I V E R A,     a witness
10            previously sworn resumes on cross-examination.
11                    THE COURT:   Mr. Rivera, you are reminded
12            you are still testifying under oath.
13     CROSS-EXAMINATION
14     BY MR. McCARTHY CONTINUED:
15         Q.       I want to talk about July 25th, 1996 the day
16     of the shooting of Lamar Jones, okay?
17         A.       (Affirmative nod.)
18         Q.       Had your drug spot been open for business
19     that day?
20         A.       No.
21         Q.       What time did you get to the courtyard?
22         A.       Like I was there a half an hour.
23         Q.       When you had come out into the courtyard was
24     it light or dark in terms of the sun?
25         A.       It was dark.
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                      Rivera-Defense-Cross                      862

2          Q.        The sun was down?

3          A.        (Affirmative nod.)

4          Q.        You have to answer.

5          A.        Yes.  Yes.

6          Q.        Okay.  Just before the shooting who was in the

7     courtyard?

8          A.        The little kids.

9          Q.        Okay.  Little kids, little enough that you

10    could sell them  crack  or  big enough that you wouldn't

11    sell them crack, or big enough that you would sell them

12    crack?

13         A.        I wouldn't.

14         Q.        Meaning your age or older?

15         A.        Younger.

16         Q.        Younger.  Were any of them on bicycles?

17         A.        No.

18         Q.        How about Lamar, was he on a bicycle?

19         A.        No.

20         Q.        Did he have a bicycle with him?

21         A.        No.

22         Q.        Did you see any bicycles in the courtyard?

23         A.        I seen one bike.

24         Q.        Where?

25         A.        It was, it was by the steps.

1                          Rivera-Defense-Cross                    863

2          Q.        What kind of bike?

3          A.        A little mountain bike.

4          Q.        Was that Lamar's?

5          A.        No.

6          Q.        Was Lamar in the courtyard when you got there?

7          A.        No.

8          Q.        When did he get there?

9          A.        He had came up like half an hour after I was

10    there.  He only been there for like ten minutes.

11         Q.        When he got shot?

12         A.        Yes.

13         Q.        Did he have a baseball hat on?

14         A.        As to my knowledge I can't recall.

15         Q.        Sorry?

16               MS. HAYES:  Excuse me?

17               THE COURT:   He said he couldn't recall.

18         Q.        Now, in addition to selling crack did you use

19    crack?

20         A.        No.

21         Q.        Did you ever use crack?

22         A.        Nope.

23         Q.        How about powder cocaine?

24         A.        Nope.

25         Q.        Okay.  So selling drugs you use as a business

Rivera-Defense-Cross                    864

but you didn't use crack yourself, right?

    A.      Yes.

    Q.      How about marijuana?

    A.      Yes.

    Q.      That day had you smoked any marijuana?

    A.      Earlier in the day.

    Q.      When?

    A.      Six o'clock.

    Q.      Now, were you inside or outside when you did
that?

    A.      Inside.

    Q.      And when you say about six o'clock did you
have dinner that night?

    A.      No.

    Q.      When the shooting happened were you still
feeling the effects of having smoked marijuana?

    A.      No.

    Q.      Did you have anything to drink?

    A.      Nope.

    Q.      Do you drink alcohol?

    A.      Nope.

    Q.      Ever?

    A.      Yes.

    Q.      Had you had any that day at all?

```
 1                    Rivera-Defense-Cross                  865

 2          A.       Nope.

 3          Q.       Okay.  Would it be fair to say that you are

 4   telling us that there were no other adults in the courtyard

 5   when the shooting happened?

 6          A.       No.

 7          Q.       "No" there were no other adults?

 8          A.       Yes.

 9          Q.       Now, you said that you saw a lady that you

10   knew as Pepsi in the window, do you remember that?

11          A.       Yes.

12          Q.       And Pepsi is Priscilla's mom?

13          A.       Yes.

14          Q.       Is she a spanish lady?

15          A.       Yes.

16          Q.       What window did you see her?

17          A.       The middle window.

18          Q.       Sorry, I didn't hear?

19          A.       The middle window.

20          Q.       Is that her kitchen, do you know?

21          A.       No, that's the livingroom.

22          Q.       And what's in that window, if you can tell us?

23          A.       I really don't know.

24          Q.       Was there a fan?

25          A.       No.
```

1                          Rivera-Defense-Cross                866

2          Q.        How   about   a   gate or bars across the

3    windows?

4          A.        It had child-proof gates.

5          Q.        But no fan?

6          A.        No.

7          Q.        Now, oh, and the two guys that were--

8                    Only one guy was shooting, right?

9          A.        Yes.

10         Q.        But there were two people there, correct?

11         A.        Yes.

12         Q.        Were they both wearing baseball hats?

13         A.        No.

14                   MR. McCARTHY:  No other questions.

15                   THE COURT:  Okay, redirect.

16                   MS. HAYES:  One second, Your Honor.

17                   Your Honor, could we approach a second?

18                   THE COURT:  Yes.

19                   (Whereupon there was an off the record

20                discussion with all counsel and Mr. Kallor.)

