UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LAWRENCE FOWLER,                    :

      Plaintiff,     :     **DECLARATION OF**
           **PAMELA D. HAYES, ESQ.**

   -against-               :
           07 CV 10274 (JSR)
THE CITY OF NEW YORK,               :
ROBERT T. JOHNSON, District
Attorney, Bronx County, and the     :
STATE OF NEW YORK,
ELIOT SPITZER, Governor,            :

      Defendants.    :
-------------------------------------------------------x

  **PAMELA D. HAYES**, declares pursuant to 28 U.S.C. § 1746, under penalty of

perjury, that the following is true and correct.

  1.  I am the attorney for Plaintiff, Lawrence Fowler.  I was Plaintiff's attorney

in the trial of *People v. Lawrence Fowler*, Bronx County Ind. No. 5627/98.  As such, I am

familiar with the facts stated below and submit this Declaration to place the relevant

information and documents on the record in support of Plaintiff's Opposition to

Defendant's Motion for Summary Judgment dismissing this action in all respects pursuant

to Rule 56 of the Federal Rules of Civil Procedure.

  2.  Plaintiff's List of Exhibits are as follows:

| EXHIBIT 1 | Plaintiff's counsel's sworn affidavit. |
|-----------|----------------------------------------|
| EXHIBIT 2 | Notes of Detective John Tierney, dated April 1, 1998, of the Bronx County District Attorney's Office. |

| **EXHIBIT 3** | *Brady* letter dated April 3, 1998, from Bronx County ADA Dan McCarthy. |
|---|---|
| **EXHIBIT 4** | Writs for Production of Material Witnesses in the case of *People v. Lawrence Fowler*. |
| **EXHIBIT 5** | Excerpts of testimony and exhibits from certain witnesses at the criminal trial of *People v. Lawrence Fowler*. |
| **EXHIBIT 6** | Decision by the Appellate Division, First Department (see Defendant's Exhibit H). |
| **EXHIBIT 7** | Letter to Pierre Moore, dated May 19, 2000. |
| **EXHIBIT 8** | Letters to Justice Davidowitz, dated May 19, 2000. |
| **EXHIBIT 9** | Letter from Joseph J. Milano, Esq., dated May 22, 2000. |
| **EXHIBIT 10** | Letter to Dan McCarthy dated November 13, 2001, from Plaintiff's counsel. |
| **EXHIBIT 11** | Affidavit from James Ulrich dated 2004. |
| **EXHIBIT 12** | Notice of Motion - CPL § 440.10 and supporting documents, dated August 1, 2006. |
| **EXHIBIT 13** | Order vacating Plaintiff's conviction, dated August 2, 2006. |
| **EXHIBIT 14** | Plaintiff's Notice of Claim, dated November 2, 2006. |
| **EXHIBIT 15** | NYS Division of Parole Final Decision. |
| **EXHIBIT 16** | NYPD Patrol Guide. |
| **EXHIBIT 17** | Court of Appeals case on citing Dan McCarthy. |
| **EXHIBIT 18** | Letters and documents to Defendant's counsel and the U.S. Attorney's Office (SDNY) from Plaintiff, and from the U.S. Attorney's Office to Plaintiff and Defendant. |
| **EXHIBIT 19** | Transcript of Hearing before the Honorable Jed S. Rakoff, USDJ, May 8, 2008. |

| **EXHIBIT 20** | Plaintiff asked for the DA's case file from the case of *People v. Fowler*, Ind. No. 5827/96.  A hearing was held to resolve said issue.  Outside of the case file, Plaintiff had no need for any other documents from Defendant.  Defendant informed Plaintiff it did not need any of Plaintiff's file after this Court ordered her to turn over what she had.  Plaintiff's brief and declaration contain the policies, customs, practices and duties of both the DA's Office and the City of New York. |
|---|---|

DATED:   New York, New York
          June 10, 2008

                                      PAMELA D. HAYES, ESQ. (PH-2737)
                                        *Counsel for Plaintiff*
                                        200 West 57th Street, Suite 900
                                        New York, New York 10019
                                        (212) 687-8724 (Phone)
                                        (212) 980-2968 (Fax)
                                        E-mail: pdhayesesq@aol.com

TO:    Susan P. Scharfstein, Esq.
        Assistant Corporation Counsel
        City of New York Law Department

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LAWRENCE FOWLER,                          :

                   Plaintiff,      :     **AFFIDAVIT OF**
                                   **PAMELA D. HAYES**

          -against-                :     07 CV 10274 (JSR)

THE CITY OF NEW YORK,                     :
ROBERT T. JOHNSON, District
Attorney, Bronx County, and the           :
STATE OF NEW YORK,
ELIOT SPITZER, Governor,                  :

                Defendants.       :
-------------------------------------------------------x

       PAMELA D. HAYES, an attorney, declares pursuant to 28 U.S.C. § 1746, under

penalty of perjury that the following is true and correct:

       1.      I represent the Plaintiff, Lawrence Fowler, in this matter.  Prior to filing

this lawsuit, I represented Mr. Fowler at his State trial when he was charged with Second

Degree Murder and related charges before the Honorable Edward Davidowitz, J.S.C., a

Supreme Court Justice, sitting in Bronx County.

       2.      Counsel was appointed pursuant to § 35B of the Judiciary Law, when the

case was in a death penalty phase and later pursuant to 18-B of the County Law, through

trial and Plaintiff's sentence.  Plaintiff was then represented by Barry Eugene Rhodes,

Esq., who unsuccessfully prosecuted his appeal, in the Appellate Division.  Plaintiff was

denied leave to appeal his conviction, by the New York State Court of Appeals (see Exh.

6).

3.    During Plaintiff's incarceration and trial, Plaintiff's counsel conducted numerous investigations which eventually led to Plaintiff's filing of a CPL § 440.10 Motion based in newly discovered evidence, which exonerated him, caused his conviction to be vacated, and caused him to be released from prison, on August 23, 2006 (see Exhs. 12 and 13).

4.    Specifically, Plaintiff provided the City of New York, through its Police Department and the Bronx District Attorney's Office, *after* trial, during Plaintiff's incarceration with solid information, had either party sought to investigate, would have caused Plaintiff to be released sooner (see Exhs. 7, 8, 9, 10 and 11).

5.    Starting in May, 2000 Plaintiff's counsel brought to the attention of the District Attorney of Bronx County, through ADA Daniel McCarthy, that the NYC Police Department knew that Plaintiff Lawrence Fowler was not involved in this particular case for which he was convicted (see Exh. 11).

6.    Specifically, Plaintiff's counsel called ADA McCarthy and told him that an arrest had been made in May 2000 Bronx County and an individual (by the name of Pierre Moore) told the police ... while under arrest at the 44th Precinct, that he had information on the individual who shot Lamont Jones (see Exhs. 7 and 8).

7.    Specifically Pierre Moore told the arresting officers who did the murder and noted *it was not the individual* who was ultimately convicted (see Exh. 11).

8.    While the officers were at the precinct Officer James Anthony Ulrich called

2

the Night Watch Division of the NYPD, two individuals came to the precinct. When they arrived they were given the information by Officer Ulrich who was one of the individuals at the debriefing of Mr. Moore. Nevertheless, PO Ulrich was told the police department "wasn't interested in old news," and they refused to write the information down or fill out a report. This response flies directly in the face of the Police Department's guidelines under the NYC Patrol Guide (see Exh. 16).

9.    If that was not enough, Plaintiff's counsel immediately called ADA McCarthy in May, 2000, and given him the specifics on Mr. Moore, such as his complaint number, permission from his lawyer to speak with him, etc. (see Exh. 9). The DA in this instance did nothing. Mr. McCarthy testified he did not make any memorializations of his activities. He merely told the Court at the hearing on May 4 that he looked but nothing turned up (see Transcript, Exh. 19).

10.    Counsel continued to provide the Bronx DA's Office with leads through to 2004 (see Exh. 10).

11.    However, it was not until some time in 2005 or May of 2006 that the Bronx District Attorney's Office told Plaintiff's counsel they had a lead from the U.S. Attorney's Office but needed time to do their own investigation, which was concluded in late May 2006. Mr. McCarthy never gave Plaintiff any details of his investigation.

12.    As a result, Plaintiff filed a CPL 440.10 Motion on August 2, 2006, and

Plaintiff's conviction was vacated. He was released on August 23, 2006. Mr. Fowler was held on parole until January 26, 2008 (see Exhs. 12 and 13).

13.    Plaintiff filed a Notice of Claim on November 2, 2006. Defendant did not receive the allege disallowance of claim. Plaintiff filed a federal lawsuit on November 13, 2007 (see Defendant's Exh. A).

14.    Prior to Plaintiff's counsel becoming a defense attorney, Plaintiff's counsel was a Special Assistant Attorney General for Corruption in the New York City Criminal Justice System. Between February 23, 1986 and December 31, 1989, Plaintiff's counsel worked on several high profile cases involving corruption in the New York City Criminal Justice System. Within that capacity Plaintiff's counsel worked with the New York City Police Department and all of the law enforcement agencies which supported it, including various DA Offices, U.S. Attorney Offices, the DEA, the FBI and several other law enforcement agencies. Plaintiff's counsel was intricately involved with the rules and regulations of the City of New York Law Enforcement Agencies. After Plaintiff's counsel left the Office of the Special Prosecutor for Corruption, Plaintiff's counsel was appointed an Assistant District Attorney and Bureau Chief of the Sex Crimes and Special Victims Bureau, on January 2, 1990. Plaintiff's counsel resigned that position in September, 1991. As a result, Plaintiff's counsel got to know all the responsibilities and duties of being a managing ADA in a City's DA's Office. Plaintiff's counsel met ADA McCarthy, in 1996, and knew him to be Chief Trial Counsel at the Bronx DA's Office,

4

which position held managerial, and policy making decisions.

15.    Plaintiff also participated in a hearing before this Court on May 8, 2008. This Court received testimony from the Bronx District Attorney's Office through two witnesses and from the United States Attorney's Office (see Transcript, Exh. 19).

16.    This Court reserved on the motion and set a motion schedule.

PAMELA D. HAYES (PH-2737)

Sworn to before me this
10th day of June, 2008

NOTARY PUBLIC

THERESA S. PETERS
Notary Public, State of New York
No. 03-4882379
Qualified in Bronx County
Commission Expires Jan. 5, 2011

5

# EXHIBIT 2



1- Light Skin w/B
corn rolls 17-20
Y.O.A. Lives
w 280-300 E.161
ST went to
is 166 + is older
then Ricky.

2- Now 18 Y.O.A
Cliff! w/Box
Braids - Slim
Black pants
Lives 280-300 E/161
w/Lives few 380?

TELS 340 28 18 (2)
457 1584 (1)
8 MW (2)

Leader of Gang
AT 280 -300 IS
JASON 3230
HIS FATHER LIVES
AT 162 & MELROSE
where the gang
BOAT & JET SKI
IS.
HIS BOYS = WEBB
SHOT in the EYE
on coplaw ST w/44
CAL. & his brother
IS Webb's = LINCOLN
+ his Lumps

SHEPI QUA = Buck
teeth 19-20 -
Light Skin - Braid
thn light skin
2wys haie from
280-300.

Reds i lives
on 17H FL. did
She see Anything <
Nor has hand is
FEAST the
dispatcher
From WEBSTER CAB.

# EXHIBIT 3



# OFFICE OF THE DISTRICT ATTORNEY, Bronx County

ROBERT T. JOHNSON
*District Attorney*

198 East 161st Street
Bronx, New York 10451

(718) 590-2000

April 3, 1998

Pamela D. Hayes, Esq.
245 Fifth Avenue
New York, New York 10016
**VIA TELEFAX**

RE:   PSNY v.LAWRENCE FOWLER
IND. 5827/96

Dear Ms. Hayes:

    This letter will confirm our conversation today in
furtherance of my obligation pursuant to the teaching of Brady v.
Maryland. As I indicated, detectives from my office interviewed
one Ricky Rivera on April 1, 1998. Rivera indicated that he was
the intended target of the shooting which resulted in the death
of Lamar Jones, for which your client stands indicted. He further
stated that the shooter was one "Cliff" (last name unknown) who
resides in the area of 161st Street and Park Avenue in the Bronx.
In addition, it was Rivera's belief that the shooting was the
result of an on-going drug dispute between himself and rival
neighborhood drug dealers.

    Rivera is presently incarcerated at the Massachusetts
Department of Correction (Concord, Massachusetts). The following
information serves to identify him:

            INMATE NAME:    RICKY RIVERA
            INMATE PIN:     288171
            COMMITMENT:     W64-227

    I am in possession of the notes of Det. John Tierney of this
office, who conducted the interview of Mr. Rivera and will
provide you with a copy on Monday, April 6, 1998, as we
discussed.

If you have any questions or desire any further information, please don't hesitate to contact me at 718-590-2462.

Sincerely yours,

Daniel T. McCarthy
Assistant District Attorney

cc: Hon. Edward Davidowitz
    Bronx Supreme Court

000144

# EXHIBIT 4

COUNTY COURT STATE OF NEW YORK
BRONX COUNTY
------------------------------------------X
                                          :
THE PEOPLE OF THE STATE OF NEW YORK       :   Indictment No.5827-96
                                          :
                                          :
        -against-                         :
                                          :
LAWRENCE FOWLER,                          :   NOTICE OF MOTION TO
                                          :   DECLARE A PERSON AS A
                         Defendant.       :   MATERIAL WITNESS
                                          :
------------------------------------------X

                                              **RECEIVED**

                                              APR 0 8 1998

                                              SUPREME COURT CLERK'S OFFICE
                                              BRONX COUNTY

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )


        PLEASE TAKE NOTICE, upon the annexed affirmation of counsel
and accompanying affidavit, that on the 6th day of April 1998,
counsel will move for a Hearing and an Order pursuant to CPL 620
adjudicating Sheila Overby and Elizabeth Perkins as material
witness in the above captioned trial.


                              Pamela D. Hayes, Esq.
                              Attorney for the Defendant,
                              245 Fifth Avenue - Suite 1905
                              New York, NY  10016
                              (212) 684-6250



Dated:    New York, New York
          March 31, 1998



To:  Clerk, Supreme Court Criminal, Bronx County
     Hon. Robert T. Johnson, District Attorney

                         000121

COUNTY COURT STATE OF NEW YORK
COUNTY OF BRONX
----------------------------------------X
                                    :
THE PEOPLE OF THE STATE OF NEW YORK  :  Indictment No.5827-96
                                    :
                                    :  AFFIRMATION ON
        -against-              :  APPLICATION COMMENCING
                                    :  PROCEEDING TO ADJUDGE
LAWRENCE FOWLER,                 :  A PERSON AS A MATERIAL
                                    :  WITNESS
                    Defendant.    :
                                    :
----------------------------------------X

STATE OF NEW YORK   )
                     ) ss.:
COUNTY OF NEW YORK  )

    **PAMELA D. HAYES,** an attorney duly admited to the practice of law in the Courts fo the State of New York, makes this affirmation under panalty of law:

1.    I have been appointed to represent the defendant, Lawrence Fowler, pursuant to §18-B of the County Laws, on the above captioned indictment.

2.    That the above-named defendant has been indicted by the Grand Jury of Bronx County for the Crime of Murder in the Second Degree, two counts, Manslaughter 1° and Criminal Possession of a Weapon 2° and 3°, in that on the 25th of July, 1996 in the county of the Bronx, he shot and killed one Lamar Jones. Defendant is presently in custody and on trial on said indictment before the Honorable Edward M. Davidowitz.

3.    That there are two witnesses, Shelia Overby and Elizabeth Perkins in possession of information material to the determination of this action.

to secure their future attendance thereat, and for such other and
further relief as to the court may seem just and proper.

Pamela D. Hayes, Esq.
Attorney for the Defendant,
245 Fifth Avenue - Suite 1905
New York, NY  10016
(212) 684-6250

Dated:    New York, New York
          March 31, 1998


To:  Clerk, Supreme Court, Bronx County
     Hon. Robert T. Johnson

SUPREME COURT STATE OF NEW YORK
BRONX COUNTY
------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

          -against-

LAWRENCE FOWLER,

                    Defendant.

------------------------------------------X

Indictment No.5827-96

AFFIDAVIT OF PRIVATE
INVESTIGATOR

STATE OF NEW YORK   )
                ) ss.:
COUNTY OF NEW YORK  )

    **DONALD MAY**, a private investigator, employed by Security Professionals, Inc., and Pamela D. Hayes, Esq., swear to the following under penalty of law:

1. I was retained to work as an investigator pursuant to §18-B of the County Law in the above captioned case pursuant to an Order signed by the Honorable Edward M. Davidowitz, a Justice of the Supreme Court, dated May 15, 1997.

2. I have performed various investigatory functions in said case as per request of Pamela D. Hayes, the attorney assigned to this case.

3. During my tenure, I was specifically asked to interview a Sheila Overby who was an eye-witness to the murder of Lamar Jones. I spoke with her on January 6, 1997, on two (2) occasions. She informed me that she knew who did the murder and it wasn't the person who was arrested. She said she was afraid of getting involved. She had previously told a Leon Sessions the same thing. Leon

000124

Sessions lead me to her, when I spoke to him, he said Sheila told him Clinton, or some name like that, did the shooting.

4.   I tried on numerous other times to speak with Sheila Overby so I could reduce her statement to writing, but she and her mother refused to allow me into their home and called the police and my job to complain that I was harassing them. Her information is relevant and without it would place the Defendant in a tenuous position.

5.   I have every reason to believe that Sheila Overby will not make her self available to testify if subpoenaed and would flee the jurisdiction of this Court.

6.   I interviewed Elizabeth Perkins on March 28, 1997, who lives at Morrisania II Apartments located at 280-300 East 161st Street, #3CC, Bronx, New York. She informed me that a Richard, who lives at 3211 Park Avenue, had sexually assaulted a girlfriend of her son's friend, an individual named Joey, aka, "Doughboy". According to Ms. Perkins, Joey became enraged and went to Ricky's apartment complex with a man named Clifton on July 25, 1996, where Clifton shot at Ricky but missed and killed a boy (Lamar James). Ms. Perkins told me she personally confronted Clifton after Lawrence had been arrested and told him it wasn't right for Lawrence to be in jail for a shooting he didn't do, when in fact, Clifton did it. Clifton did not respond to Ms. Perkins

7.   Approximately two weeks prior to my interview, Ms. Perkins said she approached Clifton again and he just walked away after having the same discussion. Ms. Perkins also stated that she previously actually observed Clifton shooting a hand gun in a store on 161st Street after the murder.

Elizabeth Perkins, a Black female approximately 5'6, weighing between 170 and 230.

_____
Donald May

Dated:    New York, New York
          March 31, 1998

Signed and sworn to me this
31st day of March, 1998.

_____
          Notary

PAMELA D. HAYES
NOTARY PUBLIC, STATE OF NEW YORK
NO.02HA5012998
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES JULY 15, 19__

000126

*Pamela D. Hayes*
*Attorney at Law*
*245 Fifth Avenue, Suite 1905*
*New York, New York 10016*
*(212) 684-6250*
*Fax (212) 684-6593*

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

April 14, 1998

Massachusetts Department of Corrections
P.O. Box 9106
965 Elm Street
West Concord, MA  01742-9106
Attn:      Records/Commitment

Re:   People v. Lawrence Fowler
      Ind. No.:5827-96
      Inmate: Ricky Rivera
      Inmate Pin: #288171/Commitment #W64-227
      Writ to Produce Out of State Witness

Dear Sir or Madam:

Enclosed is the Writ of Habeas Corpus Certificate on the above
captioned individual pursuant to Massachusetts Statute MGLA 233 §§
13A to 13D and New York State Statute CPL § 650.20.   Justice
Davidowitz, of the Supreme Court of Bronx County signed this Order
and the Court seal is affixed.   The Assistant District Attorney
from Bronx County District Attorney Office handling this matter is
Daniel McCarthy, his telephone number is (718) 590-2462.   The Bronx
County District Attorney's Office will provide and pay all costs
and transportation for the witness.   I assume he will be held
within the New York City Department of Corrections.

If you have any questions or if there is anything else needed,
please contact myself or Mr. McCarthy.

Sincerely,

Pamela D. Hayes, Esq.

cc:  Daniel McCarthy

COMMON WEALTH OF MASSACHUSETTS

MIDDLESEX, ss

---------------------------------------------------------X
IN THE MATTER OF THE APPLICATION OF THE
STATE OF NEW YORK FOR THE PRODUCTION OF
RICKY RIVERA, TO TESTIFY IN A CRIMINAL
TRIAL IN BRONX COUNTY, STATE OF NEW YORK,
PURSUANT TO MASSACHUSETTS M.G.L.A. 233
§13A-13D OF CRIMINAL PROCEDURE ART.

---------------------------------------------------------X

SUPERIOR COURT

SUBPOENA and
ORDER

TO:  RICKY RIVERA

It appearing that it will not cause undue hardship to the witness herein, and that the witness will be provided with travel and lodging by members of the Bronx County District Attorney's Office and

This Court relying on the reciprocity between the State of Massachusetts and the State of New York pursuant to their mutual adoption of the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases, Massachusetts M.G.L.A. 233 §13A, 13B, 13C and 13D, and this Court being satisfied that from all the papers presented in support hereof, that the attendance of Ricky Rivera is required as a material witness in the criminal proceedings now pending in the Supreme Court, Bronx County, New York,

YOU ARE HEREBY COMMANDED to attend and testify before the Supreme Court of Bronx County, State of New York at 851 Grand Concourse, Bronx, New York, commencing on April 23, 1998, at 10:00 a.m. in the case of People of the State of New York v. Lawrence Fowler, to give evidence on behalf of the petitioner.

And the Court further ORDERS that you be delivered to members of the Bronx County District Attorney's Office at the Massachusetts Department of Corrections at Concord to assure your attendance. This order is made because there are good grounds for believing that the said witness cannot appear in New York State to give testimony since he is presently confined.

The Court determines that it is necessary for you to be kept in custody to assure your attendance as a material witness in the State of New York.

It is also ORDERED that at the conclusion of this criminal trial (People v. Lawrence Fowler) where you are required as a material witness that you be returned to the custody of the Massachusetts Department of Corrections at Concord.

And for a failure to so attend you will be liable to be punished in the manner provided by law for the punishment of any witness who disobeys a subpoena issued from this Court to compel the attendance of a witness in a criminal proceeding.

Judge - Charles M. Grabau

4/21/98

COUNTY COURT STATE OF NEW YORK
BRONX COUNTY
------------------------------------------X
                         :

THE PEOPLE OF THE STATE OF NEW YORK   :  Indictment No.5827-96

      -against-                       :  WARRANT TO TAKE PROSPECTIVE
                             :  WITNESS INTO CUSTODY FOR
LAWRENCE FOWLER,                 :  PURPOSE OF CONDUCTING
                             :  PROCEEDING TO DETERMINE
                             :  WHETHER SHE SHOULD BE
              Defendant.     :  <u>ADJUDGED A MATERIAL WITNESS</u>
                           :
------------------------------------------X


**IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK**

TO:  ANY POLICE OFFICER OR PEACE OFFICER
      WITHIN THE CONFINES OF THE JURISDICTION
      OF THIS COURT

      An indictment having been filed on the 7th day of August in the Supreme Court of the State of New York, County of the Bronx, charging Lawrence Fowler with the crime of Murder in the second degree and other related charges, and the defendant having made an application for an Order adjudging Sheila Overby to appear at a hearing at the County Courthouse in the Bronx, New York on April 6, 1998, at 9:30 A.M. to determine whether she should be adjudged as material witness, and it appearing from the allegations of the aforesaid application that there is reasonable cause to believe that Sheila Overby would be unlikely to respond to such order,

      **YOU ARE, THEREFORE, COMMANDED** forthwith to take the above-named Sheila Overby into custody within the State of New York and bring her before this court in order that a proceeding may be conducted to determine whether she is to be adjudged a material witness.

Dated, at Bronx, New York, this _15_ day of April, 1998.


_____
HON. EDWARD M. DAVIDOWITZ
ACTING SUPREME COURT JUSTICE
BRONX, NEW YORK

EDWARD M. DAVIDOWITZ J.S.C.

000128

*Pamela D. Hayes*
*Attorney at Law*
*245 Fifth Avenue, Suite 1905*
*New York, New York 10016*
*(212) 684-6250*
*Fax (212) 684-6593*

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

April 14, 1998

Massachusetts Department of Corrections
P.O. Box 9106
965 Elm Street
West Concord, MA  01742-9106
Attn:    Records/Commitment

        Re:  People v. Lawrence Fowler
           Ind. No.:5827-96
           Inmate: Ricky Rivera
           Inmate Pin: #288171/Commitment #W64-227
           Writ to Produce Out of State Witness

Dear Sir or Madam:

Enclosed is the Writ of Habeas Corpus Certificate on the above captioned individual pursuant to Massachusetts Statute MGLA 233 §§ 13A to 13D and New York State Statute CPL § 650.20.  Justice Davidowitz, of the Supreme Court of Bronx County signed this Order and the Court seal is affixed.  The Assistant District Attorney from Bronx County District Attorney Office handling this matter is Daniel McCarthy, his telephone number is (718) 590-2462.  The Bronx County District Attorney's Office will provide and pay all costs and transportation for the witness.  I assume he will be held within the New York City Department of Corrections.

If you have any questions or if there is anything else needed, please contact myself or Mr. McCarthy.