21   REDIRECT EXAMINATION

22   BY MS. HAYES:

23         Q.        Mr. Rivera, yesterday the prosecutor asked you

24   did you know what time it was and you said---

25                   He asked you what time this incident occurred

1

2    around and you said around nine or sometime after.  Do you

3    know exactly what time it was?

4         A.     No.

5         Q.     Now, he also asked you where you saw Pepsi in

6    the window at, and you said it was in the middle window

7    which was her livingroom?

8         A.     Yes.

9         Q.     And he asked you was a fan there and you said

10   no.  Is it "no", you don't remember or "no" you didn't see a

11   fan?

12              MR. McCARTHY:  Objection to form.

13              THE COURT:  Read back the question.

14              (Whereupon the question was read back.)

15              THE COURT:  Compound question, sustained as

16         to form.   Before you ask that question.

17              Pepsi was the mother and Priscilla was the

18         daughter, is that correct?

19              THE WITNESS:  Yes.

20              THE COURT:  Ask the question again.

21        Q.     Do you recall whether there was a fan in the

22   window that night?

23        A.     There was no fan.

24        Q.     Okay.  Now, where were you looking  from when

25   you were looking at Pepsi in the window?

```
 1                    Rivera-Defense-Redirect              868
 2        A.        I was on the other side of the courtyard.
 3        Q.        You were on the other side of the courtyard?
 4        A.        On the steps, I went to the other side.
 5        Q.        And was this after the shooting?
 6        A.        Before.
 7        Q.        Yesterday you were asked questions by the
 8     prosecutor regarding the person who was doing the
 9     shooting in the courtyard.  Was it the dark skin person
10     who was shooting or the light skin kid that was
11     shooting?
12        A.        Dark skin.
13        Q.        Now, you said that you lived at 3209?
14        A.        Yes.
15        Q.        What apartment was that?
16        A.        4K.
17        Q.        4A?
18        A.        4K.
19        Q.        And you said someone had shot you, that a
20     bullet lodged in your back?
21        A.        Yes.
22        Q.        And when that happened was that crime
23     reported?  Did they know you got shot, did the police know
24     you had gotten shot in the back?
25        A.        Yes.
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
1                    Rivera-Defense-Redirect              869
2          Q.        Now, yesterday Mr. McCarthy asked you
3     questions about an enforcer, do you know if the people who
4     was shooting at you were enforcers?
5          A.        No.
6          Q.        Do you know if they were just dealers?
7          A.        No.
8          Q.        You know if they were mules?
9          A.        No.
10         Q.        Do you know anything about these people other
11    than it was just two kids shooting at you on mountain bikes,
12    you know anything else about them?
13         A.        They live around the block.
14         Q.        And they live around the block.
15                   Now, Mr. McCarthy asked you some questions
16    yesterday  about Courtlandt Avenue.  Where was your drug
17    spot at?
18         A.        161st at the corner store.
19         Q.        And the people you were having these beefs
20    with about  the drug territory; what territory are we
21    talking about?
22         A.        To  the big building--
23         Q.        The big building in the middle of the street
24    between 161st Street and Park?
25         A.        Yes.
```

```
1                    Rivera-Defense-Redirect              870

2         Q.       And that's what the beef was about, the

3    territory?

4         A.       Yes.

5         Q.       Now, when Mr. McCarthy asked you something

6    about Courtlandt Avenue you didn't have any dealings on

7    Courtlandt Avenue did you?

8         A.       No.

9         Q.       And Courtlandt Avenue extends ---

10                  You know where it extends, what street it

11   start with and what street it goes up to?

12        A.       Yes.

13        Q.       Okay.  It's your testimony you didn't have

14   anything to do down there, that wasn't your turf, right?

15        A.       No.

16        Q.       Now, when you saw these, this kid pull

17   something out of his waist line which way was he facing?

18   Was he facing directly at you and Lamar or was he facing

19   towards 161st Street?

20                  MR. McCARTHY:  Objection, Judge, improper

21            redirect.

22                  THE COURT:  I believe it is.  I don't think

23            this was covered under cross-examination.

24                  MS. HAYES:  Your Honor, I have a page.

25                  THE COURT:   Let me see the page.  If it is
```

```
 1                    Rivera-Defense-Redirect              871

 2          I will change my ruling.  I don't have a

 3          recollection.

 4                 (Whereupon all counsel approach the bench

 5          with the transcript.)

 6                 THE COURT:   Okay, proceed, counsel.

 7                 MS. HAYES:  Can we have the question read

 8          back.

 9                 THE COURT:   Read the question back.

10                 (Whereupon the question was read back.)

11     A.        161st Street.

12     Q.        And you guys were back towards 3211?

13     A.        Yes.

14     Q.        Now, Mr. McCarthy asked you about being a

15  snitch and you said it is not right to snitch, right?

16     A.        Yes.

17     Q.        A snitch usually gets something for his

18  testimony, right?

19                 MR. McCARTHY:  Objection.

20                 THE COURT:  Well, he can testify as to what

21          his understanding of it is, whether it actually

22          happened.

23                 What's your understanding about a

24          snitch?  Does a snitch from your understanding

25          get money or anything for his testimony, his
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                         Rivera-Defense-Redirect              872
 2                    cooperation?
 3                         MS. HAYES:  Or a benefit?
 4                         THE WITNESS:    Whatever, if he feel like
 5                    snitching, he  snitch.
 6          Q.         So when you say, "whatever", what do you mean
 7     by that?  Let me ask you this question.
 8                         A person who snitch, is it your understanding
 9     that they usually snitch for a reason?
10                         MR. McCARTHY:  Objection.
11                         THE COURT:  No.  This was covered on cross.
12                         MR. McCARTHY:  I object to the leading in
13                    the question though.
14                         THE COURT:  That's true, you are leading.
15                         Tell us what your understanding of what a
16                    snitch is?
17                         THE WITNESS:  Somebody that rat on you if
18                    they don't like him.
19                         THE COURT:  What is your understanding of
20                    what a snitch gets as a benefit of some sort for
21                    snitching?  Do you have an understanding of
22                    belief?
23                         THE WITNESS:  No.
24                         THE COURT:  Next question.
25          Q.         And generally a snitch would rat out somebody
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                      Rivera-Defense-Redirect              873
 2    they knew, right?
 3                     MR. McCARTHY:  Objection.
 4                     THE COURT:  Sustained.
 5         Q.      Generally what's your understanding that a
 6    snitch does?
 7                     MR. McCARTHY:  Objection.
 8                     THE COURT:  He already testified to that,
 9             but I will let him answer one more time.
10         Q.      In detail please?
11                     THE COURT:  Tell us what your understanding
12             of a snitch is?  Who is a snitch, what do you
13             believe a snitch does?
14                     THE WITNESS:   Someone tells on somebody
15             else.
16                     THE COURT:  Tells on somebody else?
17                     THE WITNESS:  Yes.
18         Q.      And do you know --- And it is your testimony
19    that you are not a snitch?
20         A.      Yes.
21         Q.      Now, in Massachusettes you had told Mr.
22    McCarthy that you were in population, right?
23         A.      Yes.
24         Q.      And you are still in population?
25         A.      Yes.
```