                Sincerely,

                Pamela D. Hayes, Esq.

cc:  Daniel McCarthy

000145

COUNTY COURT STATE OF NEW YORK
BRONX COUNTY
------------------------------------------X
                                          :
THE PEOPLE OF THE STATE OF NEW YORK        :    Indictment No.5827-96
                                          :
         -against-                        :    WARRANT TO TAKE PROSPECTIVE
                                          :    WITNESS INTO CUSTODY FOR
LAWRENCE FOWLER,                          :    PURPOSE OF CONDUCTING
                                          :    PROCEEDING TO DETERMINE
                                          :    WHETHER SHE SHOULD BE
              Defendant.                   :    ADJUDGED A MATERIAL WITNESS
                                          :
------------------------------------------X

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK

TO:  ANY POLICE OFFICER OR PEACE OFFICER
     WITHIN THE CONFINES OF THE JURISDICTION
     OF THIS COURT

        An indictment having been filed on the 7th day of August in
the Supreme Court of the State of New York, County of the Bronx,
charging Lawrence Fowler with the crime of Murder in the second degree
and other related charges, and the defendant having made an application
for an Order adjudging Elizabeth Perkins to appear at a hearing at the
County Courthouse in the Bronx, New York on April 8, 1998, at 9:30 A.M.
to determine whether she should be adjudged as material witness, and it
appearing from the allegations of the aforesaid application that there
is reasonable cause to believe that Elizabeth Perkins would be unlikely
to respond to such order,

        YOU ARE, THEREFORE, COMMANDED forthwith to take the above-
named Elizabeth Perkins into custody within the State of New York and
bring her before this court in order that a proceeding may be conducted
to determine whether she is to be adjudged a material witness.

Dated, at Bronx, New York, this _____15_____ day of April, 1998.

HON. EDWARD M. DAVIDOWITZ
ACTING SUPREME COURT JUSTICE
BRONX, NEW YORK

EDWARD M. DAVIDOWITZ J.S.C.

000130

SUPREME COURT STATE OF NEW YORK
BRONX COUNTY
------------------------------------------X
                                          :
THE PEOPLE OF THE STATE OF NEW YORK       :    Indictment No.5827-96
                                          :
            -against-                     :
                                          :
LAWRENCE FOWLER,                          :
                                          :
                                          :
                    Defendant.            :
                                          :
------------------------------------------X


### DESCRIPTION OF ELIZABETH PERKINS AS A MATERIAL WITNESS


Last known address:    216 W. 141st ST. APT 1C
                       New York, N.Y. 10030


Description:              Female Black
                          40-45 years of age
                          5'4"/5'6" tall
                          170-190 lbs. (approx)
                          Black Hair (shoulder length)


000131

PRESENT:  HON. EDWARD M. DAVIDOWITZ, J.S.C.

STATE OF NEW YORK
SUPREME COURT : COUNTY OF THE BRONX
----------------------------------------X    Indictment No.5827-96
                                         :
THE PEOPLE OF THE STATE OF NEW YORK,     :    Edward M. Davidowitz, J.S.C.
                                         :
                    Plaintiff            :    JUDICIAL CERTIFICATE AND
                                         :    REQUEST TO SECURE THE
                                         :    ATTENDANCE OF RICKY RIVERA
                                         :    PURSUANT TO THE UNIFORM ACT
        -against-                        :    TO SECURE ATTENDANCE OF
                                         :    WITNESS FROM WITHOUT THE
                                         :    STATE IN CRIMINAL CASES
                                         :
LAWRENCE FOWLER,                         :    CPL ARTICLE 650.20
                                         :
                    Defendant.           :    MASSACHUSETTS - M.G.L.A. 233
                                         :    §13A, 13B, 13C AND 13D
----------------------------------------X

TO THE SUPERIOR COURT OF MASSACHUSETTS FOR THE COMMONWEALTH OF
MASSACHUSETTS:

     The petitioner, Lawrence Fowler, by his attorney, Pamela D.
Hayes, having applied to this Court for a certificate pursuant to
the above captioned "Uniform Act", codified as Article 650.20 of
the Criminal Procedure Law of the State of New York and M.G.L.A.
233 §13A, 13B, 13C and 13D, certifying the necessity for the
attendance of Ricky Rivera as a witness in this proceeding, and the
Court having heard Pamela D. Hayes Esq. and Daniel T. McCarthy,
Assistant District Attorney for Bronx County, in relation to the
Application, the Court hereby certifies, requests and orders as
follows:

     1.  A criminal trial is pending in the Bronx County Supreme
Court in which the petitioner, Lawrence Fowler, seeks the
attendance of Ricky Rivera as a witness.

     2.  Mr. Ricky Rivera, whose attendance for the purpose of
giving testimony is sought by the petitioner, is a material witness
within the meaning of the Uniform Act.

3.    Mr. Rivera is not within the jurisdiction of the State of New York.  He resides in Massachusetts and is in custody at the Massachusetts Department of Correction, 913 Elm Street, Concord, Massachusetts. He is described as follows:  Male Hispanic, age 18.

4.    Mr. Rivera's presence is required for a period of no more than 21 days commencing on April 21, 1998.

5.    It would not cause undue hardship for the witness to present him before this Court for the purpose of giving testimony. Moreover, should the Massachusetts Court issue the subpoena requested herein, the witness would be lodged with the New York City Department of Corrections.  The Bronx District Attorney's Office will arrange for his transportation, lodging and expenses.

6.    It is therefore REQUESTED that the Superior Court of Massachusetts for Middlesex County, cause said Ricky Rivera to appear before the said Court for a hearing to determine whether or not the said Court should issue a subpoena with a copy of this certificate attached, requiring the said Ricky Rivera to appear before the Honorable Edward M. Davidowitz at the Supreme Court of Bronx County at 851 Grand Concourse, 7th Floor, Bronx, New York, at 10:00 a.m. on April 21, 1998.

7.    For the purpose of this hearing it is recommended, in lieu of notification of the hearing, that the witness be forthwith brought before the Superior Court.

8.    It is hereby REQUESTED that the Superior Court of the State of Massachusetts order that the said witness, Ricky Rivera, following a hearing, be taken into custody forthwith and delivered to members of the Bronx County District Attorney's Office at the Massachusetts Department of Corrections at Concord, to assure his attendance.  This recommendation is made because there are good grounds for believing that the said witness cannot appear in New York State to give testimony, since he is presently confined.

9.    It is also RECOMMENDED that the Superior Court for the State of Massachusetts determine whether it is necessary for the said witness to be kept in custody to assure the attendance of material witnesses in the State of New York, would be sufficient to assure his attendance at these proceedings.

10. It is therefore ORDERED that the District Attorney of Bronx County take custody of said witness Ricky Rivera and transport and bear all expenses to and from the State of Massachusetts to the State of New York.

J.S.C.

COUNTY COURT STATE OF NEW YORK
BRONX COUNTY
----------------------------------------X
                                        :
THE PEOPLE OF THE STATE OF NEW YORK  :  Indictment No.5827-96

      -against-  :  WARRANT TO TAKE PROSPECTIVE
                                     :  WITNESS INTO CUSTODY FOR
LAWRENCE FOWLER,  :  PURPOSE OF CONDUCTING
                                     :  PROCEEDING TO DETERMINE
                                     :  WHETHER HE SHOULD BE
                  Defendant.  :  ADJUDGED A MATERIAL WITNESS
----------------------------------------X

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK

TO:  DISTRICT ATTORNEY'S OFFICE - BRONX COUNTY and
     THE MASSACHUSETTS DEPARTMENT OF CORRECTIONS
     WITHIN THE CONFINES OF THE JURISDICTION OF
     OF THIS COURT

       An indictment having been filed on the 7th day of August in the Supreme Court of the State of New York, County of the Bronx, charging Lawrence Fowler with the crime of Murder in the second degree and other related charges, and the defendant having made an application for an Order adjudging Ricky Rivera to appear at a trial at the County Courthouse in the Bronx, New York on April 20, 1998, at 9:30 A.M. to testify in the trial of People of the State of New York vs. Lawrence Fowler as a material witness and is appearing from the allegations of the aforesaid application that there is reasonable cause to believe that Rick Rivera would be unlikely to respond to such order, since he is incarcerated within the custody of the Massachusetts Department of Corrections at Concord, Massachusetts.

       **YOU ARE, THEREFORE, COMMANDED** forthwith to take the above-named Ricky Rivera into custody within the State of Massachusetts and bring him before this court in order that he may testify in the above stated trial, pursuant to CPL §640.10 and Massachusetts statute (MGLA c.233 §§ 13A to 13D.

Dated:     Bronx, New York
           April 14, 1998

HON. EDWARD M. DAVIDOWITZ
ACTING SUPREME COURT JUSTICE
BRONX, NEW YORK

EDWARD M. DAVIDOWITZ J.S.C.

SUPREME COURT STATE OF NEW YORK
BRONX COUNTY
------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK EX REL:   Indictment No.5827-96
LAWRENCE FOWLER BY PAMELA D. HAYES, ESQ.,   :
                                             :
                    Petitioner,              :   WRIT OF
                                             :   HABEAS CORPUS
          -against-                          :
                                             :
WARDEN, MASSACHUSETTS DEPT OF CORRECTIONS    :
AT CONCORD OR ANY OTHER PERSON HAVING        :
CUSTODY OF THE WITNESS, RICKY RIVERA         :
(INMATE PIN #288171                          :
                                             :
                         Defendant.          :
------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK


upon the relation of


TO:  WARDEN, MASSACHUSETTS DEPARTMENT OF CORRECTIONS AT CONCORD


     **WE COMMAND YOU,** that you have and produce the body of Ricky
Rivera (Inmate Pin #288171/Commitment W64-227) by you imprisoned
and detained, as it is said, together with your full return to this
writ and the time and cause of such imprisonment and detention, by
whatsoever name the said person shall be called or charged before
Hon. Edward M. Davidowitz one of the Justices of the Supreme Court
of the State of New York County of the Bronx at 851 Grand Concourse
in the courthouse thereof on the 20th day of April, 1998 at 9:30
a.m. to do and receive what shall then and there be considered
concerning the said person and have you then and there this writ.

WITNESS, Hon. Edward M. Davidowitz one of the Justices of our said
Court the 14th day of April, 1998.

                              ~~Clerk~~

                              EDWARD M. DAVIDOWITZ J.S.C.


                    Pamela D. Hayes, Esq.
                    Attorney for Petitioner
                    245 Fifth Avenue - Suite 1905
                    New York, New York  10016
                    (212) 684-6250

The within writ is hereby allowed this 14th day of April, 1998.

000138

SUPREME COURT STATE OF NEW YORK
BRONX COUNTY
-------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK EX REL:    Indictment No.5827-96
LAWRENCE FOWLER BY PAMELA D. HAYES, ESQ., :
                                          :
                    Petitioner,           :    PETITION FOR WRIT OF
                                          :    HABEAS CORPUS
        -against-                         :
                                          :
WARDEN, MASSACHUSETTS DEPT OF CORRECTIONS :
AT CONCORD OR ANY OTHER PERSON HAVING     :
CUSTODY OF THE WITNESS, RICKY RIVERA      :
(INMATE PIN #288171)                      :
                                          :
                            Defendant.    :
-------------------------------------------X

TO:   WARDEN
      MASSACHUSETTS DEPARTMENT OF CORRECTIONS

The petition of Lawrence Fowler:

1.    This petition is made on behalf of Lawrence Fowler by Pamela
      D. Hayes, Esq., shows that: Ricky Rivers who is detained by
      the Massachusetts Department of Corrections at Concord.

2.    The cause or pretense of the detention, according to the best
      knowledge and belief of the petitioner is, Ricky Rivera is
      serving a sentence in Massachusetts on unrelated charges.
      Ricky Rivera is an eye witness to the murder of Lamar Jones.
      His presence is needed as that of a Brady Witness, in that he
      will exculpate Defendant, Lawrence Fowler. Ricky Rivera is a
      material witness and must be produced pursuant to CPL §640.10
      and Massachusetts statue M.G.L.A. 233 §§ 13A to 13D.

3.    That a court or judge of the United States does not have
      exclusive jurisdiction to order the release of said person.

4.    This writ is sought because said witness is an out of state
      witness in custody and can only be produced in the state of
      New York on authorization of a Judge.

5.    An appeal has not been taken from the order by virtue of which said person is detained.   The result of said appeal is

No previous application has been made for this relief.

WHEREFORE, your petitioner prays that a writ of habeas corpus issue, directed to the respondent, requiring the respondent to produce the said Edward M. Davidowitz before a Justice of this court a Criminal Term, Part 27 thereof on April 20, 1998.

Dated:        Bronx, New York
              April 14, 1998

_____
Pamela D. Hayes, Esq.
Attorney for the Petitioner
245 Fifth Avenue - Suite 1905
New York, NY  10016
(212) 684-6250

000140

SUPREME COURT STATE OF NEW YORK
BRONX COUNTY
--------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK EX REL:  Indictment No.5827-96
LAWRENCE FOWLER BY PAMELA D. HAYES, ESQ., :
                                            :
                    Petitioner,             :  AFFIRMATION IN
                                            :  SUPPORT OF WRIT
            -against-                       :  OF HABEAS CORPUS
                                            :  AND MATERIAL WITNESS
WARDEN, MASSACHUSETTS DEPT OF CORRECTIONS  :  ORDER
AT CONCORD OR ANY OTHER PERSON HAVING      :
CUSTODY OF THE WITNESS, RICKY RIVERA        :
(INMATE PIN #288171                         :
                                            :
                         Defendant.         :
--------------------------------------------X


     Pamela D. Hayes, an attorney duly admitted to practice law in
the Courts of the State of New York states the following under
penalty of law:


1.   I was appointed to represent the Defendant, Lawrence Fowler
     pursuant to 35-B of the Judiciary Laws and 18-B of the County
     Laws once said case was decapitalized.


2.   Lawrence Fowler was indicted by the Bronx County Grand Jury in
     August of 1996.  At that time, Defendant entered a not guilty
     plea and has steadily maintained his position that he did not
     kill Lamar Jones, nor was he present at the time and place
     where the People contend that the murder took place.


3.   After a lengthy investigation, Defendant has at least 10 eye
     witnesses that he was at a location other than where the
     murder occurred.


4.   In addition to said alibi witnesses, Defendant has ascertained
     that the "People" have located an eye witness, Ricky Rivera,
     which Defendant first told them about a year ago who will
     confirm that he was the intended target and was with the
     victim, Lamar Jones at the time of the shooting.

000141

5.  Furthermore, Ricky has told members of the District Attorney's Office that the individual who shot Lamar Jones was a "rival drug dealer" by the name of Cliff.  The name Cliff had been given to the DA's Office at least a year ago by Defendant through a witness by the name of Ms. Perkins who Cliff made a tacit admission regarding the murder of Lamar Jones.

6.  All of said evidence clearly exculpates Lawrence Fowler and the testimony of Ricky Rivers is material to said case and therefore he must be compelled to testify.

WHEREFORE, counsel requests that the Court sign said Writ of Habeas Corpus and compel said witnesses to appearance for approximately three weeks (between April 20 through May 8, 1998).

Dated:    Bronx, New York
          April 14, 1998

                        Pamela D. Hayes, Esq.
                        Attorney for the Petitioner
                        245 Fifth Avenue - Suite 1905
                        New York, NY  10016
                        (212) 684-6250

To:  Clerk, Supreme Court Criminal Term
     Bronx County

     Hon. Robert T. Johnson
     District Attorney, Bronx County

# EXHIBIT 5
## (Part A)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX
————————————————————————X

PEOPLE OF THE STATE OF NEW YORK            IND. NO. 5827/96
                                           ORDER
                AGAINST

LAWRENCE FLOWER

————————————————————————X


        THIS MATTER HAVING BEEN BROUGHT ON BY THE DEFENDANT-
PETETIONER LAWRENCE FOWLER  AND AFTER HEARING ARGUMENT BY
THE PEOPLE AND THE DEFENDANT- PETETIONER AND GOOD CAUSE
HAVING BEEN SHOWN  IT IS:

        ORDERED:   THAT THE DEFENDANT CONVICTION FOR MURDER IN
THE SECOND DEGREE RENDERED IN MAY 1998 BEFORE THIS COURT BE
VACATED PURSUANT TO CPL SECTION  440.10 BASED ON NEWLY
DISCOVERED EVIDENCE AND SECTION 8-b OF THE NEW YORK STATE
COURT OF CLAIMS ACT FOR UNJUST CONVICTION AND IMPRSIONMENT.

        THAT DEFENDANT IS IMMEADATELY RELEASED FROM THE NEW
YORK STATE DEPARTMENT OF CORRECTIONS PURSUANT TO THE ABOVE
STATUTES.


        ENTER::


        AUGUST 2, 2006
        BRONX ,NEW YORK            Hon. Edward Davidowitz
                                   Judge Court of Claims, ASCJ
                                   JSC


                            EDWARD M. DAVIDOWITZ J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX
——————————————————————X

PEOPLE OF THE STATE OF NEW YORK,                    Ind. No. 5827/96
                                    Plaintiff

                                                    Affidavit in Support of
                                                    Motion to Vacate Judgment
                     -Against-                      pursuant to CLP 440.10 and
                                                    Section 8-b of the New
                                                    York State Court of Claims
                                                    Act for Unjust Conviction
                                                    and Imprisonment.

Lawrence Fowler,

                            Defendant

——————————————————————X


        Pamela D. Hayes, Esq. an attorney duly admitted to practice law in the Courts of
this State makes the following affirmation under penalty of law.

   1.      I am the attorney of record in the above captioned matter. I represented
           the defendant Lawrence Fowler, during all stages of his trial and
           conviction, with the exception of his direct Appeal. I was appointed
           pursuant to section 18-B of the County Law as well as section 35 of the
           Judiciary Law when Mr. Fowler was charged under the Death Penalty.

   2.      Defendant Petitioner was convicted of Murder in the Second Degree
           In May 1998 after a trial in front have the Honorable Edward Davidowitz
           and a jury. The defendant was sentenced to 25 years to life and he is
           currently serving that sentence.

   3.      In May of 2000, counsel wrote the Court and explained that she had
           received information that there were individuals who had informed the
           the New York City police that Lawrence Fowler was innocent of the
           murder for which he had been convicted. Specifically an inivual by the
           name of Pierre Moore was arrested and told member of the New York
           City Police Department that Lawrence Fowler was not the shooter and was
           not involved in the murder. Pierre Moore and another individual by the
           name of Debow had been there saw the incident and Lawrence Fowler was
           not there and was not involved in the incident.

4.    Defendant hired an investigator, said investigator tracked down Mr. Moore. Mr. Moore was interviewed but refused to cooperate with Counsel to come forward and exonerate Mr. Fowler.

5.    Counsel reported this information to the District Attorney's Office, however there was no way to force Mr. Moore to come forward even with the intersession of Mr. Moore's mother and lawyer. (See attached Exhibits)

6.    In November of 2001, I called and wrote ADA Dan McCarthy who tried the case. I explained to him that the name of an individual who was one the police Officers who had taken the information from Mr. Moore on the evening that Mr. Moore had given the information to the police. Unfortunately Mr. McCarthy was not able to locate Police Officer's Ortiz's memo books, however he remained open to my insistences that there was information out there that could potentially clear Mr. Fowler.

7.    During June of this year I received a telephone call from Dan McCarthy. He explained to me that he had received information from a confidential informant from the United States Attorney's Office, which informed the US Attorney's Office that Lawrence Fowler had not committed the murder for which he was serving time. Mr. McCarthy informed me that he would investigate the matter the information from the informant that the informant was a "look out" and Lawrence Fowler was not there nor did he participate in the murder.

8.    As a result the matter was investigated and Mr. McCarthy is convinenced that the witness is telling the truth and Lawrence has been wrongfully convicted and imprisoned.

9.    This information is consistent with the evidence that was adduced at trial including the fact that at least 6 indivuals testifies that Lawrence Fowler was not present at the scene. It is particularly relevant that the individual who was being shot at on that evening is the same invidual that Defendant brought in pursuant to subpoena from Massachusetts and said that he was the intended victim and Lawrence Fowler was not the individual he saw shooting at him that night.

10.    It is clear that Mr. Fowler has been a victim of a unjust and a wrongful and his conviction should be vacated based on the newly discovered evidence, which is being presented to the Court.

Wherefore, Defendant-Petitioner demands that he be released from prison and his conviction be vacated pursuant to CLP 440.10 as well as Section 8-b of the New York State Court of Claims Act For Unjust Conviction.

Dated:  New York, New York
       August 1, 2006

Pamela D. Hayes, Esq.
Attorney for Defendant-Petitioner

To:  Clerk, Supreme Court Criminal Term
    Robert T. Johnson, District Attorney
    Bronx County

**New York State Court of Claims**



**collection home**

Search [_____] search

# FOWLER v. THE STATE OF NEW YORK, #2008-016-005, Claim No. None, Motion No. M-74233

## Synopsis

Motion for permission to file a late claim under §8-b of the Court of Claims Act and for release from parole was denied.

## Case Information

| | |
|---|---|
| **UID:** | 2008-016-005 |
| **Claimant(s):** | LAWRENCE FOWLER |
| **Claimant short name:** | FOWLER |
| **Footnote (claimant name) :** | |
| **Defendant(s):** | THE STATE OF NEW YORK |
| **Footnote (defendant name) :** | |
| **Third-party claimant (s):** | |
| **Third-party defendant(s):** | |
| **Claim number(s):** | None |
| **Motion number(s):** | M-74233 |
| **Cross-motion number(s):** | |
| **Judge:** | Alan C. Marin |
| **Claimant's attorney:** | Pamela D. Hayes, Esq. |
| **Defendant's attorney:** | Andrew M. Cuomo, Attorney GeneralBy: Gwendolyn Hatcher, Esq., AAG |
| **Third-party defendant's attorney:** | |
| **Signature date:** | February 19, 2008 |
| **City:** | New York |
| **Comments:** | |

> **Official citation:**
>
> **Appellate results:**
>
> **See also**
> **(multicaptioned case)**

### Decision

Claimant Lawrence Fowler moves pursuant to §10.6 of the Court of Claims Act (the "Act") for permission to file a late claim under §8-b thereof, which is known as the Unjust Conviction and Imprisonment Act.[1] Mr. Fowler alleges that after having been convicted of murder on June 28, 1998 and serving over ten years on a sentence of 25 years to life, his conviction was vacated on Aug. 2, 2006. Permission to file a late claim is not available for unjust conviction claims. See, e.g., *Gurley v State of New York*, 173 Misc 2d 87, 89, 661 NYS2d 700 (Ct Cl 1997). Late claim relief under subdivision 6 of §10 of the Act is a remedy for failure to comply with the time limitations contained in such section. The time limitations for an unjust conviction claim are separately set forth in subdivision 7 of §8-b; such a claim must be filed "within two years from the dismissal of the accusatory instrument . . ." *Long v State of New York*, 7 NY3d 269, 275, 819 NYS2d 679, 683 (2006).

In view of the foregoing, having reviewed the submissions[2], IT IS ORDERED THAT motion no. M-74233 be denied, and claimant should serve and file his claim in accordance with §§8-b, 11 and 11-a of the Act.

February 19, 2008
New York, New York

HON. ALAN C. MARIN
Judge of the Court of Claims

---

1. **[1]** Claimant also seeks an order directing his release from parole status. The Court of Claims does not have jurisdiction over such a claim. See §9 of the Act.
2. **[2]** The following were reviewed: claimant's notice of motion with affidavit in support, proposed claim and undesignated exhibits; and defendant's affirmation in opposition.

## CLIENT\WITNESS STATEMENT

588-2497

Date statement taken: Dec. 31, 1996 Time: 3:15 PM Location: 3204 Park ave
Apt. 3C

Person making statement: Jose Gonzalez    Investigator assigned: Don Mas

Indicate if details are in the handwriting of person making statement ✓ or investigator ____

I remember that night was sitting across the street in the park with my friends called tito, pito, joel, I saw too people on bikes about 18 years old and had black sweater and black pants going inside the courtyard, after too gun shots and so pito and joel ran to the courtyard to see what happen and then me and tito went to see also and then the copcars, pito and joel what happen and took in the police car, The police never ask me or tito what the guys on bikes look like,

Signature: Jose Gonzalez
Person making statement.

Don Mas
Investigator

690

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX:TRIAL TERM PART 27

------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,      :      T R I A L

       -against-                               :      Indictment No.
                                                 5827-96
LAWRENCE FOWLER,                          :

                                                 AGNES SANTIAGO
                                                 JOSE SANTIAGO
                          Defendant.      :      DR. JON PEARL
                                                 RICKY RIVERA
------------------------------------------X

                                   851 Grand Concourse
                                   Bronx, New York  10451
                                   April 30th, 1998

B e f o r e :

            HONORABLE EDWARD M. DAVIDOWITZ,

                                             J. S. C.

A P P E A R A N C E S :

FOR THE PEOPLE:            OFFICE OF ROBERT T. JOHNSON,
                           BRONX DISTRICT ATTORNEY
                           851 Grand Concourse
                           Bronx, New York  10451
                           BY:  DANIEL McCARTHY.
                              JONATHAN SENNETT
                           ASSISTANT DISTRICT ATTORNEY

FOR THE DEFENDANT:         PAMELA D. HAYES, ESQ.
                           245 Fifth Avenue
                              Suite 1905
                           New York, New York   10016

                                   FAYE MOORE
                                   Senior Court Reporter

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Proceeding                                      794

1

2          THE COURT: Let me just say, as far as the

3     other documents are concerned, we are not talking

4     about his personal property.  The other documents

5     that may have come with him from Massachusettes we

6     are going to endorse the court order and order

7     these things to be brought to court and to be

8     turned over to me and then I will then give them

9     to his attorney to examine them.  In that

10    connection if there's  anything recovered in these

11    documents that would cause Ms. Hayes to reopen her

12    direct examination  I  would give you that right.

13    And  if  there's  anything in those documents that

14    would cause  Mr. McCarthy  to  reopen his

15    cross-examination I would give you that part as

16    well.  You both have that?

17          MS. HAYES:   Yes, Your Honor.

18          MR. McCARTHY:   Yes.

19          THE COURT:   The other thing is that we have

20    agreed basically that I would tèll this jury when

21    they come down that Mr. Rivera is currently in

22    jail in Massachusettes and that he has requested

23    that his attorney, Mr. Kallor, who I will

24    introduce to the jury,  to be present during his

25    testimony.  He has that right and they are not to

Proceeding                    795

1
2    draw any adverse interest from that fact.  And

3    that I also give  him the right to consult with

4    Mr. Kallor any time that he wish to.  There will

5    be a simple statement by the defendant that he

6    exercises whatever is going to be worked out.