1                    Rivera-Defense-Redirect              874

2        Q.        You are not in protective custody?

3        A.        No.

4        Q.        When you had that incident with the shooting

5    in your back did you have to go to court or make a police

6    report or anything like that?

7        A.        No.

8        Q.        Now, this person name Webb, when you say that

9    you heard he got shot around Courtlandt, you don't have

10   any independent information about Webb getting shot, do you

11   not?

12       A.        No.

13       Q.        And you were in jail in Massachusettes at the

14   time?

15       A.        Yeah.   Yeap.

16                 MS. HAYES:   That's all I have, Your Honor.

17                 THE COURT:   Okay.   Any recross?

18                 MR. McCARTHY:    No.  Subject to what we

19            discussed earlier.

20                 THE COURT:   Okay, that's what I want to talk

21            to you about.

22                 (Whereupon there was an off the record

23            discussion, all counsel approach including Mr.

24            Kallor.)

25                 THE COURT:   All right, folks, I have got to

1                        Proceeding                875

2          go.  And I am going to be back before two o'clock

3          so we are going to give you a nice long lunch hour

4          but we are going to resume at two o'clock this

5          afternoon.  That's my intention, and at two

6          o'clock we will get everybody assembled.

7          Understand the reason we are breaking is the law

8          day commitments that I have and it certainly is

9          important.  I think it is.  In any event, we will

10         going to break until two o'clock this afternoon.

11         In the meantime don't discuss the case with each

12         other, don't form any judgment or conclusions

13         about this until it is finally submitted.

14              Sorry about the break, it is inevitable.

15              (Whereupon the jurors are excused at eleven

16         twenty-five AM.)

17              (Proceeding out of the hearing and presence

18         of the jury.)

19              MS. HAYES:  Judge, you are leaving, okay, I

20         want to talk about the scene.

21              THE COURT:  Not now, we will talk about it

22         later.

23              MS. HAYES:  Yes, a jury view.

24              ( L U N C H E O N    R E C E S S. )

25     AFTERNOON SESSION:

| | | |
|---|---|---|
| 1 | Proceeding | 876 |

2    (Whereupon the following proceeding occurs out

3    of the hearing and presence of the jury.)

4    THE CLERK:   Case on trial continued.   People

5    against Lawrence Fowler.   Note the presence of

6    defendant, his counsel, the assistant district

7    attorneys, and Mr. Kallor.

8    THE COURT:   Basically both sides, the district

9    attorney does not intend to cross-examine Mr.