7         MR. KALLOR:  He is not very sophisticated so

8    it has to be explained.

9         THE COURT:   The statement is in effect, he's

10   taking the Fifth, that's the phrase that he will

11   use.  Basically that means that he is exercising

12   his Fifth Amendment privilege not to answer

13   questions on the ground that his answers may tend

14   to incriminate him.  Okay.

15              (R-E-C-E-S-S.)

16        (The witness Ricky Rivera  is present and

17   represented by Bruce Kallor, Esq., 1220 Lexington

18   Avenue, New York, New York 10028.)

19        THE COURT:  Mr. Rivera, you are here today as

20   a witness for the defense.  You know that?

21        THE WITNESS:    Yes.

22        THE COURT:  Now, in that concession, because

23   of the fact that you are in jail and because of

24   the circumstances involving this case, I have

25   assigned Mr. Kallor to represent you.  He's your

1                            Proceeding              796

2       lawyer, right?

3                THE WITNESS:   (Affirmative nod.)

4                THE COURT:   You have the right at any time

5       you want to during the course of the  questioning

6       to speak to Mr. Kallor about any of the questions

7       that are asked of you, right?

8                THE WITNESS:   (Affirmative nod.)

9                THE COURT:   I have also told Mr. Kallor if

10      there comes a time where you feel it is

11      appropriate for you to decline to answer because

12      of your Fifth Amendment rights, you are simply

13      going to say I take the Fifth.  You have any other

14      questions you want to ask me?

15               THE WITNESS:   No.

16               THE COURT:   Mr. Kallor is going to remain

17      here with you throughout your testimony, right?

18               THE WITNESS:   Right.

19               THE COURT:   Jury down.

20               (Whereupon the jurors enter the courtroom at

21      three forty PM.)

22               THE CLERK:   Case on trial continued.  Note

23      the presence of defendant, his attorney, the

24      assistant district attorneys and all jurors.

25               THE COURT:   Okay, folks, the next witness is

Rivera-Defense-Direct                    797

1
2      a gentleman name Ricky Rivera, and he's seated
3      here in the witness box.  Now, he has asked and
4      requested that his attorney, whose name is Mr.
5      Kallor, Bruce Kallor, be seated behind him,  be
6      present with him during the course of his
7      testimony.  He is here.  I have given Mr. Rivera
8      the right if he wishes to consult with Mr. Kallor
9      at any time he wishes to do so.  Okay, so that I
10     want you to understand.
11              All right.   Let's proceed.
12              (Whereupon the witness is sworn at  three
13         forty PM by the clerk.)
14   R I C K Y      R I V E R A, having been called as a
15   witness  by  and  on behalf of the Defense, having been
16   first duly sworn by the clerk was examined and testified
17   as follows:
18              THE COURT OFFICER:   Defense witness gives
19         his name as Ricky Rivera, resident of the
20         Commonwealth of Massachusettes.
21              THE COURT:     Proceed please.
22   DIRECT EXAMINATION
23   BY MS. HAYES:
24       Q.      Good afternoon, Mr.  Rivera.  Can I ask you in
25   a loud clear voice to tell the jury what you name is.

1                    Rivera-Defense-Direct                    798

2        A.        Ricky Rivera.

3        Q.        Are you known by any other nickname?

4        A.        No.

5        Q.        Does anybody call you Little Ricky?

6        A.        No.

7        Q.        Okay.  Calling your attention to July 25th,

8    1996, were you living in Bronx County?

9        A.        Yes.

10       Q.        In the Bronx?

11       A.        Yes.

12       Q.        Where were you living at?

13       A.        3209 Park Avenue.

14       Q.        3209 Park Avenue?

15       A.        Yes.

16       Q.        Is that between 161st Street and 162nd Street

17   and Park?

18       A.        Yes.

19       Q.        Is that the courtyard building?

20       A.        Yeah.

21       Q.        Now, I call your attention to approximately

22   nine PM on the evening of the 25th, did you have occasion to

23   be outside?

24       A.        Yes.

25       Q.        Where in particular were you around nine

1                    Rivera-Defense-Direct              799

2    seventeen, nine eighteen that evening?

3         A.        Top steps of the courtyard.

4         Q.        Where?

5         A.        Top steps of the courtyard.

6         Q.        And who were you with?

7         A.        Lamar.

8         Q.        Lamar.  Do you know Lamar's last name?

9         A.        Jones.

10        Q.        Lamar Jones?

11        A.        Yes.

12        Q.        And how do you know Lamar Jones?

13        A.        From school.

14        Q.        From school?

15        A.        Yes.

16        Q.        And do you know anybody else in Lamar's family?

17        A.        His uncle.

18        Q.        His uncle.  And what is Lamar's uncle's name?

19        A.        Adam.

20        Q.        Adam.  Are you and Lamar's uncle friends or

21    were you friends  at that time?

22        A.        Yes.

23        Q.        Did you all hang out together?

24        A.        Yes.

25        Q.        Now, I show you what has been marked

1                          Rivera-Defense-Direct                    800

2       Defendant's Exhibit B in evidence, I ask you to look at that

3       picture and tell me if you recognize it?

4                          (Photograph handed to the witness.)

5            A.        Yes.

6            Q.        What do you recognize that picture to be of?

7            A.        Courtyard.

8            Q.        And is that the courtyard where you were

9       living at at that time?

10           A.        Yes.

11           Q.        Specifically what building were you living?

12           A.        3209.

13           Q.        Can you see it in that picture?

14           A.        Yes.

15           Q.        Turn the picture towards the jury and show

16      them which building?

17           A.        (Indicating.)

18                     THE COURT:  Indicating the entrance of the

19                building in the middle of the picture toward the

20                rear.

21           Q.        Okay, Mr. Rivera, would you please mark 3209

22      where you were living.

23           A.        (Witness complies.)

24                     THE COURT:  Over the entrance or next to it.

25           Q.        And just write "Ricky".

Rivera-Defense-Direct                801

1
2          THE COURT:  He's marked 3209 that's it.

3    Q.        You don't have to write it.  That's okay.

4              Now mark Ricky where you and Lamar were

5    standing?

6    A.        (Witness complies.)

7              THE COURT:  Show it to the jurors.

8              He's pointed --- Turn it around and show it

9         to me.

10             That's an entrance to the courtyard.  The

11        steps to the courtyard.

12   A.        Yes.

13   Q.        Now, around nine eighteen, nine twenty,  did

14   something happen while you were standing in the courtyard

15   with Lamar?

16   A.        Yeah.

17   Q.        What happened?

18   A.        Two kids rode up on a bike.

19   Q.        Now, two kids rode up on a bike.

20             THE COURT:  One bike or two bikes there?

21   Q.        Two bikes?

22   A.        Two bikes.

23   Q.        Describe these kids?

24   A.        I can't recall, to the best of my knowledge I

25   can't.

1                          Rivera-Defense-Direct                    802

2          Q.          Excuse me?

3          A.          The best of my knowledge I can't recall it.

4          Q.          Can you tell what race they were?

5          A.          Yes, they was dark skin.

6          Q.          Dark skin?

7          A.          Yes.

8          Q.          When you say dark skin using me as an example

9     were they my complexion?

10         A.          Yes.

11         Q.          Were both of them dark skin?

12         A.          One was light skin.

13         Q.          One was light skin.  And the person who was

14    light skin, what complexion would you say he was?

15         A.          My complexion.

16         Q.          Around your complexion.

17    So two kids rode up on a bike and what happened?

18         A.          One, the dark skin kid pulled out.  I seen

19    something shine and he pulled out and started  shooting.

20         Q.          You said that you saw something shiny?

21         A.          Yes.

22         Q.          And he started shooting.  What did you see

23    that was shiny?

24         A.          Something like it was chrome.

25         Q.          Chrome?

1                          Rivera-Defense-Direct                803

2          A.        Yeah.

3          Q.        It appeared to be chrome to you?

4          A.        Yes.

5          Q.        And tell us what you heard?

6          A.        I just seen two kids on a bike, and one

7    pulled out.

8          Q.        And when he pulled out the gun the chrome

9    thing what happened?

10         A.        He started shooting and I had called Lamar's

11   name.

12         Q.        When you say he started shooting how did it

13   sound?  How did the shots sound?

14         A.        Rapidly.

15         Q.        Now, have you ever heard automatic gunfire?

16         A.        Excuse me?

17         Q.        Have you ever heard automatic gunfire, like an

18   automatic weapon being shot?

19         A.        Yes.

20         Q.        Have you ever heard like a single action

21   gunfire?

22         A.        Yes.

23         Q.        What type of gunfire did it sound like to you?

24         A.        Three eighty.

25         Q.        Like a three eighty.  Is a three eighty, a

Rivera-Defense-Direct                    804

1

2    single action or is that an automatic?

3         A.      Automatic.

4         Q.      Now, when these people ---

5               How many people were shooting?

6         A.      One.

7         Q.      I think you said it was the dark skin person?

8         A.      Yes.

9         Q.      Have you ever seen these people before?

10       A.      From around the way.

11       Q.      You had seen them from around the way?

12       A.      Yes.

13       Q.      And you describe them as kids; is there a

14   reason that you describe them as kids?

15       A.      Yes.

16       Q.      Why?

17       A.      They were around my age.

18       Q.      They appeared to be around your age?

19       A.      Yes.

20       Q.      How old are you?

21       A.      Eighteen.

22       Q.      How old were you then, two years ago?

23       A.      Sixteen.

24       Q.      You were sixteen years old?

25       A.      Yes.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Rivera-Defense-Direct                    805

1

2        Q.        All right.  Now, I am going to ask you to look

3   at Defendant's A in evidence, and look at this picture and

4   tell me if you could see where the two people were standing,

5   where the dark skin guy started firing the gun?

6        A.        (Witness writing something.)

7                  THE COURT:  What have you marked?

8                  THE WITNESS:  A line.

9                  THE COURT:  A line.  Could you hand that to

10        me, I'm sorry.

11                 MS. HAYES:  Could you use a triangle.  And

12        mark it like heavy the two triangles.

13       A.        (Witness complies.)

14                 THE COURT:  Can I see it now please.  And

15        then I will ask you to show this to the jury.

16        Okay.  So they were standing to the left of this

17        little railing, is that right?

18                 THE WITNESS:  Yes.

19                 THE COURT:  Show that to the jury.  He has

20        marked a triangle where the two people were.

21                 Has the jury seen it?

22                 (Whereupon the photograph is shown to the

23        jurors.)

24       Q.        And you have indicated that by two triangles,

25   correct?

```
1                        Rivera-Defense-Direct              806
2        A.        Yes.
3        Q.        Do you recall whether either of these kids had
4   on glasses?
5        A.        No.
6                  THE COURT:  I didn't hear the answer.
7        A.        No.
8        Q.        "No", you don't recall or "no" they didn't
9   have glasses?
10       A.        Did not have glasses.
11       Q.        Did not have on glasses?
12       A.        No.
13       Q.        Could you recall anything about their hair?
14       A.        One of them had braids.
15       Q.        One had braids.  Which one had braids?
16       A.        The dark skin one.
17       Q.        The dark skin one.  Now, do you recall, you
18   said that you had seen them in the neighborhood and they
19   were your age, do you recall any names that you associated
20   with these individuals?
21       A.        Just one.
22       Q.        Which one was that?
23       A.        Cliff.
24       Q.        And which one was Cliff?
25       A.        I am not sure.
```

Rivera-Defense-Direct                    807

Q.        Now, after the shots rang out what happened?

A.        Shots rang out I had called Lamar.

          THE COURT:  What did you do with Lamar?

          THE WITNESS:  I had called Lamar name out,
          and we started running in 3211.  And he was in
          back of me.  And when I got upstairs to the fifth
          floor, 5D, I looked back and I realized Lamar
          wasn't in back of me.  And then I had looked out
          the window and I heard screaming.

Q.        Now, when you heard the screaming, when you
looked out the window did you see anybody?

A.        No.

Q.        Okay, when you -- Strike that.

          Not when you looked out the window, where were
you  when  you were looking out in the courtyard at that
time?

A.        Right on top of 3211, fifth floor.

Q.        You were on the roof?

A.        No.

Q.        Where?

A.        In the house.

Q.        And when you were on top of 3211 could you see
anybody in the courtyard at that point?

A.        Little kids.

Rivera-Defense-Direct                    808

Q.        All right.  And at that point what were they doing?

A.        They were screaming.

Q.        All right, do you know a lady name Pepsi?

A.        Yes.

Q.        Do you know a lady name, a young lady name Priscilla?

A.        Yes.

Q.        Who is Priscilla?

A.        Pepsi's daughter.

Q.        Now, do you know another name for Pepsi?

A.        No.

Q.        What her real name is?

A.        No, Ma'am.

Q.        But Priscilla is Pepsi's daughter, right?

A.        Yes.

Q.        And do you know where they live?

A.        3211.

Q.        And do you know where their windows were?

A.        Yes.

Q.        Okay, I ask you to look at Defendant's A in evidence, look at that picture and tell me if you can see Pepsi's windows?

A.        (Witness writing something.)

Rivera-Defense-Direct                          809

1

2      Q.        Okay.  And where you have made the triangles

3   are those Pepsi's windows?

4      A.        Yes.

5      Q.        And is that under where it says "Priscilla's

6   windows"?

7      A.        Yes.

8      Q.        Those are the same family's windows, right?

9      A.        Yes.

10      Q.        Okay, did there ever ----

11               MS. HAYES:   Can I show it to the jury,

12          Judge?

13               THE COURT:  Yes.

14               (Whereupon the photograph is shown to the

15          jurors.)

16      Q.        Now, did you ever leave the courtyard after

17   the shooting, after you had went upstairs?

18      A.        Excuse me?

19      Q.        Did you ever leave the courtyard?  Did you

20   ever leave from 3211 Park Avenue, that's the courtyard; did

21   you ever leave the building?

22      A.        I went to my building 3209.

23      Q.        And did you ever leave 3209?

24      A.        Yes.

25      Q.        How did you leave 3209?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                    Rivera-Defense-Direct              810

2        A.        The next day I left.

3        Q.        Ha?

4        A.        The next day I left.

5        Q.        Did you stay in the building the entire time

6    after the shooting?

7        A.        Yes.

8        Q.        Did you ever see anybody inside a window in

9    Pepsi's house?

10        A.        Yes.

11        Q.        Who did you see?

12        A.        Pepsi.

13        Q.        Where was she standing?

14        A.        Sitting.

15        Q.        She was sitting.  And where was she sitting?

16        A.        The middle window.

17        Q.        And was that after the shooting?

18        A.        Before.

19        Q.        Before.  Now, Mr. Rivera, you are in jail

20    serving a sentence in Massachusettes, is that correct?

21        A.        Yes.

22        Q.        And you are at the Concord Correctional

23    Facility?

24        A.        Yes.

25        Q.        And how did you come to get here to Bronx

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                      Rivera-Defense-Direct              811

 2   County, back to Bronx County?

 3        A.          Some Bronx  DA  detectives had came and got

 4   me.

 5        Q.          Now, somebody  had  to  come and get you,

 6   right?

 7        A.          Yes.

 8        Q.          You couldn't leave on your own, right?

 9        A.          No.

10        Q.          Did you have to go before a judge in

11   Massachusettes to be brought back to New York?

12        A.          Yes.

13        Q.          Okay and did that happen?

14        A.          Yes.

15        Q.          Okay.  Now, see this gentleman over here?

16        A.          Yes.

17        Q.          Have you ever seen him before today?

18        A.          No.

19        Q.          Was he the person, the dark skin man who was

20   shooting at you on July 25th, 1996?

21        A.          No.

22        Q.          Was he the light skin man that was shooting at

23   you in front of 3211 Park Avenue?

24        A.          No.

25        Q.          On July 25th?
```

Rivera-Defense-Direct                           812

1

2      A.        Nope.

3      Q.        Did you ever see Lamar Jones after that day

4   anymore?

5      A.        No, Ma'am.

6                FROM THE AUDIENCE:  You're a liar.  You're

7         a liar.

8                THE COURT:  Please don't do that.

9                I am going to direct the jury to please

10        disregard all of that.  That was an outburst, it

11        is unfortunate but you disregard it and

12        concentrate only on the evidence that you hear

13        from the witness stand.

14     Q.        Mr. Rivera, when was the first time that you

15   spoke to me about this case?

16               MR. McCARTHY:  Objection.

17               THE COURT:  No, I will permit you to say when

18        was the first time you spoke to her.

19     A.        Yesterday.

20     Q.        And was that in the presence of your lawyer?

21     A.        Yes.

22     Q.        And prior to that had you spoken to people

23   from the Bronx County district attorney's office?

24     A.        Yes.

25     Q.        And did they come up to your jail place to

1       Rivera-Defense-Direct    813

2 speak to you?

3    A.   Yes.

4    Q.   Was Mr. Sennett one of the people who came?

5    A.   Yes.

6    Q.   You how many other people came to speak to

7 you?

8    A.   Two other people.

9    Q.   Two other people.  And were all three of them

10 speaking to you at the same time?

11    A.   One.

12    Q.   Who was speaking to you?

13    A.   Detective.

14    Q.   It wasn't Mr. Sennett?

15    A.   He had said a few words.

16    Q.   Oh he said a few words?

17    A.   Yes.

18      MS. HAYES:  Thank you.

19      THE COURT:   Cross-examination.

20 CROSS-EXAMINATION

21 BY MR. McCARTHY:

22    Q.   You testified that there were two guys

23 shooting at you?

24    A.   Right.

25    Q.   Ms. Hayes just asked you if the dark skin guy

Rivera-People-Cross

814

2  was shooting at you and you said no.  And then she asked you

3  if the light skin guy was shooting at you and you said it

4  wasn't the light skin guy?

5      A.      Yes.

6      Q.      So how many guys were shooting at you?

7      A.      One.

8      Q.      And this is the sixteen year old guy with a

9  silver three eighty?

10     A.      Yes.

11     Q.      Okay.  Now, would you tell the jurors what you

12  mean by three eighty?

13     A.      Three eighty automatic.

14     Q.      And automatic means you know the difference,

15  do you not, between a revolver type gun and an automatic or

16  semi-automatic?

17     A.      Yes.

18     Q.      And a semi-automatic would be the kind of gun

19  that when it is  fired the shells eject from it, right?

20     A.      Yes.

21     Q.      That's the kind of gun we are talking about

22  that someone was shooting at you?

23     A.      Yes.

24     Q.      What are you in jail in Massachusettes for?

25     A.      For attempted murder.

Rivera-People-Cross                              815

1

2   Q.      What happened with that?

3   A.      Nothing happened.

4   Q.      Who did you try to murder?

5   A.      Some kid.

6   Q.      You know his name?

7   A.      Lance Tatter.

8   Q.      Why did you try to murder him?

9   A.      Personal problems.

10  Q.      What kind of problems?

11  A.      He tried to murder me.

12  Q.      How did he try to murder you?

13  A.      He pulled out on me.  He pulled a gun out on

14  me.

15  Q.      And you had a gun yourself?

16  A.      Yes.

17  Q.      And did you actually shoot him?

18  A.      Yeah.

19  Q.      Where did you hit him?

20  A.      In the chest.

21  Q.      Were you trying to kill him?

22  A.      Yes.

23  Q.      Did he hit you when he shot at you?

24  A.      No.

25  Q.      Did he get a chance to get a shot off?

# EXHIBIT 5
## (Part B)

```
 1                    Rivera-People-Cross                   816
 2        A.        Nope.
 3        Q.        So, when he pulled out, you pulled out faster
 4   and you shot him?
 5        A.        Right.
 6        Q.        Why did you pull out on him?
 7        A.        Excuse me?
 8        Q.        Why did he pull an automatic and try to kill
 9   you?
10        A.        I have no idea.
11        Q.        Well, you knew his name, right?
12        A.        Yes.
13        Q.        And you said that you had a personal problem
14   with him?
15        A.        Yes.
16        Q.        What was the personal drug problem?
17        A.        Over drugs.
18        Q.        Okay.  Were you dealing drugs in
19   Massachusettes?
20                  (Defendant confers with attorney.)
21        A.        Plead the Fifth.
22        Q.        When you say it was over drugs, what do you
23   mean by that?
24        A.        Over drugs.
25        Q.        How?
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Rivera-People-Cross                817
 2         A.        Plead the Fifth.
 3                   MR. McCARTHY:    I want to talk to you about
 4              that at the bench, Judge.
 5                   THE COURT:   Come on up.
 6                   (Whereupon there was an off the record
 7              discussion.)
 8                   (Counsel confers with the witness.)
 9         Q.        You said that after the shooting you ran into
10     3211, am I right?
11         A.        Yes.
12         Q.        You ran up to the fifth floor?
13         A.        Yes.
14         Q.        You didn't live there did you?
15         A.        No.
16         Q.        Who lived on the fifth floor?
17         A.        A friend of mine.
18         Q.        What's the person's name?
19         A.        Danny.
20         Q.        Danny what?
21         A.        I don't know his last name.
22         Q.        And you stayed in the house all through the
23     night until the next day?
24         A.        No.
25         Q.        You went up to the roof?
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                        Rivera-People-Cross                    818

2          A.          After.  After I seen everybody downstairs then

3    I went over the roof.

4          Q.          Then where did you go?

5          A.          To my house.

6          Q.          3209?

7          A.          Yes.

8          Q.          Did you go down from the roof?

9          A.          Yes.

10         Q.          And by then ----

11                     How long did it take the cops to get there do

12   you know?

13         A.          Not, best of my knowledge I don't.

14         Q.          After you went back to 3209 did you go into

15   your house then?

16         A.          Yes.

17         Q.          And when did you next come out of your  house?

18         A.          Next morning.

19         Q.          And okay you said that you were with a Lamar

20   Jones, right?

21         A.          Yes.

22         Q.          And you knew Lamar didn't you?

23         A.          Yes.

24         Q.          Okay.  He was a good kid, right?

25         A.          Yes.

DC7

1      MRS. AGNES SANTIAGO,  after having been duly

2  sworn, testified as follows:

3

4  EXAMINATION BY MR. SENNETT:

5

6      Q.   Good afternoon, ma'am.  In a loud, clear

7  voice would you please state your full name and your

8  county of residence.  And I'm going to ask that you

9  please speak up so that everyone in the Grand Jury

10 can hear you, including the folks here in the back

11 of the room.

12     A.   Yes.  My name is Agnes Santiago.  I live

13 in the Bronx.

14     Q.   Mrs. Santiago, I'm going to direct your

15 attention, now to July 25, 1996, in the vicinity of

16 3211 Park Avenue here in the County of Bronx.

17     Were you present on that date, and in that

18 location?

19     A.   Yes.

20     Q.   And did anything unusual occur on the

21 evening of July 25th?

22     A.   Yes, there was a shoot-out.

23     Q.   Could you please tell me what happened

24 that evening?

25     A.   I was in my kitchen and I heard -- it

DC8

1    sounded like a fire cracker going off.  I went to my

2    living room window and I saw two kids on bikes.  One

3    was shooting into the courtyard.

4        Q.    Let me ask you this.  What time was it

5    when you were in your kitchen and you heard that

6    first noise?

7        A.    It could have been around 10:00.

8        Q.    Is there any reason why you said it was at

9    10:00?

10       A.    Because earlier I had looked at my clock

11   and my daughter was outside.  It was about 9:40.

12       Q.    And this happened -- you heard this shot

13   after you saw your daughter outside at 9:40?

14       A.    A little while later.

15       Q.    A little while later?

16       A.    Yes.

17       Q.    Do you have any idea how much later it

18   was?

19       A.    I really can't say.

20       Q. ／ Was it more than a half hour later?

21       A.    Not that much.

22       Q.    Was it more than ten minutes?

23       A. ✓ About fifteen minutes more or less.

24       Q.    After you heard the first shot, you said

25   you were in your kitchen?

DC9

1    A.    Yes.

2    Q.    Where in relation to the courtyard is your

3    kitchen window or is there a window in your kitchen?

4    A.    Yes, there is a window in the kitchen.

5    Q.    And where in relation to the courtyard is

6    your kitchen window?

7    A.    It looks straight in the -- it looks

8    straight into the courtyard.

9    Q.    Can you see the street from that window?

10   A.    No, I can't.

11   Q.    After you heard the first shot, what did

12   you do?

13   A.    Well, I ran over to the living room

14   window.

15   Q.    About how long would you say it took from

16   you to go to the kitchen to the living room?

17   A.    A few seconds.

18   Q.    How many rooms are in your apartment?

19   A.    Five.

20   Q.    And how many rooms were there between the

21   kitchen and the living room?

22   A.    One.  You just walked straight across.

23   Q.    Is there a room between the kitchen and

24   the living room?

25   A.    No.

DC10

1    Q.    The kitchen is connected right to the
2    living room?
3    A.    Yes, it is.
4    Q.    How far away is -- approximately in feet,
5    if you can, how far away was the kitchen to the
6    living room window that you looked out of?
7    A.    Not even ten feet.  Less -- it's a very
8    small kitchen.
9    Q.    And, approximately how much time was there
10   between what you thought to be the first shot and
11   the additional shots?
12   A.    A few seconds.
13   Q.    When you got to the living room and looked
14   out the window, can you tell us again in relation to
15   the courtyard where does the living room window
16   face?
17   A.    The living room window faces into Park
18   Avenue.
19   Q.    I'm sorry?
20   A.    Towards Park Avenue.  The entrance of the
21   building.
22   Q.    It actually faces Park Avenue?
23   A.    No.  Well, you can look at Park Avenue
24   from that angle.
25   Q.    So it's not facing Park Avenue itself

DC1:

1    though?

2         A.    No.

3         Q.    It's facing the entrance to the courtyard?

4         A.    Yes, it is.

5         Q.    So, when you look out your window in the

6    living room, the window that you said you went to,

7    what can you see from there?

8         A.    You can see the first two steps by the

9    sidewalk and then the next few steps going up into

10   the courtyard.