10   Rivera any further.   The defense counsel doesn't

11   intend to ask him any questions on redirect.   So

12   what we have agreed to do, we will hold him over

13   the weekend in the event that something arises

14   that requires his being recalled.   And we will

15   continue now with the defendant's case.   So now

16   Mr. Kallor is excused.   If either of you wish to

17   recall him for some reason or other notify him,

18   notify me, otherwise I will simply execute an

19   order on Tuesday returning him back to

20   Massachusettes.

21   MR. McCARTHY:   Just so that everyone knows,

22   Judge, I expect that the actual transportation of

23   him back to Massachusettes probably won't take

24   place until Wednesday or Thursday of next week.

25   MR. KALLOR:   I will check in on the part on

1 of 1 DOCUMENT

**The People of the State of New York, Respondent, v. Lawrence Fowler, Appellant.**

**1088**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DE-PARTMENT**

*272 A.D.2d 127; 708 N.Y.S.2d 852; 2000 N.Y. App. Div. LEXIS 5405*

**May 9, 2000, Decided**
**May 9, 2000, Entered**

**COUNSEL:** [***1] For Respondent: Elizabeth F. Bernhardt.

For Defendant-Appellant: Barry Gene Rhodes.

**JUDGES:** Concur--Rosenberger, J. P., Mazzarelli, Ellerin, Rubin and Friedman, JJ.

**OPINION**

[*127] [**853] Judgment, Supreme Court, Bronx County (Edward Davidowitz, J.), rendered June 25, 1998, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 25 years to life, unanimously affirmed.

The verdict was based on legally sufficient evidence and was not against the weight of the evidence. There is no basis upon which to disturb the jury's determinations concerning identification and credibility.

Defendant's application pursuant to *Batson v Kentucky (476 US 79)* was properly denied. The court properly found that the prosecutor provided a nonpretextual explanation for peremptorily striking a prospective juror based on bona fide concerns, supported by the record, as to the juror's demeanor (*see. People v Pena, 265 AD2d 259*).

[*128] Defendant's suppression motion was properly denied. The showup was justified by its close temporal and spatial proximity to the crime and the desirability of obtaining a prompt [***2] and reliable identification (*People v Duuvon, 77 NY2d 541*), and was not unduly suggestive.

Defendant's remaining contentions, each of which requires preservation, are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would reject them.

Concur--Rosenberger, J. P., Mazzarelli, Ellerin, Rubin and Friedman, JJ.

BARRY GENE RHODES

Attorney at Law
16 Court Street
Brooklyn, New York 11241
Telephone (718) 624-3784

May 10, 2000

Chief Judge Judith S. Kaye
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

<u>Attn</u>: Donald M. Sheraw, Chief Clerk

Re: <u>People v. Lawrence Fowler</u>
Ind. No.: 5827/96
(Bronx County)

Dear Chief Judge Kaye:

I respectfully request leave to appeal to the Court of
Appeals from the decision and order of the Appellate Division,
First Department, entered May 9, 2000. The order unanimously
affirmed a judgement of conviction rendered June 25, 1998,
convicting the defendant of Murder in the Second Degree.

I enclose the decision and order of the Appellate Division
as well as my brief and my adversary's brief to the intermediate
appellate court.

One proposed basis for review by the Court of Appeals was
one that affected "the organization of the court or the mode of
proceedings proscribed by law," <u>People v. Patterson</u>, 39 N.Y.2d
288, 295 (1976), <u>aff'd sub nom Patterson v. New York</u>, 432 U.S.
197. It is therefore submitted that the issue was and is
reviewable despite the absence of objection. Two of the other
issues sought to be heard by the Court of Appeals were preserved
by timely objections. The defendant's final contention is that
he is actually innocent of the crime.

The defendant's central issue at this stage is that the
transcripts reflected that two of the trial jurors were not
sworn. As is set out in Point Three of his brief to the court
below, this apparent lapse was such a fundamental error in the
proceedings at trial that it is reviewable despite the absence of

BARRY GENE RHODES

Chief Judge Kaye   -Page 2-   May 10, 2000

objection.  In the view of the Appellate Division, the issue was unpreserved and required an objection.  Leave to appeal to the Court of Appeals would permit exploration of the important concern as to whether this error, if such it was, required a timely protest.  Additionally, the opinion of the First Department was that were the issue reviewed it would have been decided against the defendant.  This is apparently based upon the prosecution's argument that the clerk's minutes were contrary to the transcripts.  This contradiction in the record, it is submitted, could and should have been remanded to the trial court for an evidentiary hearing rather than being perfunctorily resolved on the assumption that the clerk was correct and the stenographer was wrong.

An issue that was unquestionably preserved was that the eyewitnesses were permitted to simultaneously view the defendant at a showup and after being told that someone was in custody who matched the description they provided.

An additional issue concerned a <u>Batson</u> challenge by the defense.  The trial prosecutor, after excluding five of six African-American veniremen, opined that one of his peremptory strikes of an African-American juror was because the potential juror had a "stern" face.  This is submitted to have been plainly pretextual.

The defendant's final contention is that he is actually innocent of the crime of conviction.  He argued to the intermediate appellate court that the two eyewitnesses were incredible as a matter of law so that guilt was neither proven beyond a reasonable doubt nor supported by the weight of the credible evidence.