11        Q.    Is that window perpendicular to the

12   street?

13        A.    Excuse me?

14        Q.    While you're standing facing out your

15   window in a window that you looked out of, is Park

16   Avenue on your left?

17        A.    Yes, it is.  That is Park Avenue.  I live

18   in Park Avenue.

19        Q.    I understand that, ma'am, but is Park

20   Avenue directly on your left when you're looking out

21   that window?

22        A.    Yes.

23        Q.    And the courtyard is to your right?

24        A.    To my right.

25        Q.    I see.  When you got to the window, what

DC12

1  did you do?

2      A.    I stood at the window and I saw two kids

3  on bikes.

4      Q.    Where were you in relation to the window?

5  Did you stick your head out?

6      A.    Uh-uh.

7      Q.    How far were you from the window?

8      A.    A few inches away from it, but more to the

9  corner.  But I was able to see what was happening

10 outside.

11     Q.    Is there anything obstructing along that

12 window?  Is there a shade?

13     A.    No, I have a window fan and a gate.  A

14 window guard.

15     Q.    Where is the window fan on the window?

16     A.    The middle of the window, the bottom.

17     Q.    It's on the bottom of the window?

18     A.    Yes.

19     Q.    And does it take up the entire bottom

20 portion of the window?

21     A.    No, it doesn't.

22     Q.    Where is the gate in the window?

23     A.    It's on the same area where the fan is at.

24     Q.    Do you have a curtain or a shade or

25 drapes?

DC13

1    A.    Yeah, very thin curtains.

2    Q.    You have curtains?

3    A.    Yes.

4    Q.    And was it dark outside?

5    A.    No -- yes, it was.

6    Q.    Was there any kind of artificial lighting,

7    street lights?

8    A.    Just the lights from outside in the

9    street.

10   Q.    Could you see clearly outside?

11   A.    Yeah, I could see clearly enough to see

12   that there were two boys on bikes.

13   Q.    Would you describe the lighting as good,

14   poor, excellent?

15   A.    No, fair.

16   Q.    That's better than poor?

17   A.    Very.  Right on the borderline.

18   Q.    When you saw those two individuals, can

19   you describe what either one of them looked like?

20   A.    No.  When I first went -- I took a quick

21   glance at one of them.  The one that was shooting.

22   He had -- he just turned to the side and just

23   continued shooting.

24   Q.    What direction was he shooting at?

25   A.    Into the courtyard.

DC14

1      Q.    And, approximately how many shots did he

2   fire?

3      A.  ✓ When I got to the window, three.

4      Q.    Can you tell what kind of gun it was that

5   he was firing?

6      A.  ✓  It was a black gun.   That's all I can

7   say.

8      Q.  ✓ And could you see what the individual who

9   was firing -- could you see what he was wearing?

10     A.   ✓ He was wearing a baseball cap turned back

11  and a black sweatshirt with a hood.

12     Q.    He was wearing a hooded sweatshirt?

13     A.    Yes.

14     Q.    And you said that he was on a bicycle?

15     A.    Yes.

16     Q.    Can you describe the bicycle?

17     A.    They were small bikes.

18     Q.    Can you describe anything else about the

19  bikes?  Can you describe the condition of the

20  bicycles?

21     A.    No, I can't.

22     Q.    Can you describe what the handlebars

23  looked like?

24     A.    No.

25     Q.    Can you describe the color of either

DC15

1   bicycles?

2       A.    I wasn't concentrating on the bikes.  Once

3   I saw the gun, I just stood focused on that gun.

4       Q.    And the second individual who was not

5   firing, did you see him holding a weapon?

6       A.    No.  He just stood next to him.  I didn't

7   see him with no weapon.

8       Q.    Can you tell the race or ethnicity of

9   either of those individuals?

10      A.    Afro-American.

11      Q.    Can you -- how can you tell?

12      A.    When I first looked, I was able to see the

13  color of the skin, dark skin, very dark skin.

14      Q.    But you couldn't see his face?

15      A.    Yeah, because I looked at his face

16  momentarily when I first got to the window.

17      Q.    Can you describe his face then?

18      A.    He looked like a thin kid.

19      Q.    I'm sorry?

20      A.    Thin.  It was a skinny kid.  That's all I

21  was able to see.  Once I saw the gun, I didn't

22  bother looking at him any more.

23      Q.    How did you know it was a kid?

24      A.    He looked like a kid to me.

25      Q.    What did he look like?

DC16

1    A.  ✓I can't say -- I can't tell a young kid

2  from an older person.

3    Q.    And what is it about his appearance that

4  makes you say he was an Afro-American?

5    A.    It was an Afro-American.

6    Q.    And based on what?  Any particular point,

7  ma'am?

8    A.    He was Afro-American.  I don't know what

9  you want me to say.

10    Q.    Well, something must be telling you in

11  your mind that he was an Afro-American?  What is it

12  about that individual tells you he was an

13  Afro-American?

14    A.    He looked like an Afro-American.

15    Q.    What part of him looked like an

16  Afro-American?

17    A.    When I first saw him, I saw a black kid on

18  the bike.

19    Q.    You're basing it on the color of his skin?

20    A.    Yes, unfortunately, yes.

21    Q.    And is that the only thing you are basing

22  it on is the color of the skin?

23    A.    Yes.

24    Q.    Yes?

25    A.    Yes.

DC17

1      MR. SENNETT:  Are there any questions from the

2  Grand Jury?

3

4      Q.    Can you tell us what the other person, not

5  the shooter, what he was wearing?

6      A.    They both had caps on.  That's all.

7      Q.    What kind of cap was it?

8      A.    They were baseball caps turned back.

9      Q.    Can you tell what color the hats were?

10      A.    All I can tell you, the kid that was

11  shooting had a black cap on.

12      Q.    Was there any kind of logo or insignia on

13  the cap?

14      A.    No, I didn't see any logo or insignia on

15  it.

16      Q.    And what color was the sweatshirt?

17      A.    The sweatshirt from the kid that was

18  shooting was black.

19      Q.    Was there any kind of notation or logo on

20  that?

21      A.    No, there wasn't.

22      Q.    What about the other individual?

23      A.    I didn't look at the other individual.

24

25      MR. SENNETT:  Any other questions from the

SL17

1                           C E R T I F I C A T I O N

2

3

4              I, SUSAN LYNCH, a Grand Jury Reporter within

5       and for the State of New York, County

6       of the Bronx, do hereby certify:

7              That the within transcript is a true

8       and accurate record of the testimony given by

9       AGNES SANTIAGO to A.D.A. SENNETT in Room 4D-16 on

10      August 7, 1996.

11             IN WITNESS WHEREOF, I have hereunto set my

12      hand this 7th day of August, 1996.

13

14

15

16

17                         SUSAN LYNCH

18

19

20

21

22

23

24

25

DC18

1    Grand Jury?

2

3         Q.   What did these two individuals do after

4    the shooting, ma'am?

5         A.   The one that was shooting said come on

6    lets go.

7         Q.   And then what did they do?

8         A.   They left.

9         Q.   How did they leave?

10        A.   On the bike.

11        Q.   What direction did they go towards?

12        A.   Towards 161st Street.

13        Q.   Towards 161st Street?

14        A.   Yeah, because their backs were towards

15   me.  They weren't facing me.  Their backs were

16   towards me.

17        Q.   Is that -- withdrawn.

18

19        MR. SENNETT:  Any other questions?

20

21        Q.   Ma'am, did you actually hear someone say

22   come on lets go?

23        A.   Yes, I did.

24        Q.   And how do you know that it was one of

25   those individuals?

DC19

1    A.    Because he stopped shooting and he went

2    like this and said come on lets go.

3    Q.    Were there any other people in the

4    courtyard?

5    A.    No.

6    Q.    There was no one else out there?

7    A.    I don't know who was in the courtyard.  I

8    did not look into the courtyard.  I could see where

9    I was at.

10   Q.    You said you were in your kitchen just

11   prior to hearing shots, did you look out your window

12   then?

13   A.    No.

14   Q.    You didn't look out your window?

15   A.    Which window?

16   Q.    The window in your kitchen?

17   A.    After awhile when I saw the police

18   and --

19   Q.    Excuse me, let me back you up.  Before you

20   heard what you thought were shots, you were in your

21   kitchen, correct?

22   A.    Yes.

23   Q.    Did you look out your window at all?

24   A.    After I closed it, no.

25   Q.    Well, how about before you closed it?

DC20

1    Did you look out your window?

2    A.    Yes, to see my daughter going up with my

3    grandson.

4    Q.    And was there anyone else in the courtyard

5    at that time?

6    A.    No.

7    Q.    There was not a single sole in the

8    courtyard?

9    A.    No.  Everybody had went into the building.

10   Q.    Everyone had exited the courtyard?

11   A.    They entered the building where I live at

12   at 321 --

13   Q.    So you're saying there was nobody else in

14   the courtyard?

15   A.    I didn't see nobody else in the courtyard.

16   Q.    What about on the street?  Did you see

17   anybody else on the street?

18   A.    After the shooting.

19   Q.    No, before the shooting or after the

20   shooting?

21   A.    No, I didn't go to the window.

22   Q.    So you heard someone say lets go?

23   A.    Yes.  After he stopped shooting he put his

24   gun to the front and left.

25   Q.    Did you actually see anyone's lip move?

DC2:

1    Did you see anyone speaking?

2        A.    No, I heard him say that.  That's all he
3    said.

4        Q.    And your window was opened or closed at
5    that time?

6        A.    Opened, because I had the fan on.

7        Q.    Other than the fan at the bottom of the
8    window, is there any opening that's unobstructed?

9        A.    Yes, I got a small fan so it's enough
10   room.

11       Q.    And the rest of the window is wide opened?

12       A.    Yes.

13       Q.    Ma'am, at any point did you see either one
14   of these individuals enter the courtyard?

15       A.    No.

16       Q.    They were on Park Avenue?

17       A.    They never got off their bikes.

18       Q.    You said that you heard or you saw
19   emergency medical technicians and the police
20   arrive.  How much later in time after the shooting
21   did they arrive?

22       A.    I got to give them credit, they got there
23   pretty quick.

24       Q.    When you say pretty quick --

25       A.    Not even two minutes went by.

DC22

1     Q.   A couple of minutes later they arrived?

2     A.   Yeah.

3     Q.   And what, if anything, did you see them

4  do?

5     A.   Nothing.  After the shooting my husband

6  and I went to the window.  We saw the police

7  officers and then I saw the EMT.

8     Q.   Was there anyone else in your house at

9  that time?

10    A.   My kids, they were sleeping.

11    Q.   How many kids?

12    A.   I got six kids.

13    Q.   How many were in the house at the time?

14    A.   Five.

15    Q.   I'm sorry?

16    A.   Five of them.

17    Q.   Five of them were in the house.  Where

18  were they in the house?

19    A.   In their rooms.

20    Q.   Do you know what they were doing in the

21  rooms?

22    A.   Sleeping.

23

24    MR. SENNETT:  Any other questions?

25

DC23

1     Q.    What floor do you live on, ma'am?

2     A.    The first floor.

3     Q.    And how far off of the street level are

4 you on the first floor?

5     A.    From the living room window I'm pretty

6 high up.  From the courtyard I'm about four feet up.

7     Q.    When you say pretty high up, approximately

8 how high?

9     A.    It's pretty high.  I can't say.  I'm

10 pretty high up.  More than ten feet up.

11     Q.    Let me ask you this, is there a lobby

12 level between your floor and the entrance or are you

13 on the entrance level floor?  When you walk into the

14 building, ma'am do you walk up any steps?

15     A.    Yes, you have to walk up some steps.

16     Q.    A full flight of stairs?

17     A.    You have to go up about six steps.  You

18 got to go up to the -- to get to the courtyard.

19     Q.    But, what about when you walk into the

20 front door of your building.  Do you walk up any

21 steps before you have to get into your apartment?

22     A.    Yes.

23     Q.    How many?

24     A.    There's about another six or five.

25     Q.    Ma'am, is there a light in the courtyard?

DC24

1     A.   If you want to call it that.  They have

2  very poor lighting.

3     Q.   The courtyard was poorly lit?

4     A.   (witness nodded her head).

5     Q.   What about the street?

6     A.   It wasn't that great.

7     Q.   It was also poorly lit?

8     A.   Yeah, but it wasn't that bad either.

9     Q.   Ma'am, where was your husband during the

10  shooting?

11     A.   In the bathroom.

12     Q.   Did either one of these individuals --

13  from what you could see, did they have braids in

14  their hair?

15     A.   No.

16     Q.   Did either one of them have glasses?

17     A.   No.

18     Q.   No to both questions?

19     A.   No, to both questions.

20     Q.   Ma'am, you've stated that the lighting was

21  more to fair at best.

22     A.   Yes.

23     Q. ✓ And you -- and you've also stated that the

24  individuals did not have any braids but nonetheless

25  you say they were of Afro-American?

DC2[

1    A.    Uh-huh.

2    Q.    Please describe as best you can, if you
3 can, what their faces looked like?

4    A.    I can't describe what the faces looked
5 like.  All I saw was the kid's face turn sideways to
6 where he was shooting.

7    Q.    And you're characterization of these
8 individuals as Afro-American, that is based solely
9 on the color of their skin?

10    A.    Yes.

11    Q.    How was their skin, ma'am?

12    A.    It was very dark brown.

13    Q.    Very dark brown.  Ma'am, how did you come
14 to testify today?  How did it come about that you
15 were asked to testify?

16    A.    Well, unfortunately I was going after my
17 -- someone.  They were going outside and I went --
18 ran into Ms. Pamela Hayes, I think it is.  And she
19 asked me a couple of questions.  I said yeah, they
20 were shooting outside.  And that's when they took my
21 name and you called me.

22    Q.    And do you know who Ms. Hayes is?

23    A.    I don't know who she was.

24    Q.    Do you know who she is now?

25    A.    Yes, she is the attorney for the defense.

DC26

1      Q.    Do you know an individual by the name of

2  Lawrence Fowler?

3      A.    No, I don't.

4

5      MR. SENNETT:  Any other questions?

6      Seeing no show of hands, there being no further

7  questions, this witness is hereby excused.

8      You may step down Mrs. Santiago.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2 Boys in handcuffs.

```
                                                          SL1
 1

 2          DATE:           August 7, 1996

 3          PLACE:          Bronx District

 4                          Attorney's Office

 5                          Room 4D-16

 6          A.D.A.:         Sennett

 7          TIME:           10:13 a.m.

 8          REPORTER:       Susan Lynch

 9          STATEMENT OF:   Agnes Santiago

10

11

12     *    *    *    *    *    *    *    *    *    *    *    *    *

13

14       MR. SENNETT:  All right.  Good morning.  My

15    name is Jonathan Sennett.  I am an Assistant

16    District Attorney in the Grand Jury Evaluations

17    Bureau of the Bronx District Attorney's Office.

18        This is in regards to the matter of the People

19    of the State of New York versus Lawrence Fowler, an

20    investigation into the death of Lamar Jones on

21    Docket 96X044063.

22        We are present today, August 7, 1996, at

23    approximately 10:13 a.m. in Room 4D-16 of the Bronx

24    District Attorney's Office.

25        Present in this office in -- in addition to
```

SL2

1    myself and stenographer Susan Lynch is Miss Agnes

2    Santiago.

3         Is that your name, ma'am?

4         THE WITNESS:  Yes, it is.

5         MR. SENNETT:  And I'm going to ask now that the

6    witness be sworn in, please.

7

8         AGNES SANTIAGO,  after having been duly sworn,

9    testified as follows:

10

11   EXAMINATION BY MR. SENNETT:

12

13        Q.   Miss Santiago, would you please, um, tell

14   me what your date of birth is.

15        A.   May 28, '59.

16        Q.   And can you tell me what your address is,

17   please.

18        A.   3211 Park Avenue.

19        Q.   Bronx, New York?

20        A.   Yes.

21        Q.   How long have you lived there?

22        A.   19 years.

23        Q.   And, um, I'd like to direct your

24   attention --

25        A.   Oh, well, I'm sorry.  In the apartment I'm

SL3

1    at now is two years, but I lived in the complex 19.

2        Q.    You lived within that building?

3        A.    The same building, yeah.

4        Q.    Okay.  I'd like to direct your attention

5    now to July 25, 1996 --

6        A.    Okay.

7        Q.    -- the evening of July 25, 1996.  Were you

8    home that night?

9        A.    Yes, I was.

10       Q.    And, um, can you tell me if anything

11   unusual happened that night?

12       A.    Yes.  There was a shooting.

13       Q.    All right.  Can you tell me what, if

14   anything, you know about that shooting?

15       A.    Well, I know that when I heard the -- it

16   sounded like a firecracker.  I went to my living

17   room window and saw two kids on bikes wearing caps,

18   and one was shooting into the courtyard.

19       Q.    Let me just stop you there for a moment.

20   Do you know what time it was when you first heard

21   the shots?

22       A.    I don't know.  I believe it was around

23   10:00.

24       Q.    Is there anything that would lead you to

25   believe that it was 10:00?

SL4

1      A.    I know because when I was looking at my

2   daughter and grandson outside in the courtyard, yes,

3   it must have been about 9:40.  When she went

4   upstairs, I stood at the window for another few

5   minutes, and then I closed the curtain.  I was

6   heading out of the kitchen when I heard what sound

7   like a firecracker.  So I went to my -- proceeded to

8   go to my living room window where I saw two boys on

9   bikes.

10      Q.    Okay.  Where -- I'm sorry.  Actually, how

11   many shots did you hear total?

12      A.    I would have to say it would have to have

13   been four, the first two and the other two when

14   I was by the window.

15      Q.    What did you do after you heard the first

16   shot?

17      A.    I went -- I ran to my living room window.

18   I went to my living room window.

19      Q.    At the time that you heard the first shot,

20   you were in the kitchen?

21      A.    Yes.

22      Q.    And where does the kitchen window face?

23      A.    Into the courtyard.

24      Q.    Can you see the street from the kitchen

25   window?

S

```
1        A.    No, I can't.

2        Q.    You then proceeded out of the kitchen into

3   the living room?

4        A.    Yes.

5        Q.    Did you run into the living room?

6        A.    I would have to say I jumped over the gate

7   from the kitchen because I have a gate so my kids

8   won't go into the kitchen.

9        Q.    And then you went out into the living

10  room?

11       A.    Yes.

12       Q.    And how far into the living room did you

13  go before you looked out the window?

14       A.    How far?  I got close enough to the

15  window.

16       Q.    How close?

17       A.    To the window frame.

18       Q.    You were right up against the window --

19       A.    Yes.

20       Q.    -- but not outside?

21       You have to wait for me to finish talking

22  before you start, okay?

23       A.    Yes.

24       Q.    Were you outside of the window?

25       A.    No, I wasn't.
```

SL6

1  Q. Was it dark outside?

2  A. Yes, it was.  We have very poor lighting.

3  Q. There's poor lighting out there?

4  A. Yes.  That's one of the problems there.

5  Q. Was there anything blocking your view?
6 Was there a lamppost, an automobile, an individual,
7 anyone?

8  A. No.  On my window, there's a fan, so I was
9 just looking from the corner of my window.

10  Q. How much of the window is obstructed by
11 the fan?

12  A. Well, the window's pulled up halfway, so
13 I was looking through the corner of it.

14  Q. So the lower half of the window is
15 obstructed by the fan?

16  A. Yes.

17  Q. About how big is the window?

18  A. Oh, about 42 inches.

19  Q. Wide or long?

20  A. Wide.

21  Q. And how high was it?

22  A. I really can't say.

23  Q. Well, how about this?  How much, um, or
24 how large rather was the space of the window that
25 you were looking through?

SL7

1      A.    Well, I was looking out the -- um, I was

2    looking through the window.  I just had to -- you

3    know, like when I -- when I noticed what was

4    happening, I just backed up on the window.

5      Q.    Were you looking through the upper half of

6    the window?

7      A.    Yeah.

8      Q.    All right.  And was there a shade down on

9    the window?

10      A.    No.

11      Q.    Are there bars on the window?

12      A.    There are bars on the lower part, yes.

13      Q.    On the same part that has the fan?

14      A.    Yes.

15      Q.    When you looked outside, how far away --

16    well, let me ask you this first.  What -- um, what

17    direction does the window in the living room face,

18    the one that you are now looking out of the corner

19    of?

20      A.    My window faces the entrance.  It's like

21    going into the courtyard, but it would be facing

22    towards 161st Street.

23      Q.    Okay.  It faces the opening of the --

24      A.    Courtyard.

25      Q.    -- the courtyard?

SL8

1        A.    Yes.

2        Q.    It does not face Park Avenue?

3        A.    No.  It -- sideways.

4        Q.    But you can see Park Avenue from the

5    window?

6        A.    I can see Park Avenue.

7        Q.    Approximately, how far away were these

8    individuals that you saw?

9        A.    They was standing on the sidewalk all the

10    way to the corner of the building.  There's a little

11    gate there.  And all I saw was the guy's arm

12    extended almost up against the wall and shoot into

13    the courtyard.  That's it.

14        Q.    When you say up against the wall, can you

15    be a little bit more specific?

16        A.    Yes.  He almost had his hand up against

17    the brick wall.

18        Q.    All right.  But it was facing straight

19    out?

20        A.    Yeah.

21        Q.    Which brick wall, the one closer to you or

22    the one further away from you?

23        A.    The one opposite from me.

24        Q.    You -- you say that you saw

25    two individuals on bicycles?

1      A.    Yes.

2      Q.    Can you describe what they looked like?

3      A.    No, I can't.

4      Q.    Can you describe anything about them?

5      A.    All I could -- all I could say is that

6   they had some baseball caps turned back, and the one

7   that was shooting had a black -- a black sweatshirt

8   with a hood.

9      Q.    Was the hood on?

10     A.    No, it wasn't.

11     Q.    Can you -- could you see the race or

12  ethnicity of these two individuals?

13     A.    It was black.

14     Q.    How do you know they were black?

15     A.    Because I -- you know, because when he was

16  shooting, you could see his hands, you know.

17     Q.    Was it --

18     A.    He had no gloves on.

19     Q.    And you said that it was dark out, right?

20     A.    It was dark.

21     Q.    And that the lighting was poor?

22     A.    Yeah.

23     Q.    Did anyone say -- did either of those

24  individuals say anything?

25     A.    No.  Right away, he just said come on;

SL10

1   let's go.

2       Q.    Which one said that?

3       A.    The one that was doing the shooting.

4       Q.    How could you tell?

5       A.    Because he said come on; let's go.

6   I mean, they just -- that's when I realized --

7   that's when I realized there was a shooting, and

8   I start screaming to my husband my God, there was a

9   shooting.

10      Q.    Did you see this person say that?   Could

11  you see his lips moving?

12      A.    No, because he already turned.   He already

13  had turned to leave.

14      Q.    And his back was to you?

15      A.    All the -- all the time.

16      Q.    His back was to you the whole time?

17      A.    Yes.

18      Q.    You said they were wearing baseball caps,

19  correct?

20      A.    Yes.

21      Q.    Could you see what color the caps were?

22    √ A.    It looked dark.   It could have been black,

23  navy blue.

24      Q.    Could you see any kind of an insignia or

25  marking on the caps?

1      A.    No.

2      Q.    The sweatshirt, you said that it wa

3      A.    It was dark.

4      Q. ✓  Is it possible that it was a dark purple

5  or a maroon?

6      A.    I don't think so.  It looked like a faded

7  black.  I don't know.  It didn't look -- it didn't

8  look no other color, but a black or dark blue.

9      Q.    How close was the one who was not shooting

10 to the one who was shooting?

11     A.    They was side-by-side.

12     Q.    And what was he doing?

13     A.    Once I saw the kid shooting, my attention

14 just went onto the gun.  All I saw was flares coming

15 out.  Once -- I didn't look anywhere else after

16 that.  I mean, I was just like shocked.

17     Q.    So you heard shots, so you ran to the

18 window?

19     A.    Yes.

20     Q.    Where were your children?

21     A.    Well, my smaller children were in bed, but

22 my oldest daughter was outside.  She was -- wasn't

23 really going upstairs, so it was a reaction.

24     Q.    But you didn't run to the -- you didn't

25 run to the, um, window in the courtyard?  You ran to

000113

1    the window that faces outside?

2         A.    Right.

3         Q.    And where was your daughter?

4         A.    My daughter was in the courtyard, but she

5    was going up -- going up to her apartment.

6         Q.    And is her apartment entrance -- is it

7    outside of the courtyard, or is it in the courtyard?

8         A.    It's in the courtyard.

9         Q.    But nonetheless, you went to the outside?

10        A.    You have to know my grandson.  He just

11   leaves his mom wherever he feels like it.  He's

12   four-year old with a mind of his own.

13        Q.    So you -- you never actually saw the faces

14   of any of these individuals?

15        A.    No.  Fortunately, no.

16        Q.    And you couldn't say for certain, um,

17   whether they were black or Hispanic from their

18   faces?

19        A.    The hand was black.

20        Q.    The hand of one of the individuals?

21        A.    Dark.  Yes, dark-skinned.

22        Q.    Could you see the other individual?

23        A.    Like I said, I took a glance.  I'm very

24   sure that both of them were African-American.

25        Q.    I'm very sure that both of them were

SL13

1    African-American, correct?

2         A.    Yes.

3         Q.    What did you do after you heard the shots?

4         A.    I started screaming.  Once they left, it

5    dawned on me that there was actually a shooting.

6         Q.    Did you see anyone, um, shot as a result?

7         A.    No, I didn't.

8         Q.    Did you look into the courtyard?

9         A.    No, I didn't.

10        Q.    What did you do after you were done

11   screaming?

12        A.    I said oh, my God, I forgot to lock my

13   door.  As I approached my door, I felt my door

14   moving, and I said who's there.  I asked twice.

15   Nobody answered.  So I locked my door real quick.

16        Then my husband went to the window and

17   I followed him and I saw all of the police and the

18   EMTs.  So when I saw them entering the courtyard,

19   I went to my kitchen window.  I saw them entering my

20   building, 3211.  So then we ran to the front door,

21   and that's when I seen Lamar laying on the floor.