The defendant therefore respectfully requests permission to appeal to the Court of Appeals based on these unjust aspects of his conviction.

Oral argument is respectfully requested.

Chief Judge Kaye   -Page 3-   May 10, 2000

Respectfully yours,

BARRY GENE RHODES

BGR:cs
Enc.
cc: Robert T. Johnson, Esq.
    District Attorney of Bronx County

# State of New York

# Court of Appeals

BEFORE: HON. ALBERT M. ROSENBLATT,
Associate Judge

---

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

LAWRENCE FOWLER,

Appellant.

**CERTIFICATE
DENYING
LEAVE**

---

     I, ALBERT M. ROSENBLATT, Associate Judge of the Court of Appeals of the State of New York, do hereby certify that upon application timely made by the above-named appellant for a certificate pursuant to CPL 460.20 and upon the record and proceedings herein,* there is no question of law presented which ought to be reviewed by the Court of Appeals and permission is hereby denied.

Dated at Poughkeepsie, New York

July / Y , 2000

_____<br>Associate Judge

*Description of Order*: Order of the Appellate Division, First Department, entered May 9, 2000, affirming a judgment of the Supreme Court, Bronx County, rendered June 25, 1998.

May 30, 2006


Hon. Edward M. Davidowitz
Justice of the Supreme Court
Bronx County
851 Grand Concourse
Bronx, New York 10451

                              RE:  PSNY v. LAWRENCE FOWLER
                                   IND 5827/96

Your Honor:

     I am enclosing a copy of a letter sent by me to Pamela D.
Hayes, Esq., attorney for the captioned defendant. It relates to
potentially exculpatory information which has just come to our
attention as a result of an on-going investigation by the U.S.
Attorney's Office for the Southern District of New York.

     Though this information comes many years post-final appeal,
I wanted you to be aware of this development.



                              Very truly yours,



                              Daniel T. McCarthy
                              Assistant District Attorney

Enc.

May 30, 2006


Pamela D. Hayes, Esq.
200 West 57th Street
Suite 900
New York, New York 10019

                         RE:  PSNY v. LAWRENCE FOWLER
                              IND 5827/96

Dear Ms. Hayes:

     This will confirm our telephone conversation today during
which I indicated that I had received preliminary information
last week from the U. S. Attorney's Office (SDNY)to the effect
that a cooperating witness claimed to have been involved as a
lookout during the shooting which resulted in the death of Lamar
Jones. I am informed that the witness has identified a person
other than Lawrence Fowler as the shooter. I hope to be able to
personally interview this cooperator in the near future and will
report to you the results of that meeting.

     My office intends to pursue any potentially exculpatory
information arising out of the federal investigation and will
keep you updated as to the results.


                         Very truly yours,



                         Daniel T. McCarthy
                         Assistant District Attorney

cc:  Hon. Edward M. Davidowitz

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX

———————————————————————— X

PEOPLE OF THE STATE OF NEW YORK,

                                          Plaintiff

                    -Against-

Lawrence Fowler,

                              Defendant

———————————————————————— X

Ind. No. 5827/96

Affidavit in Support of
Motion to Vacate Judgment
pursuant to CLP 440.10 and
Section 8-b of the New
York State Court of Claims
Act for Unjust Conviction
and Imprisonment.

          Pamela D. Hayes, Esq. an attorney duly admitted to practice law in the Courts of
this State makes the following affirmation under penalty of law.

1.     I am the attorney of record in the above captioned matter. I represented
       the defendant Lawrence Fowler, during all stages of his trial and
       conviction, with the exception of his direct Appeal. I was appointed
       pursuant to section 18-B of the County Law as well as section 35 of the
       Judiciary Law when Mr. Fowler was charged under the Death Penalty.

2.     Defendant Petitioner was convicted of Murder in the Second Degree
       In May 1998 after a trial in front have the Honorable Edward Davidowitz
       and a jury. The defendant was sentenced to 25 years to life and he is
       currently serving that sentence.

3.     In May of 2000, counsel wrote the Court and explained that she had
       received information that there were individuals who had informed the
       the New York City police that Lawrence Fowler was innocent of the
       murder for which he had been convicted. Specifically an inivual by the
       name of Pierre Moore was arrested and told member of the New York
       City Police Department that Lawrence Fowler was not the shooter and was
       not involved in the murder. Pierre Moore and another individual by the
       name of Debow had been there saw the incident and Lawrence Fowler was
       not there and was not involved in the incident.

NYC 000178

4.   Defendant hired an investigator, said investigator tracked down Mr. Moore. Mr. Moore was interviewed but refused to cooperate with Counsel to come forward and exonerate Mr. Fowler.

5.   Counsel reported this information to the District Attorney's Office, however there was no way to force Mr. Moore to come forward even with the intersession of Mr. Moore's mother and lawyer. (See attached Exhibits)

6.   In November of 2001, I called and wrote ADA Dan McCarthy who tried the case. I explained to him that the name of an individual who was one the police Officers who had taken the information from Mr. Moore on the evening that Mr. Moore had given the information to the police. Unfortunately Mr. McCarthy was not able to locate Police Officer's Ortiz's memo books, however he remained open to my insistences that there was information out there that could potentially clear Mr. Fowler.