22        Q.    Did you know Lamar?

23        A.    Well, he was in the block.  He was one

24   my -- of my daughter's friends' boyfriend.

25        Q.    Do you know an individual by the name of

SL14

1    Little Ricky?

2         A.    Everybody knows Little Ricky.

3         Q.    Does he look like Lamar?

4         A.    No, not really.

5         Q.    Did you see Little Ricky in the courtyard

6    that night?

7         A.    Ricky was in the courtyard.  Ricky is a

8    coward.  He always hides behind the kids.

9    I personally never had no problems with him, but

10   he's always in the courtyard when there's more

11   children.

12        Q.    After you heard the shots, and you saw

13   those two individuals out there, um, did you see

14   what they did after they -- after the shooting was

15   finished?

16        A.    They left.  They got on the bicycle.  You

17   know, they were on the bikes.  They just took off.

18        Q.    Which direction did they run?

19        A.    To the -- 161st Street, the direction they

20   were facing.

21        Q.    They left together, both of them?

22        A.    Yeah.

23        Q.    Can you describe what the bike looked

24   like, what either bike looked like?

25        A.    They were small bikes.  I'm not that good

SL15

1   at bikes.  They were small.

2        Q.   Um, they both had two wheels, for

3   instance?

4        A.   Yeah.

5        Q.   All right.  Can you describe what the

6   handlebars looked like?

7        A.   No.

8        Q.   Could you tell what either bike was?

9        A.   No, I can't.

10       Q.   Can you tell what condition either bike

11  was in?

12       A.   No, I can't.

13       Q.   Did it -- did it look like one of the

14  seats on one of the bicycles was beat up?

15       A.   No, I can't say.

16       Q.   Is there anything else that you want to

17  tell me about this incident?

18       A.   Not --

19       Q.   Anything else that you can tell me about

20  the incident?

21       A.   Nope.  Nothing else.

22       Q.   Did you speak with, um, a woman by the

23  name of Pamela Hayes?

24       A.   Yes, I did.

25       Q.   All right.  And, um, what did Miss Hayes

SL16

1   say to you?

2       A.   She asked me if, um -- if I was taken to a

3   line-up because I told her the police were in my

4   building.   They were looking up on -- they were all

5   over in the building and all around the courtyard.

6   And I told one of the officers the shooting that

7   occurred inside the building.   They were shooting

8   from outside.

9       Q.   What did she tell you, if anything, about

10  the incident itself?   Did she say anything to you

11  about what happened?

12      A.   No, she didn't tell me anything.

13

14      MR. SENNETT:   Okay.   All right.   The time is

15  now approximately 10:27 a.m., and I have no further

16  questions.   This session is hereby concluded.

17

18

19

20

21

22

23

24

25

## CLIENT\WITNESS STATEMENT

Date statement taken: Dec, 31, 1996  Time: 3:15 PM  Location: 3204 Park ave
Apt, 3C

588-2494

Person making statement: Jose Gonzalez   Investigator assigned: Don May

Indicate if details are in the handwriting of person making statement ✓ or investigator ___

I remeber that night war sitting across the street
in the park with my friends called tito,
pito, joel, I saw two people on bikes about
18 years old and had black sweater and
black pants going inside the courtyard,
after two gun shots and so pito and joel
ran to the court yard to see what happen and
then me and tito went to see also and then
the cop ask pito and joel what happen
and itook inthe police car, the police
neveer ask me or tito what the guys on
bikes look like,

Signature: Jose Gonzalez
Person making statement.

Investigator: Don May

147

# EXHIBIT 6
# (See Defendant's Exhibit H)

# EXHIBIT 7

*Pamela D. Hayes*

*Attorney at Law*

*501 Fifth Avenue, Suite 2202*

*New York, New York 10017*

*(212) 687-8724*

*Fax (212) 687-8754*

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

**FILE COPY**

May 19, 2000

Mr. Pierre Moore
280 East 161st Street
New York, N.Y. 10451

Re: <u>People v. Lawrence Fowler</u>

Dear Mr. Moore:

I received permission to speak to you from your lawyer on your present pending case in Bronx County. I represent an individual by the name of Lawrence Fowler, who was wrongfully convicted of a murder, which he did not commit. After <u>three</u> days of deliberations, the jury found him guilty. His <u>appeal</u> was denied last week.

Needless to say, the only person who can right this <u>injustice</u> is you. I know that you saw what happened and told the police. Obviously you want to help. I have spoken with Assistant District Attorney Daniel McCarthy and the only person who can help is you. So I need to interview you <u>as soon as possible</u>, so that I can have you sign an affidavit and I can file a 440.10 (g) motion.

If you remember, this is the case that a young kid was killed in the court yard off of 161st street near the corner, in 1997. I understand "Debow" was present also.

Listen, it takes a lot of courage to finally come forward. If you can help justice, I am sure justice will help you.

Please call me.

Sincerely,

Pamela D. Hayes, Esq.

# EXHIBIT 8

*Pamela D. Hayes*

*Attorney at Law*

*501 Fifth Avenue, Suite 2202*

*New York, New York 10017*

*(212) 687-8724*

*Fax (212) 687-8754*

**FILE COPY**

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

May 19, 2000

Honorable Edward M. Davidowitz
Supreme Court Bronx County
851 Grand Concourse
Bronx, New York 10451

                                    Re: <u>People v. Lawrence Fowler</u>
                                        Indictment No. 5827-96
                                        Request to be re-appointed 18-B,
                                        for purposes of a 440.10 (g) motion

Dear Judge Davidowitz:

       I am writing this letter on behalf of Lawrence Fowler, who is presently serving a 25-to-life
sentence after being convicted by a jury in front of your honor in May of 1998. As you know, the
jury deliberated for three days before they found Mr. Fowler guilty of depraved indifference
murder.

       More importantly, I think you know how close the evidence was in that particular case.
Since that time, I have learned from a reliable source that an individual informed members of the
40th Precinct that Mr. Fowler was not the individual on the bike who shot into the courtyard and
killed the innocent bystander. It appears that a Pierre Moore was there and saw how the entire
incident transpired, along with another individual by the name of "Debow". Both of these
individuals say it was not Lawrence Fowler and that they know who it was and they were present.

       It is my duty as a lawyer to continue this process, needless to say that I would like to get
paid. I have spoked to Assistant District Attorney Daniel McCarthy, as well as Mr. Moore's
lawyer, so I have permission to move forward. I just have to get re-appointed, which I am sure
the Court will do.

I have enclosed an order for the Court's signature.    If there is going to be a problem, please do not hesitate to call me at my new office.

Take care.

Sincerely,

Pamela D. Hayes, Esq.

Enclosure

cc: Ella Jordan

# EXHIBIT 9

**JOSEPH J. MILANO**
Attorney

Office hours by appointment

P.O. Box 970
**Briarcliff Manor, NY 10510**
Tel 1-914-923-3255
Fax 1-914-923-3221
E-mail Osslaw@aol.com

May 22, 2000

Mr. Pierre Moore
280 E. 161st Street Apt 7-S
Bronx, New York 10451

Re: People v. Pierre Moore
    Bronx Criminal Court Part F
    Docket Number 2000BX029013
    Next court date: June 20, 2000

Dear Mr. Moore:

I received a call from Pamela Hayes, who informed me that she is an attorney representing a client with regard to a homicide matter. She believes you may have some information about the case she is handling. The case concerns the death of a kid in the summer of 1997 at 161st Street and Park Avenue (in a courtyard). I told Ms. Hayes that I have no objection to her speaking with you about that case but since I don't have a telephone number for you, all I could do was send you this letter.

Please call Ms. Hayes at 212-687-8724 or write her at 501 Fifth Avenue, Suite 2202, New York, New York 10017.

The case I represent you on is pending in Part F for June 20, 2000. I will see you in court on that date. If you have any questions, please feel free to contact me.

Very truly yours,

Joseph J. Milano

P.S. I understand you entered a guilty plea to a violation in Part AP-5 on May 10, 2000 on docket 2000BX022794 and were sentenced to pay $45 plus perform 3 days of community service.

cc: Pamela Hayes, Esq. By Fax: 212-687-87

# EXHIBIT 10

*Pamela D. Hayes*
*Attorney at Law*
*501 Fifth Avenue, Suite 2202*
*New York, New York 10017*
*(212) 687-8724*
*Fax (212) 687-8754*
*E-Mail pdhayesesq@aol.com*

# FILE COPY

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

November 13 2001

Mr. Dan McCarthy
Bronx County District
Attorney's Office
198 E. 161 Street
Bronx, NY 10451

Re: <u>PSNY v. Lawrence Fowler</u>
§CPL 440.

Dear Dan:

As you know sometime a[...] \ke to you about Lawrence Fowler and a Pierre Moore who was arrested at the 40th Precinct [...] May of 2000. His docket number is 2000BX 029013. He spoke to members of the 40th Precinct and told them that Lawrence Fowler was not the shooter of the deceased in our trial and told them who was.

After speaking with my investigator and having Mr. Moore interviewed he acknowledged talking to the police, but refused to talk with my investigator or provide him with any details. These details which were given to the officers on the is case are important. I'd like to see their police reports, because they could provide the information which could provide a basis for making Mr. Moore talk.

Police Officer Ortiz was the individual; who had this information . I spoke with you about it over a year ago. I realize you think Lawrence is the person who shot the deceased. If you'd get me information it bears checking out. I know you'd look into it even if you were proven wrong (smile). Please obtain the information for me or ask the officer if he would speak with me, then I'll go directly to the judge.

Thanks.

Sincerely,

Pamela D. Hayes, Esq.

cc: Lawrence Foler, #984199
    Elmira Correctional Facility
    P.O. Box 500
    Elmira, NY 14902-0500

# EXHIBIT 11

*Pamela D. Hayes*

**FILE COPY**

*Attorney at Law*
*501 Fifth Avenue, Suite 2202*
*New York, New York 10017*
*(212) 687-8724*
*Fax (212) 687-8754*
*E-Mail pdhayesesq@aol.com*

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

March 29, 2004

Mr. Daniel McCarthy
Assistant District Attorney
Bronx District Attorney's Office
E. 161st Street
Bronx, NY 10451

Re: <u>People of the State of New York v. Lawrence Fowler</u>
Index No. 5827-96

Dear Danny:

As you know I am still pursuing the "Actual Innocence" of Lawrence Fowler. We have been discussing this particular case for years. I feel you have to look into it. Lawrence didn't do it and although I know what the jury verdict was; I know you know, that this case was close.

Nevertheless, I'm moving forward. The police officer's name was Eddie Vargas of the 40th Precinct. He was on duty with Office James Ulrich when the information was given Pierre Moore. The individual who spoke with the officer's name was Pierre Moore. His docket numbers were 2000BX 029013 and 2000BX022794. I realize you said you've looked, but now with the **correct name** and the fact that "**Night Watch**" was told on the arrest date, I think there is information which can substantiate this my contention of the New York Police Department.

In addition to that there is very close scrutiny on "Actual Innocence Cases." The New York Times just did a lengthy article, in last Sunday's paper, about the Bronx District Attorney's Office.

It would go a long way if I proved I was right, I know it would go even further, if I convince you. I am filing the C.P.L. 440.10 (g). I'd appreciate it if you'd look again to see what info Night Watch and Police Officer Eddie Vargas had.

Lastly, my investigator interviewed Mr. Moor, even in the face of his mother, he didn't want to assign an affidavit telling he saw what happened. As you know I was a prosecutor, I still believe you would not let another person rot in jail for something they didn't do regardless of

000 52

their background.  I'm asking the Court for a late April date, since you and Dick skip out during that month.

Tell me what dates are good for you.

Sincerely,

Pamela D. Hayes, Esq

cc: Lawrence Fowler

SUPREME COURT STATE OF NEW YORK
COUNTY OF THE BRONX
-------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK,

                                Plaintiff.           AFFIDAVIT IN SUPPORT
                                               OF CPL 440. 10 (G) MOTION

      -against-

LAWRENCE FOWLER,

                             Defendant.
-------------------------------------------------------X

STATE OF NEW YORK     )
COUNTY OF NEW YORK  )


James Anthony Ulrich being duly sworn swears to the following under penalty of law.

1.     I am a former New York City Police Officer, I live at 99 Foster Avenue, Valley Stream, New York.

2.     Previous to May, 2002 I was a Police Officer assigned to Queens Warrant Squad, prior to that, I worked Bronx Street Crime, and prior to that I was assigned to the 40th Precinct.

3.     During May of 2000, while I was assigned at the 40th Precinct in the Bronx, I learned certain information if true would have proved the actual innocence of an individual by the name of Lawrence Fowler.

4.     I was a witness in that case. Consequently, when I found out this information I immediately told Mr. Fowlers trial counsel.

5.     Officer Eddie Varges was my partner during May 2000. There was a radio run of an armed robbery. We were canvassing trying to find a suspect for the description we'd been given.

6.     Pierre Moore was spotted, when we stopped the car. He began to run and he threw a gun over the fence. We gave chase and he was apprehended and brought back to the 40th Precinct.

knew the actual shooter of a case was someone other than the actual person who was convicted.

8.    He gave all the specific details of the crime and stated the shooter was at liberty. He also gave me a nickname of the shooter and told me where he lives.

9.    In addition to Moore mentioned that another individual was present, along with him and they both saw what happened, and the individuals who was convicted was not the shooter.

10.    He gave specific details, about the case that only an eyewitness could have seen.

11.    Notes were taken by me, and perhaps by partner.

12.    Said information was passed to Night Watch.  Two detectives came down and I gave the information.  They weren't interested in old information.


New York, New York
Dated: March 29, 2004

James Anthony Ulrich

Sworn to me this 29th
day of March 2004

Pamela D. Hayes, Notary

NOTARY
QUALIFIED
COMMISSION EXPIRES

Oct. 15, 2005

# EXHIBIT 12

SUPREME COURT STATE OF NEW YORK
COUNTY OF THE BRONX
—————————————————————————X

THE PEOPLE OF THE STATE OF NEW YORK,
                                        PLAINTIFF                          Ind. No. 5827/96
                                                                           Motion to Vacate Judgement,
                                                                           Pursuant to CPL 440.10

                    AGAINST

LAWRENCE FOWLER
    ,
                              DEFENDANT
—————————————————————————X


        PLEASE TAKE NOTICE UPON THE MOTION AND ATTACHED AFFIDAVIT

OF PAMELA D. HAYES, ESQ., Attorney for the Defendant-Petitioner Lawrence Fowler, that

the defendant will move this Honorable Court for and order vacating the defendant's conviction

for Murder in the 2nd Degree, pursuant to CPL section 440.10 and section 8-b of the New State

Court of Claims Act for Unjust Conviction and Imprisonment, on Tuesday August 2, 2006 at the

Courthouse located at 851 Grand Course, Room 103, Bronx, New York at 9:30 in the forenoon

or such other time that counsel may be heard.



Dated: New York, New York
        August 1, 2006

                                        Pamela D. Hayes, Esq.
                                        200 West 57th Street, Ste. 200
                                        New York, New York 10019
                                        212 687-8724


                              000 43

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX

————————————————————————X

PEOPLE OF THE STATE OF NEW YORK,
                                Plaintiff

                 -Against-

Lawrence Fowler,

                              Defendant

————————————————————————X

Ind. No. 5827/96

Affidavit in Support of
Motion to Vacate Judgment
pursuant to CLP 440.10 and
Section 8-b of the New
York State Court of Claims
Act for Unjust Conviction
and Imprisonment.

Pamela D. Hayes, Esq. an attorney duly admitted to practice law in the Courts of
this State makes the following affirmation under penalty of law.

1.    I am the attorney of record in the above captioned matter.  I represented
the defendant Lawrence Fowler, during all stages of his trial and
conviction, with the exception of his direct Appeal.  I was appointed
pursuant to section 18-B of the County Law as well as section 35 of the
Judiciary Law when Mr. Fowler was charged under the Death Penalty.

2.    Defendant Petitioner was convicted of Murder in the Second Degree
In May 1998 after a trial in front have the Honorable Edward Davidowitz
and a jury.  The defendant was sentenced to 25 years to life and he is
currently serving that sentence.

3.    In May of 2000, counsel wrote the Court and explained that she had
received information that there were individuals who had informed the
the New York City police that Lawrence Fowler was innocent of the
murder for which he had been convicted.  Specifically an inivual by the
name of Pierre Moore was arrested and told member of the New York
City Police Department that Lawrence Fowler was not the shooter and was
not involved in the murder.  Pierre Moore and another individual by the
name of Debow had been there saw the incident and Lawrence Fowler was
not there and was not involved in the incident.

4.   Defendant hired an investigator, said investigator tracked down Mr. Moore. Mr. Moore was interviewed but refused to cooperate with Counsel to come forward and exonerate Mr. Fowler.

5.   Counsel reported this information to the District Attorney's Office, however there was no way to force Mr. Moore to come forward even with the intersession of Mr. Moore's mother and lawyer. (See attached Exhibits)

6.   In November of 2001, I called and wrote ADA Dan McCarthy who tried the case. I explained to him that the name of an individual who was one the police Officers who had taken the information from Mr. Moore on the evening that Mr. Moore had given the information to the police. Unfortunately Mr. McCarthy was not able to locate Police Officer's Ortiz's memo books, however he remained open to my insistences that there was information out there that could potentially clear Mr. Fowler.

7.   During June of this year I received a telephone call from Dan McCarthy. He explained to me that he had received information from a confidential informant from the United States Attorney's Office, which informed the US Attorney's Office that Lawrence Fowler had not committed the murder for which he was serving time. Mr. McCarthy informed me that he would investigate the matter the information from the informant that the informant was a "look out" and Lawrence Fowler was not there nor did he participate in the murder.

8.   As a result the matter was investigated and Mr. McCarthy is convinenced that the witness is telling the truth and Lawrence has been wrongfully convicted and imprisoned.

9.   This information is consistent with the evidence that was adduced at trial including the fact that at least 6 indivuals testifies that Lawrence Fowler was not present at the scene. It is particularly relevant that the individual who was being shot at on that evening is the same invidual that Defendant brought in pursuant to subpoena from Massachusetts and said that he was the intended victim and Lawrence Fowler was not the individual he saw shooting at him that night.

10.   It is clear that Mr. Fowler has been a victim of a unjust and a wrongful and his conviction should be vacated based on the newly discovered evidence, which is being presented to the Court.

Wherefore, Defendant-Petitioner demands that he be released from prison and his conviction be vacated pursuant to CLP 440.10 as well as Section 8-b of the New York State Court of Claims Act For Unjust Conviction.

Dated: New York, New York
August 1, 2006

Pamela D. Hayes, Esq.
Attorney for Defendant-Petitioner

To: Clerk, Supreme Court Criminal Term
Robert T. Johnson, District Attorney
Bronx County

# EXHIBIT 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX

————————————————————————————— X

PEOPLE OF THE STATE OF NEW YORK                    IND. NO. 5827/96
                                                    ORDER
            AGAINST

LAWRENCE FLOWER

————————————————————————————— X


        THIS MATTER HAVING BEEN BROUGHT ON BY THE DEFENDANT-
PETETIONER LAWRENCE FOWLER  AND AFTER HEARING ARGUMENT BY
THE PEOPLE AND THE DEFENDANT- PETETIONER AND GOOD CAUSE
HAVING BEEN SHOWN  IT IS:

        ORDERED:   THAT THE DEFENDANT CONVICTION FOR MURDER IN
THE SECOND DEGREE RENDERED IN MAY 1998 BEFORE THIS COURT BE
VACATED PURSUANT TO CPL SECTION  440.10 BASED ON NEWLY
DISCOVERED EVIDENCE AND SECTION 8-b OF THE NEW YORK STATE
COURT OF CLAIMS ACT FOR UNJUST CONVICTION AND IMPRSIONMENT.

        THAT DEFENDANT IS IMMEADATELY RELEASED FROM THE NEW
YORK STATE DEPARTMENT OF CORRECTIONS PURSUANT TO THE ABOVE
STATUTES.


        ENTER::


        AUGUST 2, 2006
        BRONX ,NEW YORK
                                    Hon. Edward Davidowitz
                                    Judge Court of Claims, ASCJ



                                        EDWARD M. DAVIDOWITZ J.S.C

# EXHIBIT 14

N 113—Notice of Claim against The City of New York:
Section 50e General Municipal Law, 6-88

JULIUS BLUMBERG, INC., PUBLISHER
62 WHITE STREET, NEW YORK, N. Y. 10013

*In the Matter of the Claim of*

LAWRENCE FOWLER

*against*

THE CITY OF NEW YORK

RECEIVED
CITY ... YORK

06 NOV -2 PM 3: 26

COMP...
CENTR...
BUREAU    ... OFFICE
           ... FACILITY
           ... SYSTEMS

TO: COMPTROLLER OF THE CITY OF NEW YORK

**PLEASE TAKE NOTICE** that the undersigned claimant(s) hereby make(s) claim and demand against the City of New York, as follows: [Office of the Comptroller requests the following additional information: in Section 2, specific defect (e.g. pothole) if applicable; in Section 3, street address wherever possible.]

1. The name and post-office address of each claimant and claimant's attorney is:

Pamela D. Hayes, Esq.
200 W. 57th St. Ste. 900
New York, NY 10019

2. The nature of the claim: Wrongful Conviction, Unjust Conviction
AND Imprisonmen, (NYS Court of Claims Act), False Arrest,
False Imprisonment, Violations of Civil Rights

3. The time when, the place where and the manner in which the claim arose:

A was wrongfully convicted of Murder 2° (depraived
Indifference). He severed 10 years only to be set free
pursant to the above statute.

4. The items of damage or injuries claimed are (include dollar amounts)

Montary (15 million)
loss of freedom, loss of job, ect



000 51

TOTAL AMOUNT CLAIMED                                    ($                    )

# EXHIBIT 15



STATE OF NEW YORK
# EXECUTIVE  DEPARTMENT
DIVISION OF PAROLE

# **FINAL DISCHARGE**

Albany, New York
**1/26/2008**

*This is to certify that*

## ***LAWRENCE  FOWLER***

*has this day been discharged from further jurisdiction of*

*the Board of Parole in accordance with the provisions of law.*

**NYSID/DIN:**   04916801M/83A5982
**AREA**:   BRONX I
**SPO**:   WELCH,RAQUEL
**PO**:   MARTINEZ,LOURDES

# EXHIBIT 16

Interim Order No: 25          PG SERIES 210     Date Issued:   07-27-06

## DEBRIEFING OF PRISONERS

**PURPOSE**   To provide a central repository of criminal intelligence received from prisoners and improve communications and sharing of information among Department units.

**SCOPE**   All prisoners in custody of this Department and all new arrestees must be debriefed by a member of the service.  For the purposes of this procedure, the debriefing member of the service may be an investigator from the Detective Bureau, Organized Crime Control Bureau (OCCB), Intelligence Division, a Field Intelligence Officer (FIO), Anti-Crime / Street Narcotics Enforcement Unit (SNEU) supervisor, desk officer etc.  Police officers will not normally conduct debriefings.

**DEFINITIONS**     POSITIVE DEBRIEFINGS – Specific information received from a prisoner during the course of an interview regarding crime, criminal activity, or evidence related to a crime that is not related to the current arrest charges against the prisoner.  For the purpose of this definition, a prisoner is to include new arrestees, and parolees, probationers, and inmates in custody.

> *NOTE  A confession / admission is a statement (oral or written) made by a prisoner during the course of an interview which acknowledges guilt or involvement.  A confession / admission on a new arrest is <u>NOT</u> considered a positive debriefing.*
>
> *Enhancements are augmentations of certain designated arrests conducted by an appropriate investigative unit for the purpose of enhancing the prosecutability of that arrest.  A confession / admission is a goal of the enhancement.  Case enhancement is <u>NOT</u> considered a positive debriefing.*
>
> *Should an allegation of corruption or serious misconduct arise out of a prisoner debriefing, the member of the service obtaining the information shall follow established Department guidelines regarding the reporting of such matters.*

**PROCEDURE**     Upon debriefing a prisoner in custody of this Department:

## DEBRIEFING MEMBER OF THE SERVICE

1. Log all debriefings into a log with general captions across a double page as follows:
<u>FIRST PAGE</u>
DATE  TIME  COMMAND  SERIAL#   PRISONER NAME   NYSID ARREST CHARGE
<u>SECOND PAGE</u>
ARRESTING OFFICER  DEBRIEFING MOS   RESULTS    INTELLIGENCE
NAME /COMMAND                           (positive or negative)  REPORT #

> *NOTE  All commands where arrests are debriefed are responsible for maintaining a debriefing log.  To ensure the debriefing log is properly maintained, desk officers will inspect the log each tour and make a Command Log entry of the results.  Commands which possess the technical capability may utilize a computer database in lieu of the above log but shall comply with the above captions when creating the database. If a database is used, a hardcopy of the debriefings will be printed out, maintained in a binder and safeguarded.*

<u>FOR ALL POSITIVE DEBRIEFINGS WHICH YIELD INTELLIGENCE NOT RELATED TO AN ACTIVE CRIMINAL INVESTIGATION:</u>

## DEBRIEFING MEMBER OF THE SERVICE

2. Prepare a **COMPLAINT FOLLOW-UP INFORMATIONAL (PD313-081a)** to record the information.

**Section:  Prisoners**

676-C

| Interim Order No: 25 | PG SERIES 210 | Date Effective: 07-27-06 |

## REGIONAL INTELLIGENCE SUPPORT CENTER (R.I.S.C.)

9. Obtain information for the preparation of an Intelligence Report.
10. Enter the information into the IDS system and furnish an Intelligence Report number to the calling command.
    a. Issue a Positive Debriefing Log number to members of the service    notifying the RISC of a positive debriefing.
11. Track Intelligence Reports relating to active criminal investigations and generate a notification to the FIO concerned after seventy two (72) hours to ensure proper follow up.