7.   During June of this year I received a telephone call from Dan McCarthy. He explained to me that he had received information from a confidential informant from the United States Attorney's Office, which informed the US Attorney's Office that Lawrence Fowler had not committed the murder for which he was serving time. Mr. McCarthy informed me that he would investigate the matter the information from the informant that the informant was a "look out" and Lawrence Fowler was not there nor did he participate in the murder.

8.   As a result the matter was investigated and Mr. McCarthy is convinenced that the witness is telling the truth and Lawrence has been wrongfully convicted and imprisoned.

9.   This information is consistent with the evidence that was adduced at trial including the fact that at least 6 indivuals testifies that Lawrence Fowler was not present at the scene. It is particularly relevant that the individual who was being shot at on that evening is the same invidual that Defendant brought in pursuant to subpoena from Massachussetts and said that he was the intended victim and Lawrence Fowler was not the individual he saw shooting at him that night.

10.  It is clear that Mr. Fowler has been a victim of a unjust and a wrongful and his conviction should be vacated based on the newly discovered evidence, which is being presented to the Court.

NYC 000179

Wherefore, Defendant-Petitioner demands that he be released from prison and his conviction be vacated pursuant to CLP 440.10 as well as Section 8-b of the New York State Court of Claims Act For Unjust Conviction.

Dated:  New York, New York
       August 1, 2006

                                 Pamela D. Hayes, Esq.
                                 Attorney for Defendant-Petitioner

To:  Clerk, Supreme Court Criminal Term
     Robert T. Johnson, District Attorney
     Bronx County

NYC 000180

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX
———————————————————————X

PEOPLE OF THE STATE OF NEW YORK          IND. NO. 5827/96
                                         ORDER
          AGAINST

LAWRENCE FLOWER

———————————————————————X


     THIS MATTER HAVING BEEN BROUGHT ON BY THE DEFENDANT-
PETETIONER LAWRENCE FOWLER  AND AFTER HEARING ARGUMENT BY
THE PEOPLE AND THE DEFENDANT- PETETIONER AND GOOD CAUSE
HAVING BEEN SHOWN  IT IS:

     ORDERED:   THAT THE DEFENDANT CONVICTION FOR MURDER IN
THE SECOND DEGREE RENDERED IN MAY 1998 BEFORE THIS COURT BE
VACATED PURSUANT TO CPL SECTION  440.10 BASED ON NEWLY
DISCOVERED EVIDENCE AND SECTION 8-b OF THE NEW YORK STATE
COURT OF CLAIMS ACT FOR UNJUST CONVICTION AND IMPRSIONMENT.

     THAT DEFENDANT IS IMMEADATELY RELEASED FROM THE NEW
YORK STATE DEPARTMENT OF CORRECTIONS PURSUANT TO THE ABOVE
STATUTES.


     ENTER::


     AUGUST 2, 2006                   Hon. Edward Davidowitz
     BRONX ,NEW YORK                  Judge Court of Claims, ASCJ

                                      JSC

                                EDWARD M. DAVIDOWITZ J.S.C.


NYC 000181

SUPREME COURT OF THE STATE OF NEW YORK        NO FEE
BRONX COUNTY
851 GRAND CONCOURSE
BRONX, NY 10451

CERTIFICATE OF DISPOSITION DISMISSAL

DATE: 01/03/2008

CERTIFICATE OF DISPOSITION NUMBER: 19440

PEOPLE OF THE STATE OF NEW YORK
VS.

CASE NUMBER:              5827-96
LOWER COURT NUMBER(S):  96X044063
DATE OF ARREST:          07/25/1996
ARREST #:                B96043865
DATE OF BIRTH:           12/15/1958
DATE FILED:              08/13/1996

FOWLER,LAWRENCE

DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 08/02/2006 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE  DAVIDOWITZ,E    THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.

IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 01/03/2008.

COURT CLERK

**NYC 000001**

 **Blumberg Law Products**

X 13—Notice of Claim against The City of New York:
Section 50-e General Municipal Law, 6-83

JULIUS BLUMBERG, INC., PUBLISHER
62 WHITE STREET, NEW YORK, N. Y. 10013

In the Matter of the Claim of

*LAWRENCE FOWLER*

against

**THE CITY OF NEW YORK**

TO: COMPTROLLER OF THE CITY OF NEW YORK

**PLEASE TAKE NOTICE** that the undersigned claimant(s) hereby make(s) claim and demand against the City of New York, as follows: [Office of the Comptroller requests the following additional information: in Section 2, specific defect (e.g. pothole) if applicable; in Section 3, street address wherever possible.]