## PRECINCT/BOROUGH TRANSIT/PATROL BOROUGH HOUSING FIELD INTELLIGENCE OFFICER

12. Review IDS system where the information obtained relates to an active criminal investigation and conduct a follow-up conferral within seventy two (72) hours with the investigator assigned.
13. Ensure copies of positive debriefing **COMPLAINT FOLLOW-UP INFORMATIONALS** have been forwarded to the appropriate investigative unit after review of the original IDS entries.

## ADDITIONAL DATA

*Criminal Procedure Law 240.45(1)(a), also referred to as the "Rosario rule," requires the prosecutor to make available to the defendant any written or recorded statements made by a person whom the prosecutor intends to call as a witness at trial and which relates to the subject matter of witness' testimony. Failure to preserve and provide such statements to the defense can have an impact on the outcome of a criminal trial and in some cases, provide a basis to overturn a conviction. Information obtained through debriefing of prisoners and which is included in an Intelligence Report can sometimes be covered by this rule. Similarly, if an FIO includes in the IDS system information about an active investigation obtained from the case investigator, that information also may constitute "Rosario" material if the case investigator testifies at trial. Therefore, case investigators should include in their case folders printouts from the IDS system of information transmitted by the FIO or case investigator. In addition, if a debriefing results in the opening of a new investigation, a copy of the IDS printout detailing the information provided by the debriefed prisoner should be included in the new investigation folder.*

## FORMS AND REPORTS

COMPLAINT FOLLOW-UP INFORMATIONAL (PD313-081a)

**Section: Prisoners**

676-E

3. Notify, by telephone, any other units or commands that may be concerned, and record the name of the receiving member of the service in the **COMPLAINT FOLLOW-UP INFORMATIONAL** "Details" section.

   a. An immediate response, if appropriate, will be made by the concerned unit / command for the purposes of personally debriefing the subject.

4. Telephone the Regional Intelligence Support Center at (646) 805-6000, upon completion of debriefing to relay the basic information necessary for the preparation of an Intelligence Report (date, time, name of person     debriefed, MOS debriefing, brief description of information obtained, command concerned, etc.) for input into the Intelligence Data System     (IDS).

   a. Record the Intelligence Report and Positive Debriefing numbers received from the Regional Intelligence Support Center in the **COMPLAINT FOLLOW-UP INFORMATIONAL** "Details" section.

> *NOTE   If more than one uniformed member of the service or if an outside law enforcement member (i.e., Joint Federal Task Force, etc.) debriefs prisoner, a telephone notification to the Regional Intelligence Support Center must be made and the information in step 4 provided.*

5. Forward copies of the **COMPLAINT FOLLOW-UP INFORMATIONAL** to the investigative unit concerned.

   a. The FIO concerned will be responsible for reviewing all   IDS entries for positive debriefings in their respective commands.

   b. Ensure a copy of the **COMPLAINT FOLLOW-UP  INFORMATIONAL** has been forwarded and received by the appropriate investigative unit after reviewing the IDS.

## FOR ALL POSITIVE DEBRIEFINGS WHICH YIELD INTELLIGENCE ON AN ACTIVE CRIMINAL INVESTIGATION:

### DEBRIEFING MEMBER OF THE SERVICE

6. Telephone the investigator / supervisor responsible for the active investigation and relay the information obtained through the debriefing.

> *NOTE The investigator / supervisor responsible for the active investigation will respond and personally debrief the prisoner if appropriate and fully investigate the veracity of the information provided.*
> *The active case investigator / supervisor will be responsible for documenting any information pertinent to the active case on a COMPLAINT FOLLOW-UP INFORMATIONAL after thoroughly investigating the information, and include it in the case folder.*

7. Telephone the Regional Intelligence Support Center at (646) 805-6000, upon completion of debriefing to relay the basic information necessary for the preparation of an Intelligence Report (date, time, name of person debriefed, MOS debriefing, brief description of information obtained, command concerned, etc.) for input into IDS.

### INVESTIGATOR/ SUPERVISOR RESPONSIBLE FOR ACTIVE INVESTIGATION

8. Record the Intelligence Report and Positive Debriefing numbers in the *COMPLAINT FOLLOW-UP INFORMATIANL* "Details" section.

> *NOTE  In situations where information obtained relates to an active criminal investigation, the appropriate precinct/Borough Transit/Patrol Borough Housing FIO will conduct a follow-up conferral within seventy two (72) hours with the investigator assigned to ensure a COMPLAINT FOLLOW-UP INFORMATIONAL has been prepared in conjunction with the original IDS entries.*

676-D

© FPA January, 2007

# EXHIBIT 17

Westlaw.

82 N.Y.2d 1
82 N.Y.2d 1, 623 N.E.2d 509, 603 N.Y.S.2d 382
**(Cite as: 82 N.Y.2d 1)**

**H**

The People of the State of New York, Respondent,
v.
Gary Steadman, Appellant.
The People of the State of New York, Respondent,
v.
Raymond Blair, Appellant.

Court of Appeals of New York

Argued September 1, 1993;

Decided October 12, 1993
CITE TITLE AS: People v Steadman

SUMMARY

Appeal, in the first above-entitled action, by permission of an Associate Judge of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, entered October 13, 1992, which affirmed a judgment of the Supreme Court (William D. Friedmann, J.), rendered in Queens County upon a verdict convicting defendant of manslaughter in the second degree and criminal possession of a weapon in the second degree.

Appeal, in the second above-entitled action, by permission of an Associate Judge of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, entered October 13, 1992, which affirmed a judgment of the Supreme Court (William D. Friedmann, J.), rendered in Queens County upon a verdict convicting defendant of manslaughter in the second degree and criminal possession of a weapon in the second degree.

People v Steadman, 186 AD2d 693, reversed.

People v Blair, 186 AD2d 665, reversed.*2

HEADNOTES
Crimes--Disclosure--Failure to Disclose Exculpat-

ory Material--Promise of Leniency to Witness in Exchange for Testimony--Lack of Knowledge of Promise by Witness and Trial Assistant District Attorneys

(1) An agreement between the Assistant District Attorney, who was the superior of two trial assistants, and counsel for a witness pursuant to which the witness would not be required to go to prison on charges pending against him if he testified against the defendants whom the trial assistants were prosecuting, constitutes *Brady* material, notwithstanding the People's claim that the witness and the trial assistants were never informed of the agreement, and the prosecution's failure to disclose it requires a new trial. The duty imposed on the People by the *Brady* decision (373 US 83) to disclose to the defense evidence in its possession that is favorable to the accused includes promises of leniency given to the witness in exchange for favorable testimony against an accused. Moreover, the prosecutor's duty extends to correcting mistakes or falsehoods by a witness whose testimony on the subject is inaccurate. Here, the Assistant District Attorney's scheme effectively foreclosed any meaningful inquiry into the witness's knowledge and whether promises of leniency affected his testimony. Further, it placed the trial assistants in the position of not only advising the witness to testify that no promises of leniency had been made to him when they had been, either directly or indirectly, but also, because the trial preparation took place in his presence, of compromising the witness's attorney's ethical position and implicating him in the scheme to mislead the court and the defendants. Even if the trial assistants had no personal knowledge of the agreement and could not advise the court and jury about it, they were required to produce their superior or someone else who could. Nor can the People's failure to disclose the *Brady* material be considered harmless error, since the witness was the sole identification witness, and his credibility was a pivotal consideration.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 N.Y.2d 1
82 N.Y.2d 1, 623 N.E.2d 509, 603 N.Y.S.2d 382
**(Cite as: 82 N.Y.2d 1)**

Page 2

TOTAL CLIENT SERVICE LIBRARY REFER-
ENCES
Am Jur 2d, Depositions and Discovery, §§ 450-454.

NY Jur 2d, Criminal Law, §§2316, 2321.

ANNOTATION REFERENCES
Withholding or suppression of evidence by prosec-
ution in criminal case as vitiating conviction. 34
ALR3d 16.

Prosecutor's duty, under due process clause of Fed-
eral Constitution, to disclose evidence favorable to
accused--Supreme Court cases. 87 L Ed 2d 802.

POINTS OF COUNSEL
*Sally Wasserman,* New York City, for appellant in
the first above-entitled action.

Defendant's State and Federal constitutional *3
rights were violated by the prosecution's refusal to
disclose the complete terms of its cooperation
agreement with the only alleged eyewitness to the
crime and by the prosecution's calculated scheme to
evade its obligations to disclose this exculpatory
evidence which rendered that material virtually un-
usable to defendant. *(People v Novoa,* 70 NY2d
490; *People v Cwikla,* 46 NY2d 434; *Brady v
Maryland,* 373 US 83; *Giglio v United States,* 405
US 150; *People v Cortijo,* 70 NY2d 868; *People v
Pelchat,* 62 NY2d 97; *People v Simmons,* 36 NY2d
126; *People v Vilardi,* 76 NY2d 67; *People v Sav-
vides,* 1 NY2d 554; *People v Mangi,* 10 NY2d 86.)

*Richard A. Brown, District Attorney* of Queens
County, Kew Gardens *(Elizabeth M. Fox* and
*Steven J. Chananie* of counsel), for respondent in
the first above-entitled action.

The nondisclosure of a promise made by the pro-
secutor to an attorney for an eyewitness did not vi-
olate defendant's rights where defendant was aware
of the promise during trial, and effectively presen-
ted evidence of it during the defense case. *(People v
Vilardi,* 76 NY2d 67; *People v Cortijo,* 70 NY2d
868; *People v Brown,* 67 NY2d 555; *People v
Smith,* 63 NY2d 41; *People v Stridiron,* 33 NY2d

287; *People v Bolling,* 157 AD2d 733; *People v
Murphy,* 179 AD2d 559; *People v Knowles,* 177
AD2d 597; *People v Taylor,* 160 AD2d 556.)

*Randall D. Unger,* Forest Hills, for appellant in the
second above-entitled action.

I. The prosecutor's failure to disclose the existence
and terms of the cooperation agreement entered into
with Anthony Malloy deprived appellant of a fair
trial. *(Brady v Maryland,* 373 US 83; *United States
v Agurs,* 427 US 97; *Giglio v United States,* 405 US
150; *People v Cwikla,* 46 NY2d 434; *People v Sav-
vides,* 1 NY2d 554; *People v Lewis,* 174 AD2d 294;
*People v Novoa,* 70 NY2d 490; *People v Vilardi,* 76
NY2d 67.)

II. Appellant was deprived of his fundamental right
of confrontation as a result of the trial court's erro-
neous refusal to allow cross-examination regarding
Mr. Latimer's communication of the prosecution's
promise to his client Malloy and its refusal to com-
pel Malloy to testify about his pending cases.
*(People v Mitchell,* 58 NY2d 368; *Matter of Priest
v Hennessy,* 51 NY2d 62; *Matter of Jacqueline F.,*
47 NY2d 215; *Rossi v Blue Cross & Blue Shield,* 73
NY2d 588; *Matter of Le Fever v Lefkowitz,* 18 Misc
2d 278, 6 AD2d 998; *Chambers v Mississippi,* 410
US 284; *Davis v Alaska,* 415 US 308; *People v
Osorio,* 75 NY2d 80; *People v Schneider,* 44 AD2d
845, 36 NY2d 708; *People v Chin,* 67 NY2d 22.)

III. The pervasive *4 pattern of misconduct by the
prosecution deprived appellant of a fair trial.
*(People v Pelchat,* 62 NY2d 97; *People v Ven-
timiglia,* 52 NY2d 350; *People v Holt,* 67 NY2d
819; *People v Conyers,* 52 NY2d 454; *People v Liv-
ingston,* 128 AD2d 645; *People v Crimmins,* 36
NY2d 230.)

*Richard A. Brown, District Attorney* of Queens
County, Kew Gardens *(Elizabeth M. Fox* and
*Steven J. Chananie* of counsel), for respondent in
the second above-entitled action.

I. The nondisclosure of a promise made by the pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 N.Y.2d 1
82 N.Y.2d 1, 623 N.E.2d 509, 603 N.Y.S.2d 382
**(Cite as: 82 N.Y.2d 1)**

Page 3

secutor to an attorney for an eyewitness did not vi-
olate defendant's rights where the defense was
aware of the promise during trial and effectively
presented evidence of it during the defense case.
(*People v Vilardi*, 76 NY2d 67; *People v Cortijo*,
70 NY2d 868; *People v Brown*, 67 NY2d 555;
*People v Smith*, 63 NY2d 41; *People v Stridiron*, 33
NY2d 287; *People v Bolling*, 157 AD2d 733;
*People v Murphy*, 179 AD2d 559; *People v
Knowles*, 177 AD2d 597; *People v Taylor*, 160
AD2d 556; *People v Dunn*, 149 AD2d 528.)

II. Defendant was not denied his right to confronta-
tion by the assertion of the attorney-client privilege
by Malloy's attorney. (*People v Nuccie*, 57 NY2d
818; *Davis v Alaska*, 415 US 308; *People v Chin*,
67 NY2d 22; *Chambers v Mississippi*, 410 US 284;
*Douglas v Alabama*, 380 US 415; *Rock v Arkansas*,
483 US 44; *Washington v Texas*, 388 US 14;
*People v Shapiro*, 308 NY 453; *People v Wilkins*,
65 NY2d 172; *Matter of Creekmore*, 1 NY2d 284.)

III. Defendant was not denied a fair trial due to ac-
tions by the prosecution. (*People v Ventimiglia*, 52
NY2d 350; *People v Santarelli*, 49 NY2d 241;
*People v Allweiss*, 48 NY2d 40; *People v Berg*, 59
NY2d 294; *Feldsberg v Nitschke*, 49 NY2d 636;
*Martin v Alabama 84 Truck Rental*, 47 NY2d 721;
*People v Dickman*, 42 NY2d 294; *People v
Stanard*, 42 NY2d 74; *People v Nuccie*, 57 NY2d
818; *People v Trowbridge*, 305 NY 471.)

OPINION OF THE COURT
Simons, J.

Defendants have been convicted of manslaughter,
second degree, and criminal possession of a
weapon, second degree, charges resulting from the
death of Maxine Peterson on May 28, 1988. The
prosecution's principal witness against defendants,
and the only one identifying them, was Tony Mal-
loy. Malloy admittedly had been a drug user and
had two prior felony convictions. At the time of tri-
al, he was on probation *5 for one of the prior con-
victions and three open felony charges were
pending against him.

Defendants sought pretrial disclosure of any prom-
ise of leniency made to Malloy in exchange for his
favorable testimony against them. Although the
prosecution revealed some arrangements made with
Malloy, it failed to advise defendants that Assistant
District Attorney Dan McCarthy, the trial assistants'
superior, had in fact agreed with Malloy's attorney
that Malloy would not be required to go to prison
on the pending charges if he testified against de-
fendants. Defendants assert that McCarthy's agree-
ment with Malloy's counsel was *Brady* material and
that the prosecution's failure to disclose it requires a
new trial. We agree and therefore reverse the orders
of the Appellate Division.

I

In response to the pretrial request for *Brady* materi-
al, the prosecution acknowledged that a few days
after Malloy's Grand Jury appearance it purchased
airplane tickets to Virginia for Malloy and his girl-
friend and paid their first month's rent there. It also
paid Malloy a total of $1,500 in cash before he re-
turned to New York for the trial about a year later.
The pending charges against him were adjourned
until after defendant's trial.

Malloy testified at trial that he was told by the Dis-
trict Attorney's office at the time he returned that he
would be relocated in the future, but asserted that
no promises of leniency had been made with re-
spect to his pending charges. Inasmuch as a convic-
tion on any of the open charges would render Mal-
loy a persistent felony offender, subject to a lengthy
mandatory sentence of imprisonment, defense attor-
neys asked him how he could be assured of reloca-
tion unless the District Attorney contemplated a
dismissal of the pending charges. Notwithstanding
this apparent inconsistency, Malloy insisted no
promises had been made. He acknowledged,
however, that while in Virginia he had talked with
McCarthy at least 25 times on the telephone and
had met with him on other occasions after his return
to New York and before he testified.

During the trial, the defense learned that McCarthy
had promised Malloy's attorney, Jonathan Latimer,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 N.Y.2d 1
82 N.Y.2d 1, 623 N.E.2d 509, 603 N.Y.S.2d 382
**(Cite as: 82 N.Y.2d 1)**

Page 5

sought to arrange negotiations so that only he and attorney Latimer knew of the promises and he urged Latimer not to divulge them to his client. Moreover, after the defendants learned of the agreement and subpoenaed Latimer to testify, they were blocked from determining whether Latimer had advised his client of the agreement by Latimer's invocation of the attorney-client privilege. McCarthy's scheme effectively foreclosed any meaningful inquiry into Malloy's knowledge and whether promises of leniency affected his testimony. Moreover, it placed the trial assistants in the position of not only advising Malloy to testify that no promises of leniency had been made to him when they had been, either directly or indirectly, but also, because the trial preparation took place in his presence, of compromising Latimer's ethical position and implicating him in the scheme to mislead the court and the defendants.*8

In the final analysis, however, it does not matter whether the trial assistants were genuinely unaware of the arrangement or not. A prosecutor's obligations to correct false testimony given by prosecution witnesses and to disclose *Brady* material are duties exercised by individual prosecutors and shared by the prosecutor's office as a whole. Promises made to a defendant by one prosecutor are generally binding on others in the criminal law enforcement system and certainly promises made by a superior are binding on subordinates in the same office. More importantly, the trial assistants here were chargeable with knowledge of McCarthy's promises to Malloy's attorney *(see, United States v Giglio,* 405 US 150, 154; *People v Novoa, supra,* at 498; *Matter of Chaipis v State Liq. Auth.,* 44 NY2d 57, 64; *People v Conlan,* 146 AD2d 319, 331). After Malloy had testified that no deal for leniency had been struck, the trial assistants, as representatives of their office, had the responsibility of clarifying the record by disclosing all the details of what had actually transpired between their office and Malloy and his attorney. They could not profess ignorance of the arrangement and rely on Latimer's successful invocation of the attorney-client priv-

ilege to conceal the facts about the arrangement between Latimer and McCarthy. If the trial assistants had no personal knowledge of the agreement and could not advise the court and the jury about it, then they were required to produce McCarthy or someone else who could. The one thing they could not do was sit silently by and leave the issue in doubt *(see, People v Novoa, supra,* at 498).

The People's position is not saved by the rule stated in *Cortijo* and similar decisions *(supra)* in which we concluded that disclosure of the *Brady* material during trial obviated the *Brady* violation, provided the defendant had a meaningful opportunity to use the material. There was no full disclosure by an informed prosecutor here. With the record in this state, it is pointless to talk about an opportunity to use *Brady* material when the court and defense counsel are kept in ignorance of what the material is.

III
The error cannot be said to be harmless *(People v Crimmins,* 36 NY2d 230, 237). Malloy was the sole identification witness, and his credibility was a pivotal consideration. Though the applicability of a harmless error analysis in cases such as this has been open to some question *(see, *9People v Novoa,* 70 NY2d 490, 499, *supra; People v Conlan,* 146 AD2d 319, 331, *supra),* we hold that it is required. *People v Savvides* (1 NY2d 554, 557, *supra)* suggested that a violation like the one here constituted fundamental error requiring reversal, but the *Savvides* Court in fact employed a harmless error analysis. In labeling the error fundamental, it relied on *People v Creasy* (236 NY 205, 221), which likewise employed a harmless error analysis.

Accordingly, in each case the order of the Appellate Division should be reversed, a new trial ordered on the present indictment solely with respect to the count of criminal possession of a weapon in the second degree, and the indictment otherwise dismissed without prejudice to the People, if they so advised, to re-present any appropriate charges to another Grand Jury *(see, People v Villani,* 59 NY2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 N.Y.2d 1
82 N.Y.2d 1, 623 N.E.2d 509, 603 N.Y.S.2d 382
**(Cite as: 82 N.Y.2d 1)**

781, 782; *People v Mayo,* 48 NY2d 245, 253).

Chief Judge Kaye and Judges Titone, Hancock, Jr., Bellacosa and Smith concur; Judge Levine taking no part.

In each case: Order reversed and case remitted to Supreme Court, Queens County, for further proceedings in accordance with the opinion herein.**10**

Copr. (c) 2008, Secretary of State, State of New York.

N.Y. 1993.

PEOPLE v STEADMAN

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1                          Proceedings

2     SUPREME COURT OF THE STATE OF NEW YORK

3     TRIAL TERM :  PART 27 :  COUNTY OF BRONX

4     - - - - - - - - - - - - - - - - - - - - - - - - - - -X

5     PEOPLE OF THE STATE OF NEW YORK        Ind. 5827/96

6            -against-
                                           Excerpt of
7                                          hearing

8     LAWRENCE FOWLER,

9              Defendant(s)
      - - - - - - - - - - - - - - - - - - - - - - - - - - -X

10                    April 15, 1998
                      851 Grand Concourse
11                    Bronx, New York, 10451

12

13    BEFORE:        HONORABLE EDWARD M. DAVIDOWITZ,
                     J U S T I C E.

14

15

16    APPEARANCES:

17                     ROBERT JOHNSON, ESQ.,
                       Bronx District Attorney
18                     For the People
              BY:  DANIEL McCARTHY, ESQ.
19                     Assistant District Attorney.

20

21

22                     PAMELA D. HAYES, ESQ.
                       Attorney for Defendant.

23

24                     - - - - - - - - - - - - - - -

25                     BETH ABRAMOWITZ, RPR
                       Senior Court Reporter

                          000154

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Proceedings

THE COURT:  Okay, basically tell us
what it is that you were notified you
need in order to secure the attendance of
this man in New York.

MS. HAYES:  In Massachusetts.  I
spoke to an individual by the name of
Assistant District Attorney Kennedy, Leo
Kennedy.  And, he informed me that in
order to proceed to have him help us,
what we would need is the Court to make
findings of fact stating that this
individual is a, is needed for the trial
and that you have made that
determination.  After that I have to send
him all that together with an order which
I have up to a Massachusetts judge who
will look at the Court's determination
and make a finding as to whether or not
he will sign the writ.  Once that is
done, they will send it to Concord.  Once
that is done they will notify us, then I
will notify Mr. McCarthy and they can go
get Mr. Rivera.

THE COURT:  The only thing I would

3

Proceedings

1

2     ask the district attorney to do, I am

3     asking, is once all of this has been

4     done, if there's someone you can call to

5     expedite it.

6         MR. McCARTHY:  I will do my best,

7     Judge.  As I told you, I will accommodate

8     the Court in whatever way is necessary to

9     not hold up the proceedings.  With the

10    understanding that this is not my

11    application and I don't seek to get

12    involved in any way with the paperwork.

13        THE COURT:  What I am asking you to

14    do, once the application has been

15    processed in accordance with the

16    procedure that Ms. Hayes just gave us, if

17    you can somehow speak to someone and say

18    please we need this person as a witness.

19        MR. McCARTHY:  I will be pleased to

20    grease the skids in whatever way I can.

21        MS. HAYES:  To let you know, A.D.A.

22    Kennedy, he seemed pretty good that he

23    would speed it up along and this wouldn't

24    be taking a long time because I told him

25    we need him for next week and he probably

4

1                          Proceedings
2       would be here for about three weeks.
3              THE COURT:  Off.
4              (Discussion held off the record.)
5              THE COURT:  In order for me to make
6       these findings of fact, you need to give
7       me reasons why this man is a material
8       witness for your trial, critical witness
9       for your trial.
10             MS. HAYES:  Your Honor, on Monday, I
11      think it was, April 6th, I received a
12      telephone call from Mr. McCarthy of the
13      Bronx County District Attorney's Office
14      notifying me that he had some Brady
15      material.  He outlined the Brady material
16      which he had informing me that one of his
17      detectives, a Detective Tierney, had
18      spoken with an individual by the name of
19      Ricky Rivera.  Ricky Rivera is a male
20      Hispanic born on February 27, 1980.  And,
21      he had spoken to this individual in
22      Concord, Massachusetts at the
23      Massachusetts Department of Corrections.
24             He informed me at that point that
25      Ricky Rivera had told Detective Tierney

000157

5

3/98B

PENGAD CO BAYONNE NJ 07002 FORM FED

1                         Proceedings

2          of the Bronx D.A.'s Office that on the

3          25th of July, 1996 he was in the

4          courtyard of 3211 Park Avenue with an

5          individual by the name of Lamar Jones;

6          that they were talking, that all of a

7          sudden a person by the name of Cliff

8          pulled up on bikes, and he was with

9          another person on a bike, and that they

10         started shooting.  He stated to Detective

11         Tierney that he was in fact the intended

12         victim, that he knew Cliff, that they had

13         been from a rival drug gang or they had

14         some type of beef about drugs in a drug

15         tiff and it was Cliff who shot him.  He

16         said he was with Lamar, they moved over

17         out of the way of the shooting.  He

18         didn't realize that Lamar had gotten

19         shot.  And, when he got in the hallway he

20         found out that Lamar was struck.

21         Consequently, he describes this Cliff as

22         a male black, light skinned, braids, in a

23         gang who likes to have a .380 revolver.

24         And that's what he told Detective

25         Tierney.  So, since he was there, he was

6

1                        Proceedings

2       with Lamar, he knows who did it, it's

3       clearly Cliff, not Lawrence.  I think

4       that's the testimony, that's the

5       testimony the jury should hear and weigh

6       that in their determination as to whether

7       or not Mr. Fowler is the person who

8       killed Lamar Jones.

9            THE COURT:  Okay, you have nothing

10      to add?

11           MR. McCARTHY:  I have nothing to

12      add, Judge.  I think that's a fair

13      statement of things as they unfolded.  I

14      should indicate and I think this record

15      should note that Ricky Rivera to some

16      degree in the course of his discussions

17      with Detective Tierney implicated himself

18      in drug dealing activities and other

19      violent activities and potentially

20      another homicide in the 44 Precinct upon

21      which there is still an open case.  And

22      he did tell Detective Tierney he would

23      refuse to testify if called.  That's

24      another issue and I understand that.

25           THE COURT:  That's something else.

000159

7

1          Proceedings

2          MR. McCARTHY:  Right.  But, I think

3    this record that's going to be made part

4    of the application for his arrival here

5    should reflect that as well.