1. The name and post-office address of each claimant and claimant's attorney is:

*Pamela D. Hayes, Esq.*
*200 W. 57th St. Ste. 900*
*New York, NY 10019*

2. The nature of the claim: *Wrongful Conviction, Unjust Conviction and Imprisonment, (NYS Court of Claims Act), False Arrest, False Imprisonment, Violations of Civil Rights*

3. The time when, the place where and the manner in which the claim arose:

*A was wrongfully convicted of Murder 2° (depraived indifference). He served 10 years only to be set free pursant to the abore statute.*

4. The items of damage or injuries claimed are (include dollar amounts):

*Monitary (15 Million)*
*loss of Freedom, loss of job, ect*

RECEIVED
CITY OF NEW YORK
06 NOV -2 PH 3: 25
COMPTROLLER'S OFFICE
CONTRACT FACILITY
BUREAU - N4 SYSTEMS

*TOTAL AMOUNT CLAIMED*

($                )

*The undersigned claimant(s) therefore present this claim for adjustment and payment. You are hereby notified that unless it is adjusted and paid within the time provided by law from the date of presentation to you, the claimant(s) intend(s) to commence an action on this claim.*

Dated: *Nov. 1, 2006*

*Lawrence Fowler*

The name signed must be printed beneath

*LAWRENCE FOWLER*

The name signed must be printed beneath

*Pamela D. Hayes*

*Attorney(s) for Claimant(s)*
*Office and Post Office Address, Telephone Number*

PAMELA D. HAYES, ESQ.
200 WEST 57th ST. STE 900
NEW YORK, NY 10019
(212) 687-8724

**CORPORATE VERIFICATION**

*State of New York, County of*      *ss.:*

*being duly sworn, deposes and says that deponent is the of*
*corporate claimant named in the within action; that deponent has read the foregoing Notice of Claim and knows the contents thereof, and that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true.*

    *This verification is made by deponent because said claimant is a*      *corporation, and deponent an officer thereof, to wit its*
*The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows:*

**INDIVIDUAL VERIFICATION**

*State of New York, County of* NEW YORK      *ss.:*

*being duly sworn, deposes and says that deponent is the claimant in the within action; that ..he has read the foregoing Notice of Claim and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true.*

*Sworn to before me, this* 1st
*day of* NOVEMBER 2006

PAMELA D. HAYES
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
NO. 02HA5012998
COMMISSION EXPIRES DEC. 15, 2009

*Sworn to before me, this*
*day of*      19

*In the Matter of the Claim of*

LAWRENCE FOWLER

*against*

THE CITY OF NEW YORK

**Notice of Claim Against the City of New York**

PAMELA D. HAYES
200 W. 57TH ST. STE 200
NEW YORK, NY 10019
*Attorney(s) for Claimant(s)*
*Office and Post Office Address*



X 13—Notice of Claim against The City of New York:
Section 50e General Municipal Law, 6-83

JULIUS BLUMBERG, INC., PUBLISHER
62 WHITE STREET, NEW YORK, N. Y. 10013

*In the Matter of the Claim of*

LAWRENCE FOWLER

*against*

THE CITY OF NEW YORK

TO: COMPTROLLER OF THE CITY OF NEW YORK

**PLEASE TAKE NOTICE** that the undersigned claimant(s) hereby make(s) claim and demand against the City of New York, as follows: [Office of the Comptroller requests the following additional information: in Section 2, specific defect (e.g. pothole) if applicable; in Section 3, street address wherever possible.]

1. The name and post-office address of each claimant and claimant's attorney is:

Pamela D. Hayes, ESQ.
200 W. 57th St. Ste. 900
New York, NY 10019

2. The nature of the claim: Wrongful Conviction, Unjust Conviction AND Imprisonment, (NYS Court of Claims Act), False Arrest, False Imprisonment, Violations of Civil Rights

3. The time when, the place where and the manner in which the claim arose:

A was wrongfully convicted of Murder 2° (depraved indifference). He served 10 years only to be set free pursuant to the above statute.

4. The items of damage or injuries claimed are (include dollar amounts)

Monetary (15 million)
loss of freedom, loss of job, Act



RECEIVED CITY OF NEW YORK
06 NOV -2 PM 3:25
COMPTROLLERS OFFICE
BUREAU OF LAW AND ADJUSTMENT

TOTAL AMOUNT CLAIMED                    ($                    )

X 13—Notice of Claim against The City of New York:
Section 50e General Municipal Law. 6-53

JULIUS BLUMBERG, INC., PUBLISHER
62 WHITE STREET, NEW YORK, N. Y. 10013

*In the Matter of the Claim of*

LAWRENCE Fowler

*against*

## THE CITY OF NEW YORK

TO: COMPTROLLER OF THE CITY OF NEW YORK

**PLEASE TAKE NOTICE** that the undersigned claimant(s) hereby make(s) claim and demand against the City of New York, as follows:  [Office of the Comptroller requests the following additional information: in Section 2, specific defect (e.g. pothole) if applicable; in Section 3, street address wherever possible.]