6          THE COURT:  It should also reflect,

7    therefore, that when he comes here I will

8    arrange for an attorney to be assigned to

9    represent him and to advise him and to

10   work out whatever parameters have to be

11   worked out with respect to his

12   testimony.

13        In accordance with the provisions of

14   Article 650 of the Criminal Procedure Law

15   I am going to adopt the statements that

16   you made, the narrative that you made,

17   and adopt it as a finding that Mr.

18   Rivera, in my judgment, is a material and

19   necessary witness in this state for the

20   trial and I will issue an order.

21   directing, therefore, that he attend in

22   this court where the trial is pending on

23   the terms and conditions that I just set

24   forth and that is that he will be

25   represented by an attorney who will, if

9

Proceedings

1

2    application and support of my order

3    directing that he be brought to this

4    state.

5         I ask you to prepare whatever orders

6    have to be executed.  I will sign them

7    tomorrow and perhaps you can FAX them up

8    to the District Attorney's Office.

9         MS. HAYES:  Yes, sir.  I will take

10   care of that.

11        THE COURT:  That concludes the

12   session for today.

13        (Hearing is adjourned to Thursday,

14   April 16, 1998.)

15                * * * * * * * * * * * * * * * * * *

16   This is to certify that the foregoing is

17   a true and accurate transcript of the

18   stenographic minutes taken within.

19

20

21

22   BETH ABRAMOWITZ, RPR
     Senior Court Reporter

23

24

25

# EXHIBIT 18

PAMELA D. HAYES

ATTORNEY AT LAW

200 WEST 57TH STREET, SUITE 900
NEW YORK, NEW YORK 10019

———

(212) 687-8724
FAX (212) 980-2968
E-MAIL: pdhayesesq@aol.com

MEMBER OF
GEORGIA BAR
NEW JERSEY BAR
NEW YORK BAR

May 5, 2008

**E-MAIL**

Honorable John M. McEnany
Associate United States Attorney
United States Department of Justice
United States Attorney's Office
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Re:    Lawrence Fowler v. The City of New York,
       Robert T. Johnson, District Attorney, Bronx County,
       The State of New York and Governor Eliot Spitzer
       07 Civ. 10274 (JSR)

Dear Mr. McEnany:

This letter is written in response to your May 2, 2008 letter and the telephone calls of May 1, and May 2, 2008. I submit the following explanation of why your office's participation is needed, in turning over any files your office may have regarding a shooting surrounding a Lamar Jones on July 26, 1996, and the exoneration of one Lawrence Fowler for that murder.

Some time ago, the City of New York was sued pursuant to § 1983 of the U.S. Code regarding allegations of prosecutorial misconduct with regard to actions on behalf of the Bronx District Attorney's Office, and police misconduct on behalf of the City of New York.

Specifically, plaintiff has reason to believe that the District Attorney's Office

Honorable John M. McEnany
May 6, 2008
Page 2

and the New York City Police Department had reason to know that Lawrence Fowler was not the killer of Lamont Jones, which occurred in Bronx County on July 26, 1996. Specifically, the District Attorney's Office was told that Lawrence Fowler was not the shooter, nor did he have any involvement in the shooting. The shooting was regarding a "Drug War".

Ever since 1996, I have represented Mr. Fowler. I tried the case personally and I continued over the years to prove his innocence. Prior to May 2000, I called and wrote to ADA Daniel McCarthy and explained to him that I had information from a member of the NYC Police Department, that a witness by the name of Pierre Moore had come forward during an arrest and told members of the 40th Precinct that Lawrence Fowler was not the killer, in a 1996 murder of one Lamar Jones, nor was he even present, and there had been a miscarriage of justice. I retained an investigator (Don May) to interview Pierre Moore who gave the information to the police; however, Pierre Moore refused to be interviewed, by my investigator.

I even sent out the information to Mr. Moore's lawyer, who also explained to his client that it would be okay to speak with me (see attached). I never received any help from the Bronx DA's Office, in terms of locating the arresting officer, the Moore file, or even the arresting officer's Memo Book. I was told no one could find anything and that was it.

Because the witness would not speak with me, I could not find out what he had told the DA or the police at any further debriefings. I could not confirm if Mr. Moore became a cooperator. Consequently, since they did not pursue it, or advise me if Pierre was a cooperating witness, there was nothing I could do. The individual who gave me the information was a police officer by the name of James Anthony Ulrich who was working in the 40th Precinct. Some time before May of 2000, he specifically told me that he and his partner, PO Eddie Varges or Eddie Ortiz were looking for a robbery suspect and was chasing a Pierre Moore and saw him throw a gun over a fence. Once Pierre was apprehended, he actually told the officers while he was being debriefed, the details of the crime (Jones shooting) and told them the shooter was at liberty and the person who was convicted of the killing was not the shooter or involved in the killing. The details which were given were those only an eyewitness

Honorable John M. McEnany
May 6, 2008
Page 3


could have known about!

Officer Ulrich reported this information to the "Night Watch", section of the Police Department.  He was told they were not interested in "old information." Consequently, the police and DA knew of this information and refused to do anything about it.  In November, 2001, plaintiff's counsel once again contacted ADA Daniel McCarthy and asked him if he had looked for the Memo Book of Police Officer Ortiz or Vargas* or the officer who took the arrest of Pierre Moore.  (Clearly, it was not an issue as to which officer took the arrest since it was on Mr. Moore's arrest sheets.) Once again the Memo Book could not be found, and no information was given.

During the time between 2000 and 2006, counsel kept in contact with the Bronx County DA's Office, trying to follow up any leads which she obtained, to no avail.

In late 2005, plaintiff's counsel received a telephone call from ADA McCarthy explaining that the U.S. Attorney's Office was working on a case and a cooperator had given the same information plaintiff's counsel had given them that Lawrence Fowler was not involved.  At the trial which was held in April and May of 1998, counsel presented a defense, including 11 witnesses, two of which were eyewitnesses and six which were alibi witnesses.  One of the six alibi witnesses was PO James Ulrich.  During the trial, an eyewitness by the name of Ricky Rivera was produced from a Massachusetts Correctional Institution and testified he was the intended victim of the shooting and Lawrence was not the person who shot at him and killed Lamar Jones.

At the trial, the Office of the District Attorney provided me with the name of the individual; however, I was only given his name but not how his name was received, by the DA's Office, and I do not know if he came a cooperator or target in the United States Attorney's case or the Bronx District Attorney's investigation.

I have always felt that Lawrence Fowler was a scape goat in this particular instance.  The information which is possessed in the files of the DA as well as your office, shows when the DA found out about the USAO's investigation, who the

Honorable John M. McEnany
May 6, 2008
Page 4

cooperators were, what role Pierre Moore or "Debo" or Cliff or Ricky Rivera played. The DA was given the name of these individuals as being involved in the murder, by plaintiff's counsel and did nothing.

More importantly, it shows the role of the NYC Police Department and Bronx County District Attorney's Office and the role they played in keeping this exculpatory information from Lawrence Fowler, after the trial and during the trial.

As of this writing, counsel is asking the United States Attorney's Office to give over their files on this particular case and produce the witness and the document because the Bronx District Attorney's Office is alleging they cannot find their folder regarding the trial and investigation regarding the 440.10 allegations of plaintiff, Lawrence Fowler. Without this evidence plaintiff's right to compulsory process and examination remain in jeopardy. Defendant will be able to have the opportunity of utilizing summary judgment by keeping said information out of the hands of plaintiff, which would need it to prove specifically the New York City Police Department and Bronx District Attorney's Office did nothing to exonerate plaintiff when they had a chance to, thus violating plaintiff's due process rights.

While the government does have a quasi privilege, it is not an absolute right, especially when one weighs the competing interests, such as plaintiff's constitutional rights; prejudice to plaintiff's case as well as the availability of alternative options. *See Wardus v. Oregon*, 412 U.S. 470, 472 (1973).

In this instance, the United States Attorney's Office has an option to provide this information to counsel with a directive that it be placed under seal. Once it is obtained, if it shows that counsel's theory is correct, there would be no further need to expose it. This information goes to the heart of this civil case and if the Bronx District Attorney's Office has violated plaintiff's rights, that should trump the

Honorable John M. McEnany
May 6, 2008
Page 5


concerns of the United States Attorney's Office, in this instance.

Very truly yours,

Pamela D. Hayes

PDH/tp
Encls.

cc:    Susan P. Scharfstein, Esq.  (by e-mail)
       Assistant Corporation Counsel

# SUPPORTING DOCUMENTS

*Pamela D. Hayes*
*Attorney at Law*
*501 Fifth Avenue, Suite 2202*
*New York, New York 10017*
*(212) 687-8724*
*Fax (212) 687-8754*

Member of
Georgia Bar
New Jersey Bar
New York Bar

**FILE COPY**

May 19, 2000

Mr. Pierre Moore
280 East 161st Street
New York, N.Y. 10451

Re: <u>People v. Lawrence Fowler</u>

Dear Mr. Moore:

I received permission to speak to you from your lawyer on your present pending case in Bronx County. I represent an individual by the name of Lawrence Fowler, who was wrongfully convicted of a murder, which he did not commit. After <u>three</u> days of deliberations, the jury found him guilty. His <u>appeal</u> was denied last week.

Needless to say, the only person who can right this <u>injustice</u> is you. I know that you saw what happened and told the police. Obviously you want to help. I have spoken with Assistant District Attorney Daniel McCarthy and the only person who can help is you. So I need to interview you <u>as soon as possible</u>, so that I can have you sign an affidavit and I can file a 440.10 (g) motion.

If you remember, this is the case that a young kid was killed in the court yard off of 161st street near the corner, in 1996. I understand "Debow" was present also.

Listen, it takes a lot of courage to finally come forward. If you can help justice, I am sure justice will help you.

Please call me.

Sincerely,

Pamela D. Hayes, Esq.

**JOSEPH J. MILANO**
Attorney

_Office hours by appointment_

P.O. Box 970
Briarcliff Manor, NY 10510
Tel 1-914-923-3255
Fax 1-914-923-3221
E-mail Osslaw@aol.com

May 22, 2000

Mr. Pierre Moore
280 E. 161st Street Apt 7-S
Bronx, New York 10451

Re: People v. Pierre Moore
    Bronx Criminal Court Part F
    Docket Number 2000BX029013
    Next court date: June 20, 2000

Dear Mr. Moore:

I received a call from Pamela Hayes, who informed me that she is an attorney representing a client with regard to a homicide matter. She believes you may have some information about the case she is handling. The case concerns the death of a kid in the summer of 1990 at 161st Street and Park Avenue (in a courtyard). I told Ms. Hayes that I have no objection to her speaking with you about that case but since I don't have a telephone number for you, all I could do was send you this letter.

Please call Ms. Hayes at 212-687-8724 or write her at 501 Fifth Avenue, Suite 2202, New York, New York 10017.

The case I represent you on is pending in Part F for June 20, 2000. I will see you in court on that date. If you have any questions, please feel free to contact me.

Very truly yours,

Joseph J. Milano

P.S. I understand you entered a guilty plea to a violation in Part AP-5 on May 10, 2000 on docket 2000BX022794 and were sentenced to pay $45 plus perform 3 days of community service.

cc: Pamela Hayes, Esq. By Fax: 212-687-87

*Pamela D. Hayes*
*Attorney at Law*
*501 Fifth Avenue, Suite 2202*
*New York, New York 10017*
*(212) 687-8724*
*Fax (212) 687-8754*
*E-Mail pdhayesesq@aol.com*

**FILE COPY**

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

November 13 2001

Mr. Dan McCarthy
Bronx County District
Attorney's Office
198 E. 161 Street
Bronx, NY 10451

Re: <u>PSNY v. Lawrence Fowler</u>
§CPL 440.

Dear Dan:

As you know sometime ago I spoke to you about Lawrence Fowler and a Pierre Moore who was arrested at the 40th Precinct during May of 2000.  His docket number is 2000BX 029013.  He spoke to members of the 40th Precinct and told them that Lawrence Fowler was not the shooter of the deceased in our trial and told them who was.

After speaking with my investigator and having Mr. Moore interviewed he acknowledged talking to the police, but refused to talk with my investigator or provide him with any details. These details which were given to the officers on the is case are important.  I'd like to see their police reports, because they could provide the information which could provide a basis for making Mr. Moore talk.

Police Officer Ortiz was the individual, who had this information .  I spoke with you about it over a year ago.  I realize you think Lawrence is the person who shot the deceased.  If you'd get me information it bears checking out.  I know you'd look into it even if you were proven wrong (smile).  Please obtain the information for me or ask the officer if he would speak with me, then I'll go directly to the judge.

Thanks.

Sincerely,

Pamela D. Hayes, Esq.

cc: Lawrence Foler, #984199
    Elmira Correctional Facility
    P.O. Box 500
    Elmira, NY 14902-0500

*Pamela D. Hayes*

**FILE COPY**

*Attorney at Law*
*501 Fifth Avenue, Suite 2202*
*New York, New York 10017*
*(212) 687-8724*
*Fax (212) 687-8754*
*E-Mail pdhayesesq@aol.com*

*Member of*
*Georgia Bar*
*New Jersey Bar*
*New York Bar*

March 29, 2004

Mr. Daniel McCarthy
Assistant District Attorney
Bronx District Attorney's Office
E. 161st Street
Bronx, NY 10451

Re: <u>People of the State of New York v. Lawrence Fowler</u>
Index No. 5827-96

Dear Danny:

As you know I am still pursuing the "Actual Innocence" of Lawrence Fowler. We have been discussing this particular case for years. I feel you have to look into it. Lawrence didn't do it and although I know what the jury verdict was; I know you know, that this case was close.

Nevertheless, I'm moving forward. The police officer's name was Eddie Vargas of the 40th Precinct. He was on duty with Office James Ulrich when the information was given Pierre Moore. The individual who spoke with the officer's name was Pierre Moore. His docket numbers were 2000BX 029013 and 2000BX022794. I realize you said you've looked, but now with the **correct name** and the fact that "**Night Watch**" was told on the arrest date, I think there is information which can substantiate this my contention of the New York Police Department.

In addition to that there is very close scrutiny on "Actual Innocence Cases." The New York Times just did a lengthy article, in last Sunday's paper, about the Bronx District Attorney's Office.

It would go a long way if I proved I was right, I know it would go even further, if I convince you. I am filing the C.P.L. 440.10 (g). I'd appreciate it if you'd look again to see what info Night Watch and Police Officer Eddie Vargas had.

Lastly, my investigator interviewed Mr. Moor, even in the face of his mother, he didn't want to assign an affidavit telling he saw what happened. As you know I was a prosecutor, I still believe you would not let another person rot in jail for something they didn't do regardless of

their background.  I'm asking the Court for a late April date, since you and Dick skip out during that month.

Tell me what dates are good for you.

Sincerely,

Pamela D. Hayes, Esq

cc: Lawrence Fowler

SUPREME COURT STATE OF NEW YORK
COUNTY OF THE BRONX
-----------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK,

                                Plaintiff.          AFFIDAVIT IN SUPPORT
                                              OF CPL 440. 10 (G) MOTION

       -against-

LAWRENCE FOWLER,

                              Defendant.
-----------------------------------------------------------X

STATE OF NEW YORK    )
COUNTY OF NEW YORK   )

James Anthony Ulrich being duly sworn swears to the following under penalty of law.

1.    I am a former New York City Police Officer, I live at 99 Foster Avenue, Valley Stream, New York.

2.    Previous to May, 2002 I was a Police Officer assigned to Queens Warrant Squad, prior to that, I worked Bronx Street Crime, and prior to that I was assigned to the 40th Precinct.

3.    During May of 2000, while I was assigned at the 40th Precinct in the Bronx, I learned certain information if true would have proved the actual innocence of an individual by the name of Lawrence Fowler.

4.    I was a witness in that case. Consequently, when I found out this information I immediately told Mr. Fowlers trial counsel.

5.    Officer Eddie Varges was my partner during May 2000. There was a radio run of an armed robbery. We were canvassing trying to find a suspect for the description we'd been given.

6.    Pierre Moore was spotted, when we stopped the car. He began to run and he threw a gun over the fence. We gave chase and he was apprehended and brought back to the 40th Precinct.

knew the actual shooter of a case was someone other than the actual person who was convicted.

8. He gave all the specific details of the crime and stated the shooter was at liberty. He also gave me a nickname of the shooter and told me where he lives.

9. In addition to Moore mentioned that another individual was present, along with him and they both saw what happened, and the individuals who was convicted was not the shooter.

10. He gave specific details, about the case that only an eyewitness could have seen.

11. Notes were taken by me, and perhaps by partner.

12. Said information was passed to Night Watch. Two detectives came down and I gave the information. They weren't interested in old information.

New York, New York
Dated: March 29, 2004

James Anthony Ulrich

Sworn to me this 29th day of March 2004

Pamela D. Hayes, Notary

PAMELA D. HAYES
NOTARY PUBLIC, State of New York
QUALIFIED IN ... County
COMMISSION EXPIRES JULY 15, 19...
Oct. 15, 2005

PAMELA D. HAYES

ATTORNEY AT LAW

200 WEST 57TH STREET, SUITE 900

NEW YORK, NEW YORK 10019

(212) 687-8724

FAX (212) 980-2968

E-MAIL: pdhayesesq@aol.com

MEMBER OF

GEORGIA BAR

NEW JERSEY BAR

NEW YORK BAR

May 6, 2008

**E-MAIL**

Honorable John M. McEnany
Associate United States Attorney
United States Department of Justice
United States Attorney's Office
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Re:    Lawrence Fowler v. The City of New York,
       Robert T. Johnson, District Attorney, Bronx County,
       The State of New York and Governor Eliot Spitzer
       <u>07 Civ. 10274 (JSR)</u>

Dear Mr. McEnany:

As I explained, I have to look for the missing page which I will do so today. In regard to page 3, I am referring to Ricky Rivera, as the individual.

The individuals that I named as Cliff and Debo are individuals whose names were given to me during the trial, as people who were involved in the murder. Ricky Rivera mentioned the names to the DA's investigator, who gave it to me as *Brady*. Cliff was the shooter. The DA's investigator gave both me and the prosecutor the names Debo and Cliff as being involved. I spoke to Dan McCarthy during the trial about Cliff, Debo and Ricky, during April-May, 1998. I spoke to him in May of 2000 about Pierre Moore.

I am providing you with a Court of Appeals case, which talks about this same

Honorable John M. McEnany
May 6, 2008
Page 2

sort of activity and lays out the responsibility of the DA, as well as a transcript from the trial.

Sorry for the inconvenience of those pages.

Very truly yours,

Pamela D. Hayes

PDH/tp
Encls.

cc:   Susan P. Scharfstein, Esq.  (by e-mail)
      Assistant Corporation Counsel

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 8, 2008

Pamela Denise Hayes
Law Office of Pamela D. Hayes, Esquire
200 West 57th Street, Suite 200
New York, Ny 10019
(212)-687-2724
Fax: (212)-980-2968
Email: pdhayesesq@aol.com

Susan P. Scharfstein
New York City Law Department
100 Church Street
New York, NY 10007
(212) 227-4071
Fax: (212) 788-9776
Email: sscharfs@law.nyc.gov

Re:    *Lawrence Fowler v. The City of New York, Robert T. Johnson, District Attorney Bronx County, The State of New York, and Governor Eliot Spitzer,* **07 CIV 10274 (JSR)**

Dear Mss. Hayes and Scharfstein:

By subpoena signed by the Court on May 4, 2008, you seek testimony by

A person who is knowledgeable about a matter handled by the U.S. Attorney's Office for the Southern District of New York involving a cooperating witness who had information concerning a shooting that resulted in a death in Bronx County, New York, on or about July 25, 1996, and plaintiff Lawrence Fowler, who was convicted by a jury on criminal charges arising out of the shooting.

From the telephonic conference with the Court on May 2, 2008, and Ms. Hayes' *Touhy* letters of May 5 and May 6, 2008, we understand you wish to know whether certain information developed in the course of an investigation conducted by this Office, which exculpates Lawrence Fowler–who was convicted in 1998 of the 1996 murder of Lamont Jones–was known to the New York Police Department and the Bronx County District Attorney's Office "after the trial and during the trial." May 5 letter at 4.

We have reviewed our files and conducted such further inquiry as has been possible in the very short time we have had to evaluate this matter. As a result we represent the following: (1) There is

*Lawrence Fowler v. The City of New York*, 07 CIV 10274 (JSR)                    Page 2

absolutely no basis to believe that the information in question was known to the NYPD or to the Bronx District Attorney's Office at the time of the *Fowler* trial, and indeed we are virtually certain that the information was not and could not have been known to the NYPD or to the Bronx District Attorney's Office at that time, or at any time until this Office communicated on the matter with the Bronx District Attorney's Office. (2) This Office did not commence looking into the Lamont Jones murder until the summer or fall of 2005, and while it may have become known to members of the NYPD around that time that this Office was revisiting the murder, we have no recollection or record of communicating to the Bronx District Attorney's Office the exculpatory evidence we eventually developed until approximately June 2006, when ADA McCarthy came to our Office.

Any further disclosure, whether by this Office or the Bronx District Attorney's Office, of any details of the exculpatory information developed by this Office would pose a threat to the continuing investigation of the Lamar Jones murder and to individuals who have or may provide information to this Office in connection with that investigation. We believe that the foregoing fully satisfies your needs in your case and that any further disclosure is not appropriate under the regulations and applicable privileges referenced in our May 2, 2008, request for *Touhy* particulars.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

by: _____
JOHN M. McENANY
Associate United States Attorney
(212) 637-2571

# EXHIBIT 19

8586FOWA[2]

1

8586FOWA
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  LAWRENCE FOWLER,
3
4              Plaintiff,
4
5         v.                              07 CV 10274(JSR)
5
6  CITY OF NEW YORK,
6
7              Defendant.
7
8  ------------------------------x
8                                         New York, N.Y.
9                                         May 8, 2008
9                                         9:40 a.m.
10
10  Before:
11
11                 HON. JED S. RAKOFF,
12
12                                        District Judge
13
13                      APPEARANCES
14
14  LAW OFFICES OF PAMELA D. HAYES, ESQ.
15       Attorney for Plaintiff
15  BY:  PAMELA DENISE HAYES, ESQ.
16
16  MICHAEL A. CARDOZO, Corporation Counsel
17  for the City of New York
17       Attorney for Defendant
18  BY:  SUSAN SCHARFSTEIN, ESQ.
18
19  MICHAEL J. GARCIA
19       United States Attorney for the
20       Southern District of New York
20  JOHN M. MCENANY
21  DAVID RODY
21       Assistants United States Attorney
22
23
24
25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

⬜                                                               2

8586FOWA
1         (Case called; in open court)
2         THE COURT:  Please be seated.  Let me apologize
3  profusely.  A family matter came up that I just had to deal
4  with.  I am very sorry.
5         So this is Fowler v. City of New York.  Would counsel,
6  including counsel for the parties relevant to the discovery,
7  please identify themselves.
8         MS. HAYES:  Pamela D Hayes on behalf of Lawrence
9  Fowler.  Good morning, your Honor.
10        MS. SCHARFSTEIN:  Susan Schartstein for the defendant,
11  City of New York.  I also represent Bronx County Assistant
                        Page 1

8586FOWA[2]

12  District Attorney Daniel McCarthy and Nathaniel Simmons is not
13  party to this action.
14              THE COURT:  Good morning.
15              MR. MCENANY:  John McEnany and David Rody for the
16  United States, your Honor.
17              THE COURT:  Good morning.  The immediate issue is what
18  happened to the underlying file?  So let me hear from defense
19  counsel and then we will hear from witnesses.
20              MS. SCHARFSTEIN:  Thank you, your Honor.  There
21  actually have been some recent developments in locating
22  portions of the materials.  Within the last few business days
23  we have been able to locate some appeals materials, one of the
24  two trial folders that were developed in the course of the
25  underlying criminal trial, and some limited correspondence and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8586FOWA                                                         3

1  notes that related to the subsequent developments in 2006 when
2  Mr. McCarthy learned additional information.  There is,
3  however, one folder that we still have not been able to locate.
4              THE COURT:  Which is that?  Do you know what is in it?
5              MS. SCHARFSTEIN:  I do know some materials that are in
6  it.  There is a special folder that is created in the complaint
7  room when a new case comes.  It has some work-product
8  materials, attorney notes relating to the case.  These are the
9  documents that proceed the filing of a criminal court
10  affidavit.  That file also should have contained the criminal
11  complaint, some background information on the defendant, some
12  materials from the New York City Police Department -- that is a
13  crime scene unit folder -- and some working notes of the
14  assistant district attorney, things like preparation of witness
15  examinations for trial.
16              THE COURT:  Why don't we get Mr. McCarthy up here
17  first.  If you would come forward please.
18              MS. SCHARFSTEIN:  If I might, your Honor, I just
19  wanted to make the Court aware quickly of some preliminary
20  concerns that we had.
21              First, we have objections to this discovery.  A
22  document request has never been served in this case requesting
23  the materials that plaintiff apparently is now --
24              THE COURT:  Well, in the several telephone conferences
25  we have had on this matter, plaintiff's counsel has made clear,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8586FOWA                                                         4

1  at least in the Court's view, that she is really limiting her
2  discovery or at least what she is primarily concerned about in
3  this discovery is to find out -- she alleges that she provided
4  to the district attorney's office at an early stage, and I am
5  going to try to get from plaintiff's counsel the precise time
6  on this, but in an early stage leads which she believes if
7  followed up would have led to the exoneration of her client.
8  So what she is seeking now is simply evidence that that
9  information was received and when it was received by the Bronx
10  District Attorney's Office.
11              Then she is also seeking whether that was the same as
12  the information subsequently obtained from the U.S. Attorney's
13  Office.  And finally she is seeking what efforts, if any, were
14  made to follow up on the original information she provided.
15              With a possible exception of that last item, I don't
16  see that there are any concerns that anyone could possibly be