1. The name and post-office address of each claimant and claimant's attorney is:

   Pamela D. Hayes, Esq.
   200 W. 57th St. Ste. 900
   New York, NY 10019

2. The nature of the claim: Wrongful Conviction, Unjust Conviction
   AND Imprisonmen, (NYS Court of Claims Act), False Arrest,
   False Imprisonment, Violations of Civil Rights

3. The time when, the place where and the manner in which the claim arose:

   A was wrongfully convicted of Murder 2° (depraived
   indifference). He served 10 years only to be set free
   pursant to the above statute.

4. The items of damage or injuries claimed are (include dollar amounts)

   Monitary (15 million)
   loss of Freedom, loss of job, ect



*TOTAL AMOUNT CLAIMED*

(8                    )

RECEIVED
CITY OF NEW YORK

06 NOV -2 PM 3: 25

OCTPS
CONTROL
BUREAU

OFFICE
FACILITY
SYSTEMS

OCTPS
CONTROL
BUREAU
OFFICE
FACILITY
SYSTEMS

06 NOV -2 PM 3: 25

CITY OF NEW YORK
RECEIVED



THE CITY OF NEW YORK OFFICE OF THE COMPTROLLER
1 CENTRE STREET, NEW YORK, N.Y. 10007-2341

WILLIAM C. THOMPSON, JR.
COMPTROLLER

015 - 158

Date:    12/27/2006
RE:  Disallowance - Insuff. Proof
  LAWRENCE FOWLER
Claim number:    2006PI028479
Agency: POLICE DEPARTMENT

LAWRENCE FOWLER c/o PAMELA D HAYES
200 WEST 57TH STREET STE 900
NEW YORK, NY 10019

     Your claim has been disallowed.  You failed to provide one of the following items:  the date, location and description of the alleged accident and the manner in which the claim arose, as required by General Municipal Law Section 50-e.

     If you wish to pursue your claim you must start an action within one year and ninety days from the date of occurrence.

     If you have been scheduled for a Comptroller's hearing pursuant to General Municipal Law, Section 50-h) you should deem the hearing canceled.

Bureau of Law & Adjustment

By:_____

PERSONAL INJURY
(212) 669-4445



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 8, 2008

Pamela Denise Hayes
Law Office of Pamela D. Hayes, Esquire
200 West 57th Street, Suite 200
New York, Ny 10019
(212)-687-2724
Fax: (212)-980-2968
Email: pdhayesesq@aol.com

Susan P. Scharfstein
New York City Law Department
100 Church Street
New York, NY 10007
(212) 227-4071
Fax: (212) 788-9776
Email: sscharfs@law.nyc.gov

> **Re:** *Lawrence Fowler v. The City of New York, Robert T. Johnson, District Attorney Bronx County, The State of New York, and Governor Eliot Spitzer, 07 CIV 10274 (JSR)*

Dear Mss. Hayes and Scharfstein:

By subpoena signed by the Court on May 4, 2008, you seek testimony by

> A person who is knowledgeable about a matter handled by the U.S. Attorney's Office for the Southern District of New York involving a cooperating witness who had information concerning a shooting that resulted in a death in Bronx County, New York, on or about July 25, 1996, and plaintiff Lawrence Fowler, who was convicted by a jury on criminal charges arising out of the shooting.

From the telephonic conference with the Court on May 2, 2008, and Ms. Hayes' *Touhy* letters of May 5 and May 6, 2008, we understand you wish to know whether certain information developed in the course of an investigation conducted by this Office, which exculpates Lawrence Fowler--who was convicted in 1998 of the 1996 murder of Lamont Jones--was known to the New York Police Department and the Bronx County District Attorney's Office "after the trial and during the trial." May 5 letter at 4.

We have reviewed our files and conducted such further inquiry as has been possible in the very short time we have had to evaluate this matter. As a result we represent the following: (1) There is

*Lawrence Fowler v. The City of New York*, 07 CIV 10274 (JSR)                      Page 2

absolutely no basis to believe that the information in question was known to the NYPD or to the Bronx District Attorney's Office at the time of the *Fowler* trial, and indeed we are virtually certain that the information was not and could not have been known to the NYPD or to the Bronx District Attorney's Office at that time, or at any time until this Office communicated on the matter with the Bronx District Attorney's Office. (2) This Office did not commence looking into the Lamont Jones murder until the summer or fall of 2005 and while it may have become known to members of the NYPD around that time that this Office was revisiting the murder, we have no recollection or record of communicating to the Bronx District Attorney's Office the exculpatory evidence we eventually developed until approximately June 2006, when ADA McCarthy came to our Office.

Any further disclosure, whether by this Office or the Bronx District Attorney's Office, of any details of the exculpatory information developed by this Office would pose a threat to the continuing investigation of the Lamar Jones murder and to individuals who have or may provide information to this Office in connection with that investigation. We believe that the foregoing fully satisfies your needs in your case and that any further disclosure is not appropriate under the regulations and applicable privileges referenced in our May 2, 2008, request for *Touhy* particulars.

                      Very truly yours,

                      MICHAEL J. GARCIA
                      United States Attorney

                  by: _____
                      JOHN M. McENANY
                      Associate United States Attorney
                      (212) 637-2571