Page 2

8586FOWA[2]

17  raising about the acknowledgment or denial, as the case may be,
18  that she provided X, Y and Z to The Bronx District Attorney's
19  Office on date, A, B and C.
20          MS. SCHARFSTEIN:  Well, your Honor, normally we take
21  discovery according to the federal rules and --
22          THE COURT:  Well, you just heard my rules.
23          MS. SCHARFSTEIN:  I understand, your Honor.
24          THE COURT:  Very good.
25          MS. SCHARFSTEIN:  I also would just for the record

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8586FOWA                                                            5

1   like to note that we do not believe that the information that
2   Ms. Hayes is seeking is relevant to any issue in the case as
3   set form in this complaint.
4           THE COURT:  I don't agree with that.  I have a
5   separate concern whether Ms. Hayes is going to be a witness in
6   this case if this is relevant and whether therefore she needs
7   to find separate counsel for her, but we will take that up
8   subsequently.  Let's deal with this one item at a time.
9           Maybe, Ms. Hayes, we will start with you rather than
10  Mr. McCarthy.
11          What information is it that you say you provided to
12  the District Attorney and when did you provide it?
13          MS. HAYES:  Yes, your Honor.  The information I
14  provided to the District Attorney's Office started back in 1998
15  when we were actually trying the case.  We have several
16  transcripts.  Mr. McCarthy was the individual that I dealt with
17  throughout the case.  It has the name of certain witnesses who
18  had some information in this case.
19          THE COURT:  Let me interrupt you.  So this was not
20  provided until post-indictment?
21          MS. HAYES:  Some of the information was provided
22  post-indictment.  Some of the information was provided pre-CPL
23  240.10 motion, that is the motion for newly discovered
24  evidence.
25          THE COURT:  Well, when was the first information that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8586FOWA                                                            6

1   you provided that is relevant to your claims in this case?
2           MS. HAYES:  In 2000, your Honor.  May of 2000.
3           THE COURT:  May of 2000?
4           MS. HAYES:  Yes.
5           THE COURT:  When was the indictment in this case?
6           MS. HAYES:  The indictment was in 1996.  I do believe,
7   August of 1996.
8           THE COURT:  I am misunderstanding you.  I had thought
9   that you represented to me on the phone that you had presented
10  information to Mr. McCarthy either while the case was still
11  being tried originally or shortly thereafter.
12          Am I misunderstanding that?
13          MS. HAYES:  No, you are not.
14          THE COURT:  The information that is relevant to your
15  claims here -- that is all I am interested in -- when was the
16  first such information provided by you?
17          MS. HAYES:  I do believe in 1998 either in April or
18  May while we were on trial.
19          THE COURT:  Was that on the record or off the record?
20          MS. HAYES:  It was on the record.
21          THE COURT:  So that could be obtained through just

Page 3

8586FOWA[2]

22  getting the court records?
23          MS. HAYES:  Yes, that is correct.  I have a transcript
24  of it.
25          THE COURT:  What was that information?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8586FOWA                                                          7

1           MS. HAYES:  The information was that the homicide was
2   not in fact committed by my client's Lawrence Fowler.  It was
3   committed by an individual by the name of Cliff and surrounded
4   a drug war that had nothing to do with my client.  In fact, the
5   intended victim was a person by the name of Ricky Rivera who
6   they were shooting at and unfortunately an innocent bystander
7   Mr. Lamar Jones got killed.
8           THE COURT:  So when you provided this other than what
9   you just said, did you give the name of any witness to this?
10          MS. HAYES:  Yes, sir, I did.
11          THE COURT:  Who is that?
12          MS. HAYES:  I gave the names of two female witnesses
13  that I explained to Mr. McCarthy I felt were material witnesses
14  because they knew the names of the individuals.
15          THE COURT:  Who were they?
16          MS. HAYES:  I think one is Elizabeth Moore and I have
17  forgotten the other name, your Honor.  But it is names of
18  individuals that are readily available to us.
19          THE COURT:  You provided that on the record?
20          MS. HAYES:  Yes, sir.
21          THE COURT:  But the case was being tried at that time?
22          MS. HAYES:  Yes.
23          THE COURT:  How long did the trial last?
24          MS. HAYES:  About, I guess, a month and a half.
25          THE COURT:  This was towards the end of the trial,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8586FOWA                                                          8

1   towards the beginning of the trial?
2           MS. HAYES:  In the middle of the trial on the People's
3   case.
4           THE COURT:  Now, was there subsequently any additional
5   information you provided to Mr. McCarthy?
6           MS. HAYES:  We subsequently got the names of the
7   individuals of all Cliff and a Debo.  Those were the only names
8   that I had but we understood that Cliff was the shooter and
9   Debo was something with him.
10          After the case was over and my client was convicted,
11  down the line I got information from a New York City Police
12  Officer.  This is in 2000.  Mr. Fowler has been convicted since
13  1998.  Once I got that information, I immediately called
14  Mr. McCarthy who I had been calling for years presenting my
15  opinion that my client was wrongfully convicted.  But I called
16  him, I gave him the information regarding an individual by the
17  name of Pierre Moore who had been arrested who in fact told
18  members of the New York City Police Department that the
19  individual who killed Lamar Jones was not the person in fact
20  who was convicted and he told them who did it.  He told them
21  how it was done and he told them that information.
22          The individual who gave me that information as I said
23  was a New York City Police Officer by the name of James Anthony
24  Ulrich.
25          THE COURT:  You gave that name as well to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              Page 4

8586FOWA[2]
(212) 805-0300

8586FOWA                                                                          9

1   Mr. McCarthy.
2           MS. HAYES:  Yes.  Mr. McCarthy was familiar with that
3   name anyway because he was a witness in the trial.  I also gave
4   the name of a police officer who was Mr. Ulrich's partner who
5   had heard this information and who had took the arrest.  I also
6   gave Mr. McCarthy the name of the police department, it is
7   called Night Watch.  I guess it is a section of the police
8   department who came down and interviewed Pierre Moore and who
9   told Mr. Ulrich they weren't interested in old information.
10          We didn't get any memo books, we didn't get any
11  information like that, and that is part of what I am concerned
12  that the police department as well as the DA's office and
13  didn't turn over the notebook.  That is really the information
14  I am looking for.
15          THE COURT:  Let me make sure I understand.  The
16  information you are looking for again is precisely what?
17          MS. HAYES:  The information I am looking for is the
18  investigation into the allegations that it was somebody other
19  than --
20          THE COURT:  The investigation, if any, undertaken
21  after you provided this information in 2000?
22          MS. HAYES:  That's correct.
23          And I am also looking for the information on Pierre
24  Moore because what his information does is tells me who the
25  police officer was, you know, it shows that they knew who he
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8586FOWA                                                                         10

1   was.  They could have gotten his memo book.  In fact, they knew
2   who the people were from Night Watch who came to do the
3   interview and did nothing.
4           THE COURT:  Could have gotten whose memo book?
5           MS. HAYES:  Could have gotten I think his name is Mr.
6   Ortiz.  Police Officer Eddie Ortiz's memo book.
7           THE COURT:  He is the one as you understand it
8   interviewed Mr. Moore?
9           MS. HAYES:  Yes.
10          THE COURT:  Back when?
11          MS. HAYES:  In 2000.
12          THE COURT:  I see.  So there was some investigation
13  carried out?
14          MS. HAYES:  Well, I don't know what was carried out.
15  All I know is that Police Officer Ulrich told me that the
16  individual when he was being debriefed told them all the
17  information he knew about what had happened in the Lamar Jones
18  killing and at that point the police department said they
19  weren't interested in old news.
20          THE COURT:  What is it that is the information that
21  you believe the U.S. Attorney's Office turned over to the
22  District Attorney's Office?
23          MS. HAYES:  Your Honor, today I spoke with both
24  members from the United States Attorney's Office and they did
25  tell me that they didn't know anything about Pierre Moore.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8586FOWA                                                                         11

1           However, I do believe that if the Bronx DA's Office
2   didn't have their information, they might well have information
                              Page 5

8586FOWA[2]

3  regarding the investigation of the death of Lamar Jones.
4  Meaning that they would have the information of who told them
5  who committed the murder, how this information was obtained,
6  and it would show whether or not the New York City Police
7  Department or the Bronx District Attorney's Office played any
8  role in obtaining that information and what that information
9  was.  I guess I would try to prove that they knew this
10 information, they sat on it, and they just didn't give it to
11 plaintiff's counsel.
12          THE COURT:  So now let me ask Mr. McCarthy to come on
13 up.
14          MR. McENANY:  Your Honor, the Court might also find it
15 useful, we have made formal written responses to the parties
16 which contains some representations from the government which
17 may be useful for the Court.
18          THE COURT:  Thank you very much.
19          MR. McENANY:  I will hand a copy of my May 8 letter to
20 Ms. Hayes and Ms. Scharfstein and to the clerk.
21          THE COURT:  Thank you very much.
22          Mr. McCarthy, we don't need to put you under oath.  At
23 this is just a document discovery issue.  Bear with me for one
24 minute while I look at the letter that was just handed up.
25          MR. McCARTHY:  Of course.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              12
8586FOWA
1          THE COURT:  The letter from the U.S. Attorney's
2  Office, and I thank counsel very much for bringing that to my
3  attention this morning, a letter dated May 8, 2008, to counsel
4  in this case and I think for today's purposes the relevant
5  representations are as follows:
6          "One, there is absolutely no basis to believe that the
7  information in question -- let me pause to say that is a
8  reference back to exculpatory information provided by the U.S.
9  Attorney's Office to the District Attorney's office in
10 approximately June of 2006.  Going back to the sentence.
11          "There is absolutely no basis to believe that the
12 information in question was known to the NYPD or to the Bronx
13 District Attorney's office at the time of the Fowler trial and
14 indeed we are virtually certain that the information was not
15 and could not have been known to the NYPD or to the Bronx
16 District Attorney's Office at that time or at any time until
17 this office communicated on the matter with The Bronx District
18 Attorney's Office.
19          "Two, this office did not commence looking into the
20 Lamar Jones murder until the summer or fall of 2005.  And while
21 it may have become known to members of the NYPD around that
22 time that this office was revisiting the murder, we have no
23 recollection or record of communicating to the Bronx District
24 Attorney's Office the exculpatory evidence we eventually
25 developed in approximately June 2006 when ADA McCarthy came to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              13
8586FOWA
1  our office."
2          So against that background, first of all Mr. McCarthy,
3  will you identified yourself for the record.
4          MR. McCARTHY:  Judge, where would you like me to
5  stand?
6          THE COURT:  That's fine.
7          MR. McCARTHY:  MY name is Daniel, middle initial T as
                        Page 6

8586FOWA[2]

8  in Thomas, McCarthy.  I am an assistant district attorney in
9  Bronx County, New York.
10          THE COURT:  Thank you for coming down here today,
11  Mr. McCarthy.
12          You heard Ms. Hayes represented that she had provided
13  you various information at various times, some of which there
14  is a record of in a court transcript or in the trial, and then
15  some further follow-up information that she believed she
16  provided to you in 2000.
17          Does that accord with your own recollection?
18          MR. McCARTHY:  Yes, Judge.
19          THE COURT:  Would that have been, it may become
20  relevant and it may not, reflected in the later information in
21  2000 information, would it have been reflected in notes you
22  would have kept?
23          MR. McCARTHY:  No, Judge.
24          THE COURT:  So this was just oral conversations that
25  you had with her?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

8586FOWA

1          MR. McCARTHY:  She sent me two letters, your Honor,
2  and we had a number of phone calls relating to the content of
3  those letters.
4          THE COURT:  And was there follow-up done with respect
5  to anything that she referred you to?
6          MR. McCARTHY:  Yes.  There was follow-up by me, your
7  Honor, verbally and in an effort to track down the information
8  that she provided to see if it was worth looking into.
9          THE COURT:  Was any of that recorded in any written
10  form in your files?
11          MR. McCARTHY:  No, sir.
12          THE COURT:  The information that led to the
13  exculpation, did that derive entirely or originate entirely
14  with the information provided by the U.S. Attorney's Office or
15  did it have multiple sources?
16          MR. McCARTHY:  It came only from the U.S. Attorney's
17  Offices, Judge.
18          THE COURT:  Did it have anything directly to do with
19  the information provided by Ms. Hayes?
20          MR. McCARTHY:  No, your Honor.
21          THE COURT:  Ms. Hayes, is there any question you
22  wanted the Court to put to Mr. McCarthy?
23          MS. HAYES:  Your Honor, just with regard to Mr. Moore,
24  what specifically was done with the information that was
25  provided by counsel with regard to Mr. Moore and what in fact

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

8586FOWA

1  he gave the police.  Secondly, whether there was any
2  information done with regard to the police officers on Night
3  Watch and if so what.
4          THE COURT:  Well, I think that is a different issue.
5  I may want to reach that today, but right now the reason I
6  convened this hearing was because at the time of the
7  representation had been made that the files could not be found
8  at all and thus I wanted to find out why the files couldn't be
9  found and if we had to recreate the equivalent of the files
10  through the testimony of Mr. McCarthy, but now I understand
11  that the files have been found.
12          Nevertheless, if defense counsel has no objection to

Page 7

8586FOWA[2]

13  the question just put by Ms. Hayes, I will allow Mr. McCarthy
14  to answer that.
15          MS. SCHARFSTEIN: Yes, your Honor, I do object. I
16  think it is not relevant to any matter at issue in this case.
17          THE COURT: Well, let me ask you this, Ms. Hayes: The
18  U.S. Attorney's Office has represented that information they
19  provided has nothing do with the information you provided and
20  it is that information according to U.S. Attorney's Office and
21  Mr. McCarthy that led to the exculpation.
22          So what is the relevance. Do you think this more
23  stuff would have been an independent way of exculpating your
24  client?
25          MS. HAYES: Absolutely, your Honor. I think it could
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    16
8586FOWA
1   would have been an independent way because my understanding is
2   what Mr. Moore told them was that an individual by the name of
3   Cliff was the shooter.
4           THE COURT: Told the police officer in 2000?
5           MS. HAYES: Who told the police officers in May of
6   2000 that an individual by the name of Cliff did the shooting.
7           Now, I think that is valuable information.
8           THE COURT: Let me have you hold your thought on that
9   for a minute.
10          Do you have a recollection of being told that by
11  Ms. Hayes?
12          MR. McCARTHY: About the individual named Cliff?
13          THE COURT: Yes.
14          MR. McCARTHY: Yes. At trial and in the letter that
15  we are now referencing, Judge.
16          THE COURT: Was there a follow-up with a police
17  officer? Don't tell me what he said. Just yes or no.
18          MR. McCARTHY: I attempted to follow up.
19          THE COURT: You were unable to reach the police
20  officer?
21          MR. McCARTHY: Unable to confirm any of the
22  information that had allegedly been provided by this person.
23          THE COURT: You talked to the police officer himself?
24          MR. McCARTHY: I spoke to a number of officers, yes,
25  Judge.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    17
8586FOWA
1           THE COURT: And they did not confirm what had been
2   represented to you by Ms. Hayes?
3           MR. McCARTHY: Correct.
4           THE COURT: So I think Ms. Hayes then the only
5   question is you have the name of the police officer who you
6   think was most involved. You can seek to take his deposition.
7   There may be objections to that, but I will deal with that when
8   that happens. But it sounds like the District Attorney's
9   Office is not going to be able to provide with anything that is
10  relevant. You were right to follow up on this so we could
11  follow up what the story was, but know that we know the story
12  it sounds like it is the police officer you will need to
13  depose.
14          Have you attempted to depose him?
15          MS. HAYES: Your Honor, I have an affidavit from him.
16  He is no longer a police officer and the other individual is no
17  longer a police officer. But I know I can get to one of those
                         Page 8

8586FOWA[2]

18  two individuals.  The second one, you know, I guess we would
19  have to see if I could track him down.  Seemingly in the DA's
20  office couldn't do it and I am not sure of my abilities but I
21  will make every effort to try again.
22      Your Honor, my point was, it is the folder, I would
23  have preferred to have looked at the folder.  Counsel said I
24  didn't make any demands.  This wouldn't have been a demand.
25      THE COURT:  I am assuming for purposes of today's
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8586FOWA                                                          18

1  proceeding that you would like to look at everything they have.
2  I am not sure, though, that a fishing expedition of that sort
3  would be warranted.  So that is what I am trying to narrow it
4  down to what it seems to be relevant.
5      MS. HAYES:  Excuse me, your Honor, can I just say
6  something for the Court.  Your Honor, I just need like one
7  small snippet.  I need to see the files of what investigation
8  was done.  Mr. McCarthy has told us today that he has no
9  written references of what he did.  So I didn't know that
10  before.
11      THE COURT:  I understand that.  I think it is very
12  useful that we have had this hearing and there is one other
13  thing I want to inquire about.
14      I wasn't totally sure, maybe you answered this,
15  Mr. McCarthy, but in your follow-up to the letters from
16  Ms. Hayes in 2000, you said several police officers.
17      MR. McCARTHY:  Yes.
18      THE COURT:  Was that recorded in any fashion on your
19  end?
20      MR. McCARTHY:  No, sir.
21      THE COURT:  Why not?
22      MR. McCARTHY:  There really wasn't any information to
23  follow up on, Judge.  As Ms. Hayes knows probably better than
24  I, the individual Pierre Moore had declined to have any further
25  conversations about this.  So I was unable to track down any
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8586FOWA                                                          19

1  police officers who had information they could give me.  I
2  called detectives and uniform personnel as well and really got
3  no where basically.
4      THE COURT:  Now, if you had had made any notes at that
5  time and you didn't, but just taking as a hypothetical, that
6  would have been, Ms. Scharfstein, in the files you have now
7  recovered?  Do they cover that period?
8      MS. SCHARFSTEIN:  I am not sure that I can answer that
9  because there is not necessarily a logical division between
10  trial folder one and trial folder two.
11      THE COURT:  Let me ask you, Mr. McCarthy, how do you
12  keep your files?
13      MR. McCARTHY:  Judge, my files and the files that have
14  been recovered are the trial folders.  They were already out of
15  my possession prior to the time I received those phone calls
16  from Ms. Hayes.
17      THE COURT:  For example, the information that you got
18  from the U.S. Attorney's Office in 2006, where would that be
19  kept?
20      MR. McCARTHY:  Judge, that information I memorialized
21  in a couple of letters to Ms. Hayes and phone calls as well.
22  That is all that exists in terms of that.
                        Page 9

8586FOWA[2]

23    THE COURT:  They are kept in your office.  What I am
24  trying to get at is physically your copy of those letters.
25    MR. McCARTHY:  On my computer, Judge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

8586FOWA

1    THE COURT:  I see.  Back in 2000 would any letters or
2  notes you generated would have been on your computer?
3    MR. McCARTHY:  If I had done so that is where it would
4  have been, Judge.
5    THE COURT:  Have you checked your computer?
6    MR. McCARTHY:  Yes, I have.
7    THE COURT:  There is nothing responsive to the issues
8  we just discussed?
9    MR. McCARTHY:  Correct, Judge, which is also in accord
10  with my recollection.
11    THE COURT:  Now, Ms. Scharfstein, the one missing file
12  again is what?
13    MS. SCHARFSTEIN:  At best we can tell that would have
14  contained the folder that is generated in the complaint room
15  called the "white folder" which it has the trial folder and it
16  has some handwritten notes as to what the attorney is thinking
17  about the case.  It would contain the criminal complaint, some
18  background information on the defendant, the NYPD crime scene
19  unit folder, which actually I understand was turned over to
20  Ms. Hayes in the course of the criminal case, and
21  Mr. McCarthy's notes of examinations of witnesses.
22    THE COURT:  Now, Mr. McCarthy, I think that is the end
23  my questions for you.  Thank you so much.
24    The other gentleman is the gentleman who knows about
25  the files?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

8586FOWA

1    MS. SCHARFSTEIN:  The search for the files, yes.
2    THE COURT:  If you will come forward, please.
3    MR. SIMMONS:  Identify yourself for the record Daniel
4  Simmons, employee of the Bronx DA's Office direct operations at
5  the Bronx DA.
6    THE COURT:  Thank you for coming down.
7    Do you have any idea what happened to this one missing
8  file is?
9    MR. SIMMONS:  No, I don't, your Honor.
10    THE COURT:  Where would it normally be stored.
11    MR. SIMMONS:  Normally what they do, they turn the
12  folder back over to our records department, put it back into
13  the file system.  And then if anybody would request the folder,
14  they call down one of my clerks and they give them the
15  indictment number and he will look on the shelf.
16    So at that point in time when that came in, they
17  contacted me.  So I got my clerks and we started looking
18  everywhere for the folder.  Maybe a month, two, three weeks ago
19  we found the second folder.  We were having problems with our
20  record system because we have boxes in front of the original
21  shelfing system and we have a storage area we keep.  That place
22  is constantly flooding.  We have rodent problems.  Stuff of
23  that nature.
24    THE COURT:  I am not totally surprised to hear all
25  that, but I understand the difficulties under which you are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8586FOWA[2]

8586FOWA
                                                                    22
1  laboring.
2          It seems to me, however, that that first file would
3  not be relevant to anything we discussed here.  I think we
4  located what even could conceivably be relevant.
5          MS. HAYES:  Excuse me, your Honor.  It is this one
6  file that no one was spoken about and seemingly it is the file
7  I haven't heard an explanation on.  That is the file after the
8  trial where the 440.10 motion was done, meaning the motion on
9  newly discovered evidence.  I would think that would be the
10 file that we were looking for because I have sense that most of
11 the other files that we have, I actually had during the trial.
12         THE COURT:  I hear what you are saying.
13         Is there an independent file of that sort, Mr. Mr.
14 McCarthy?
15         MR. MCCARTHY:  There is not, Judge.
16         THE COURT:  There is the answer.
17         Well, I do think this has been very helpful because
18 inevitably these questions would have been left a mystery, but
19 I think we have now eliminated the mystery.  I think the only
20 remaining issue is in Ms. Hayes hands which is if you want to
21 seek to take the deposition of one or both of those former
22 police officers at some point.  Of course that is something you
23 will need to pursue and we will deal with any issues relating
24 to that at that time.
25         I am very grateful to everyone here today for all of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8586FOWA
                                                                    23
1  their very considerable help in clearing up this mystery.
2          Is there anything else anyone needs to raise at this
3  time?
4          MS. SCHARFSTEIN:  Yes, your Honor.  During the
5  April 29th telephone conference we had raised with the Court
6  that Ms. Hayes has not produced all of the documents in her
7  possession.
8          THE COURT:  What documents are you talking about?
9          MS. SCHARFSTEIN:  Well, she has, I believe, a number
10 of documents she described to me as a box full of documents
11 relating to the underlying criminal matter prosecution and she
12 has produced a small portion of those.
13         THE COURT:  What is it you are looking for?  On your
14 theory it is irrelevant.
15         MS. SCHARFSTEIN:  That is correct.  But at this point
16 of discovery, we don't know where we stand.  We don't know what
17 perspective the Court will take on summary judgment motion.
18         THE COURT:  That is why I didn't find your objection
19 of relevancy totally persuasive.  What is good for the goose is
20 good for the gander or some other cliche of that sort.
21         What about that?
22         MS. HAYES:  Your Honor, some of the documents when we
23 first initiated this case, myself and Ms. Scharfstein, I told
24 her that I have my trial folder.  It is in a box, but you have
25 to tell me what you want.  She gave me no documents from the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8586FOWA
                                                                    24
1  trial case.  I only had the documents from the clerk's office.
2  That was the Rule 26 disclosures.  I will be glad to give her
3  anything she wants, but you have to tell me what you want.
                            Page 11

8586FOWA[2]

4   Some things are just not relevant.  Do you want my voir dire
5   notes?
6         THE COURT:  This is her complaint as well but going
7   the other direction but that is okay.  I think where we are at
8   this moment is the only thing I have heard that even is
9   conceivably relevant from Ms. Hayes' files would be her notes,
10  if any, of her conversation with that police officer that she
11  referred to earlier.
12        Do you have notes of that conversation?
13        MS. HAYES:  I have notes and I have an affidavit and I
14  have turned it over and I will look to see if I have any notes.
15  I am willing to give anything that I have.
16        THE COURT:  I don't see the need to do that, but just
17  check for any notes.  If there are any notes of conversations
18  with that police officer, you should turn those over.
19        MS. HAYES:  Yes, sir.
20        THE COURT:  I find it extraordinarily commendable that
21  the U.S. Attorney's office on such short notice was able to
22  provide me with this very helpful letter, but I can't imagine
23  how the office is managing to continue to exist with both Mr.
24  McEnany and Mr. Rody not back there running the show.  So I
25  think we need to bring this to a close.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8586FOWA                                                      25

1         Anything else that anyone needs to raise for the
2   Court?
3         MS. HAYES:  Just quickly, your Honor.  With regard to
4   myself perhaps being a witness, you say they can live and that
5   is fine, but I think we should talk about that because that is
6   something that I have since realized that I could be a witness
7   in this case and it may be a conflict.
8         THE COURT:  I think we can only have that discussion
9   with your client.
10        MS. HAYES:  Okay.
11        THE COURT:  At the moment that issue would only arise
12  if there was someone that you intended to call at trial whose
13  testimony there was a reasonable possibility that your own
14  testimony would contradict or that the only way to make your
15  client's case would be for you to testify.  At the moment that
16  doesn't sound like either of those is very likely.  However, I
17  think we need to advise your client of that possibility and see
18  what he wants to do.  That should be done in court on the
19  record with you and the client present and possibly
20  Ms. Scharfstein present or not as the case may be.  We would
21  have to play that by ear.  I don't think we can do that without
22  your client being present.
23        So if you want to set up a time for that with my law
24  clerk and Ms. Scharfstein and your client after talking to him,
25  we can have that inquiry.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8586FOWA                                                      26

1         MS. HAYES:  Thank you, your Honor.
2         THE COURT:  Anything else?
3         Very good.  Thank you so much.
4                         oOo
5
6
7
8

                          Page 12

8586FOWA[2]

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300